# EXHIBIT A

**ASSET PURCHASE AGREEMENT**

**dated as of**

**October 18, 2010**

**among**

**SR ACQUISITION I, LLC,**

**TDE OPERATING GP LLC,**

**TRIDIMENSION ENERGY, L.P.,**

**TDE SUBSIDIARY GP LLC,**

**AXIS E&P, LP,**

**AXIS MARKETING, LP,**

**AXIS ONSHORE, LP,**

**RAM DRILLING, LP,**

**and**

**TDE PROPERTY HOLDINGS, LP**

# TABLE OF CONTENTS

**Page**

## ARTICLE I

DEFINITIONS ........................................................................................................................1

Section 1.01   Definitions .............................................................................................1

## ARTICLE II

PURCHASE AND SALE ......................................................................................................1

Section 2.01   Purchase and Sale of the Properties .............................................1
Section 2.02   Excluded Assets ..............................................................................4
Section 2.03   Consideration .................................................................................5
Section 2.04   Adjustments to the Purchase Price .............................................5
Section 2.05   Closing ............................................................................................8
Section 2.06   Prepaid JOA Funds .....................................................................10
Section 2.07   Suspense Funds ............................................................................10
Section 2.08   Closing Accounts Receivables ....................................................10
Section 2.09   Final Settlement Statement ........................................................11
Section 2.10   Post-Closing Payments .............................................................13
Section 2.11   No Duplicative Effect; Methodologies .....................................14
Section 2.12   Purchase Price Deposit .............................................................14
Section 2.13   Survival .......................................................................................16
Section 2.14   Excluding Purchased Contracts .................................................16
Section 2.15   Division of Hydrocarbons ..........................................................16
Section 2.16   Division of Expenses; Royalties ...............................................17
Section 2.17   Preferential Purchase Rights .....................................................17
Section 2.18   Properties Sold "As Is, Where Is" ...........................................18
Section 2.19   Presence of Wastes, NORM, Hazardous Substances and Asbestos .....................18

## ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE DEBTORS .........................................19

Section 3.01   Organization ................................................................................19
Section 3.02   Authority and Authorization ......................................................19
Section 3.03   Enforceability .............................................................................20
Section 3.04   Conflicts ......................................................................................20
Section 3.05   Material Contracts ......................................................................20
Section 3.06   Approvals ....................................................................................22
Section 3.07   Permits; Environmental Matters ................................................22
Section 3.08   Well Status ..................................................................................22
Section 3.09   Payout Balances; Imbalances .....................................................22
Section 3.10   Oil and Gas Interests ..................................................................23
Section 3.11   Litigation ....................................................................................23
Section 3.12   Hedging ......................................................................................23
Section 3.13   Natural Gas Act ..........................................................................23
Section 3.14   Intellectual Property ...................................................................23
Section 3.15   Insurance Coverage ....................................................................23

Section 3.16   Taxes ..................................................................................................24
Section 3.17   Letters of Credit .....................................................................................24
Section 3.18   Outstanding Obligations .........................................................................24
Section 3.19   Broker .....................................................................................................24

## ARTICLE IV
REPRESENTATIONS AND WARRANTIES OF BUYER ..........................................25

Section 4.01   Organization............................................................................................25
Section 4.02   Authorization and Authority ...................................................................25
Section 4.03   Enforceability..........................................................................................25
Section 4.04   Conflicts ..................................................................................................25
Section 4.05   Broker .....................................................................................................25
Section 4.06   Financing..................................................................................................25
Section 4.07   Approvals .................................................................................................26
Section 4.08   Litigation .................................................................................................26
Section 4.09   Bankruptcy ..............................................................................................26
Section 4.10   Investor Status; Investigation..................................................................26
Section 4.11   Registration .............................................................................................26

## ARTICLE V
COVENANTS OF THE DEBTORS .............................................................................27

Section 5.01   Permitted Capital Expenditures ..............................................................27
Section 5.02   Solicitation; Other Offers........................................................................28
Section 5.03   Operating Agreements. ............................................................................29
Section 5.04   Assumption and Rejection of Executory Contracts and Leases. ............29
Section 5.05   Access/Environmental Assessment. ........................................................30

## ARTICLE VI
COVENANTS OF BUYER............................................................................................32

Section 6.01   Access ......................................................................................................32
Section 6.02   Tax Matters ..............................................................................................32

## ARTICLE VII
COVENANTS OF BUYER AND THE DEBTORS ......................................................34

Section 7.01   Commercially Reasonable Efforts; Further Assurances .........................34
Section 7.02   Bankruptcy Proceedings. .........................................................................34
Section 7.03   Public Announcements ............................................................................35
Section 7.04   Access to Information ..............................................................................35
Section 7.05   Confidentiality .........................................................................................36
Section 7.06   Indemnification ........................................................................................36
Section 7.07   Audits and Other Tax Proceedings .........................................................36

## ARTICLE VIII
CONDITIONS TO CLOSING .......................................................................................37

Section 8.01   Conditions to Obligations of Buyer and the Debtors..............................37
Section 8.02   Conditions to Obligation of Buyer...........................................................37
Section 8.03   Conditions to Obligation of the Debtors .................................................38

## ARTICLE IX

TERMINATION.................................................................................................38

Section 9.01    Grounds for Termination ...................................................38
Section 9.02    Effect of Termination.........................................................40
Section 9.03    Break-Up Fee.....................................................................40

## ARTICLE X

CASUALTY LOSS ...........................................................................................41

Section 10.01  Casualty Loss ....................................................................41
Section 10.02  Limitations Regarding Casualty Loss ................................42

## ARTICLE XI

DEFECTS; FINAL ACCOUNTING..................................................................42

Section 11.01  Defects ..............................................................................42
Section 11.02  Resolution of Defects........................................................43
Section 11.03  Calculation of Value of Defects and Defect Credits...........44
Section 11.04  Cure; Purchase Price Adjustment. ....................................46

## ARTICLE XII

ARBITER .........................................................................................................49

Section 12.01  Engagement of Arbiter.......................................................49
Section 12.02  Arbiter's Decision and Fees ..............................................50

## ARTICLE XIII

MISCELLANEOUS .........................................................................................51

Section 13.01  Notices ..............................................................................51
Section 13.02  Amendments and Waivers. ................................................51
Section 13.03  Expenses ...........................................................................52
Section 13.04  Successors and Assigns/Liquidating Trust. .......................52
Section 13.05  Governing Law ..................................................................52
Section 13.06  Jurisdiction........................................................................52
Section 13.07  Waiver of Jury Trial...........................................................53
Section 13.08  Counterparts; Effectiveness; Third Party Beneficiaries......53
Section 13.09  Entire Agreement ..............................................................53
Section 13.10  Severability .......................................................................53
Section 13.11  Specific Performance .........................................................53
Section 13.12  Certain Acknowledgements and Limitations.......................53
Section 13.13  Disclosure Schedules ........................................................55
Section 13.14  Actors Under this Agreement .............................................55

US 604317v.3

# SCHEDULES, EXHIBITS, ANNEXES AND DISCLOSURE SCHEDULES

## Schedules

| | |
|---|---|
| Schedule 2.02(j) | Excluded Assets |
| Schedule 2.02(n) | Excluded Litigation |
| Schedule 2.17 | Allocation for Preferential Purchase Rights |
| Schedule 5.01 | Permitted Capital Expenditures |
| Schedule 5.04(a) | 365 Schedule |
| Schedule 5.04(b) | Desired 365 Contracts |
| Schedule 11.03(a) | Acceptable Title Matters/Allocated Values |
| Schedule 11.03(b) | Permitted Post-Closing Liens |

## Exhibits

| | |
|---|---|
| Exhibit A | Definitions |
| Exhibit B | Form of Assignment and Bill of Sale |
| Exhibit C | Form of Assumption Agreement |
| Exhibit D | Form of Debtor's Certificate |
| Exhibit E | Form of Debtor's Certificate (FIRPTA) |
| Exhibit F | Form of Buyer's Certificate |
| Exhibit G | Form of Bid Procedures Order |
| Exhibit H | Form of Escrow Agreement |

## Annexes

| | |
|---|---|
| Annex A | Oil and Gas Leases |
| Annex B | Wells |
| Annex C | Equipment |
| Annex D | Purchased Contracts |
| Annex E | Permits |

## Disclosure Schedules

| | |
|---|---|
| Disclosure Schedule 3.05 | Material Contracts |
| Disclosure Schedule 3.06 | Approvals |
| Disclosure Schedule 3.07(b) | Environmental Matters |
| Disclosure Schedule 3.09(a) | Payout Balances |
| Disclosure Schedule 3.09(b) | Imbalances |
| Disclosure Schedule 3.11 | Litigation |
| Disclosure Schedule 3.14 | Intellectual Property |
| Disclosure Schedule 3.15 | Insurance Coverage |
| Disclosure Schedule 3.16 | Taxes |
| Disclosure Schedule 3.17 | Letters of Credit |
| Disclosure Schedule 3.18 | Outstanding Obligations |
| Disclosure Schedule 3.19 | Broker |

(iv)

# ASSETS PURCHASE AGREEMENT

This Assets Purchase Agreement (this "<u>Agreement</u>") dated as of October 18, 2010, is by and among SR Acquisition I, LLC, a Delaware limited liability company ("<u>Buyer</u>"); and each of TDE Operating GP, LLC, a Delaware limited liability company ("<u>Operating GP</u>"), TriDimension Energy, L.P., a Delaware limited partnership ("<u>TriDimension</u>"), TDE Subsidiary GP LLC, a Delaware limited liability company ("<u>Subsidiary GP</u>"), Axis E&P, LP, a Louisiana partnership in commendam ("<u>Axis E&P</u>"), Axis Marketing, LP, a Louisiana partnership in commendam ("<u>Axis Marketing</u>"), Axis Onshore, LP, a Louisiana partnership in commendam ("<u>Axis Onshore</u>"), Ram Drilling, LP, a Louisiana partnership in commendam ("<u>Ram Drilling</u>"), and TDE Property Holdings, LP, a Louisiana partnership in commendam ("<u>TDE Property Holdings</u>" and, together with Operating GP, TriDimension, Subsidiary GP, Axis E&P, Axis Marketing, Axis Onshore and Ram Drilling, each, a "<u>Debtor</u>" and, collectively, the "<u>Debtors</u>").  Buyer and each of the Debtors are sometimes referred to collectively herein as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## W I T N E S S E T H :

**WHEREAS**, on May 21, 2010 (the "<u>Petition Date</u>"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code (as defined below) in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division, and these cases are being jointly administered for procedural purposes only under Case No. 10-33565-SGJ (collectively, the "<u>Bankruptcy Cases</u>");

**WHEREAS**, the Debtors have continued in the possession of their assets and in the management of their businesses pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code;

**WHEREAS**, Debtors desire to sell to Buyer, and Buyer desires to purchase from Debtors, the Properties (as defined herein);

**NOW, THEREFORE**, in consideration of the mutual promises, representations and warranties made herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, agree as follows:

## ARTICLE I
## DEFINITIONS

Section 1.01  *Definitions*.  The capitalized terms used herein shall have the meanings set forth in <u>Exhibit A</u> hereto, which is incorporated herein by reference.

## ARTICLE II
## PURCHASE AND SALE

Section 2.01  *Purchase and Sale of the Properties*.  Subject to the terms and conditions and for the consideration herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Debtors agree to sell, assign, convey and deliver to Buyer, and Buyer agrees to purchase and acquire from Debtors at the

1

Closing, free and clear of all Liens (other than Permitted Post-Closing Liens), to the extent permitted under Section 363 and 365 of the Bankruptcy Code after giving effect to the Bid Procedures Order and the Sale Order, effective as of the Effective Time, all of Debtors' right, title and interest in and to the properties and interests described below, other than the Excluded Assets and the Excluded Liabilities (collectively, the "Properties"):

(a)     Oil and Gas Properties.  All Oil and Gas Interests, whether the interest of Debtors in such properties is fee interests, leasehold interests, licenses, concessions, working interests, farmout rights, royalty, overriding royalty or other non working or carried interests, operating rights or other mineral rights of every nature and any rights that arise by operation of law or otherwise in all properties and lands pooled, unitized, communitized or consolidated with such properties, including without limitation all interest (of whatever kind or character, whether legal or equitable, and whether vested or contingent) of Debtors in and to (i) the Oil and Gas Leases described on Annex A ("Leases"), (ii) the lands covered by the Leases or otherwise described on Annex A, the Leases and lands included in any units with which the Leases or the lands covered thereby or otherwise described on Annex A may have been pooled, unitized or commingled and (iii) the oil, gas and other minerals in and under or that may be produced from the lands covered by the Leases or otherwise described on Annex A, whether such lands be described on a description set forth on Annex A or described on Annex A by reference to another instrument and whether Debtors' interest therein is correctly or incorrectly described on Annex A or such referenced instrument (collectively, the "Oil and Gas Properties"; the term Oil and Gas Properties shall be deemed to include all Wells).

(b)     Wells.  All Wells located on or used in connection with the operation of the Oil and Gas Properties, including the Wells and related interests described on Annex B hereto.

(c)     Equipment.  All equipment, machinery, fixtures, physical assets and facilities, pipe, inventory, improvements, and other personal, mixed, or movable property or interests whether located on or off the lands covered by the Leases, used in connection with the ownership or operation of the Oil and Gas Properties (except for any such personal property leased from Third Parties except to the extent such lease constitutes an Assumed Liability), including the equipment, machinery fixtures, physical assets and facilities, pipe, fixtures, inventory, improvements, and other personal, mixed, or movable property or interests set forth on Annex C.

(d)     Hydrocarbons.  All Hydrocarbons produced from the Oil and Gas Properties (including Wells) and not yet past a measuring point at the Effective Time or produced on or after the Effective Time and all proceeds attributable thereto.

(e)     Surface Rights.  All fee surface interests in land, surface leases, easements, rights of way, servitudes, licenses, franchises, road, railroad, and other surface use permits or agreements, as the same may exist, and similar rights and interests (if any) located on or with respect to the lands covered by the Leases or otherwise described in clause (a) above or that otherwise relate to the interests of Debtors described in clauses (a) and (b) above.

(f)    Information and Data.  All (i) abstracts, title opinions, title reports, title policies, lease and land files, plats, surveys, analyses, compilations, correspondence, filings with and reports to regulatory agencies, other documents and instruments that relate to the Oil and Gas Properties, (ii) to the extent assignable by Debtors to Buyer pursuant to Section 363 and 365 of the Bankruptcy Code after giving effect to the Bid Procedures Order and the Sale Order, computer databases that are owned by or licensed to Debtors that relate to the Oil and Gas Properties, geophysical, geological, engineering, seismic, exploration, production and other technical data, magnetic field recordings, digital processing tapes, field prints, summaries, reports and maps, whether written or in electronically reproducible form, that are in the possession of Debtors and relate to the Oil and Gas Properties and (iii) all other books, records, files and magnetic tapes containing financial, title or other information that are in the possession of Debtors and relate to the Oil and Gas Properties (the "Data"); provided, however, that (1) Buyer's right with respect to Data pursuant to clause (iii) shall be limited to the extent the assignment and disclosure of, or rights granted hereunder with respect to, such Data are not restricted by the terms of any confidentiality, license or similar agreement (provided that Debtors shall use all commercially reasonable efforts to obtain any consent to such assignment and disclosure to the extent such restrictions exist, provided Debtors shall not be required to pay any fees or other amounts to Third Parties in connection with obtaining any such consents), (2) rights to receive access to and copies of such Data from third parties other than Debtors shall accrue to Buyer only to the same extent as such rights are vested in Debtors, and (3) Debtors shall be permitted to keep copies of the Data, and that as from time to time reasonably requested by Debtors after the Closing, Buyer shall provide Debtors with access to, and Debtors shall have the right to receive copies (at Debtors' expense) of, the Data.

(g)    Contracts.   Subject to Section 5.04, the Contracts identified on Annex D hereto and the Leases identified in clause (a) above or otherwise comprising a part of the Oil and Gas Properties, and any and all amendments, ratifications or extensions of the foregoing, including (i) all claims for take or pay or other similar payments arising before or after the Effective Time to the extent related to production of Hydrocarbons on or after the Effective Time and (ii) all rights of any Debtors that are currently serving as operator under any Operated JOA to serve as operator under such Operated JOA (which rights shall be conveyed to and vest in the Buyer Operator Designee) (collectively, subject to Section 5.04, the "Purchased Contracts");

(h)    Permits.   All Permits that relate to the Oil and Gas Properties, including the Permits described on Annex E hereto (collectively, the "Permits");

(i)    Payment Rights.   All (i) Closing Accounts Receivable, subject to Section 2.08, (ii) accounts receivable (including Gap Period JIB Receivables) attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, instruments and general intangibles (as such terms are defined in the Uniform Commercial Code of the applicable jurisdictions in which the Oil and Gas Properties to which such assets relate are located) and economic benefits (iii) attributable to the Oil and Gas Properties with respect to any period of time on or after the Effective Time, and (iv) any claim of indemnity, contribution, or reimbursement relating to the Assumed Liabilities;

3

(j)      Existing Letters of Credit.  To the extent assignable to Buyer at Closing, all Existing Letters of Credit, and Cash Deposits and proceeds of such Existing Letters of Credit so assigned to Buyer.

(k)      Intangible Rights.  All intangible rights, inchoate rights, transferable rights under warranties made by prior owners, manufacturers, vendors, and Third Parties, and rights accruing under applicable statutes of limitation or prescription to the extent related or attributable to the Properties described in clauses (a) – (j) above on or after the Effective Time.

Section 2.02    *Excluded Assets.* Notwithstanding the foregoing provisions of this Article II, any assets of Debtors that are not described or otherwise identified as Properties in Section 2.01 and all of the following assets shall not constitute Properties and shall not be sold, assigned or conveyed to Buyer pursuant to this Agreement (such assets as described herein below, the "Excluded Assets"):

(a)      all cash and cash equivalents of Debtors  (excluding (i) Prepaid JOA Funds, (ii) Suspense Funds and (iii) Existing Letters of Credit assigned to Buyer pursuant to Section 2.01(j) and all Cash Deposits and proceeds thereof);

(b)      all corporate and financial records of Debtors, and, except to the extent relating to the Properties, all Tax and legal records of Debtors;

(c)      all Contracts of insurance or indemnity, subject to Section 10.01;

(d)      all Hydrocarbons produced from or attributable to the Oil and Gas Properties prior to the Effective Time, including marketable Hydrocarbons produced from or attributable to the Oil and Gas Properties in storage tanks as of the Effective Time ("Effective Time Tank Oil") and Hydrocarbons past a measuring point as of the Effective Time (collectively, the "Debtors' Substances") and all proceeds attributable thereto, including without limitation proceeds of Effective Time Tank Oil;

(e)      all rights, claims, demands and causes of action of Debtors under this Agreement;

(f)      all rights, claims (including any claim as defined in Section 101 of the Bankruptcy Code), causes, causes of action, remedies, rights of set-off, rights of recoupment, and rights to payment or to enforce payment and credits of any of Debtors except to the extent relating directly to the Properties (other than Excluded Assets) or any Assumed Liability with respect to any period of time on or after the Effective Time, including any such items arising under insurance policies and all guarantees, warranties, indemnities and similar rights in favor of any of Debtors except to the extent relating directly to the Properties (other than Excluded Assets) or any Assumed Liability with respect to any period of time on or after the Effective Time;

(g)      any refund of costs, Taxes or expenses borne by Debtors attributable to periods, or portions thereof, prior to the Effective Time;

4

(h)     any of Debtors' rights, claims and causes of action under the Bankruptcy Code and any avoidance claims under the Bankruptcy Code in which Debtors have rights;

(i)     the name "TriDimension," "TDE", "Axis" or "RAM," and all variations and derivations thereof, and any trademark, trade names, logo or symbols containing such names;

(j)     all Contracts and other assets listed on Schedule 2.02(j);

(k)     any executory contracts or unexpired leases that are not Purchased Contracts, including all 365 Contracts that are not Desired 365 Contracts; and

(l)     Reserved.

(m)     all rights of Debtors under the letter agreement dated August 28, 2008, between Golden West Holdings, LLC, and Axis Onshore and the Drilling Contract as defined therein;

(n)     all of Debtors rights, claims and causes of action under or with respect to the litigation described on Schedule 2.02(n); and

(o)     all Equipment, Permits and Data, as well as Existing Letters of Credit and Cash Deposits related thereto, to the extent related to Excluded Assets or Excluded Liabilities.

Section 2.03     *Consideration*.  As consideration for the Properties, Buyer shall pay or deliver in accordance with this Agreement, $28,000,000.00 payable in cash (the "Purchase Price") and assume all Assumed Liabilities in accordance with this Agreement.  The Purchase Price shall be paid as provided in Section 2.05 and shall be subject to adjustment as provided in Section 2.04, Section 2.09, Section 2.17, Section 6.02 and Section 10.01.  The Purchase Price, as increased or reduced, as applicable, in accordance with this Agreement is referred to as the "Adjusted Purchase Price."

Section 2.04     *Adjustments to the Purchase Price*.  Adjustments to the Purchase Price shall be made according to the factors described in this Section 2.04, as applied in accordance with GAAP (as applied on a basis consistent for the periods covered).

(a)     *Upward Adjustments*.  The Purchase Price shall be adjusted upward by the following, but only to the extent such items relate to the Properties:

(i)     an amount equal to all Property Expenses attributable to the Properties paid by Debtors (or applied by a Person against Property Expenses owed to such Person as an offset against amounts due and payable to Debtors), whether paid by (or applied as an offset against amounts due and payable to) Debtors prior to the Closing Date or after the Closing Date and prior to the determination of the Purchase Price, to the extent attributable to the period on or after the Effective Time, and expenses attributable to Operated Properties for periods from and after the Effective Time paid by Debtors as of the Closing Date on account of Third Party working interest owners to the extent that a corresponding Gap Period JIB Receivable is included in the Properties pursuant to

Section 2.01(i); provided, however, that to the extent that any Property Expenses would be deemed to be an upward adjustment pursuant to this Section 2.04(a)(i) but such expenses have not been paid by Debtors (or applied by a Person against Property Expenses owed to such Person as an offset against amounts due and payable to Debtors), the obligation to perform and pay when due with respect to such Property Expense shall be an Assumed Liability

(ii)     to the extent not covered in Section 2.04(a)(i), an amount equal to all prepaid Property Expenses attributable to the Properties to the extent related to periods on or after the Effective Time that were paid by Debtors as of the Closing, including without limitation, prepaid drilling and/or completion costs, insurance, indemnity or surety bond costs through Closing, prepaid utility charges and prepaid expenses paid by Debtors as of the Closing Date on account of Third Party working interest owners (collectively, with the Property Expenses described in Section 2.04(a)(i), "GAP Period Expenses")

(iii)     to the extent the proceeds thereof are not received by Debtors as of the Closing Date, an amount equal to the value of Debtors' share of the Effective Time Tank Oil, to be calculated as follows: the value shall be the product of 1) the volume of marketable Effective Time Tank Oil (attributable to Debtors' interest) as of the Effective Time as shown by the gauging reports prepared by Debtors as of the Effective Time (absent any manifest errors), multiplied by 2) the price that would have been received by Debtors with respect to such Effective Time Tank Oil if such Effective Time Tank Oil were sold at the Effective Time pursuant to terms of that certain marketing agreement with Plains Marketing, L.P. (for the avoidance of doubt, to the extent Buyer incurs or pays any expenses related to the carriage or storage of Effective Time Tank Oil, such expenses shall be deducted from the Adjusted Purchase Price).

(iv)     an amount equal to $40,000 per month (or prorated portion thereof) for the Closing Period, representing overhead charges of Debtors with respect to the Oil and Gas Properties other than the Non-Operated Properties ("Operated Properties");

(v)     the total amount of all Cash Deposits that have been provided by any Debtors to any Third Parties with respect to the Oil and Gas Properties in effect as of the Closing, to the extent that any Existing Letters of Credit to which such Cash Deposits relate constitute Properties; and

(vi)     the amount of Cure Costs, if any, by which the Purchase Price is to be increased pursuant to the last sentence of Section 5.04(b).

Any expenses, including Property Expenses, attributable to any partial period occurring during the Closing Period shall be prorated for purposes of Section 2.04(a)(i) and Section 2.04(a)(ii) based on the portion of such period falling within the Closing Period.

(b)     *Downward Adjustments*.  The Purchase Price shall be adjusted downward by the following, but only to the extent such items relate to the Properties:

6

(i)    proceeds received and retained by Debtors (net of applicable Non Income Taxes not reimbursed to Debtors by a Third Party and Royalties) that are attributable to Debtors' share of production from the Oil and Gas Properties from and after the Effective Time (excluding Effective Time Tank Oil);

(ii)    an amount equal to the Excess Casualty Loss attributable to the Oil & Gas Properties excluded from the Oil and Gas Properties because of a Casualty Loss affecting such Oil and Gas Properties or, in the alternative, the insurance proceeds received by Debtors for such Casualty Loss, all as provided in Section 10.01.

(iii)    for purposes of determining the Adjusted Purchase Price pursuant to this Section 2.04, and subject to Section 11.04, an amount equal to the Closing Date Defect Amount and, after Closing, an amount equal to the Defect Excess, if any, subject to the limitations in Section 11.04(d) and Section 11.04(e); and

(iv)    the proceeds received by Debtors upon the sale of any Oil and Gas Property as provided in Section 2.17.

(c)    *Tax Adjustments/Apportionment of Prepaid Expense Items*.

(i)    To adjust the Purchase Price for the apportionment of Non-Income Taxes and Tax Refunds, the Parties agree to adjust the Purchase Price, downward or upward, as appropriate, pursuant to the provisions of Section 6.02.

(ii)    For purposes of the Purchase Price, to the extent not otherwise provided for under the definition of "Property Expenses," Section 2.04(a) and Section 2.04(b), those other items of expenses and accounts payable in relation to the Oil and Gas Properties and are paid or payable before and after the Effective Time on an annual, quarterly, monthly or other regular periodic basis ("Prorated Expense Items") shall be prorated as of the Effective Time and apportioned, such that Buyer will receive the economic benefit or burden, as applicable, of all such items on and after the Effective Time and Debtors shall receive the economic benefit or burden, as applicable, of all such items for the period prior to the Effective Time. After the Closing Date, (x) if Buyer receives any bills or accounts or any reimbursement for prepaid expenses in relation to Prorated Expense Items that are attributable in whole to the period prior to the Effective Time, then Buyer shall promptly forward the same to Debtors (for payment, in the case of any such bills or accounts), (y) if Debtors receive any bills or accounts or any reimbursement for prepaid expenses in relation to the Prorated Expense Items that are attributable in whole to the period on or after the Effective Time, then Debtors shall promptly forward the same to Buyer (for payment, in the case of any such bills or accounts) and (z) if Buyer or Debtors receive any bills or accounts or any reimbursements for prepaid expenses in relation to the Prorated Expense Items that are attributable in part to the period prior to the Effective Time, and in part to the period on and after the Effective Time, the amount thereof shall be apportioned between Debtors, on the one hand, and Buyer, on the other hand, respectively, as of the Effective Time, based on the number of days in such period falling prior to the Effective Time, on the one hand, and on and after the Effective Time, on the other hand. In the case of bills or accounts

7

referred to in clause (z), the party receiving the same shall be required to pay only such portion of such bill or account for which it is responsible in accordance with this <u>Section 2.04(c)(ii)</u>.

        (d)    *Closing Statement.*

        (i)    The Debtors shall deliver to Buyer, not less than five (5) Business Days before the Closing Date, a statement (the "<u>Closing Statement</u>") setting forth the adjustments to the Purchase Price provided in <u>Section 2.04</u>, using estimates where actual amounts are not known at the Closing, and the Debtors' calculation of the estimated Adjusted Purchase Price; such estimated Adjusted Purchase Price (as such may be modified pursuant to any changes proposed by Buyer and accepted by the Debtors) shall be referred to as the "<u>Closing Date Adjusted Purchase Price</u>." The Closing Statement shall be prepared in accordance with GAAP (as applied on a basis consistent for the periods covered and otherwise in accordance with this Agreement). If Buyer has any questions or disagreements regarding the Closing Statement, then, upon request by Buyer, at least two (2) Business Days prior to the Closing Date, the Debtors and Buyer shall in good faith attempt to resolve any disagreements, and the Debtors shall afford Buyer the opportunity to examine the Closing Statement and such supporting schedules, analyses and workpapers on which the Closing Statement is based or from which the Closing Statement is derived as are reasonably requested by Buyer. If (A) Buyer and the Debtors agree on changes to the Closing Statement based on such discussions, then the Closing Date Adjusted Purchase Price shall be paid at Closing based on such changes; or (B) Buyer and the Debtors do not agree on changes to the Closing Statement, then the Closing Date Adjusted Purchase Price shall be paid at the Closing based on the amounts set forth in the Closing Statement; provided, however, that in either of (A) or (B), appropriate adjustments to the Purchase Price shall be made after the Closing pursuant to <u>Section 2.09</u>.

        (ii)    The Debtors will include in the Closing Statement Debtors' good faith calculation of the prorations provided for in <u>Section 2.04(c)</u>. If final bills or accounts in relation to any Prorated Expense Items or rent receivable referred to in <u>Section 2.04(c)</u> are not available or have not been issued prior to that date for any Prorated Expense Item, the Debtors shall estimate the amount of each such item in good faith and in accordance with customary industry practices, and such estimate shall be reflected in Closing Statement. The amount payable by Buyer at the Closing will be increased or decreased to reflect the net amount owing between the parties as shown on such Closing Statement, using such estimates where necessary. Final adjustment between the Parties as to any estimated item used in the preparation of the Closing Statement in accordance with this <u>Section 2.04</u> shall be made in accordance with this <u>Section 2.09</u>, <u>Section 6.02</u> and <u>Section 10.01</u>.

        Section 2.05    *Closing.* The closing (the "<u>Closing</u>") of the purchase and sale of the Properties hereunder shall take place at the offices of Vinson & Elkins LLP, 2001 Ross Avenue, Suite 3700, Dallas, Texas, as soon as possible, but in no event later than two Business Days, after satisfaction or waiver by the requisite Parties of the conditions to Closing set forth in <u>Article VIII</u> (other than those conditions that by their nature cannot be satisfied until the time of

Closing, but subject to the satisfaction or waiver by the requisite Parties of those conditions), or at such other time or place as Buyer and the Debtors may agree in writing. At and as of the Closing:

(a)     Pursuant to Section 363 of the Bankruptcy Code:  effective as of the Closing, Debtors shall sell, assign and convey all Properties  (other than Excluded Assets) to Buyer free and clear of all Claims and Liens other than Permitted Post-Closing Liens**;**

(b)     Buyer shall assume, and from and after the Closing, shall perform and pay when due, all Assumed Liabilities, and from and after the Closing, Buyer shall indemnify Debtors with respect to any Liability incurred by any Debtor with respect to any Assumed Liabilities.  All Liabilities and obligations of Debtor, other than Assumed Liabilities, are referred to herein as "Excluded Liabilities."

(c)     Debtors shall deliver to Buyer the following instruments, each dated the Closing Date, properly executed by authorized officers or representatives of each Debtor and, where appropriate, acknowledged:

(i)     counterparts to an Assignment and Bill of Sale in the form of Exhibit B (the "Assignment and Bill of Sale");

(ii)     executed certificates of titles for the transfer of title to any motor vehicles owned by Debtors included in the Property;

(iii)     executed counterparts to letters in lieu of division orders addressed to each purchaser of Hydrocarbons produced from the Oil and Gas Properties;

(iv)     executed counterparts to an Assumption Agreement between Debtors and Buyer in the form of Exhibit C (the "Assumption Agreement");

(v)     a certificate in the form of Exhibit D;

(vi)     a certificate in the form attached as Exhibit E.

(d)     At the Closing, Buyer shall deliver to Debtors executed counterparts of the following instruments each dated the Closing Date, properly executed by an authorized officer of Buyer and, where appropriate, acknowledged:

(i)     a certificate in the form of Exhibit F;

(ii)     the Assignment and Bill of Sale; and

(iii)     the Assumption Agreement.

(e)     Buyer shall deliver an amount equal to the Closing Date Adjusted Purchase Price by wire transfer of immediately available funds, to an account of the Debtor designated by the Debtor, by notice to Buyer delivered no later than two Business Days prior to

9

the Closing Date (or if not so designated, then by certified or official bank check payable in immediately available funds to the order of TriDimension Energy L.P. in such amount).

Section 2.06 *Prepaid JOA Funds*. To the extent that as of Closing, any Debtor holds funds received by the Debtors (in their capacity as operator with respect to the Operated Properties) as prepayments for items under operating agreements for which a payable has not been incurred as of the Effective Time (solely to the extent related to Purchased Contracts, "Prepaid JOA Funds") (a) no adjustment to the Purchase Price shall be made with respect to such Prepaid JOA Funds or any funds received by the Debtors that would constitute Prepaid JOA Funds if such funds were related to Purchased Contracts and (b) Debtors shall deliver to Buyer at Closing, to an account designated by Buyer in writing to Debtors, an amount of money equal to such Prepaid JOA Funds and an accounting of each of such prepayments and Buyer shall from and after such time be responsible for the application of such Prepaid JOA Funds under the applicable operating or other agreement pursuant to which such Prepaid JOA Funds were collected.

Section 2.07 *Suspense Funds*. To the extent that as of Closing, any Debtor holds funds received by the Debtors (in their capacity as operator with respect to the Operated Properties) in "suspense" (excluding any joint interest billings received by the Debtors, in their capacity as operator with respect to the Operated Properties, on or prior to the Petition Date that any Debtor holds as of the Closing) (solely to the extent related to Purchased Contracts, "Suspense Funds") (a) no adjustment to the Purchase Price shall be made with respect to such Suspense Funds or any funds received by the Debtors that would constitute Suspense Funds if such funds were related to Purchased Contracts and (b) Debtors shall deliver to Buyer at Closing, to an account designated by Buyer in writing to Debtors, the amount of Suspense Funds then held by Debtors and Buyer shall from and after such time be responsible for the application of such Suspense Funds under the applicable operating or other agreement governing the application of such Suspense Funds.

Section 2.08 *Closing Accounts Receivables*.

(a)     On the Closing Date, the Debtors shall deliver to Buyer a statement setting forth (i) the names of the obligor and amount of each Closing Accounts Receivable, and (ii) the aggregate amount of all the Closing Accounts Receivable (as such statement may be modified or supplemented within 30 days after the Closing Date by written notice of Debtor or the Liquidating Trustee to Buyer, the "Closing Accounts Receivables Statement").

(b)     From and after the Closing until the date that is 179 calendar days after the Closing Date, Buyer shall use the same level of efforts in the collection of the Closing Accounts Receivable that Buyer and its Subsidiaries use in the collection of their own accounts receivables; provided that (i) Buyer shall settle any Closing Accounts Receivable by setoff (each such setoff, an "Accounts Receivable Setoff") of any amounts owed by the obligor thereunder against any amount that Buyer or any of its Subsidiaries owes to such obligor, to the extent such Accounts Receivable Setoff is permitted under Applicable Law, and Buyer shall give written notice to the Debtors on or prior to 185 calendar days after the Closing Date of each Accounts Receivable Setoff, (ii) Buyer must obtain the prior written consent of the Debtors (which consent may not be unreasonably withheld, conditioned or delayed) to settle (whether in cash or by way

of an Accounts Receivable Setoff) any Closing Accounts Receivable for an amount less than the applicable amount set forth on the Closing Accounts Receivables Statement, (iii) neither Buyer nor any of its Subsidiaries shall be required to incur any out-of-pocket expenses or admit or consent to any liability or obligation in connection with the collection of any Closing Accounts Receivable and (iv) prior to commencing any litigation in connection with the collection of any Closing Accounts Receivable, Buyer will obtain the prior written consent of the Liquidating Trustee and will have no obligation to commence or prosecute any litigation unless and until arrangements acceptable to Buyer and the Liquidating Trustee are made to ensure that all of Buyer's costs and expenses (including legal fees and expenses) incurred in connection with such litigation shall be fully paid, reimbursed or otherwise compensated. Each Party acknowledges that Buyer is making efforts to collect the Closing Accounts Receivable hereunder shall be acting solely pursuant to a contractual relationship on an arm's length basis and that the Parties do not intend that Buyer act or be responsible as a fiduciary to the Debtors or the Liquidating Trust, any holders of Claims or any other Person, and expressly disclaim any such fiduciary relationship, whether between or among Buyer, on the one hand, and any Debtors and/or the Liquidating Trust, on the other hand. Buyer and any Person acting on its behalf shall not be liable for any act or omission taken, or omitted to be taken, related to, or in connection with, the collection of the Closing Accounts Receivables, other than acts or omissions resulting from such Person's willful misconduct, gross negligence or fraud. In the case of an Accounts Receivable Setoff, the date of such Accounts Receivable Setoff shall be the earlier of (A) the date notice of such Accounts Receivable Setoff is delivered to the Liquidating Trustee pursuant to this Section 2.08(b) and (B) the date such Accounts Receivable Setoff is reflected on the books of Buyer or any of its Subsidiaries.

(c)     Buyer shall promptly deliver the amount of any and all cash collected in respect of Closing Accounts Receivables and the amount of any and all Accounts Receivable Setoffs (collectively, the "Accounts Receivable Collections") to the Debtors. Within ten calendar days after the last day of each calendar month completed after the Closing Date and through the month in which the 179th calendar day after the Closing Date occurs, Buyer shall deliver to the Debtor or, after the formation of the Liquidating Trust and written notice thereof to Buyer, the Liquidating Trust a statement setting forth the aggregate amount of all the Accounts Receivable Collections.

(d)     On the date that is 185 calendar days after the Closing Date, Buyer shall (i) deliver to the Debtors a statement setting forth (A) the names of the obligor and amount of each Closing Accounts Receivable that remains uncollected, whether by cash or setoff (collectively, the "Remaining Accounts Receivables"); and (B) the aggregate amount of all the Remaining Accounts Receivables; and (ii) convey, transfer, assign and deliver to the Debtors all the Remaining Accounts Receivables.

Section 2.09     *Final Settlement Statement.*

(a)     As soon as practical and, in any event, no later than ninety (90) calendar days after the Closing Date, Buyer shall prepare and deliver to the Liquidating Trustee a statement (the "Final Settlement Statement") setting forth the adjustments to the Purchase Price in accordance with Section 2.02. The Final Settlement Statement shall be prepared in accordance with this Agreement and on a basis consistent with the preparation of the Closing

Statement as described in Section 2.02(d), and shall set forth Buyer's calculation of the Adjusted Purchase Price.

(b)     Following the delivery of the Final Settlement Statement, Buyer shall afford the Liquidating Trustee the opportunity to examine the Final Settlement Statement and Buyer's calculation of the Adjusted Purchase Price, and such supporting schedules and analyses as are reasonably necessary and appropriate in connection with such review.  Buyer shall cooperate fully and promptly with the Liquidating Trustee in such examination, including responding to questions asked by the Liquidating Trustee, and Buyer shall make available to the Liquidating Trustee any records under Buyer's control that are requested by the Liquidating Trustee in connection with such review.

(c)     If, within 30 calendar days following delivery of the Final Settlement Statement to the Liquidating Trustee, the Liquidating Trustee has not delivered to Buyer written notice (the "Objection Notice") of the Liquidating Trustee's objections to the Final Settlement Statement or Buyers' calculation of the Adjusted Purchase Price (which Objection Notice must contain a statement describing in reasonable detail the basis of such objections), then the Adjusted Purchase Price as set forth in such Final Settlement Statement shall be deemed final and conclusive.  In addition, any of Buyer's calculations of the Adjusted Purchase Price as set forth in the Final Settlement Statement which are not objected to in the Objection Notice shall be deemed final and conclusive.

(d)     If the Liquidating Trustee delivers the Objection Notice satisfying Section 2.09(c) above, within such 30-day period, then the Liquidating Trustee and Buyer shall endeavor in good faith to resolve the objections of the Liquidating Trustee set forth in the Objection Notice for a period not to exceed 15 calendar days from the date of delivery of the Objection Notice.  If at the end of the 15-day period there are any objections that remain in dispute, then the remaining objections in dispute shall be submitted for resolution to an independent accounting firm to be selected jointly by the Buyer and the Liquidating Trustee within the following ten calendar days or, if the Buyer and the Liquidating Trustee are unable to mutually agree within such ten-day period, such accounting firm shall be the Dallas, Texas office of Ernst & Young LLP (such jointly selected accounting firm or Ernst & Young LLP the "Referee").  The Referee's engagement shall be limited to the resolution of disputed amounts set forth in the Final Settlement Statement that have been identified by the Liquidating Trustee, which resolution shall be in accordance with this Agreement and no other matter relating to the Final Settlement Statement shall be subject to determination by the Referee except to the extent affected by resolution of the disputed amounts.  In connection with the engagement of the Referee, each of Buyer and the Liquidating Trustee shall execute any engagement, indemnity, and other agreement as the Referee shall require as a condition to such engagement.  If Ernst & Young LLP is unable or unwilling to serve as the Referee and the Buyer and the Liquidating Trustee are unable to agree upon the designation of a Person as substitute arbitrator, then Buyer or the Liquidating Trustee, or any of them, may in writing request the Bankruptcy Court to appoint the substitute arbitrator; provided that such Person so appointed shall be a national or regional accounting firm with no prior material relationships with Buyer or the Liquidating Trustee or their respective Affiliates and shall have experience in auditing companies engaged in oil and gas exploration and development activities.

(e)    The Referee shall determine such items of the calculation of the Adjusted Purchase Price as are disputed within 30 calendar days after the objections that remain in dispute are submitted to it.

(f)    If any disputed items are submitted to the Referee for resolution, (i) each of Buyer and the Liquidating Trustee shall furnish to the Referee such workpapers and other documents and information relating to such disputed items as the Referee may request and are available to that party or its Affiliates (or its independent public accountants) and will be afforded the opportunity to present to the Referee any material relating to the determination of the matters in dispute and to discuss such determination with the Referee prior to any written notice of determination hereunder being delivered by the Referee; (ii) to the extent that a value has been assigned by Buyer or the Liquidating Trustee to any item subject to dispute that is submitted to the Referee, the Referee shall not assign a value to such objection that is greater than the greatest value for such objection claimed by either party or less than the smallest value for such objection claimed by either party; (iii) the determination by the Referee of items of the calculation of the Adjusted Purchase Price, as applicable, as set forth in a written notice delivered to the Liquidating Trustee and Buyer by the Referee, shall be made in accordance with this Agreement and shall be binding and conclusive on the parties and shall constitute an arbitral award that is final, binding and unappealable and upon which a judgment may be entered by a court having jurisdiction thereof; and (iv) the fees and expenses of the Referee (the "Audit Fees") shall be paid by and apportioned between Buyer and the Liquidating Trust based on the aggregate dollar amount in dispute and the relative recovery as determined by the Referee of the Liquidating Trustee and Buyer, respectively (such that, by way of example, if the amount in dispute is $100 and it is resolved $70 in favor of Buyer and $30 in favor of the Liquidating Trustee, then the Liquidating Trustee would bear 70% of the cost and Buyer would bear 30% of the cost).

(g)    From and after the Closing Date, the Debtors (and, after formation of the Liquidating Trust, the Liquidating Trustee) shall retain from the Closing Cash Balance and the proceeds of the Closing Date Adjusted Purchase Price, an amount equal to $625,000 as a cash reserve for the express purpose of fulfilling the Liquidating Trustee's obligations under this Section 2.09 and Section 2.10 until the date that final payment is made pursuant to Section 2.10.

Section 2.10    *Post-Closing Payments.*

(a)    If the Closing Date Adjusted Purchase Price is greater than the Adjusted Purchase Price determined in accordance with Section 2.09, then the Liquidating Trustee shall pay to Buyer the amount of such excess within five Business Days of the final determination of the Adjusted Purchase Price in accordance with Section 2.09.

(b)    If the Adjusted Purchase Price determined in accordance with Section 2.09 is greater than the Closing Date Adjusted Purchase Price (the amount by which the Adjusted Purchase Price exceeds the Closing Date Adjusted Purchase Price herein referred to as the "Closing Amount Shortfall"), Debtors shall be entitled to a distribution out of the Escrow Fund in an amount equal to the Closing Amount Shortfall. If the Closing Amount Shortfall is greater than the amount of cash in the Escrow Fund distributed by the Escrow Agent to the Debtors on account of the Closing Amount Shortfall (such excess, the "Escrow Cash Shortfall"), then, in

addition to the cash distribution out of the Escrow Fund as provided above, Buyer shall deliver to the Debtors, within two (2) Business Days after written notice of an Escrow Cash Shortfall to Buyer, an amount in cash equal to the Escrow Cash Shortfall.

Section 2.11 *No Duplicative Effect; Methodologies*. The provisions of <u>Section 2.04</u>, <u>Section 2.09</u>, this <u>Section 2.11</u> and of any other Transaction Document shall apply in such a manner so as not to give the components and calculations duplicative effect to any item of adjustment and, except as otherwise expressly provided in this Agreement, the Parties covenant and agree that no amount shall be (or is intended to be) included, in whole or in part (either as an increase or reduction) more than once in the calculation of (including any component of) the Adjusted Purchase Price, or any other calculated amount pursuant to this Agreement if the effect of such additional inclusion (either as an increase or reduction) would be to cause such amount to be overstated or understated for purposes of such calculation. The Parties acknowledge and agree that, if there is a conflict between a determination, calculation, methodology, procedure or principle set forth in the definitions contained in this Agreement, as applicable, on the one hand, and those provided by GAAP, on the other hand, (i) the determination, calculation, methodology, procedure or principle set forth in this Agreement, as applicable, shall control to the extent that the matter is specifically provided for in this Agreement and (ii) the determination, calculation or methodology, procedure or principle prescribed by GAAP shall control to the extent the matter is not so addressed in this Agreement, as applicable, or requires reclassification as an asset or liability to be included in a line item or specific adjustment.

Section 2.12 *Purchase Price Deposit*.

(a) *Escrow Deposit*. No later than one Business Day after the execution of this Agreement by all Parties, Buyer shall deposit with Wells Fargo Bank, National Association, in its capacity as escrow agent (the "Escrow Agent") pursuant to the Escrow Agreement, $1,250,000.00 in cash or other form of immediately available U.S. funds (the "<u>Escrow Amount</u>"; the Escrow Amount together with any and all interest and other earnings thereon while held by the Escrow Agent, the "<u>Escrow Funds</u>"), which Escrow Funds shall be held, invested and released by the Escrow Agent in accordance with the provisions of the Escrow Agreement and this <u>Section 2.12</u>.

(b) *Distribution of Escrow Funds.* Subject to the provisions of the Escrow Agreement, the Escrow Funds shall be distributed as follows:

(i) if this Agreement is terminated prior to Closing by Debtors pursuant to <u>Section 9.01(e)(ii)</u> or the conditions to the obligations of Buyer to consummate the Closing set forth in <u>Section 8.01</u> and <u>Section 8.02</u> shall have been satisfied or waived by Buyer but Buyer shall have failed to perform its obligations under <u>Section 2.05</u> for more than two Business Days after notice thereof by Debtors, then the Escrow Amount shall be delivered to Debtors and all interest or earnings thereon shall be delivered to Buyer (subject to deduction for any amounts payable by Buyer to the Escrow Agent under the Escrow Agreement); or

(ii) if this Agreement is terminated prior to Closing for any reason other than as stated in <u>Section 2.12(b)(i)</u>, the Escrow Funds shall be delivered to Buyer

(subject to deduction for any amounts payable by Buyer to the Escrow Agent under the Escrow Agreement).

(iii)     if the Closing shall occur, upon final determination of the Adjusted Purchase Price pursuant to Section 2.09:

(A)     if Debtors are entitled to a distribution of all or a portion of the Escrow Fund pursuant to Section 2.10(b), the Escrow Agent shall deliver (A) to the  Debtors out of the Escrow Fund an amount in cash equal to the Closing Amount Shortfall, (B) to the Referee an amount in cash equal to the amount of the Audit Fees payable by Buyer pursuant to Section 2.09(f), if applicable, and (C) to Buyer any cash remaining in the Escrow Fund after the payments in clauses (A) and (B) of this Section 2.12(b)(iii)(A) have been made (subject to deduction for any amounts payable by Buyer to the Escrow Agent under the Escrow Agreement); or

(B)     if Debtors are not entitled to a distribution of any portion of the Escrow Fund pursuant to Section 2.10(b), the Escrow Agent shall deliver (A) to the Referee an amount in cash equal to the Audit Fee payable by Buyer pursuant to Section 2.09(f), if applicable, and (B) to Buyer all of the cash remaining in the Escrow Fund upon such distribution (subject to deduction for any amounts payable by Buyer to the Escrow Agent under the Escrow Agreement).

(c)     *Disbursement Directions.*     When any Party becomes entitled to any distribution of all or any portion of the Escrow Funds pursuant to this Agreement, Buyer and Debtors shall promptly execute and deliver to the Escrow Agent joint written instructions setting forth the amounts to be paid to such Party from the Escrow Funds in accordance with Section 2.10(b) (a "Joint Direction").     Each of Buyer and Debtors agree to confer as promptly as practicable and to use its reasonable best efforts to reach agreement as to the calculation of and entitlement to such amounts. In furtherance and not in limitation of the foregoing:

(i)     Buyer and Debtors agree jointly to instruct the Escrow Agent in writing within two (2) Business Days after any termination of this Agreement or prior to Closing to distribute the Escrow Funds in accordance with Section 2.12(b)(i) or Section 2.12(b)(ii), as applicable; and

(ii)     if Debtors or Buyer shall fail to execute and deliver a Joint Direction, either Debtors or Buyer, as applicable, shall be entitled to receive distributions from the Escrow Funds from the Escrow Agent promptly upon delivery to the Escrow Agent of a written instruction, order or judgment (setting forth the amounts to be paid to such Party pursuant to Section 2.12(b) issued or entered by the Bankruptcy Court, if the Bankruptcy Cases remain open or the Bankruptcy Court then has jurisdiction to enter such instruction, order or judgment or if the Bankruptcy Cases have been closed and the Bankruptcy Court no longer has such jurisdiction, a court of competent jurisdiction.

15

Section 2.13     *Survival*.  The representations and warranties contained herein and in any certificate or other writing delivered pursuant hereto shall terminate upon and not survive the Closing and there shall be no liability thereafter in respect thereof.  Each of the covenants of the Parties hereto contained in this Agreement shall terminate upon the Closing except to the extent that performance under such covenant is to take place after Closing, in which case such covenant shall survive the Closing until the earlier of (i) performance of such covenant in accordance with this Agreement or, if time for performance of such covenant is specified in this Agreement, 60 days following the expiration of the time period for such performance and (ii) the expiration of applicable statute of limitations with respect to any claim for any failure to perform such covenant; *provided* that if a written notice of any claim with respect to any covenant to be performed after Closing is given prior to the expiration of such covenant then such covenant shall survive until, but only for purposes of, the resolution of such claim by final, non-appealable judgment or settlement.

Section 2.14     *Excluding Purchased Contracts*.  Notwithstanding anything to the contrary contained in this Agreement, if, notwithstanding the entry of the Bid Procedures Order and the Sale Order, any Purchased Contract (other than a Purchased 365 Contract) cannot be assigned by Debtors to Buyer because a party to such Contract has objected to the assignment of such Contract to Buyer in accordance with the terms of, or based on any anti-assignment or consent to assign provision contained in, such Contract and such objection is not resolved, by order of the Bankruptcy Court or otherwise, to permit the assignment of such Contract to Buyer pursuant to the Agreement, Debtors may delete such Contract from the Properties prior to Closing by delivery of written notice of such deletion by Debtors to Buyer.  In the event a Contract is deleted from the Properties in accordance with this <u>Section 2.14</u>, (i) such Contract and any other Purchased Contract that relates solely to such Contract(s) so deleted (such other Purchased Contract, an "<u>Ancillary Contract</u>") will be deemed to be an Excluded Asset, (ii) such Contract (and each Ancillary Contract) will not be transferred to Buyer at Closing and (iii) the Purchase Price will be reduced by an amount equal to the fair market value of such Contract (and each Ancillary Contract).  For purposes of this <u>Section 2.14</u>, the Parties shall use good faith efforts to agree on the fair market value of such Contract and each Ancillary Contract, if applicable.  If Buyer and Debtors are not able to agree on the fair market value of such Contract (and each Ancillary Contract, if applicable), the Parties shall engage the Arbiter in accordance with <u>Article XII</u> (*mutadis mutandis)* to determine the fair market value of such Contract.  For the avoidance of doubt, this <u>Section 2.14</u> does not apply to any Contracts (and any other Ancillary Contract) that comprise any Oil and Gas Property, which Contracts (and each such Ancillary Contract) to the extent they contain any unresolved anti-assignment or consent to assign provisions as described above will be treated as having a Defect under <u>Article XI</u>.

Section 2.15     *Division of Hydrocarbons*.  After the Closing, all Hydrocarbons produced from the Oil and Gas Properties other than Debtor's Substances as of the Effective Time and all Hydrocarbons produced from the Oil and Gas Properties on or after the Effective Time shall be owned by Buyer.  Debtors' Substances shall be owned by Debtors.  To the extent Debtors have sold Hydrocarbons (other than Debtors' Substances) which constitute Properties and the Purchase Price has not been adjusted pursuant to <u>Section 2.04</u> or <u>Section 2.09</u> for such proceeds, Debtors shall deliver such proceeds to Buyer promptly upon Debtors' receipt thereof.

16

Section 2.16  *Division of Expenses; Royalties.*  As between Buyer and Debtors, (i) all operating costs and expenses incurred in connection with the Properties prior to the Effective Time shall be borne by Debtors and (ii) all operating costs and expenses incurred after the Effective Time and attributable to the Properties, other than Excluded Liabilities, shall be borne by Buyer.  Notwithstanding the foregoing, Debtors shall retain responsibility in accordance with Applicable Law for all royalty payments under the Leases (the "Royalties") related to the Operated Properties to the extent such Royalties relate to production before the Effective Time to the extent the proceeds of Hydrocarbons out of which such Royalties are payable are received by Debtors (rather than paid by the purchaser of Hydrocarbons).  Buyer shall be responsible for and shall timely pay and discharge all Royalties related to the Operated Properties to the extent such Royalties relate to production on and after the Effective Time.

Section 2.17  *Preferential Purchase Rights.*

(a)  If a bona-fide preferential purchase right or right of first offer or right of first refusal with respect to any Oil and Gas Property is exercised prior to the Closing, such Oil and Gas Property and the related Contracts shall be excluded from the Properties conveyed to Buyer at the Closing, the Properties will be deemed to be Excluded Assets, the Purchase Price shall be reduced by an amount equal to the cash proceeds received by Debtors with respect to the affected Oil and Gas Property and related Contracts, and Debtors shall be entitled to retain all proceeds received for the affected Oil and Gas Property and related Contracts from the Person exercising such preferential right to purchase or right of first offer or right of first refusal.

(b)  If Buyer may elect to (but shall be under no obligation to) purchase at the Closing an Oil and Gas Property burdened by a preferential purchase right or right of first offer or right of first refusal that has not been exercised as of the Closing Date, regardless of whether the time period for the exercise of such right has expired, no reduction of the Purchase Price paid at the Closing shall be made with respect thereto.  If, for any reason, such preferential purchase right or right to first offer or right of first refusal is successfully exercised by the holder thereof after the Closing, Buyer shall be entitled to retain all proceeds paid for the affected Oil and Gas Property by the holder of the relevant preferential purchase right or right of first offer or right of first refusal, and Debtors shall have no liability with respect to such affected Oil and Gas Property and no adjustment to the Purchase Price shall be made with respect thereto.

(c)  To the extent any Property set forth on Schedule 2.17 is subject to a valid and enforceable preferential purchase right or right of first offer or right of first refusal in favor of a Third Party, Buyer and Debtor agree that the portion of the consideration to be paid under this Agreement allocable to each such Property is that portion of the Purchase Price set forth opposite such Property on Schedule 2.17 plus the assumption of the Assumed Liabilities related to such Property.

(d)  If prior to Closing any Person asserts that it is the beneficiary of a preferential purchase right or right of first offer or right of first refusal with respect to any Oil and Gas Property and objects to the sale of such Oil and Gas Property to Buyer pursuant to this Agreement and such objection is not resolved so as to permit the sale of such Oil and Gas Property free and clear of such right to Buyer (by Final Order of the Bankruptcy Court or otherwise to Buyer's reasonable satisfaction), then, at Buyer's option, such Oil and Gas Property

17

shall be excluded from the Properties and the Purchase Price shall be reduced by (i) the amount set forth opposite such Oil and Gas Property on Schedule 2.17, or (ii) if such Oil and Gas Property is not set forth on Schedule 2.17 by the Allocated Value of such Oil and Gas Property.

(e)     For the avoidance of doubt, and notwithstanding anything in this Section 2.17 to the contrary, any Oil and Gas Property that is subject to a preferential purchase right, right of first offer, right of first refusal or similar restriction on the Closing Date will be treated as provided in Section 2.17 and any such preferential purchase right, right of first offer, right of first refusal or similar restriction will not be deemed to be Defect or subject to Article XI.

Section 2.18   *Properties Sold "As Is, Where Is"*.  BUYER ACKNOWLEDGES AND AGREES THAT THE PROPERTIES SOLD PURSUANT TO THIS AGREEMENT ARE SOLD, CONVEYED, TRANSFERRED AND ASSIGNED ON AN "AS IS, WHERE IS" BASIS "WITH ALL FAULTS" AND THAT, EXCEPT AS SET FORTH IN ARTICLE III OF THIS AGREEMENT, DEBTORS MAKE NO REPRESENTATIONS OR WARRANTIES, TERMS, CONDITIONS, UNDERSTANDINGS OR COLLATERAL AGREEMENTS OF ANY NATURE OR KIND, EXPRESS OR IMPLIED, BY STATUTE OR OTHERWISE, CONCERNING THE PROPERTIES OR THE CONDITION, DESCRIPTION, QUALITY, USEFULNESS, QUANTITY OR ANY OTHER THING AFFECTING OR RELATING TO THE PROPERTIES, INCLUDING WITHOUT LIMITATION ANY IMPLIED WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, WHICH WARRANTIES ARE ALSO HEREBY EXPRESSLY DISCLAIMED.  BUYER FURTHER ACKNOWLEDGES THAT DEBTORS HAVE MADE NO AGREEMENT OR PROMISE TO REPAIR OR IMPROVE ANY OF THE PROPERTIES BEING SOLD TO BUYER, AND THAT BUYER TAKES ALL SUCH PROPERTIES IN THE CONDITION EXISTING ON THE CLOSING DATE "AS IS, WHERE IS" AND "WITH ALL FAULTS."

Section 2.19   *Presence of Wastes, NORM, Hazardous Substances and Asbestos*. BUYER ACKNOWLEDGES THAT THE PROPERTIES HAVE BEEN USED TO EXPLORE FOR, DEVELOP AND PRODUCE HYDROCARBONS, AND THAT SPILLS OF WASTES, CRUDE OIL, PRODUCED WATER, HAZARDOUS SUBSTANCES AND OTHER MATERIALS MAY HAVE OCCURRED THEREON. ADDITIONALLY, THE PROPERTIES, INCLUDING PRODUCTION EQUIPMENT, MAY CONTAIN ASBESTOS, HAZARDOUS SUBSTANCES OR NORM. NORM MAY AFFIX OR ATTACH ITSELF TO THE INSIDE OF WELLS, MATERIALS AND EQUIPMENT AS SCALE OR IN OTHER FORMS, AND NORM-CONTAINING MATERIAL MAY HAVE BEEN BURIED OR OTHERWISE DISPOSED OF ON THE PROPERTIES.   A HEALTH HAZARD MAY EXIST IN CONNECTION WITH THE PROPERTIES BY REASON THEREOF.    SPECIAL PROCEDURES    MAY    BE    REQUIRED    FOR    REMEDIATION,    REMOVING, TRANSPORTING    AND    DISPOSING    OF    ASBESTOS,    NORM,    HAZARDOUS SUBSTANCES AND OTHER MATERIALS FROM THE PROPERTY.   Except for the Identified Claims identified in a Defect Notice (which Identified Claims shall be treated as provided in Article XI), with respect to the Properties actually acquired by Buyer at Closing hereunder, Buyer assumes all liability for the assessment, remediation, removal, transportation and disposal of these materials and associated activities.

US 604317v.3

# ARTICLE III
## REPRESENTATIONS AND WARRANTIES OF THE DEBTORS

The Debtors, jointly and severally, represent and warrant to Buyer as follows:

Section 3.01    *Organization.*

(a)    Operating GP is a limited liability company validly existing and in good standing under the Laws of the State of Delaware. Operating GP is qualified to do business and is in good standing under the Applicable Laws of the States of Louisiana, Mississippi and Texas.

(b)    TriDimension is a limited partnership validly existing and in good standing under the Laws of the State of Delaware. TriDimension is qualified to do business and is in good standing under the Applicable Laws of the States of Louisiana, Mississippi and Texas.

(c)    Subsidiary GP is a limited liability company validly existing and in good standing under the Laws of the State of Delaware. Subsidiary GP is qualified to do business and is in good standing under the Laws of the States of Louisiana, Mississippi and Texas.

(d)    Axis E&P is a limited partnership validly existing and in good standing under the Laws of the State of Louisiana.

(e)    Axis Onshore is a limited partnership validly existing and in good standing under the Laws of the State of Louisiana. Axis Onshore is qualified to do business and is in good standing under the Applicable Laws of the State of Mississippi.

(f)    Axis Marketing is a limited partnership validly existing and in good standing under the Laws of the State of Louisiana.

(g)    Ram Drilling is a limited partnership validly existing and in good standing under the Laws of the State of Louisiana.

(h)    TDE Property Holdings is a limited partnership validly existing and in good standing under the Laws of the State of Louisiana. TDE Property Holdings is qualified to do business and is in good standing under the Applicable Laws of the State of Mississippi.

Section 3.02    *Authority and Authorization.*  Each Debtor has full power and authority to carry on its business as presently conducted and, subject to the entry of the Bid Procedures Order and the entry of the Sale Order, to enter into this Agreement and the other Transaction Documents to which such Debtor is or will be a party and to perform its obligations under this Agreement and the other Transaction Documents to which such Debtor is or will be a party. The execution and delivery by each Debtor of this Agreement and the other Transaction Documents to which such Debtor is or will be a party, and the performance by each Debtor of its obligations under this Agreement and the other Transaction Documents to which such Debtor is or will be a party and the transactions contemplated hereby and thereby have been duly and validly authorized by all requisite limited liability company or limited partnership action on the part of such Debtor.

US 604317v.3

Section 3.03  *Enforceability*.  Subject to the entry of the Bid Procedures Order and the Sale Order, this Agreement has been duly executed and delivered on behalf of each Debtor and (assuming due authorization, execution and delivery thereof by Buyer), provided no stay exists with respect to the Bid Procedures Order or the Sale Order, will constitute the legal, valid and binding obligation of each Debtor enforceable in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, reorganization or moratorium statutes, or other similar Applicable Laws affecting the rights of creditors generally or equitable principles (collectively, "Equitable Limitations").  At the Closing, all other Transaction Documents required hereunder to be executed and delivered by each Debtor shall be duly executed and delivered and (assuming due authorization, execution and delivery thereof by the other parties thereto) shall constitute legal, valid and binding obligations of such Debtor enforceable in accordance with their terms, except as enforceability may be limited by Equitable Limitations, subject to the entry of the Sale Order and provided no stay exists with respect to the Sale Order.

Section 3.04  *Conflicts*.  The execution and delivery by each Debtor of this Agreement and the other Transaction Documents to which such Debtor is or will be a party does not, and the consummation of the transactions contemplated by this Agreement and the other Transaction Documents to which such Debtor is or will be a party shall not, (i) violate or be in conflict with, or require the consent (other than consents that have been obtained) of any person or entity under, any provision of such Debtor's Organizational Documents, (ii) subject to the entry of the Bid Procedures Order and the Sale Order and obtaining the consents described on Disclosure Schedule 3.06, conflict with, result in a breach of, constitute a default (or an event that with the lapse of time or notice, or both would constitute a default) under any agreement or instrument to which such Debtor is a party or by which any of the Oil and Gas Interests of such Debtor listed on Annex A or Annex B are bound, (iii) subject to the entry of the Bid Procedures Order and the Sale Order, violate any provision of or require any consent, authorization or approval under any judgment, decree, judicial or administrative order, award, writ, injunction, statute, rule or regulation applicable to any Debtor or the Oil and Gas Interests listed on Annex A or Annex B or (iv) result in the creation of any Lien on any of the Oil and Gas Interests listed on Annex A or Annex B, other than Liens that may arise or be deemed to arise with respect to the Oil and Gas Interests as a result of the transactions contemplated by this Agreement.

Section 3.05  *Material Contracts*.

(a)  Disclosure Schedule 3.05(a) sets forth a list, as of the date of this Agreement, of, to Debtors' Knowledge the following Contracts to which any of the Oil and Gas Interests are bound, or to which any Debtor is a party and which relates primarily to the Oil and Gas Interests, and any and all amendments, extensions, or other modifications thereof (each, such Contract listed on Disclosure Schedule 3.05(a), other than any such Contract that is an Excluded Asset or an Excluded Liability a "Material Contract"):

(i)  any Oil and Gas Lease;

(ii)  any Contract with any Affiliate of the Debtors, including Contracts between or among the Debtors (other than operating agreements listed in Disclosure Schedule 3.05 to which two or more Debtors are a party);

20

(iii)     any Contract for the sale, exchange or other disposition of Hydrocarbons produced from the Oil and Gas Interests, and any other Contract granting any Third Party the right or option to purchase Hydrocarbons produced from the Oil and Gas Interests (other than any right of lessors under the Oil and Gas Leases, and any rights of the Parties under operating agreements described on Disclosure Schedule 3.05(a), to take Hydrocarbons in-kind), in each case that requires more than 90 days prior written notice to cancel;

(iv)     any Contract to sell, lease or otherwise dispose of any the Debtors' interests in any of the Oil and Gas Interests;

(v)     any tax partnership or joint venture Contract;

(vi)     any operating agreement to which any Debtor's interests in any of the Oil and Gas Interests is subject;

(vii)     any Contract providing for an "earnout," "back-in" working interest, or other contingent payment or interest;

(viii)     any Contract for drilling or well workover services or other well services agreement;

(ix)     any Contract for the providing, use, processing and/or analysis of seismic or geophysical data;

(x)     any development Contract, farm-in Contract, farm-out Contract area of mutual interest Contract or similar Contract;

(xi)     any Contract relating to indebtedness for borrowed money (whether incurred, assumed, guaranteed or secured by any asset of any Debtor);

(xii)     any Contract containing any preferential purchase rights, rights of purchase, rights of first offer, right of first refusal or other similar rights affecting the Oil and Gas Interests;

(xiii)     any Contract that expressly prohibits or restricts in any material respect the ability of any Debtor to compete in any line of business or with any Person or in any geographic area; or

(xiv)     any employment or consulting agreement or other Contract with any employee or individual consultant.

(b)     Except as set forth on Disclosure Schedule 3.05(b), subject to entry of the Sale Order and payment of all Cure Costs, as of the date of this Agreement, all of the Material Contracts are to Debtors' Knowledge in full force and effect and no Debtor nor, to Debtors' Knowledge, any other party to any such Material Contract is in breach of or default, or with the lapse of time or the giving of notice, or both, would be in breach or default, with respect to any

of its obligations thereunder except to the extent that such breaches or defaults do not constitute a Debtor Material Adverse Effect.

Section 3.06 *Approvals*. Disclosure Schedule 3.06 contains a complete and accurate list or description of all approvals, consents, filings and notifications required to be obtained, made or given by the Debtors, after giving effect to the entry of the Bid Procedures Order and the Sale Order, for the consummation of the Transactions, other than any approvals, consents, filings and notifications of or with any Governmental Authority of the type customarily obtained, made or given after Closing and approvals as to which the failure to obtain, make or give do not constitute a Debtor Material Adverse Effect.

Section 3.07 *Permits; Environmental Matters*.

(a)      To Debtors' Knowledge, as of the date of this Agreement, all necessary Permits with regard to the ownership or operation of the Oil and Gas Interests have been obtained and maintained in effect and no violations exist in respect of such Permits, except for such non-compliance, failure to obtain or maintain, and such facts, conditions or circumstances, the existence of which would not constitute a Debtor Material Adverse Effect.  This Section 3.07(a) is not, and shall not be deemed to be, any representation or warranty as to any Environmental Claim or compliance with any Environmental Law, and the sole representation and warranty by the Debtors as to any Environmental Claim or compliance with Environmental Law is contained in Section 3.07(b).

(b)      To Debtors' Knowledge, except as set forth on Disclosure Schedule 3.07(b), as of the date of this Agreement, no Hazardous Substances are present, or have been handled, managed, stored, transported, processed, treated, disposed of, released, migrated or have escaped on, in, from, under or in connection with the Oil and Gas Interests or the ownership or operation thereof such as to cause a condition or circumstance that has resulted or would reasonably be expected to result in a material Environmental Claim or in a material remediation, removal, response, restoration, abatement, investigative or monitoring obligation. This Section 3.07(b) shall constitute the Debtors' sole representation and warranty as to Environmental Claims, compliance with Environmental Laws or environmental conditions of or affecting the Oil and Gas Interests.  Buyer acknowledges that Buyer shall not have any rights under this Agreement or any other Transaction Document, or otherwise against the Debtors, with respect to the representation or warranty of the Debtors set forth under this Section 3.07(b); provided Buyer shall have such rights as set forth in Article XI with respect to any Identified Claim.

Section 3.08 *Well Status*.  As of the date of this Agreement, except as set forth on Disclosure Schedule 3.08, to Debtors' Knowledge, there are no Wells located on the Oil and Gas Interests that: (i) any Debtor was obligated by Applicable Law or Contract to plug and abandon that have not been plugged and abandoned in accordance in all material respects with all Applicable Laws; or (ii) have been plugged and abandoned but have not been plugged and abandoned in accordance in all material respects with all Applicable Laws.

Section 3.09 *Payout Balances; Imbalances*.

US 604317v.3

(a)     The effect of any payout, back-in working interest, reversion or other adjustment based on some level of cost recovery or payout with respect to each Oil and Gas Interest listed in Disclosure Schedule 3.09(a) is accurately reflected in all material respects on Disclosure Schedule 3.09(a) as of the date set forth on Disclosure Schedule 3.09(a).

(b)     Disclosure Schedule 3.09(b) sets forth, in all material respects, all Imbalances with respect to Operated Properties as of the date(s) shown in Disclosure Schedule 3.09(b).

Section 3.10     *Oil and Gas Interests*.

(a)     No claim, notice or order from any Governmental Authority or other Person has been received by any Debtor due to Hydrocarbon production from the Oil and Gas Interests in excess of allowable production established pursuant to Applicable Law that would result in any material curtailment of production from the Oil and Gas Interests after the Closing Date.

(b)     No Oil and Gas Interest is subject to any tax partnership agreement or provisions requiring a partnership income tax return to be filed under Subchapter K of Chapter 1 of Subtitle A of the Internal Revenue Code (the "Code").

Section 3.11     *Litigation*.  Except as set forth in Disclosure Schedule 3.11, as of the date of this Agreement, other than the Bankruptcy Cases and Proceedings pending in the Bankruptcy Cases, there is no Proceeding pending against any Debtor that (a) if determined or resolved adversely in accordance with the plaintiff's demands would reasonably be expected to have, individually or in the aggregate, a Debtor Material Adverse Effect, (b) in any manner challenges or seeks to prevent, enjoin, alter or materially delay the Transactions or (c) affects the execution, delivery or performance by any Debtor of this Agreement or any other Transaction Document to which any Debtor is or will be a party.

Section 3.12     *Hedging*.  No Debtor is bound by any futures, hedge, swap, collar, put, call, floor, cap, option or other Contract that is intended to benefit from, relate to or reduce or eliminate the risk of fluctuations in the price of commodities, including Hydrocarbons, or securities.

Section 3.13     *Natural Gas Act*.  None of the facilities or operations of any gas gathering system constituting a part of the properties of any Debtor are certificated by the Federal Energy Regulatory Commission (the "FERC") under Section 7(c) of the Natural Gas Act (the "NGA") or, to Debtors' Knowledge, are now subject to FERC jurisdiction under the NGA; and none of the properties are providing service pursuant to Section 311 of the National Gas Policy Act of 1978.

Section 3.14     *Intellectual     Property*.     Except     as     set     forth     on Disclosure Schedule 3.14, the Debtors do not own any Intellectual Property related to or used in connection with the ownership or operation of the Oil and Gas Properties.

Section 3.15     *Insurance Coverage*.     The Debtors have furnished or made available to Buyer a list of, and true and complete copies of, all material insurance policies and

fidelity bonds in effect as of the date of this Agreement relating to any Debtor. As of the date of this Agreement, there is no claim by any Debtor pending under any of such policies or bonds as to which coverage has been questioned, denied or disputed by the underwriters of such policies or bonds or in respect of which such underwriters have reserved their rights. All premiums payable under all such policies and bonds have been timely paid and, to Debtors' Knowledge, the Debtors have otherwise complied fully with the terms and conditions of all such policies and bonds. The Debtors do not know of any threatened termination of, premium increase with respect to, or material alteration of coverage under, any of such policies or bonds. Disclosure Schedule 3.15 sets forth a list of all material insurance policies and fidelity bonds of the Debtors as of the date of this Agreement.

Section 3.16 *Taxes*. Except as set forth on Disclosure Schedule 3.16,

(a) To Debtors' Knowledge (i) all Tax Returns have, to the extent required by Applicable Law to be filed, been filed when due in accordance with all Applicable Law, (ii) as of the time of filing, the Tax Returns were true and complete in all material respects; and (iii) each Debtor has paid (or has had paid on its behalf) or has withheld and remitted to the appropriate Taxing Authority all Taxes due and payable.

(b) There is no claim, audit, action, suit, proceeding or investigation now pending or, to Debtors' Knowledge, threatened against or with respect to any Debtor in respect of any Tax.

(c) To Debtors' Knowledge, no Tax Authority has asserted that any Debtor is or may be liable for Tax in a jurisdiction in which such entity does not file Tax Returns.

Section 3.17 *Letters of Credit*. To Debtors' Knowledge, Disclosure Schedule 3.17 sets forth all performance bonds, surety bonds, letters of credit, guarantees, security deposits and similar assurances in effect as of the date of this Agreement that relate to the Oil and Gas Interests (the "Existing Letters of Credit").

Section 3.18 *Outstanding Obligations*. The Debtors represent that, as of the date of this Agreement, except for obligations under the Contracts listed on Disclosure Schedule 3.05 that may arise in accordance with the terms of such Contracts after the date hereof or obligations as described on Disclosure Schedule 3.18 and except for any 365 Contracts that are not Desired 365 Contracts, there are no existing commitments or obligations for which Buyer will be liable to pay costs or expenses in excess, individually or in the aggregate, of $100,000 (net to the Debtors' interests) for drilling, completing, equipping, maintaining, deepening, side tracking, reworking, plugging and abandonment or other costs or expenses arising from or relating to the ownership of the Oil and Gas Interests.

Section 3.19 *Broker*. Except as set forth on Disclosure Schedule 3.19 and other than amounts as may be payable by the Debtors for which Buyer shall have no liability, no broker, finder, investment banker or other similar person is or will be, in connection with the transactions contemplated by this Agreement or the other Transaction Documents, entitled to any brokerage, finder's or other fee or compensation based on any arrangement or agreement made by or on behalf of the Debtors.

# ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to the Debtors as follows:

Section 4.01 *Organization*. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Arkansas.

Section 4.02 *Authorization and Authority*. Buyer has full power and authority to carry on its business as presently conducted, to enter into this Agreement and the other Transaction Documents to which Buyer is or will be a party, to purchase the Properties on the terms described in this Agreement and to perform its other obligations under this Agreement and the other Transaction Documents to which Buyer is or will be a party. The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party, and the performance by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party and the transactions contemplated hereby and thereby, have been duly and validly authorized by all requisite action on the part of Buyer.

Section 4.03 *Enforceability*. This Agreement has been duly executed and delivered on behalf of Buyer, and (assuming in each case due authorization, execution and delivery thereof by the Debtors) constitutes a legal, valid and binding obligation of Buyer enforceable in accordance with its terms, except as enforceability may be limited by Equitable Limitations. At the Closing all other Transaction Documents required hereunder to be executed and delivered by Buyer shall be duly executed and delivered and (assuming in each case due authorization, execution and delivery thereof by the other parties thereto) shall constitute legal, valid and binding obligations of Buyer enforceable in accordance with their terms, except as enforceability may be limited by Equitable Limitations.

Section 4.04 *Conflicts*. The execution and delivery by Buyer of this Agreement and the other Transaction Documents to which Buyer is or will be a party does not, and the consummation by Buyer of the transactions contemplated by this Agreement and the other Transaction Documents to which Buyer is or will be a party shall not, (i) violate or be in conflict with, or require the consent of any person or entity under, any provision of Buyer's Organizational Documents, (ii) conflict with, result in a breach of, constitute a default (or an event that with the lapse of time or notice, or both, would constitute a default) under any agreement or instrument to which Buyer is a party or is bound, or (iii) violate any provision of or require any consent, authorization or approval under any judgment, decree, judicial or administrative order, award, writ, injunction, statute, rule or regulation applicable to Buyer.

Section 4.05 *Broker*. No broker, finder, investment banker or other similar person is or will be, in connection with the transactions contemplated by this Agreement or any other Transaction Documents, entitled to any brokerage, finders or other fee or compensation based on any arrangement or agreement made by or on behalf of Buyer.

Section 4.06 *Financing*. As of the date of this Agreement, Buyer has sufficient funds committed and available to it to perform all of Buyer's obligations under this Agreement,

including without limitation to pay the Adjusted Purchase Price in accordance with the terms of this Agreement and to assume the Assumed Liabilities.

Section 4.07 *Approvals*.  There are no approvals, consents, filings or notifications required to be obtained, made or given by Buyer as a condition to or in connection with the performance by Buyer of its obligations under this Agreement or any other Transaction Documents to which Buyer is or will be a party or the consummation by Buyer of the transactions contemplated by this Agreement or such other Transaction Documents.

Section 4.08 *Litigation*.  There are no Proceedings pending to which Buyer is a party or, to Buyer's Knowledge, which have been threatened against Buyer which affect the execution and delivery by Buyer of this Agreement or the other Transaction Documents to which Buyer is or will be a party, the performance by Buyer of its obligations under this Agreement or such other Transaction Documents or the consummation of the transactions contemplated hereby or thereby.

Section 4.09 *Bankruptcy*.  There are no bankruptcy, reorganization or arrangement proceedings pending against, being contemplated by, or to the knowledge of Buyer, threatened against Buyer.

Section 4.10 *Investor Status; Investigation*.

(a)  The Properties are being acquired by Buyer for investment purposes only, for Buyer's own account and not with a view to, or for resale in connection with, any distribution thereof within the meaning of the 1933 Act.

(b)  Buyer is an "accredited investor" as defined in Regulation D promulgated under the 1933 Act.  Buyer acknowledges that the sale of the Properties has not been registered under the 1933 Act or any state or foreign securities laws and that the Properties may not be sold, transferred, offered for sale, pledged hypothecated or otherwise disposed of unless such transfer, sale, assignment, pledge, hypothecation or other disposition is pursuant to the terms of an effective registration statement under the 1933 Act and are registered under any applicable state or foreign securities laws or pursuant to an exemption from registration under the 1933 Act and any applicable state or foreign securities laws.

(c)  Buyer has such expertise, knowledge and sophistication in financial and business matters generally that it is capable of evaluating, and has evaluated, the merits and economic risks of its investment in the Reorganized Debtors.

(d)  Buyer has had the opportunity to examine all aspects of the Properties that Buyer has deemed relevant and has had access to all information requested by Buyer with respect to the Properties in order to make an evaluation thereof.  In connection with the Transactions, Buyer has had the opportunity to ask such questions of and receive answers from the Representatives of the Debtors and obtain such additional information about the Properties as Buyer deems necessary for an evaluation thereof.

Section 4.11 *Registration*.  Buyer, which shall be the assignee of all Leases in which the lessor is the State of Louisiana, on the Closing Date will be (a) qualified to do business

in the State of Louisiana and "in good standing" within the meaning of LSA-R.S. 12:163(f) and (b) registered as a "prospective leaseholder" with the Louisiana Office of Mineral Resources as required under LSA-R.S. 30:128(a).

**ARTICLE V**
**COVENANTS OF THE DEBTORS**

Section 5.01    *Permitted Capital Expenditures*.  From the date hereof until the Closing or, if earlier, the termination of this Agreement, except (v) as required by this Agreement or any other Transaction Documents, (w) as required by any under any lease, Contract, or instrument listed on any Schedule hereto, (x) as required by any Applicable Law or any Governmental Authority (including by order or directive of the Bankruptcy Court or fiduciary duty of the Debtors) or any requirements or limitations resulting from the Bankruptcy Cases, (y) to the extent related solely to Excluded Assets and/or Excluded Liabilities, or (z) as otherwise consented to in writing by Buyer:

(a)    Except with respect to any Excluded Assets, each Debtor agrees that it shall use all commercially reasonable efforts to (i) preserve intact its present business organization, (ii) maintain in effect all Permits as may be necessary for the Debtors to own and, with respect to Oil and Gas Interests operated by any Debtor (the "Operated Properties"), operate (in the Ordinary Course of Business) the Oil and Gas Interests and (iii) comply in all material respects with all Applicable Laws; and

(b)    Each Debtor shall not:

(i)    except with respect to those matters identified on Schedule 5.01 (which expenditures set forth on Schedule 5.01, as well as all expenditures consented to in writing by Buyer after the date hereof, shall be deemed permitted under this Section 5.01(b)(i)), incur or make, commit to incur or make, any capital expenditures, other than capital expenditures not exceeding $100,000 in the aggregate (net to the Debtors' interest) during any calendar month, except when required by an emergency when there shall have been insufficient time to obtain advance consent (provided, that the Debtors will promptly notify Buyer of any such emergency expenditures);

(ii)    acquire (by merger, consolidation, acquisition of stock or assets or otherwise), directly or indirectly, any material assets, securities, properties, interests or businesses, other than purchases of supplies and equipment in the Ordinary Course of Business;

(iii)    sell, lease or otherwise transfer any Oil and Gas Interests, or otherwise voluntarily divest or relinquish any right or asset, other than (A) sales of Hydrocarbons in the Ordinary Course of Business, (B) sales or other dispositions of materials, supplies, machinery, equipment, improvements, or other personal property or fixtures in the Ordinary Course of Business which have been replaced with an item of substantially equal suitability and (C) dispositions of Excluded Assets;

(iv)    enter into any material Contract that if entered into prior to the date hereof would be required to be listed in Disclosure Schedule 3.05(a) other than (A)

27

Contracts for capital expenditures permitted under Section 5.01(b)(i), (B) Contracts of the type described in Section 3.05(a)(i), Section 3.05(a)(vi) and Section 3.05(a)(viii) entered into in the Ordinary Course of Business, (C) Contracts for the sale of Hydrocarbons in the Ordinary Course of Business, not to exceed 90 days in duration, (D) confidentiality agreements entered into in accordance with the Bid Procedures Order, and (E) Contracts entered into to resolve Claims or otherwise in connection with the Bankruptcy Cases that would not affect any Properties;

(v)     amend or modify in any material respect or terminate any Purchased Contract (other than terminations or expiration in accordance with its terms); or

(vi)     change the methods of accounting or accounting practice by the Debtors, except as required by concurrent changes in GAAP as agreed to by its independent public accountants.

Section 5.02     *Solicitation; Other Offers*.

(a)     The Debtors acknowledge and agree that from the date hereof until the entry of the Bid Procedures Order or the termination of this Agreement in accordance with its terms, the Debtors and their respective Affiliates and Representatives will be prohibited from, directly or indirectly, soliciting a bid for an Alternative Transaction (as defined below) or engaging in or continuing any discussions or negotiations with any party that has made or who may make such a bid until the entry of the Bid Procedures Order.

(b)     Buyer acknowledges and agrees that from the date of the entry of the Bid Procedures Order until the termination of this Agreement in accordance with its terms, the Debtors and their respective Affiliates and Representatives shall be permitted to take such actions as permitted under the Bid Procedures Order with respect to an Alternative Transaction and may take any other affirmative action (including entering into any agreement or letter-of-intent with respect thereto) to cause, promote or assist with an Alternative Transaction not otherwise prohibited under the Bid Procedures Order; provided, however, that (i) the Debtors and their respective Affiliates may only enter into, and seek Bankruptcy Court approval of, any definitive agreement with respect thereto if such Alternative Transaction is a Superior Transaction.

(c)     Until the Successful Bidder has been determined in accordance with the Bid Procedures Order, the Debtors may, directly or indirectly through Representatives of the Debtors, (i) engage in discussions and negotiations regarding an Alternative Transaction with any Third Party (an "Alternative Bidder") and any Alternative Bidder's Representatives in accordance with or as otherwise permitted under the Bid Procedures Order in connection with the solicitation of one or more proposals relating to an Alternative Transaction and (ii) furnish to any Alternative Bidder who has signed a confidentiality agreement in accordance with the Bid Procedures Order and its Representatives that has made a request therefor, public or non-public information relating to any Debtor and afford to any such Alternative Bidder access to any properties, assets, books or records of any Debtor or the business of the Debtors; provided that Alternative Bidders who have signed a confidentiality agreement prior to the date of this

Agreement shall not be required to sign another confidentiality agreement after the date hereof as a condition to receiving non-public information relating to the Debtors.

Section 5.03 *Operating Agreements*.

(a) To the extent the right of Debtors to act as operator with respect to one or more Operated Properties is not assigned to Buyer pursuant to Section 2.01, subject to obtaining any consents required under the operating agreements with respect to which a Debtor is the operator ("Operated JOAs"), on the Closing Date or as soon thereafter as such required consents shall have been obtained, each Debtor serving as an operator under an Operated JOA as of the Closing will resign as operator and use its commercially reasonable efforts to cause Buyer or an Affiliate of Buyer designated in writing by Buyer to be substituted as operator under such Operated JOA. The failure of any such consents to have been obtained as of the Closing shall not cause the failure of any condition to Closing or affect Buyer's obligations under Section 2.05 or Section 2.10.

(b) Buyer shall (i) cooperate with Debtors as reasonably requested by Debtors in obtaining consents contemplated by Section 5.03(a) and in preparing and filing applications as contemplated by Section 5.03(b) and obtaining approvals with respect thereto to cause Buyer or an Affiliate of Buyer to be designated as substitute operator with respect to the Operated Properties and (ii) take such other actions as necessary to cause Buyer or an Affiliate of Buyer to qualify to be designated as substitute operator with respect to the Operated Properties, including without limitation posting such bonds, letters of credit or similar assurances as may be requested by any Governmental Authority with respect to such appointment of Buyer or an Affiliate of Buyer as substitute operator.

Section 5.04 *Assumption and Rejection of Executory Contracts and Leases*.

(a) Schedule 5.04(a) sets forth a complete set of the most recent "Schedule G – Executory Contracts and Unexpired Leases" of the Debtors that has been filed with the Bankruptcy Court prior to the date hereof (as such schedules may from time to time be amended or supplemented with written notice to Buyer, the "365 Schedule"). The Debtors agree to amend or supplement the 365 Schedule from time to time promptly, and to provide Buyer written notice thereof, upon its determination that any Debtor is party to a 365 Contract that is not then set forth on the 365 Schedule. At least 10 days prior to the date of mailing of notice in accordance with the Bid Procedures Order (the "365 Notice Date") to all parties to 365 Contracts to be assumed, the Debtors will deliver to Buyer a copy of the 365 Schedule together with the Debtors' good faith estimate of the Cure Costs that would be payable by any Debtor in connection with the assumption of each 365 Contract and, to the extent practicable, a good faith estimate of the rejection damages by any Debtor in connection with the rejection of each 365 Contract (the actual amount of such rejection damages that would be payable by any Debtor, as finally determined, "Rejection Amount"). If the Debtors have not previously provided or made available to Buyer a copy of any such 365 Contract, including any amendments, waivers or other modifications thereof, the Debtors shall upon Buyer's request (i) provide a copy of such 365 Contract to Buyer if the Debtors have a copy of such 365 Contract readily available in its files or (ii) use its commercially reasonable efforts to obtain a copy of such 365 Contract if the

US 604317v.3

Debtors do not have a copy of such 365 Contract readily available in its files and, upon obtaining a copy, provide a copy of such 365 Contract to Buyer.

(b)     Schedule 5.04(b) sets forth a complete list of the 365 Contracts listed on the 365 Schedule received from the Debtors that Buyer desires to be assumed by the Debtor party thereto and transferred and conveyed to Buyer as a Purchased Contract (collectively, and as further modified by Buyer pursuant to the provisions of this Section 5.04(b), the "Desired 365 Contracts").  As promptly as practicable following the designation by Buyer of any 365 Contract as an additional Desired 365 Contract, the Debtors shall commence appropriate proceedings before the Bankruptcy Court and otherwise take all necessary actions in order to determine the Cure Costs with respect to such Desired 365 Contract and to effect the assumption of such Desired 365 Contract by the applicable Debtor in accordance with the Bankruptcy Code, effective as of the Closing.  Notwithstanding the foregoing, at any time prior to 5 calendar days before the commencement of the Sale Hearing (or, if any 365 Contract is first identified to Buyer by the Debtors or first identified to the Debtors by Buyer between the beginning of such 5 calendar days and the commencement of the Sale Hearing, within 1 Business Day of such identification), Buyer may designate any 365 Contract that has not been rejected as a Desired 365 Contract and upon receipt of any such notice the Debtors shall use commercially reasonable efforts to effect the assumption of such 365 Contract by the applicable Debtor in accordance with the Bankruptcy Code and, if the Debtors are successful in effecting such assumption as of Closing, such 365 Contract shall become a Desired 365 Contract and transferred and conveyed to Buyer as a Purchased Contract.  If Buyer requests any Contract other than the Desired 365 Contracts listed on Section 5.04(b) to be designated as a Desired 365 Contract and the Debtors are successful in effecting the assumption of such 365 Contract, then the Purchase Price shall be increased by an amount equal to the Cure Costs of each such additional Desired 365 Contract. Notwithstanding anything herein to the Contrary, Buyer may revise Schedule 5.04(b) by subtracting Desired 365 Contracts at any time prior to 5 calendar days before the commencement of the Sale Hearing.

(c)     At or prior to the Closing, the Debtors shall pay, or cause the Liquidating Trust after the Closing to pay, all Cure Costs with respect to the Desired 365 Contracts, and the Debtors shall provide adequate assurance of future performance of all of the Desired 365 Contracts so that all Desired 365 Contracts can be assumed by the Debtors at or prior to the Closing in accordance with the provisions of Section 365 of the Bankruptcy Code and this Agreement (provided that Buyer shall cooperate with the Debtors in providing such adequate assurance of future performance of all of the Desired 365 Contracts and Buyer acknowledges that such cooperation may require Buyer to provide information regarding Buyer and its Subsidiaries, as well as a commitment of performance by Buyer and/or its Subsidiaries with respect to the Desired 365 Contracts from and after the Closing to demonstrate adequate assurance of the performance of the Desired 365 Contracts, and the Debtors' obligation to provide such adequate assurances is subject to the cooperation and providing of such information and commitment by Buyer).  Except as set forth in Section 5.04(b), neither Buyer nor any of its Subsidiaries shall have any liability or obligation to any Person for any default under or Cure Costs related to any 365 Contract of any Debtor existing at or prior to the Closing, subject to adjustments to the Purchase Price in accordance with Article II and Assumed Liabilities.

Section 5.05    *Access/Environmental Assessment.*

US 604317v.3

(a)     Each Debtor shall afford to Buyer and its authorized representatives from the date hereof until the Closing Date, during normal business hours, reasonable access to the Properties (subject to the terms, conditions and restrictions of agreements related to Properties to which such Debtor is a party and, with respect to Non-Operated Properties, the consent of the operator) and to such Debtors' title, Contract, environmental and legal materials, books, records and operating data and information available as of the date hereof and that becomes available to any Debtor at any time prior to the Closing Date, together with the opportunity to make copies of such books, records, and other documents at Buyer's expense, and will furnish to Buyer such other information in Debtors' possession with respect to the Properties as Buyer may reasonably request; provided, however, that all such information shall be held in confidence by Buyer in accordance with the terms of the Confidentiality Agreement; provided, further, that in no event shall Debtors be obligated to provide (i) access or information in violation of Applicable Law, (ii) any information the disclosure of which would cause the loss of any legal privilege available to any Debtor relating to such information or would cause any Debtor to breach a confidentiality obligation to which it is bound; provided that the applicable Debtor has used its reasonable efforts to protect the privilege or to obtain a waiver of the applicable contractual obligation, or (iii) copies of bids, letters of intent, expressions of interest or other proposals received from other Persons prior to the Bid Deadline in connection with the transactions contemplated by this Agreement or information and analyses relating to such communications, except to the extent required in the Bid Procedures Order.

(b)     Buyer shall have the opportunity to conduct at its expense a non-invasive environmental assessment (which shall not include invasive testing of the soil, groundwater, surface water, air and other environmental media and of building materials, equipment or facilities) of the Properties, including the Wells (subject to any conditions or restrictions contained in any oil and gas lease covering such Properties and Wells and, with respect to Non-Operated Properties, the consent of the operator), which would be conducted by a reasonable and prudent purchaser under the same or similar circumstances ("Phase I Assessment"). Debtors will provide reasonable access for this purpose to the Properties and the Wells operated by Debtors; for any Non-Operated Properties, Debtors will reasonably cooperate with Buyer in contacting the operators of any such Non-Operated Properties directly to attempt to arrange for access for the purposes of such environmental assessment.

(c)     While performing any environmental assessment, Buyer or any of their representatives and agents must comply with Debtors' environmental and safety rules and policies on the Operated Properties, and with the operator's environmental and safety rules and policies on all other Properties and Wells. Buyer will notify Debtors in advance of any disclosure of the results of its environmental assessment to any Governmental Authority and will furnish Debtors copies of all materials to be disclosed prior to any disclosure thereof and will not disclose any such information unless such disclosure is expressly required by Applicable Law or is required pursuant to legal process of any Governmental Authority subsequent to the exhaustion of all appeals.

(d)     BUYER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD EACH DEBTOR, EACH OF THEIR SUCCESSORS, THEIR AFFILIATES AND ALL OF THEIR RESPECTIVE MANAGERS, MEMBERS, PARTNERS, DIRECTORS, OFFICERS AND OWNERS HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS AND

US 604317v.3

LOSSES CAUSED DIRECTLY OR INDIRECTLY BY THE ACTS OR OMISSIONS OF BUYER, BUYER'S AFFILIATES OR ANY PERSON ACTING ON BUYER'S OR ITS AFFILIATE'S BEHALF IN CONNECTION WITH ANY DUE DILIGENCE CONDUCTED PURSUANT TO OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING ANY SITE VISITS AND ENVIRONMENTAL ASSESSMENTS CONDUCTED PURSUANT TO <u>SECTION 5.08</u>; PROVIDED, HOWEVER, THAT THIS PROVISION SHALL NOT APPLY TO ANY ENVIRONMENTAL CLAIM OF DEBTOR DISCOVERED BY BUYER THROUGH DUE DILIGENCE.  Buyer shall comply with all rules, regulations, policies and instructions reasonably required by Debtors, or any Third Person operator of any Properties, which are provided to Buyer regarding Buyer's actions while upon, entering or leaving any Property, including any insurance requirements that Debtors may reasonably impose, or any such Third Person operator may impose, on contractors authorized to perform work on any property owned or operated by Debtors (or any such Third Person operator, as applicable).

## ARTICLE VI
## COVENANTS OF BUYER

Section 6.01   *Access*.  Buyer agrees that, following the Closing, and subject to Applicable Law and except as may be necessary to protect any applicable legal privilege, it shall (and shall cause its Subsidiaries to) give to the Debtors, Liquidating Trust and their Representatives reasonable access during normal business hours to the offices, books and records relating to the Debtors or any of their businesses or operations for any and all periods prior to or including the Closing Date as the Debtors, Liquidating Trust and their Representatives may reasonably request and to make copies of the same in connection with (a) the preparation of Tax returns or information returns, (b) reports or other obligations by the Debtors, the Liquidating Trust or Newco to Governmental Authorities, (c) with respect to the administration of the Excluded Assets or Excluded Liabilities, (d) with respect to the administration of the Bankruptcy Cases, (e) pursuing, prosecuting, or commencing litigation on account of or relating to Excluded Assets, including avoidance actions, (f) objecting to proofs of claims or administrative expense claims and (g) any final determination of any audit or examination, Proceeding, or determination. Buyer shall (and shall cause its Subsidiaries to) preserve all such books and records for a period of  three (3) years after the Closing; provided, however, that Buyer shall have the right at any time after the second anniversary of the Closing Date to request in writing that the Liquidating Trust (so long as the Liquidating Trust is in existence) take any such records and, if it does not agree to take such records within ninety (90) Business Days after receipt of the request, Buyer (or its Subsidiaries, as applicable) may dispose of such records.

Section 6.02   *Tax Matters.  Apportionment of Tax Liability*.

(a)    *Non-Income Taxes*.    All Non-Income Taxes (and any refunds thereof) with respect to the Properties attributable to the period before the Effective Time shall be for Debtors' account and all Non-Income Taxes (and any refunds thereof) with respect to the Properties attributable to the period after and including the Effective Time shall be for the Buyer's account.  All real estate, personal property, and similar ad valorem Taxes with respect to the Properties assessed with respect to the Properties for 2010 shall be prorated based on the number of days in such period that occur before the Effective Time, on the one hand, and the number of days in such period that occur on or after the Effective Time, on the other hand.  All

other Taxes with respect to the Properties shall be allocated between Debtors and the Buyer as though the 2010 Taxable period ended as of the close of business on the day before the Effective Time. All Taxes with respect to the Properties attributable to Taxable periods beginning on or after the Effective Time shall be for the Buyer's account. All Taxes attributable to the production of Hydrocarbons shall be deemed attributable to the period during which such production occurred. The apportionment of Taxes with respect to the Properties between the parties shall take place in the Closing Statement and the Final Settlement Statement using estimates of such Taxes if actual numbers are not available. If estimates of Taxes with respect to the Properties are used in the Closing Statement and the Final Settlement Statement to apportion Taxes, upon determination of the actual amount of such Taxes, (i) Debtors shall pay to the Buyer an amount equal to the excess, if any, of the actual Taxes allocable to Debtors over the estimated amount of Taxes allocated to Debtors, and (ii) the Buyer shall pay to Debtors an amount equal to the excess, if any, of the estimated amount of Taxes allocated to Debtors over the actual amount of such Taxes allocable to Debtors. Subject to the provisions of this Section 6.02(a). Taxes with respect to the Properties are considered part of the Property Expenses.

(b)     *Income Taxes.* All Income Taxes (and any refunds thereof) attributable to the period before and including the Closing Date shall be for Debtors' account and all Income Taxes (and any refunds thereof) attributable to the period after the Closing Date shall be for the Buyer's account. For this purpose, Income Taxes (and refunds thereof) shall be allocated to the period before and including the Closing Date by using an interim closing of the books method.

(c)     *Apportionment of Tax Refunds.* The apportionment of Tax Refunds with respect to the Properties between the Parties shall take place in the Closing Statement and Final Settlement Statement using estimates of such Tax Refunds if actual numbers are not available. If estimates of Tax Refunds are used in the Closing Statement and the Final Settlement Statement to apportion such Tax Refunds, upon determination of the actual amount of such Tax Refunds, (i) Debtors shall pay to the Buyer an amount equal to the excess, if any, of the estimated amount of Tax Refunds with respect to the Properties allocated to Debtors over the actual Tax Refunds with respect to the Properties allocable to Debtors, and (ii) the Buyer shall pay to Debtors an amount equal to the excess, if any, of the actual amount of Tax Refunds with respect to the Properties allocable to Debtors over the estimated amount of Tax Refunds with respect to the Properties allocated to Debtors.

(d)     *Tax Returns.* Debtors agree to file all Tax returns applicable to the Properties that become due prior to the Closing Date, and Buyer agrees to file all other such Tax returns. The Party not filing the return agrees to provide the filing party with appropriate information that is necessary to file any required Tax reports and returns. The Party filing a return for a Taxable period beginning before the Effective Time and ending after the Effective Time shall provide the other Party with a copy of such return at least 15 days prior to the due date thereof for such Party's review and comment. Buyer agrees to pay all required Taxes payable with respect to the Properties subject to the provisions hereof.

(e)     *Transfer Taxes.* Buyer shall be liable for and shall indemnify Debtors for any Transfer Taxes associated with the transfer of the Properties pursuant to this Agreement. If required by applicable law, Debtors shall, in accordance with applicable law, calculate and remit any sales or similar taxes that are required to be paid as a result of the transfer of the Properties

to Buyer and Buyer shall promptly reimburse Debtors therefor. If Debtors receive notice that any sales and/or use taxes are due, Debtors shall promptly forward a copy of such notice to Buyer for handling.

(f) *Purchase Price Allocation.* Debtors and Buyer shall use commercially reasonable efforts to agree to an allocation of the Purchase Price and Assumed Liabilities among the Properties that complies with Section 1060 of the Code and the Treasury regulations promulgated thereunder within 30 days after the Closing Date (the "<u>Allocation</u>"). Debtors and Buyer shall use commercially reasonable efforts to update the Allocation in a manner consistent with Section 1060 of the Code following any adjustment to the Purchase Price pursuant to this Agreement. Debtors and Buyer shall, and shall cause their Affiliates to, report consistently with the Allocation in all tax returns, including IRS Form 8594, which Buyer and Debtors shall file with the Internal Revenue Service or any other Governmental Authority and neither Debtors nor Buyer shall take any position in any such tax return that is inconsistent with the Allocation, as adjusted, in each case, unless required to do so by a final determination as defined in Section 1313 of the Code. Each of Debtors and Buyer agree to promptly advise each other regarding the existence of any tax audit, controversy or litigation related to the Allocation.

## ARTICLE VII
## COVENANTS OF BUYER AND THE DEBTORS

Section 7.01 *Commercially Reasonable Efforts; Further Assurances.* Subject to the terms and conditions of this Agreement and subject to the Bankruptcy Code and any orders of the Bankruptcy Court, Buyer and the Debtors each agree to use all commercially reasonable efforts to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary or desirable to consummate the Transactions; provided that the Parties understand and agree that the commercially reasonable efforts of any party hereto shall not be deemed to include except as expressly set forth in this Agreement, entering into any settlement, undertaking, consent decree, stipulation or agreement with any Governmental Authority in connection with the Transactions; provided that this <u>Section 7.01</u> shall not (i) limit or affect the obligation of any Party to perform its obligations and covenants expressly set forth in this Agreement or (ii) require any Party to incur any obligations or pay any fees or amounts to third parties not otherwise required under this Agreement. The Debtors and Buyer agree to execute and deliver or cause to be executed and delivered such other documents, certificates, agreements and other writings and to take such other actions as may be necessary or desirable in order to consummate or implement expeditiously the Transactions in accordance with the terms and conditions of this Agreement.

Section 7.02 *Bankruptcy Proceedings.*

(a) Within five (5) Business Days following the execution of this Agreement, Debtors will, at their sole cost and expense, file a motion (the "<u>Bid Procedures Motion</u>") pursuant to 11 U.S.C. §§ 105, 363, and 365 to request approval of the Bid Procedures Order. Debtors will use their commercially reasonable efforts to obtain the approval of the Bid Procedures Order within twenty-five (25) days after the filing of the Bid Procedures Motion. Actions taken by Debtors as permitted or required to be taken under or pursuant to the Bid Procedures Order shall not constitute a breach or violation of this Agreement by Debtors

(b)     Within ten (10) Business Days following the execution of this Agreement, Debtors will, at their sole cost and expense, file a motion (the "Sale Motion") to obtain approval of the Sale Order for the Transactions.  Debtors will use their commercially reasonable efforts to obtain the entry of the Sale Order by the Bankruptcy Court on or before November 19, 2010.

(c)     The Debtors agree to provide Buyer and its counsel with copies of all material motions, applications, supporting papers and notices prepared by any Debtor (including forms of orders and notices to interested parties) relating in any way to the Bid Procedures Order or otherwise relating to the Transactions prior to the filing of such documents and shall provide Buyer, to the extent practicable, with a reasonable opportunity to review and comment on same.

(d)     If entry of the Bid Procedures Order or any other orders of the Bankruptcy Court relating to the Transaction shall be appealed or otherwise challenged by any party (including by petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument), the Debtors agree to diligently oppose such appeal, challenge, petition or motion and to use all commercially reasonable efforts to obtain an expedited resolution of any such appeal, petition or motion.

Section 7.03   *Public Announcements*.  Each of the Debtors and Buyer agree that, prior to Closing, the consent (as to both form and content) of the other Party shall be obtained prior to issuing any press release or making any public statement with respect to this Agreement or the other Transaction Documents or the Transactions, except to the extent that such press release or other public announcement is required by Applicable Law; provided that the Debtors shall be permitted to issue a press release or make a public announcement upon the execution of this Agreement to announce such execution of this Agreement and will provide Buyer with a copy of such press release or public announcement in advance of its release and provide Buyer with a reasonable opportunity to comment on the same.  From and after the Closing until one month after the Closing, Buyer and the Liquidating Trust will provide each other a copy of any press release or other public announcement with respect to this Agreement, the other Transaction Documents or the Transactions that Buyer or the Liquidating Trust proposes to issue or make in advance of its release and provide the other with a reasonable opportunity to comment on the same, except to the extent that such press release or other public announcement is required by Applicable Law and such prior notice is not practicable given the circumstances giving rise to the requirement to issue such release.

Section 7.04   *Access to Information*.  From the date hereof until the Closing and subject to Applicable Law and the Confidentiality Agreement, the Debtors shall (a) give to Buyer and its Representatives reasonable access during normal business hours to the offices, properties, books and records of the Debtors (subject to the terms, conditions and restrictions of agreements related to such offices and properties and, with respect to Oil and Gas Interests with Third Parties acting as the operator, the consent of the operator) and (b) furnish to Buyer and its Representatives such financial and operating data and other information in possession of the Debtors and that to which they have access, as of the date hereof or that comes into the possession of the Debtors at any time prior to the Closing Date as Buyer may reasonably request in connection with the Transactions; *provided* that in no event shall the Debtors be obligated to provide (i) any information the disclosure of which would cause the loss of any legal privilege available to any Debtor relating to such information or would cause any Debtor to breach a

confidentiality obligation to which it is bound, (ii) copies of bids, letters of intent, expressions of interest or other proposals received from other Persons prior to the Bid Deadline in connection with the Transactions or information and analyses relating to such communications or (iii) access for any invasive environmental testing of any property and Buyer shall not be entitled to conduct any invasive environmental testing at, on or under any property. Any investigation pursuant to this Section 7.04 shall be conducted in such manner as not to interfere unreasonably with the conduct of the business of the Debtors. No information or knowledge obtained in any investigation pursuant to this Section 7.04 shall affect or be deemed to modify any representation or warranty made by any Party hereunder.

      Section 7.05 *Confidentiality*. The Parties acknowledge that Buyer and the Debtors previously executed the Confidentiality Agreement. Notwithstanding anything to the contrary in the Confidentiality Agreement, to the extent of any conflict between the provisions of the Confidentiality Agreement and the terms hereof, the terms hereof shall prevail. The Parties acknowledge and understand that this Agreement will be filed with the Bankruptcy Court and may be made available by the Debtors to Alternative Bidders as contemplated by the Bid Procedures Order. The Parties agree that such disclosure shall not be deemed to violate any confidentiality obligations owing to any Party, whether pursuant to this Agreement, the Confidentiality Agreement or otherwise. Notwithstanding the foregoing, this Section 7.05 shall not in any way limit, to the extent required by Applicable Law, the disclosure of information by the Debtors or their Affiliates in connection with the administration of the Bankruptcy Cases, pursuant to any provision of the Bankruptcy Code or any order of the Bankruptcy Court.

      Section 7.06 *Indemnification*. BUYER SHALL PROTECT, DEFEND, INDEMNIFY AND HOLD EACH DEBTOR, EACH OF THEIR SUCCESSORS AND ALL OF THEIR RESPECTIVE MANAGERS, MEMBERS, PARTNERS, DIRECTORS, OFFICERS, OWNERS, AGENTS AND REPRESENTATIVES HARMLESS FROM AND AGAINST ANY AND ALL CLAIMS AND LOSSES CAUSED DIRECTLY OR INDIRECTLY BY THE ACTS OR OMISSIONS OF BUYER, ANY OF BUYER'S SUBSIDIARIES OR ANY PERSON OR REPRESENTATIVE OF BUYER ACTING ON BUYER'S OR ITS SUBSIDIARIES' BEHALF IN CONNECTION WITH ANY DUE DILIGENCE CONDUCTED PURSUANT TO OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING ANY SITE VISITS. Buyer shall comply with all rules, regulations, policies and instructions reasonably required by the Debtors, or any Third Party operator of any Oil and Gas Interests, which are provided to Buyer regarding Buyer's actions while upon, entering or leaving any property, including any insurance requirements that the Debtors may reasonably impose, or any such Third Party operator may impose, on contractors authorized to perform work on any property owned, leased or operated by the Debtors (or any such Third Party operator, as applicable).

      Section 7.07 *Audits and Other Tax Proceedings*. The Debtors or the Liquidating Trust shall control the conduct of any audit, litigation or other administrative or judicial proceeding with respect to Taxes of the Debtors (each a "Tax Proceeding") for any Debtor Tax Period. The Debtors or the Liquidating Trust and Buyer shall jointly control the conduct of any Tax Proceeding for any Straddle Tax Period. Buyer shall promptly provide the Debtors or the Liquidating Trust with notice regarding the commencement of any Tax Proceeding for any Debtor Tax Period or Straddle Tax Period and shall cooperate fully as and to the extent reasonably requested by the Liquidating Trust in connection therewith. Buyer shall

US 604317v.3

not enter into any settlement or agreement of compromise with respect to any Tax Proceeding for any Debtor Tax Period or Straddle Tax Period without the prior written consent of the Liquidating Trust; provided, however that such approval may not be unreasonably withheld, conditioned or delayed.

## ARTICLE VIII
## CONDITIONS TO CLOSING

Section 8.01  *Conditions to Obligations of Buyer and the Debtors*. The obligations of Buyer and the Debtors to consummate the Closing are subject to the satisfaction (or, in the case of clauses (b) and (c) of this <u>Section 8.01</u>, waiver by each to the extent permitted under Applicable Law) of each of the following conditions:

(a)      No Applicable Law shall prohibit the Transactions or the consummation of the Closing.

(b)      All actions by or in respect of or filings with any Governmental Authority required to permit the consummation of the Closing shall have been taken, made or obtained.

(c)      No Proceeding instituted by any Governmental Authority shall be pending and no injunction, order, decree or judgment of any Governmental Authority of competent jurisdiction shall be in effect, in each case which seeks to or does, as applicable, prohibit, restrain or enjoin the consummation of the Transactions; *provided* that the Party seeking to rely on this <u>Section 8.01(c)</u> as a basis not to consummate the Closing must have used all commercially reasonable efforts to cause such Proceeding to have been dismissed or resolved in favor of the Parties or to prevent the entry of such injunction, order, decree or judgment.

Section 8.02  *Conditions to Obligation of Buyer*. The obligation of Buyer to consummate the Closing is subject to the satisfaction (or waiver by Buyer) of each of the following further conditions:

(a)      (i) The Debtors shall have performed in all material respects all of its covenants and other obligations hereunder required to be performed by it on or prior to the Closing Date, (ii) the representations and warranties of the Debtors set forth in <u>Article III</u> of this Agreement shall be true and correct on the date hereof and at and as of the Closing Date, as if made at and as of the Closing Date, other than those representations and warranties that are made as of a specific earlier date which representations need not be true and correct as of the Closing Date but must be true and correct as of such specific earlier date (except that, in each case, for purposes of this <u>Section 8.02(a)(iii)</u>, in determining whether such representations and warranties are true and correct, all qualifications in such representations or warranties as to "material," "in all material respects," Material Adverse Effect or similar materiality qualifiers shall be disregarded and all qualifications in <u>Section 3.05(a)</u>, and <u>3.16</u> as to "Debtors' Knowledge" shall be disregarded) except: (A) for those failures to be true and correct that, individually or in the aggregate, do not constitute a Debtor Material Adverse Effect; and (B) that failure of any representation nor warranty contained in <u>Section 3.07</u> shall be disregarded for purposes of this <u>Section 8.02</u> and (iii) Buyer shall have received a certificate signed by an executive officer of TriDimension to the foregoing effect.

37

(b)     The Bid Procedures Order and the Sale Order shall have been entered by the Bankruptcy Court and each such order shall be a Final Order and in full force and effect.

(c)     From the date of this Agreement through the Closing Date, Debtors shall have secured sufficient debtor-in-possession financing in order to continue to operate the Properties in the Ordinary Course of Business as required under Section 5.01(a).

(d)     The Closing Date Defect Amount and Casualty Losses (without regard to any deductibles or reductions of any kind) do not exceed in the aggregate $8,000,000.

(e)     Buyer shall not be entitled to exclude any Principal Catahoula Assets from the Transactions pursuant to Section 2.17(d).

(f)     No Principal Catahoula Assets will be treated as Excluded Assets under Section 2.17(a).

Section 8.03   *Conditions to Obligation of the Debtors*. The obligation of the Debtors to consummate the Closing is subject to the satisfaction (or waiver by the Debtors) of the following further conditions:

(a)     (i) Buyer shall have performed in all material respects all of its covenants and obligations hereunder required to be performed by it at or prior to the Closing Date, (ii) the representations and warranties of Buyer contained in this Agreement and in any certificate or other writing delivered by Buyer pursuant hereto, disregarding all qualifications and exceptions contained therein relating to materiality or Buyer Material Adverse Effect, shall be true at and as of the Closing Date, as if made at and as of such date with only such exceptions as would not in the aggregate reasonably be expected to have, individually or in the aggregate, a Buyer Material Adverse Effect and (iii) the Debtors shall have received a certificate signed by an executive officer of Buyer to the foregoing effect.

(b)     The Bid Procedures Order and the Sale Order, together with any other order of the Bankruptcy Court required to consummate the Transactions, shall have been entered by the Bankruptcy Court and each such order shall be a Final Order and in full force and effect.

## ARTICLE IX
## TERMINATION

Section 9.01   *Grounds for Termination*.  Subject to the penultimate sentence of this Article IX, this Agreement may be terminated at any time prior to the Closing:

(a)     by mutual written agreement of the Debtors and Buyer;

(b)     by either the Debtors or Buyer if the Closing shall not have been consummated on or before December 15, 2010 (the "End Date"), unless extended by mutual written agreement of all of the Parties;

(c)     by either the Debtors or Buyer if there shall be any Applicable Law that makes consummation of the Transactions illegal or otherwise prohibited or if consummation of

the Transactions would violate any nonappealable final order, decree or judgment of any Governmental Authority having competent jurisdiction;

       (d)      by Buyer if:

             (i)      the Bid Procedures Order shall not have been entered before 45 days after the date hereof  (subject to the proviso below);

             (ii)      the Bankruptcy Court shall have approved any Alternative Transaction or the Debtors shall have entered into any definitive agreement with respect to any Alternative Transaction which agreement has been approved by the Bankruptcy Court;

             (iii)      The Debtors shall have breached any of their respective representations and warranties, or shall have failed to perform or comply with any of their respective covenants and agreements, contained in this Agreement such that the condition set forth in clauses (i) and (ii) of Section 8.02(a) shall not be satisfied, and Buyer shall have given at least ten days written notice to the Debtors to cure such breaches and failures but such condition remains unsatisfied; or

             (iv)      any condition set forth in Section 8.01 or Section 8.02 shall have become incapable of being satisfied by the End Date;

*provided* that each deadline set forth in clause (i) of this Section 9.01(d) shall be subject to the Bankruptcy Court's docket, and accordingly, (A) shall be deemed extended through the date of the hearing set by the Bankruptcy Court for consideration of the applicable pleading if, after using reasonable efforts, the Debtors are unable to obtain a docket setting for such hearing prior to such deadline, (B) shall be deemed extended through the date(s) of any continued hearing set by the Bankruptcy Court for consideration of such pleading if, after using reasonable efforts, the Debtors are unable to conclude such hearing(s) prior to such deadline and (C) shall be deemed extended as required to comply with any notice periods required under the Bankruptcy Code which, as a result of any extensions described under the foregoing clauses (A) and (B), cannot be complied with prior to such deadline;

       (e)      by the Debtors if:

             (i)      the Bankruptcy Court shall have approved any Alternative Transaction or the Debtors shall have entered into any definitive agreement with respect to any Alternative Transaction which agreement has been approved by the Bankruptcy Court;

             (ii)      Buyer shall have breached any of its representations or warranties or failed to perform or comply with any of its covenants or agreements contained in this Agreement such that the condition set forth in clauses (i) and (ii) of Section 8.03(a) shall not be satisfied, and the Debtors shall have given at least ten days written notice to Buyer to cure such breaches and failures but such condition remains unsatisfied;

(iii)     any condition set forth in <u>Section 8.01</u> or <u>Section 8.03</u>  shall have become incapable of being satisfied by the End Date; or

(iv)     Buyer shall not have deposited the Escrow Amount with the Escrow Agent within one Business Day after the date of execution of this Agreement by all Parties.

(v)     permitted under <u>Section 11.04(d)</u>.

Notwithstanding the foregoing, Debtors shall not be permitted to terminate this Agreement pursuant to this <u>Section 9.01</u> if the Debtors are in breach of any of their representations and warranties or shall have failed to perform or comply with any of their covenants and agreements such that either (A) the condition to closing set forth in clauses (i) and (ii) of <u>Section 8.02(a)</u> shall not be satisfied or (B) such breach or failure to perform or comply by the Debtors is the primary cause of the occurrence of any event giving the Debtors a right to terminate this Agreement or the failure of the Closing to have occurred, and Buyer shall not be permitted to terminate this Agreement pursuant to this <u>Section 9.01</u> if Buyer is in breach of its representations and warranties or shall have failed to perform or comply with any of its covenants and agreements such that either (A) the condition to closing set forth in clauses (i) and (ii) of <u>Section 8.03(a)</u> shall not be satisfied or (B) such breach or failure to perform or comply by Buyer is the primary cause of the occurrence of any event giving Buyer a right to terminate this Agreement or the failure of the Closing to have occurred.  The Party desiring to terminate this Agreement pursuant to this <u>Section 9.01</u> (other than pursuant to <u>Section 9.01(a)</u>) shall give written notice of such termination to the other Party.

Section 9.02     *Effect of Termination*.  If this Agreement is terminated as permitted by <u>Section 9.01</u>, such termination shall be without liability of either Party (or any stockholder or Representative of such Party) to the other Party to this Agreement, except as provided in this <u>Section 9.02</u> or <u>Section 9.03</u>; *provided* that if such termination shall result from any intentional breach by either Party of any of its representations or warranties or intentional failure to perform or comply with any of its covenants or agreements contained in this Agreement, such Party shall be fully liable for any and all liabilities and damages incurred or suffered by the other Party as a result of such failure.  The provisions of <u>Section 7.05</u> and <u>Articles IX</u>, <u>XI</u> and <u>XII</u> shall survive any termination hereof pursuant to <u>Section 9.01</u>.

Section 9.03     *Break-Up Fee.*

(a)     If (i) this Agreement is terminated by (A) Buyer pursuant to and in accordance with <u>Section 9.01(d)(ii)</u> or (B) the Debtors pursuant to and in accordance with <u>Section 9.01(e)(i)</u>, (ii) Buyer shall not have breached any of its representations or warranties or failed to perform or comply with any of its covenants or agreements contained in this Agreement such that the condition set forth in clauses (i) and (ii) of <u>Section 8.03(a)</u> shall not to be satisfied and (iii) any Debtor or the Debtors consummate any Alternative Transaction at any time on or prior to the date that is 18 calendar months after the date of this Agreement, Debtors shall, subject to entry of the Bid Procedures Order, pay to Buyer a termination fee in the amount of $750,000 (the "<u>Break-Up Fee</u>"), which Break-Up Fee shall be payable upon consummation of such Alternative Transaction from proceeds of such sale.

40

(b)     Buyer agrees that, upon any termination of this Agreement under circumstances where the Break-Up Fee is payable by the Debtors pursuant to this Section 9.03 and such Break-Up Fee is paid in full to Buyer by the Debtors, Buyer shall be precluded from any other remedy against the Debtors, at law or in equity or otherwise, and Buyer shall not seek to obtain any recovery, judgment, or damages of any kind, including consequential, indirect, or punitive damages, against the Debtors or any of their respective Representatives, shareholders or Affiliates in connection with this Agreement or the Transactions and Debtors and their respective Representatives, shareholders and Affiliates shall be fully released and discharged from any liability or obligation under or resulting from this Agreement and the Transactions.

(c)     Buyer represents to the Debtors that this Section 9.03 is a condition precedent to Buyer's execution of this Agreement and is necessary to ensure that Buyer will continue to pursue its proposed acquisition of the Properties, and each Debtor acknowledges that the Break-Up Fee, if payable hereunder, (i) constitutes an actual and necessary cost and expense of preserving the Debtors' estates, within the meaning of Section 503(b) of the Bankruptcy Code, (ii) is of substantial benefit to the Debtors' estates, (iii) is reasonable and appropriate, including in light of the size and nature of the Transactions and the efforts that have been or will be expended by Buyer, notwithstanding that the proposed Transactions are subject to higher or better offers, and (iv) was negotiated by the Parties at arm's-length and in good faith.

(d)     The Debtors' obligation to pay the Break-Up Fee, as provided herein, shall (i) survive termination of this Agreement pursuant to Section 9.01(d)(ii) or Section 9.01(e)(i), (ii) be paid, in cash, on the date of consummation of the first Alternative Transaction consummated by the Debtors or within two Business Days thereafter, from the sale proceeds thereof or otherwise from the Debtors' cash balances, (iii) constitute an administrative expense Claim against any Debtor under Section 503(b) or 507(a)(2) of the Bankruptcy Code and (iv) be entitled to a "carve-out" priority status under any cash collateral or DIP financing orders approved by the Bankruptcy Court with regard to any security interest the Lenders hold in any proceeds from the sale of Lenders' collateral in such Alternative Transaction (but only to the extent unencumbered sales proceeds thereof, if any, are not available to pay the Break-Up Fee). Such right to payment from sales proceeds of an Alternative Transaction shall be *pari-passu* with any other party entitled to "carve-out" priority status in any cash collateral or DIP financing orders approved by the Bankruptcy Court.  However, provided that the Buyer is ready, willing and able to consummate the Transaction in accordance with this Agreement and the deadlines within any Bankruptcy Court order, if the Alternative Transaction includes a conveyance, assignment or transfer of ownership to the Lenders without generating proceeds, the Break-Up Fee shall be paid by Lenders upon consummation of such Alternative Transaction.

## ARTICLE X
## CASUALTY LOSS

Section 10.01 *Casualty Loss*.  As used herein, the term "Casualty Loss" means, with respect to all or any major portion of any of the Oil and Gas Interests, any destruction by fire, blowout, storm or other casualty or any taking, or pending or threatened taking, in condemnation or expropriation or under the right of eminent domain of any of the Oil and Gas Interests or portion thereof, in each case during the Closing Period.  The Debtors shall promptly notify Buyer of any Casualty Loss of which the Debtors becomes aware.  If any Casualty Loss

occurs during the Closing Period, Buyer may elect to (a) require the Debtors or the Liquidating Trust (or, at the election of the Liquidating Trustee, Newco) to retain the Oil and Gas Interests affected by the Casualty Loss as an Excluded Asset, and to reduce the Purchase Price by the Allocated Value of such Oil and Gas Interest (in which case Debtors shall retain all insurance proceeds and rights to make claims and receive proceeds under any insurance policy relating to the Casualty Loss): or (b) (i) notwithstanding such Casualty Loss, acquire all such Oil and Gas Interest and all rights to receive all unpaid insurance proceeds, claims, awards and other payments arising out of such Casualty Loss, and (ii) reduce the Purchase Price by an amount equal to all sums paid to the Debtors prior to Closing as insurance proceeds, awards or other payments arising out of such Casualty Loss and, in the case of clause (b), neither Debtors nor the Liquidating Trustee shall voluntarily compromise, settle or adjust any amounts payable by reason of any Casualty Loss without first obtaining the written consent of Buyer.

Section 10.02 *Limitations Regarding Casualty Loss*. Notwithstanding any other provision of this Agreement, (i) <u>Section 10.01</u> shall have no effect, and the Purchase Price shall not be adjusted as provided in <u>Section 10.01</u> or <u>Section 2.04(b)(ii)</u>, with respect to any Casualty Loss to an Oil and Gas Property with an Allocated Value of less than $5,000, (ii) the Purchase Price shall not be adjusted as provided in <u>Section 10.01</u> for any Casualty Loss until the Allocated Value of Oil and Gas Properties (with an Allocated Value of $5,000 or greater) sustaining a Casualty Loss during the Closing Period, in the aggregate, exceeds $50,000, and upon the Allocated Value of such Oil and Gas Properties exceeding $50,000 (the sum of the Allocated Value of such Oil and Gas Property with an Allocated Value of $5,000 or greater excluded pursuant to <u>Section 10.01(a)</u> and the amount of Purchase Price reduction calculated pursuant to <u>Section 10.01(b)(ii)</u> in excess of, in the aggregate, $50,000, the "Excess Casualty Loss") the Purchase Price shall be adjusted as provided in <u>Section 10.01</u> and <u>Section 2.04(b)(ii)</u> only to the extent of such Excess Casualty Loss and (iii) no Oil and Gas Property that does not have an Allocated Value shall be taken into account for purposes of determining any adjustment to the Purchase Price Pursuant to this <u>Article X</u> or <u>Section 2.04(b)(ii)</u>.

## ARTICLE XI
## DEFECTS; FINAL ACCOUNTING

Section 11.01 *Defects*. If Buyer intends to assert that there are one or more Defects giving rise to a claim for a reduction in the Purchase Price to determine the Adjusted Purchase Price in accordance with <u>Section 2.04(b)(iii)</u>, Buyer must deliver to the Debtors no later than by 5:00 pm on the Bid Deadline.

(a)     written notice of all Defects asserted by Buyer (a "<u>Defect Notice</u>") setting forth:

(i)     a description of each Defect;

(ii)     Buyer's determination of the dollar amount of each such Defect (an "<u>Asserted Defect Amount</u>"), which shall be a good faith estimate, based on customary industry standards, shall be determined giving effect to <u>Section 11.03</u> and shall not in any event, as to any Oil and Gas Interest, exceed the Allocated Value of such Oil and Gas Interest except with respect to Identified Claims on Oil and Gas Assets; and

(b)     all internal or external engineering or other reports (and work papers related thereto reflecting information with respect to the Oil and Gas Interests to which each asserted Defect relates) prepared by or for Buyer with respect to the Oil and Gas Interests forming the basis of any Defect asserted by Buyer in the Defect Notice or the dollar amount or value thereof (the "Defect Reports").

Upon receipt of a Defect Notice, the Debtors shall have the right and opportunity, but not the obligation, to Cure any Defect.  Any Defect that is not included in the Defect Notice shall thereafter be forever waived, any Liability related to such Defect shall be assumed by the Buyer and shall be deemed to have become a Permitted Post-Closing Lien.

Section 11.02  *Resolution of Defects.*

(a)     If Buyer delivers a Defect Notice as provided in Section 11.01, the Debtors shall have ten (10) Business Days after the Debtors' receipt of a Defect Notice to object to any Defect and any Asserted Defect Amount as set forth in the Defect Notice, which objection and assertion shall be in writing (a "Debtor Dispute Notice") and shall identify:

(i)     those Defects that the Debtors dispute exist;

(ii)     those Asserted Defect Amounts the Debtors disagree with (including any Asserted Defect Amounts attributable to a Defect that the Debtors do not dispute exists);

(iii)     those Defects that the Debtors desire to attempt to Cure; and

(iv)     those Defect Credits the Debtors desire to assert.

The Debtors shall deliver to Buyer all internal or external engineering or other reports (and work papers related thereto reflecting information with respect to the Oil and Gas Interests to which any Defect subject to an objection by the Debtors or to which any Defect Credit relates) prepared by or for the Debtors with respect to the Oil and Gas Interests forming the basis of any dispute of any item in the Defect Notice or dollar amount or value thereof asserted by the Debtors in the Debtor Dispute Notice.

(b)     If the Debtors fail to object to any Defect or Asserted Defect Amount set forth in the Defect Notice, then the Debtors shall be deemed to have acknowledged the existence of such Defect and agreed to such Asserted Defect Amount.

(c)     If the Debtors timely deliver a Debtor Dispute Notice, Buyer and the Debtors shall use good faith efforts to agree on the following, giving effect to customary industry standards and practices as would be followed and accepted by a reasonable prudent operator of Oil and Gas Interests:

(i)     the validity and amount of each Defect claim disputed by the Debtors;

(ii)     the effect of any effort by the Debtors to Cure any Defect pursuant to Section 11.04(a); and

(iii)    the validity and amount of each Defect Credit asserted by the Debtors (the dollar amount of Defect claims agreed to by Buyer and the Debtors, net of any Defect Credits agreed to by Buyer and the Debtors, is referred to as the "Agreed Defect Amount").

If Buyer and the Debtors do not agree on the validity or amount of any Defect claim disputed by the Debtors or Defect Credit asserted by the Debtors in accordance with this Section 11.02 (the "Disputed Defect Claim(s)") within five (5) Business Days after the Debtors' delivery of the Debtor Dispute Notice, either Buyer or the Debtors (or the Liquidating Trustee) may engage the Arbiter in accordance with Article XII to determine the Final Disputed Defect Amount.

Section 11.03  *Calculation of Value of Defects and Defect Credits.*

(a)     The amount or value of any Title Defect shall take into consideration, without limitation, all of the following applicable guidelines:

(i)     If, because of a Title Defect, title to a particular Oil and Gas Interest fails completely with the effect that the Debtors have no ownership interest in the relevant Oil and Gas Interest, the amount of such Title Defect shall be equal to the Allocated Value of such Oil and Gas Interest.

(ii)    If a Title Defect exists with respect to an Oil and Gas Interest listed on Schedule 11.03(a) because the Debtors own a net revenue interest in such Oil and Gas Interest that is less than the net revenue interest for such Oil and Gas Interest as set forth on Schedule 11.03(a) and there is change in the working interest owned by the Debtors in such Oil and Gas Interest directly proportional to the change in the net revenue interests, then the amount of such Title Defect shall be equal to the product of (A) the Allocated Value for such Oil and Gas Interest determined based on the net revenue interest set forth on Schedule 11.03(a) for such Oil and Gas Interest multiplied by (B) a fraction, the numerator of which is an amount equal to (x) the net revenue interest for such Oil and Gas Interest set forth on Schedule 11.03(a) minus (y) the net revenue interest for such Oil and Gas Interest agreed or determined to be owned by the Debtors and the denominator of which is the net revenue interest for such Oil and Gas Interest set forth on Schedule 11.03(a).

(iii)   If a Title Defect represents a Lien upon an Oil and Gas Interest, other than a Permitted Lien or a Lien that will be discharged or released from such Oil and Gas Interest at Closing, the amount of such Title Defect shall be the amount required to be paid to the obligee to remove such Title Defect from such Oil and Gas Property; provided that if the economic detriment to Buyer is not liquidated but can be estimated with reasonable certainty, the amount of such Title Defect shall be the sum Buyer and the Debtor mutually agree upon in writing in good faith as the present value of the adverse economic effect such Title Defect will have on such Oil and Gas Interest or, if the parties

44

cannot reach such written agreement, then such dispute shall be resolved in the manner set forth in Article XII.

(iv)    With respect to any Oil and Gas Lease on Schedule 11.03(a) with respect to which no net revenue interest is attributed on Schedule 11.03(a), if the Title Defect represents a discrepancy between (A) the actual Net Acres for any Oil and Gas Lease and (B) the Net Acres for such Oil and Gas Lease set forth on Schedule 11.03(a), then the amount of such Title Defect shall be equal to the product obtained by multiplying the positive difference between such Net Acres amount by the Allocated Value with respect to such Net Acre set forth on Schedule 11.03(a).

(v)    With respect to any Identified Claim, the amount of the Defect shall be the amount to remove, remediate or otherwise resolve, to standards as required by a Lowest Cost Response, the matter giving rise to the Identified Claim.

(b)    The amount or value of any Title Credit shall take into consideration, without limitation, the following guidelines:

(i)    if a Title Credit exists with respect to an Oil and Gas Interest listed on Schedule 11.03(a) because the Debtors own a net revenue interest in such Oil and Gas Interest that is more than the net revenue interest for such Oil and Gas Interest as set forth on Schedule 11.03(a) and there is change in the working interest owned by the Debtors in such Oil and Gas Interest directly proportional to the change in the net revenue interests, then the amount of such Title Credit shall be equal to the product of (A) the Allocated Value for such Oil and Gas Interest determined based on the net revenue interest set forth on Schedule 11.03(a) for such Oil and Gas Interest multiplied by (B) a fraction, the numerator of which is an amount equal to (x) the net revenue interest for such Oil and Gas Interest agreed or determined to be owned by the Debtors minus (y) the net revenue interest for such Oil and Gas Interest set forth on Schedule 11.03(a) and the denominator of which is the net revenue interest for such Oil and Gas Interest set forth on Schedule 11.03(a); and

(ii)    With respect to any Oil and Gas Lease on Schedule 11.03(a) with respect to which no net revenue interest is attributed on Schedule 11.03(a), if the Title Credit represents a discrepancy between (A) the actual Net Acres for any Oil and Gas Lease and (B) the Net Acres for such Oil and Gas Lease set forth on Schedule 11.03(a), then the amount of such Title Credit shall be equal to the product obtained by multiplying the positive difference between such Net Acres amount by the Allocated Value with respect to such Net Acre set forth on Schedule 11.03(a).

(c)    The amount or value of any Title Defect or Title Credit, as applicable, also shall take into account any increase or decrease, respectively, of any working interest of the Debtors in any Oil and Gas Interest from the working interest for such Oil and Gas Interest set forth on Schedule 11.03(a) (without a corresponding increase or decrease, respectively, in the associated net revenue interest).

45

(d)     If the Property subject to a Defect does not have a specific Allocated Value attributed to it but is part of a larger group of Properties to which an Allocated Value is attributed on Schedule 11.03(a), the Allocated Value of such Property shall be determined giving due consideration to (and shall not exceed) the Allocated Value attributed to the larger group of Properties of which such Property is a part and the relative value of such Property to the group of such Properties, utilizing customary industry practices where applicable.

Section 11.04  *Cure; Purchase Price Adjustment.*

(a)     The Debtors may, at their option,

(i)     With respect to each Title Defect (A) include the lesser of the dollar amount of or cost to remedy such Title Defect in the calculation of the Closing Date Defect Amount in accordance with Section 11.04(c), (B) take such action as may be necessary to Cure such Defect to Buyer's reasonable satisfaction or (C) upon the occurrence of a Defect as described in Section 11.03(a)(i) with respect to any Oil and Gas Interest or, with the consent of Buyer upon the occurrence of any other Title Defect, retain the Oil and Gas Interest (and any rights of the Debtors in or to such Property) affected by such Defect and each Contract that relates solely to such Oil and Gas Interest affected by such Defect (collectively, the "Title Affected Interest"), in which case the Title Affected Interest shall be deemed to be an Excluded Asset and the Purchase Price shall be reduced by an amount equal to the Allocated Value of such Title Affected Interest as provided in Section 11.04(c); or

(ii)     with respect to each Identified Claim (A) elect to include the cost to Cure such Identified Claim with respect to any Oil and Gas Interest that has an Allocated Value in the calculation of the Closing Date Defect Amount in accordance with Section 11.04(c), (B) subject to Section 11.04(b), take such action as may be necessary to Cure such Identified Claim with respect to any Oil and Gas Interest that has an Allocated Value to Buyer's reasonable satisfaction or (C) with the consent of Buyer (provided that the consent of Buyer shall not be required if the amount of the Identified Claim exceeds the Allocated Value of such Oil and Gas Interest), or upon the request of Buyer if the Debtors do not elect to attempt to Cure such Identified Claim pursuant to Section 11.04(a)(ii)(B) or there is no Allocated Value as to such Oil and Gas Interest, the Debtors shall retain the Oil and Gas Interest affected by such Identified Claim and each Contract that relates solely to such Oil and Gas Interest affected by such Identified Claim (collectively, the "Identified Claim Affected Interest" and, together with the Title Affected Property, the "Affected Interest"), in which case the Identified Claim Affected Property shall be deemed to be an Excluded Asset and the Purchase Price shall be reduced by an amount equal to the Allocated Value, if any, of such Identified Claim Affected Interest as provided in Section 11.04(c).

If the Debtors Cure a Defect in accordance with the clause (B) of Section 11.04(a)(i) or (ii) or there is no Allocated Value as to such Oil and Gas Interest affected by such Defect, then any Asserted Defect Amount with respect to such Defect shall be disregarded for purposes of Section 11.04(c) and otherwise in calculating the Closing Date Defect Amount and any reduction of the Purchase Price.

46

(b)    Buyer and the Debtors agree that:

(i)    If the Debtors elect to attempt to Cure any Identified Claim prior to Closing pursuant to the terms of Section 11.04(a)(ii)(B) above, and such actions cannot be accomplished prior to the Closing Date, the Debtors may notify Buyer within three Business Days prior to the Closing Date of the Debtors intention to diligently pursue and complete such actions.  In such event, the affected Oil and Gas Interest and each Contract that relates solely to such Oil and Gas Interest shall be deemed to be removed from the Properties (any such Oil and Gas Interest and related Contracts, a "Retained Remediation Interest") on the Closing Date and the Closing Date Defect Amount shall include an amount equal to the Allocated Value of such Retained Remediation Interest as provided in Section 11.04(c).

(A)    If, within one hundred eighty (180) days after the Closing Date, Debtors or the Liquidating Trustee has provided to Buyer evidence satisfactory to Buyer, in Buyer's good faith reasonable discretion, that the Identified Claim with respect to a Retained Remediation Interest has been removed, remediated and resolved at least to standards required for a Lowest Cost Response, such Oil and Gas Interest shall no longer be a Retained Remediation Interest, the Debtors or Liquidating Trust shall assign to Buyer pursuant to an Assignment and Bill of Sale in the form of Exhibit B and Buyer shall accept and pay for such Oil and Gas Interest and related Contracts in accordance with this Agreement, effective as of the Effective Time; and

(B)    As to any Retained Remediation Interests with respect to which an Identified Claim has not been Cured in accordance with Section 11.01(b)(i), Buyer, at its option may (x) offer the Debtors and the Liquidating Trust an extension of the Cure period on such terms and conditions as Buyer may, in its sole discretion, elect to impose and Debtors and the Liquidating Trustee may accept or reject such extension; (y) waive the relevant Identified Claim, in which case such Oil and Gas Interest and related Contracts shall no longer be a Retained Remediation Interest, Debtors or the Liquidating Trust shall assign to Buyer pursuant to an Assignment and Bill of Sale in the form of Exhibit B and Buyer shall accept and pay for such Oil and Gas Interest and related Contracts in accordance with this Agreement, effective as of the Effective Time and upon such assignment such waived Identified Claim shall be an Assumed Liability; or (z) eliminate the affected Retained Remediation Interest from the transactions contemplated by this Agreement, and thereupon any and all rights of Buyer in or to such Retained Remediation Interest and related Contracts shall terminate.

(ii)    If the Debtors assign any Oil and Gas Interest to Buyer pursuant to Section 11.04(b)(i)(A) or Section 11.04(b)(i)(B)(y), then such Oil and Gas Interest shall no longer be deemed an Excluded Asset and the Purchase Price reflected in the Final Settlement Statement shall be increased by an amount equal to the Allocated Value of such Retained Remediation Interest or, if the Final Settlement Statement shall have been finalized and any payment due pursuant to Section 2.10 shall have been paid at the time

47

of such assignment, (A) Buyer shall pay to the Debtors or Liquidating Trust an amount equal to the Allocated Value of such Retained Remediation Interest, subject to the adjustments required under Section 2.04, Section 2.15 and Section 2.16 with respect to such Retained Remediation Interest, for the period from the Effective Time to the date of assignment, and (B) the Reorganized Debtors shall perform and pay when due the obligations with respect to the Purchased Contracts with respect to such Retained Remediation Interest; provided the amount paid to Liquidating Trust pursuant to this Section 11.04(b)(ii) shall not exceed the lesser of (i) the Identified Claims Excess or (ii) the amount by which the Purchase Price is reduced pursuant to Section 2.04(b)(iii).

(iii)     During the period beginning the day after the Closing Date through the date any Retained Remediation Interest is purchased and sold hereunder, with respect to any such Retained Remediation Interest, the Debtors or the Liquidating Trust (or Newco) shall remain the record owner thereof.

(c)     The "Closing Date Defect Amount" shall be determined upon the earlier of (i) agreement on the final Agreed Defect Amount or (ii) if any Disputed Defect Claims are submitted to the Arbiter, the delivery by the Arbiter of a written notice setting forth the Arbiter's determination with respect to all Disputed Defect Claims submitted to the Arbiter, and shall be the sum of:

(i)     the Asserted Defect Amount of all Defects identified in the Defect Notice that the Debtors did not dispute in the Debtor Dispute Notice or attempt to Cure pursuant to Section 11.04(a)(i)(B) or Section 11.04(a)(ii)(B) prior to Closing;

(ii)     the Agreed Defect Amount of Defect and Defect Credit claims agreed to by Buyer and the Debtors;

(iii)     the Allocated Value (without duplication) of any Affected Interest and any Retained Remediation Interest; and

(iv)     the Final Disputed Defect Amount with respect to all other Defect or Defect Credit claims; provided however, that if an Arbiter is engaged to resolve any Disputed Defect Credit claim in accordance with Article XII and the Final Disputed Defect Amount  has not been determined by Closing, the Closing Date Defect Amount shall be the sum of clauses (i), (ii) and (iii) above plus the Asserted Defect Amount of all other Defects set forth in the Defect Notice without regard or adjustment for any asserted Defect Credit (the "Estimated Closing Date Defect Amount").

(d)     If (i) the Asserted Defect Amount (as set forth in the Defect Notice) would result in a Defect Excess calculated pursuant to Section 11.04(e) in excess of $8,000,000, or (ii) the Closing Date Defect Amount (or any amount that would constitute the Closing Date Defect Amount if calculated at such time in accordance with Section 11.04(c)) would result in a Defect Excess calculated pursuant to Section 11.04(e) in excess of $8,000,000, then in either case and notwithstanding any other provision of this Agreement, Debtors may terminate this Agreement without Liability or further obligation of Debtors to Buyer; provided that if Debtors provide notice to Buyer pursuant to Section 9.01(e)(v) that Debtors elect to terminate this Agreement

pursuant to this Section 11.04(d), Buyer nonetheless may elect to proceed with the Closing by giving written notice to TriDimension within two Business Days after Buyer's receipt of written notice from Debtors and reduce the Purchase Price pursuant to Section 2.04(b)(iii) only by an amount equal to the lesser of (x) the Closing Date Defect Amount determined in accordance with Section 11.04(c) or (y) $8,000,000, in which case Buyer will be deemed to have accepted all Title Defects not Cured as of Closing as Permitted Post-Closing Liens.

(e)     Notwithstanding anything to the contrary in this Article XI Buyer shall not be entitled to any adjustment to the Purchase Price for purposes of determining the Adjusted Purchase Price pursuant to Section 2.04 until and unless the Closing Date Defect Amount related to Title Defects exceeds $50,000 (the "Title Defect Deductible," and the amount of such excess over the Title Defect Deductible is referred to as the "Title Defect Excess") or the Closing Date Defect Amount related to Identified Claims exceeds $50,000 (the "Identified Claims Deductible," and the amount of such excess over the Identified Claims Deductible herein is referred to as the "Identified Claims Excess"), at which time Buyer would be entitled to an adjustment to the Purchase Price for purposes of determining the Adjusted Purchase Price pursuant to Section 2.04 in an amount equal to the sum of the Title Defect Excess and the Identified Claims Excess (such sum, the "Defect Excess").

(f)     If the Estimated Closing Date Defect Amount is used for purposes of Section 2.04(b)(iii), then upon final resolution of all Disputed Defect Claims and determination of the Final Disputed Defect Amount, if  (i) the Final Settlement Statement has not then become final, the Closing Date Defect Amount as determined giving effect to the Final Disputed Defect Amount shall be used for purposes of the Final Settlement Statement and calculation of the Adjusted Purchase Price for purposes of Section 2.08 and (giving effect to Section 11.04(d) and Section 11.04(e)) and Section 2.10 or (ii) the Final Settlement Statement has become final then, within three (3) Business Days after the determination of the Final Disputed Defect Amount, Buyer will pay to the Liquidating Trustee the amount by which the Purchase Price was reduced pursuant to Section 2.04(b)(iii) in excess of the amount by which the Purchase Price would have been reduced pursuant to Section 2.04(b)(iii) had the Final Disputed Defect Amount been used for purposes of determining the Closing Date Defect Amount (giving effect to Section 11.04(d) and Section 11.04(e)).

## ARTICLE XII
## ARBITER

Section 12.01 *Engagement of Arbiter*.  In the event the Parties are unable to reach agreement on any Disputed Defect Claim in accordance with Article XI, the Buyer and the Debtors or Liquidating Trust shall engage an attorney with at least 10 years experience in oil and gas title matters that is mutually acceptable to Buyer and the Debtors or the Liquidating Trustee (such attorney, the "Arbiter") to determine the validity or value, as applicable, of any such matter; provided, however, that if the Disputed Defect Claim is related to a disagreement with respect to an Identified Claim, the parties shall instead engage an independent environmental consulting firm mutually acceptable to Buyer and the Debtors or Liquidating Trustee to act as the Arbiter for purposes of this Section 12.01 with respect to such Identified Claims.  The Arbiter's engagement shall be limited to the determination of the validity and/or value of the matter submitted to the Arbiter as being in dispute.  In connection with the engagement of the Arbiter,

each of Buyer and the Debtors or Liquidating Trustee shall execute any engagement, indemnity, and other agreements as the Arbiter shall require as a condition to such engagement. If Buyer and the Debtors or Liquidating Trustee are unable to agree upon the designation of a Person to act as Arbiter, then Buyer or the Debtors or Liquidating Trustee, or any of them, may in writing request the Bankruptcy Court to appoint the Arbiter; provided that such person so appointed shall be an attorney with at least 10 years experience in oil and gas matters (or, in the case of an Identified Claim, an independent environmental consulting firm) with no prior material relationships with Buyer or the Debtors or their respective Affiliates and shall have experience with companies engaged in oil and gas exploration and development activities. If the Debtors elect to engage an Arbiter prior to Closing or after Closing prior to the establishment of the Liquidating Trust, any one or more of the Debtors shall be entitled and authorized to take all actions under this Article XII to be taken by the Liquidating Trustee, and upon the establishment of the Liquidating Trust, such authority shall cease and such authority thereafter shall be exercised by the Liquidating Trustee.

Section 12.02 *Arbiter's Decision and Fees*. The Arbiter shall determine the validity and/or value of the matters submitted to it within 30 days after the matter is submitted to it. If any matters are submitted to the Arbiter for resolution, (i) each of Buyer and the Debtors or Liquidating Trustee shall furnish to the Arbiter such workpapers and other documents and information relating to such matters as the Arbiter may request and are available to that party or its Affiliates and will be afforded the opportunity to present to the Arbiter any material relating to the determination of the matters in dispute and to discuss such determination with the Arbiter prior to any written notice of determination hereunder being delivered by the Arbiter, (ii) to the extent that a value has been assigned by Buyer or the Liquidating Trustee to any item that is submitted to the Arbiter, the Arbiter shall not assign a value to such item that is greater than the greatest value for such item claimed by either party or less than the smallest value for such item claimed by either Party, (iii) the determination by the Arbiter of the validity and/or value of a Disputed Defect Claim (such validity and/or value of a Disputed Defect Claim as determined by the Arbiter or by the agreement of the Debtors or, if after the establishment of the Liquidating Trust, the Liquidating Trustee and Buyer after such Disputed Defect Claims is submitted to the Arbiter, the "Final Disputed Defect Amount") as set forth in a written notice delivered to the Debtors or, if after the establishment of the Liquidating Trust the Liquidating Trustee and Buyer by the Arbiter shall be made in accordance with this Agreement and the principles set forth in Section 11.03 for determining appropriate Defect and Defect Credit amounts, as applicable, and shall be binding and conclusive on the parties and shall constitute an arbitral award that is final, binding and unappealable and upon which a judgment may be entered by a court having jurisdiction thereof and (iv) the fees and expenses of the Arbiter shall be paid by and apportioned between Buyer and the Debtors or the Liquidating Trust based on the aggregate dollar amount in dispute and the relative recovery as determined by the Arbiter of Debtors or the Liquidating Trust and Buyer, respectively (such that, by way of example, if the amount in dispute is $100 and it is resolved $70 in favor of Buyer and $30 in favor of the Debtors or the Liquidating Trust, then the Debtors or the Liquidating Trust would bear 70% of the cost and Buyer would bear 30% of the cost).

US 604317v.3

# ARTICLE XIII
# MISCELLANEOUS

Section 13.01 *Notices*. All notices, requests and other communications to any party hereunder shall be in writing (including facsimile transmission) and shall be given,

if to Buyer, to:

1111 Bagby Street
Suite 1600
Houston, TX 77002
Attention: Gerry Willinger
Facsimile No.: (713) 756-2784

with a copy to:

Jones Day
717 Texas Avenue, Suite 3300
Houston, Texas 77002
Attention: Shahid Ghauri
Facsimile No.: (832) 239-3600

if to the Debtors, to:

TriDimension Energy, L.P.
16100 Dallas Parkway, Suite 2500
Dallas, Texas 75248
Attention: Ken Gregg
Facsimile No.: (972) 267-2089

with a copy to:

Vinson & Elkins LLP
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201
Attention: Rodney L. Moore
Facsimile No.: (214) 999-7781

or such other address or facsimile number as such party may hereafter specify for the purpose by notice to the other parties hereto. All such notices, requests and other communications shall be deemed received on the date of receipt by the recipient thereof if received prior to 5:00 p.m. in the place of receipt and such day is a Business Day in the place of receipt. Otherwise, any such notice, request or communication shall be deemed not to have been received until the next succeeding Business Day in the place of receipt.

Section 13.02 *Amendments and Waivers*.

US 604317v.3

(a)     Any provision of this Agreement may be amended or waived prior to Closing if, but only if, such amendment or waiver is in writing and is signed, in the case of an amendment, by each Party to this Agreement, or in the case of a waiver, by the Party against whom the waiver is to be effective.

(b)     No failure or delay by any Party in exercising any right, power or privilege hereunder shall operate as a waiver thereof nor shall any single or partial exercise thereof preclude any other or further exercise thereof or the exercise of any other right, power or privilege.  The rights and remedies herein provided shall be cumulative and not exclusive of any rights or remedies provided by law.

Section 13.03  *Expenses*.  Except as otherwise expressly provided herein, all costs and expenses incurred in connection with this Agreement shall be paid by the Party incurring such cost or expense.

Section 13.04  *Successors and Assigns/Liquidating Trust*.

(a)     Subject to <u>Section 13.04(b)</u>, the provisions of this Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns; provided that neither Party may assign, delegate or otherwise transfer any of its rights or obligations under this Agreement, in whole or in part, by operation of law or otherwise, without the prior written consent of each other Party hereto under this Agreement, in whole or from time to time in part, to one or more of its Subsidiaries; provided that no such transfer or assignment will release Buyer of its obligations hereunder or enlarge, alter or change any obligation of any Debtors to Buyer.

(b)     All rights and obligations of Debtors under this Agreement shall accrue to and be for the benefit of an shall be exercisable by the Liquidating Trust from and after the formation of the Liquidating Trust.  Debtors will provide written notice to Buyer upon the formation of the Liquidating Trust.

Section 13.05  *Governing Law*.  THE AGREEMENT SHALL BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH THE LAWS OF THE STATE OF TEXAS, WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

Section 13.06  *Jurisdiction*.  Each party hereto agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement or the transactions contained in or contemplated by this Agreement and the Ancillary Agreements, exclusively in (a) the Bankruptcy Court so long as the Bankruptcy Cases remain open and (b) after the close of the Bankruptcy Cases or in the event that the Bankruptcy Court determines that it does not have jurisdiction, the United States District Court for the Northern District of Texas or any Texas State court sitting in Dallas (together with the Bankruptcy Court, the "<u>Chosen Courts</u>"), and solely in connection with claims arising under this Agreement or any other Transaction Document or the Transactions (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts, (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party hereto and (iv) agrees that service of process upon

52

such party in any such action or proceeding shall be effective if notice is given in accordance with <u>Section 13.01</u>.

Section 13.07 *Waiver of Jury Trial*.    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

Section 13.08 *Counterparts; Effectiveness; Third Party Beneficiaries*.    This Agreement may be signed in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument.  This Agreement shall become effective when each party hereto shall have received a counterpart hereof signed by all of the other parties hereto.  Until and unless each party has received a counterpart hereof signed by the other party hereto, this Agreement shall have no effect and no party shall have any right or obligation hereunder (whether by virtue of any other oral or written agreement or other communication).  No provision of this Agreement is intended to confer any rights, benefits, remedies, obligations or liabilities hereunder upon any Person other than the parties hereto and their respective successors and assigns prior to Closing.  From and after the establishment of the Liquidating Trust, the Liquidating Trustee shall be a third party beneficiary of the Debtors' rights under this Agreement.

Section 13.09 *Entire Agreement*.    This Agreement, the Confidentiality Agreement, the Escrow Agreement and the other Transaction Documents constitute the entire agreement between the parties with respect to the subject matter hereof and thereof and supersede all prior agreements and understandings, both oral and written, between the parties with respect to the subject matter hereof and thereof.

Section 13.10 *Severability*.    If any term, provision, covenant or restriction contained in this Agreement is held by a court of competent jurisdiction to be invalid, void or unenforceable, the remainder of the terms, provisions, covenants and restrictions of this Agreement shall remain in full force and effect and shall in no way be affected, impaired or invalidated; and in lieu of each such invalid, void or unenforceable provision there shall be added automatically as part of this Agreement a provision as similar in terms to such invalid, void or unenforceable provision as may be valid, binding and enforceable.

Section 13.11 *Specific Performance*.    The Parties hereto agree that irreparable damage would occur if any provision of this Agreement were not performed in accordance with the terms hereof and that the Parties shall be entitled to an injunction or injunctions to prevent breaches or threatened breaches of this Agreement (without posting any bond or other undertaking) or to enforce specifically the performance of the terms and provisions hereof in any federal court located in the Northern District of Texas or any Texas State court sitting in Dallas, in addition to any other remedy to which they are entitled at law or in equity.

Section 13.12 *Certain Acknowledgements and Limitations*.

(a)      Buyer confirms, acknowledges and agrees that it has had access to and has inspected the books, records and assets of the Debtors to the extent that they wish to do so prior

53

to the execution of this Agreement and that Buyer is relying entirely upon their own investigations and inspections of the books, records and assets of the Debtors, including the Properties, prior to the execution of this Agreement in entering into this Agreement and proceeding with the Transactions on the terms as set forth herein.  Buyer acknowledges and agrees that any description of Debtors, their businesses, operations and assets (including the Oil and Gas Properties) in this Agreement, the Disclosure Schedules or any other Transaction Document is for the sole purpose of identification only and no representation, warranty or condition is or will be given by Debtors in respect of the accuracy of any description.  Buyer has reviewed and has had access to all documents, records and information which it has desired to review prior to the execution of this Agreement, and have had the opportunity to ask questions, and have received sufficient answers, in connection with its decision to enter into this Agreement, and to consummate the Transactions.  In deciding to enter into this Agreement, and to consummate the Transactions, other than the express representations and warranties of the Debtors set forth in <u>Article III</u>, Buyer has relied solely upon its own knowledge, investigation, judgment and analysis and not on any disclosure or representation made by, or any duty to disclose on the part of, the Debtors or the Debtors' Representatives.

(b)     Any and all duties and obligations which any Party may have to any other Party with respect to or in connection with this Agreement, the other Transaction Documents or the Transactions are limited to those specifically set forth in this Agreement and the other Transaction Documents.  Neither the duties nor obligations of any Party, nor the rights of any Party, shall be expanded beyond the terms of this Agreement and the other Transaction Documents on the basis of any legal or equitable principle or on any other basis whatsoever.  Neither any equitable or legal principle nor any implied obligation of good faith or fair dealing nor any other matter requires any Party to incur, suffer or perform any act, condition or obligation contrary to the terms of this Agreement and the other Transaction Documents, whether or not existing and whether foreseeable or unforeseeable.  Each of the Parties acknowledges that it would be unfair, and that it does not intend, to increase any of the obligations of the other Party on the basis of any implied obligation or otherwise.

(c)     **EACH OF BUYER AND DEBTORS AGREE THAT, (A) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY THE DEBTORS THAT ARE EXPRESSLY SET FORTH IN <u>ARTICLE III</u> OF THIS AGREEMENT, NEITHER DEBTORS NOR ANY OF THEIR AFFILIATES OR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO BUYER OR TO ANY OF ITS REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND, AND (B) EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES MADE BY BUYER THAT ARE EXPRESSLY SET FORTH IN <u>ARTICLE IV</u> AND <u>SECTION 9.03(d)</u> OF THIS AGREEMENT, NEITHER BUYER NOR ANY OF ITS AFFILIATES OR REPRESENTATIVES HAVE MADE AND SHALL NOT BE DEEMED TO HAVE MADE TO DEBTORS OR TO ANY OF THEIR REPRESENTATIVES ANY REPRESENTATION OR WARRANTY OF ANY KIND.  NO PERSON HAS BEEN AUTHORIZED BY DEBTORS TO MAKE ANY REPRESENTATION OR WARRANTY RELATING TO DEBTORS OR THEIR BUSINESS OR OPERATIONS OR THE ASSETS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.  NO PERSON HAS BEEN AUTHORIZED BY BUYER TO MAKE ANY**

**REPRESENTATION OR WARRANTY RELATING TO BUYER OR ITS BUSINESSES OR OPERATIONS, OR OTHERWISE IN CONNECTION WITH THE TRANSACTIONS AND, IF MADE, SUCH REPRESENTATION OR WARRANTY MAY NOT BE RELIED UPON.**

(d)     **UNDER NO CIRCUMSTANCES SHALL ANY PARTY TO THIS AGREEMENT BE LIABLE FOR ANY SPECIAL, EXEMPLARY, PUNITIVE, REMOTE, SPECULATIVE, INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES OR LIABILITIES ARISING OUT OF ANY ACTUAL, ALLEGED OR INTENTIONAL BREACH OF THIS AGREEMENT, INCLUDING LOSS OF REVENUE OR INCOME, DAMAGES BASED ON ANY MULTIPLIER OF PROFITS OR OTHER VALUATION METRIC, COST OF CAPITAL, DIMINUTION OF VALUE OR LOSS OF BUSINESS REPUTATION OR OPPORTUNITY, AND NO CLAIM SHALL BE MADE OR AWARDED AGAINST ANY PARTY TO THIS AGREEMENT THEREFOR.**

Section 13.13 *Disclosure Schedules*.  All references to Schedules in <u>Article III</u> of this Agreement refer to Schedules contained in the Disclosure Schedule.  The information in the Disclosure Schedule constitutes exceptions, qualifications and/or supplements to particular representations or warranties of the Debtors as set forth in this Agreement.  The Disclosure Schedule shall not be construed as indicating that any disclosed information is required to be disclosed, and no disclosure shall be construed as an admission that such information is material to, outside the ordinary course of business of, or required to be disclosed by, the Debtors or constitutes a Debtor Material Adverse Effect.  Capitalized terms used in the Disclosure Schedule that are not defined therein and are defined in this Agreement shall have the meanings given to them in this Agreement.  The captions contained in the Disclosure Schedule are for the convenience of reference only, and shall not be deemed to modify or influence the interpretation of the information contained in the Disclosure Schedules or this Agreement.  The statements in each Schedule of the Disclosure Schedule qualify and relate to the corresponding provisions in the Sections of this Agreement to which they expressly refer and to each other provision in this Agreement to which the applicability of a statement or disclosure in a particular Schedule of the Disclosure Schedule is reasonably apparent on its face.

Section 13.14 *Actors Under this Agreement*.  Notwithstanding anything to the contrary in this Agreement to the extent that any action is to be taken by the Debtors under this Agreement (i) prior to the establishment of the Liquidating Trust, such action may be taken by TriDimension, acting on behalf of itself or on behalf of the other Debtors and (ii)  from and after the establishment of the Liquidating Trust, such action shall be taken by the Liquidating Trustee.

[Remainder of page intentionally left blank.]

US 604317v.3

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SR ACQUISITION I, LLC**

By: _____

Name: _Eduardo A. Sanchez_

Title: _Manager_

**TDE OPERATING GP LLC**

By: _____
    Jason Downie, Executive Vice President

**TDE SUBSIDIARY GP LLC**

By: _____
    Jason Downie, Executive Vice President

**TRIDIMENSION ENERGY, L.P.**

By:   TDE Operating GP LLC,
     its general partner

     By: _____
        Jason Downie, Executive Vice President

**AXIS E&P, LP**

By:   TDE Subsidiary GP LLC,
     its general partner

     By: _____
        Jason Downie, Executive Vice President

**IN WITNESS WHEREOF**, the parties hereto have caused this Agreement to be duly executed by their respective authorized officers as of the day and year first above written.

**SR ACQUISITION I, LLC**

By: _____
Name: _____
Title: _____


**TDE OPERATING GP LLC**

By: _____
Jason Downie, Executive Vice President


**TDE SUBSIDIARY GP LLC**

By: _____
Jason Downie, Executive Vice President


**TRIDIMENSION ENERGY, L.P.**

By:   TDE Operating GP LLC,
      its general partner

      By: _____
      Jason Downie, Executive Vice President


**AXIS E&P, LP**

By:   TDE Subsidiary GP LLC,
      its general partner

      By: _____
      Jason Downie, Executive Vice President

**AXIS MARKETING, LP**

By:    TDE Subsidiary GP LLC,
        its general partner

        By:    _____
             Jason Downie, Executive Vice President

**AXIS ONSHORE, LP**

By:    TDE Subsidiary GP LLC,
        its general partner

        By:    _____
             Jason Downie, Executive Vice President

**RAM DRILLING, LP**

By:    TDE Subsidiary GP LLC,
        its general partner

        By:    _____
             Jason Downie, Executive Vice President

**TDE PROPERTY HOLDINGS, LP**

By:    TDE Subsidiary GP LLC,
        its general partner

        By:    _____
             Jason Downie, Executive Vice President

## Exhibit A

(a)    *Definitions*.

"1933 Act" means the Securities Act of 1933, as amended, and the rules and regulations as promulgated thereunder.

"365 Contracts" means all Contracts that may be assumed by one or more Debtors pursuant to Section 365 of the Bankruptcy Code.

"Acceptable Title" means, as to each Oil and Gas Interest, such right, title and interest that, except for Permitted Post-Closing Liens and Liens from which the Properties will be released from the Properties upon the Closing pursuant to the Sale Order, (i) entitles the Debtors to receive not less than the Net Revenue Interest with respect to all of the oil, gas, and other Hydrocarbons produced, saved and marketed from or otherwise attributable to each drilling unit or Well, as the case may be, identified in Schedule 11.03(a) (subject to rounding), (ii) obligates the Debtors to pay costs and expenses attributable to the operation and development of such drilling unit or Well in an amount not greater than the Working Interest set forth in Schedule 11.03(a) (subject to rounding) other than increases in any such working interest that have a corresponding increase in the applicable Net Revenue Interest, (iii) as to each Oil and Gas Lease identified on Schedule 11.03(a) with respect to which the Net Acres covered by such Oil and Gas Lease are identified on Schedule 11.03(a), entitles the Debtors to receive not less than the Net Acres set forth in Schedule 11.03(a) as to such Oil and Gas Lease and (iv)  is free and clear of all Liens.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by, or under common control with such other Person.  For such purposes, the term "control" means the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a Person, whether through the ownership of voting securities, by contract or otherwise.

"Allocated Value" means, with respect to any Oil and Gas Property, Affected Interest or any Retained Remediation Interest, the value of Debtors' interest therein as set forth on Schedule 11.03(a).  If any Oil and Gas Property is not set forth on Schedule 11.03(a) or, if no value is set forth on Schedule 11.03(a) with respect to such Oil and Gas Property, the Allocated Value of such Oil and Gas Property shall be zero.

"Alternative Transaction" means, other than the Transactions or any transactions effected in the Ordinary Course of Business, any (i) sale, transfer or other disposition, directly or indirectly, of any assets of any Debtor (except any such sale, transfer or other disposition (A) to the extent permitted by Section 5.01(b)(ii), or (B) with respect to any Trust Assets), (ii) issuance, sale, transfer or other disposition, in each case by any Debtor, of any class of equity securities, ownership interests or voting securities of any Debtor, (iii) merger, consolidation, recapitalization, business combination or other similar transaction involving any Debtor, (iv) Chapter 11 plan of reorganization or other restructuring or reorganization for, or liquidation of, any Debtor (v) the consummation of any state court foreclosure action as to a material portion of the Properties or (vi) any Lenders' successful credit bid transaction with respect to the

Properties; *provided* that solely for purposes of clause (ii) of <u>Section 9.03(d)</u>, the term Alternative Transaction shall not include (x) any sale, transfer or other disposition, directly or indirectly, of any assets between or among any Debtors, (y) any issuance, sale, transfer or other disposition by any Debtor to any other Debtor of any class of equity securities, ownership interests or voting securities of any Debtor or (z) any merger, consolidation, recapitalization, business combination or other similar transaction solely between or among any Debtors.

"<u>Applicable Law</u>" means, with respect to any Person, any federal, state or local law (statutory, common or otherwise), constitution, ordinance, code, rule, regulation, order, injunction or judgment adopted or promulgated by a Governmental Authority that is binding upon or applicable to such Person, as amended unless expressly specified otherwise.

"<u>Assumed Liabilities</u>" means (a) all Property Expenses to the extent attributable to the Properties and related to periods from and after the Effective Time (other than Property Expenses for which the Purchase Price is reduced pursuant to <u>Section 2.04(a)</u>), (b) all other Liabilities (other than Property Expenses) under or associated with or appurtenant to the Properties, to the extent related to periods from and after the Effective Time, including without limitation all such Liabilities arising out of the operation and/or ownership of the Properties from and after the Effective Time, (c) all Liabilities under, associated with or appurtenant to the Properties with respect to Environmental Claims whether arising on, before or after the Effective Time, and (d) costs, expenses and Liabilities attributable to obligations to plug Wells included in the Properties, dismantle or decommission facilities, close pits and restore the surface around such Wells, facilities and pits; *provided* that Assumed Liabilities shall not include (A) Debtor Taxes, (B) Cure Costs, except as required to be paid by Buyer pursuant to the last sentence of <u>Section 5.04(b)</u>, (C) any Identified Claims identified in the Defect Notice (except to the extent provided in Section 11.04) or (D) any Liabilities discharged or from which the Properties are otherwise released as of the Closing in accordance with the Sale Order, each of which (A), (B), (C) and (D) shall be deemed an Excluded Liability.

"<u>Bankruptcy Code</u>" means title 11 of the United States Code, as amended.

"<u>Bankruptcy Court</u>" means the United States Bankruptcy Court for the Northern District of Texas or any other court having jurisdiction over the Bankruptcy Cases from time to time.

"<u>Bid Deadline</u>" has the meaning set forth in the Bid Procedures.

"<u>Bid Procedures</u>" means the Bid Procedures, substantially in the form attached as <u>Exhibit A</u> to the Bid Procedures Order, with such changes, if any, as shall be reasonably acceptable in form and substance to Buyer and the Debtors.

"<u>Bid Procedures Order</u>" means an order of the Bankruptcy Court, substantially in the form attached hereto as <u>Exhibit G</u>, with such changes, if any, as shall be reasonably acceptable in form and substance to Buyer and the Debtors.

"<u>Business Day</u>" means any day, excluding Saturdays, Sundays or "legal holidays" (as referenced in Bankruptcy Rule 9006(a)), on which commercial banks are open for business in Dallas, Texas.

A - 2

"Buyer Material Adverse Effect" means a material adverse effect on the ability of Buyer to consummate the Transactions or to perform its obligations hereunder and under the other Transaction Documents to which it is or will be a party.

"Buyer's Knowledge" means the actual knowledge of the executive officers of Buyer.

"Buyer Operator Designee" means an Affiliate of Buyer designated in writing by Buyer no later than the Bid Deadline to be the operator under each Operated JOA as of immediately following the Closing, which Affiliate designee must satisfy all requirements under Applicable Law and the applicable Operated JOA to act in the capacity of operator with respect to each such Operated JOA.

"Cash Deposits" means the total amount of any cash and negotiable instruments of the Debtors that constitute deposits securing any Existing Letters of Credit outstanding as of the Closing Date.

"Claim" means a claim against any of the Debtors as defined in Bankruptcy Code § 101(5).

"Closing Accounts Receivable" means all accounts receivable (including, without limitation, JIB Receivables) of the Debtors, determined in accordance with GAAP, as of 11:59 p.m. on the date immediately prior to the Effective Time for which any balance remains payable as of 11:59 p.m. on the date immediately prior to the Closing Date.

"Closing Cash Balance" means all cash and cash equivalents of the Debtors, determined in accordance with GAAP, as of 11:59 p.m. on the date immediately prior to the Closing Date, excluding all Prepaid JOA Funds, all Suspense Funds, all Withholding Taxes and all Cash Deposits included in the Properties.

"Closing Date" means the date of the Closing.

"Closing Period" means the period commencing at the Effective Time and ending at 7:00 a.m., central time, on the Closing Date.

"Committee" means the Official Committee of Unsecured Creditors appointed in one or more of the Bankruptcy Cases pursuant to Bankruptcy Code § 1102(a).

"Confidentiality Agreement" means the Confidentiality Agreement between TriDimension and Buyer dated April 29, 2010.

"Contract" means any contract, agreement, lease, license, indenture, note, bond, sale and purchase order, instrument or other commitment, whether oral or written (including any amendments or modifications thereto).

"Cure" means correction of a condition constituting a Defect in a manner such that a reasonable person in the oil and gas industry would no longer consider the condition, as corrected, to be a Defect that is reasonably satisfactory to Buyer.

A - 3

"Cure Costs" means, with respect to any Desired 365 Contract, any and all amounts necessary to cure all defaults, if any, and to pay all losses that have resulted from defaults under such Desired 365 Contract.

"Debtor Material Adverse Effect" means a material adverse effect on (i) the ability of the Debtors to produce Hydrocarbons from the Oil and Gas Interests listed on Annex A and Annex B, taken as a whole, in the Ordinary Course of Business, (ii) the Debtors' entitlement to receive revenues (net to the Debtors' interest) from Hydrocarbons produced from the Oil and Gas Interests listed on Annex A and Annex B, as applicable, or (iii) the ability of the Debtors to perform their respective obligations under the Transaction Documents or consummate the Transactions; *provided* that any such material adverse effect that results primarily from any of the following matters shall not be taken into account in determining whether a material adverse effect has occurred under clause (i) or clause (ii) of this definition: (A) changes in financial or securities markets generally, (B) changes in general economic conditions in the United States, (C) changes in the market price of oil and natural gas, (D) matters disclosed on, and facts and circumstances that gave rise to the matters disclosed on, Disclosure Schedule 3.11 (E) actions taken or omissions made after the date of this Agreement as permitted under this Agreement or with the express written consent of Buyer and (F) Defects, which shall be treated exclusively as set forth in Article XI.

"Debtor Tax Period" means any Tax period ending before the Effective Time.

"Debtors' Knowledge" means the actual knowledge of any of the following individuals: Ken Gregg and Scott O'Neal.

"Defect" means any condition, effect or change, other than a Permitted Lien, which, in Buyer's reasonable, good faith opinion based on customary industry standards,

    (a)    causes Debtors right, title or interest in and to an Oil and Gas Property to be less than Acceptable Title to such Oil and Gas Property (a "Title Defect"); or

    (b)    results in an Identified Claim;

provided that (i) no Title Defect or Identified Claim that is not reasonably expected to have a value or Liability, as applicable, of $5,000 or more shall constitute a Defect for purposes of this Agreement, (ii) the term "Defect" shall not be deemed to exist based on lack of information in Debtor's files, and (iii) if an Allocated Value has not been given with respect to an Oil and Gas Property or if the Allocated Value for any Oil and Gas Property is zero, Debtors shall be conclusively presumed to have Acceptable Title to such Oil and Gas Properties for purposes of this Agreement.

"Defect Credit" means the dollar value of any increase in revenues, reduction in liabilities, or other economic benefit affecting any Oil and Gas Property from and after the Effective Time resulting from any event, circumstance or occurrence giving rise to any Defect or which (A) as to any drilling unit or Well set forth on Schedule 11.03(a), entitles the Debtors to receive more than the interest set forth on Schedule 11.03(a) as the "Net Revenue Interest" or "NRI" with respect to Hydrocarbons produced, saved and marketed from or otherwise attributable to such drilling unit or Well, as the case may be, (subject to rounding), (B) obligates

the Debtors to pay costs and expenses attributable to the operation and development of such drilling unit or Well in an amount less than the "Working Interest" or "WI" set forth in Schedule 11.03(a) without a corresponding reduction in the applicable net revenue interest or (C) as to any Oil and Gas Lease set forth on Schedule 11.03(a), entitles the Debtors to receive more than the Net Acres set forth in Schedule 11.03(a) as to such Oil and Gas Lease.

"Disclosure Schedule" means the letter dated the date hereof, executed by the Debtors and delivered to Buyer on the date hereof in connection with the execution and delivery of this Agreement, which letter is identified therein as the Disclosure Schedule for purposes of this Agreement.

"Effective Time" means 12:01 a.m., central time, on November 1, 2010.

"Environmental Claim" means any environmental, health, and/or safety Proceeding, pending or threatened under any Environmental Law and any obligation to effect any cleanup or remediation under any Environmental Law and any Liability associated with or arising therefrom.

"Environmental Laws" means any Applicable Law or any agreement with any Governmental Authority relating to human health and safety, the environment or to pollutants, contaminants, wastes, chemicals, or toxic or other hazardous substances.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended.

"ERISA Affiliate" of any entity means any other entity which, together with such entity, would be treated as a single employer under Section 414 of the Code.

"Escrow Agreement" means the Escrow Agreement dated as of the date hereof among TriDimension, Buyer and the Escrow Agent, in the form attached hereto as Exhibit H.

"Final Order" means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction with respect to the subject matter, (i) which has not been reversed, stayed, modified, amended, enjoined, set aside, annulled or suspended and (ii) with respect to which no stay shall have been issued in connection with any notice of appeal or petition for certiorari filed within any deadline provided by Applicable Law.

"GAAP" means generally accepted accounting principles in the United States.

"Gap Period JIB Receivable" shall mean a receivable for expenses, including capital expenditures, attributable to Operated Properties paid by Debtors on account of Third Party working interest owners prior to Closing to the extent related to periods from and after the Effective Time.

"Governmental Authority" means any transnational, domestic or foreign federal, state or local, governmental unit, authority, department, court, agency or official, including any political subdivision thereof, or any tribal authority.

"<u>Hazardous Substances</u>" means any pollutant, contaminant, waste or chemical or any toxic, radioactive, ignitable, corrosive, reactive or otherwise hazardous substance, waste or material or any substance, waste or material having any constituent elements displaying any of the foregoing characteristics, including petroleum, its derivatives, by-products and other Hydrocarbons, and any substance, waste or material regulated under any Environmental Law.

"<u>Hydrocarbons</u>" means crude oil, natural gas, condensate, casinghead gas, drip gasoline, natural gasoline, petroleum, natural gas liquids, products, liquids and other hydrocarbons and other minerals and materials of every kind and description.

"<u>Identified Claim</u>" means an Environmental Claim with respect to any of the Oil and Gas Interests which is reasonably expected to diminish the value of any Oil and Gas Interest from and after the Effective Time or materially adversely affect the ability of the Debtors (or, after the Closing, Buyer) to own, operate or maintain such Oil and Gas Interest from and after Closing in the ordinary course of business consistent with past practice of the Debtors.

"<u>Imbalance</u>" means any imbalance between (i) the quantity of Hydrocarbons produced from any Oil and Gas Interest and allocated to a Person from time to time and the share of such production to which such Person is actually entitled by virtue of its ownership interest in such Oil and Gas Interest, (ii) the quantity of Hydrocarbons produced from or allocable to the Oil and Gas Interests delivered, and the quantity of such Hydrocarbons received, in each case for gathering, transportation, or storage for the account of a Person, (iii) the quantity of Hydrocarbons produced from or allocable to the Oil and Gas Interests delivered for processing or refining, and the quantity of products or residue Hydrocarbons redelivered, in each case for the account of a Person, and (iv) other similar types of Hydrocarbon-related imbalances attributable to the Oil and Gas Interests.

"<u>Intellectual Property</u>" means inventions and invention disclosures; patents and patent applications (including statutory invention registrations); trademarks, service marks, logos, trade dress, trade names, Web addresses, domain names, and other indicia of commercial source or origin, including registrations and applications for registration thereof, and goodwill associated with any of the foregoing; copyrights, including registrations and applications for registration thereof; trade secrets, know-how, software, formulae, customer lists, data (including seismic data), processes, protocols, specifications, analyses, plans, techniques, and other forms of technology (whether or not embodied in any tangible form and including all tangible embodiments of the foregoing, such as notebooks, samples, studies and summaries); and other proprietary rights and intellectual property.

"<u>JIB Receivable</u>" means shall mean a receivable for expenses, including capital expenditures, attributable to Operated Properties paid by the Debtors on account of Third Party working interest owners.

"<u>Lenders</u>" means, collectively, Amegy Bank, N.A., BMO Capital Markets Financing, Inc. and Union Bank, N.A.

"Liability" means any direct or indirect liability, indebtedness, obligation, commitment, expense, loss, claim, deficiency, or guaranty of or by any Person of any types, whether known or unknown, and whether accrued, absolute, contingent, matured or unmatured.

"Lien" means, with respect to any property or asset, any mortgage, lien, interest pledge, charge, security interest, or encumbrance, mechanics' lien, materialman's lien, statutory lien or right, and other consensual or non-consensual lien, whenever granted and including without limitation those charges or interests in property within the meaning of "lien" under Bankruptcy Code § 101(37).

"Liquidating Trust" means a Liquidating Trust as may be established with respect to the Debtors' estates in conjunction with the Bankruptcy Case.

"Liquidating Trust Agreement" means the Liquidating Trust Agreement governing the Liquidating Trust.

"Liquidating Trustee" means the Trustees of the Liquidating Trust.

"Lowest Cost Response" means the response or corrective action that addresses the condition present at the lowest cost required or allowed under Environmental Law (considered as a whole, taking into consideration any material negative impact such response may have on the operations of the relevant assets and any potential material additional costs or liabilities that may likely arise as a result of such response), such as the use of risk based closure combined with institutional controls, as compared to any other response that is required or allowed under Environmental Law, but not such a response or corrective action that would be inconsistent with what a reasonably prudent operator would do or that would otherwise violate good oilfield practice.

"Net Acre" means, as computed separately with respect to each Oil and Gas Lease, (a) the number of gross acres in the lands covered by such Oil and Gas Lease, multiplied by (b) the undivided percentage interest in oil, gas or other Hydrocarbons covered by such Oil and Gas Lease in such lands, multiplied by (c) the applicable Debtors' working interest in such Oil and Gas Lease; provided, that if items (b) and/or (c) vary as to different areas of such lands (including depths) covered by such Oil and Gas Lease, a separate calculation shall be done for each such area as if it were a separate Oil and Gas Lease.

"Newco" means a Delaware limited liability company as may be formed by the Liquidating Trust to hold certain Excluded Assets.

"Non-Income Tax" means any Tax other than U.S. federal income tax and income tax imposed by any state or subdivision of the U.S., but including any property tax, franchise tax (including the Texas Margin Tax), severance tax, production tax or sales and use tax.

"Non-Operated Oil and Gas Interests" has the meaning set forth in the definition of Property Expenses.

"Oil and Gas Interests" means (a) direct and indirect interests in and rights with respect to oil, gas, mineral and related properties and assets of any kind or nature, direct or indirect,

including working, leasehold and mineral interests and operating rights and royalties, overriding royalties, production payments, net profit interests and other non-working interests and non-operating interests; (b) all interests in rights with respect to Hydrocarbons and other minerals or revenues therefrom, all Contracts in connection therewith and claims and rights thereto (including all Oil and Gas Leases unitization and pooling agreements and orders, division orders, transfer orders, mineral deeds, royalty deeds, oil and gas sales, exchange and processing contracts and agreements, and in each case, interests thereunder), surface interests, fee interests, reversionary interests, reservations, and concessions; (c) all easements, rights of way, licenses, permits, leases, and other interests associated with, appurtenant to, or necessary for the operation of any of the foregoing; and (d) all interests in equipment and machinery (including Wells, Well equipment and machinery), oil and gas production, gathering, transmission, treating, processing, and storage facilities (including tanks, tank batteries, pipelines, and gathering systems), pumps, water plants, electric plants, gasoline and gas processing plants, refineries, and other tangible personal property and fixtures associated with, appurtenant to, or necessary for the operation of any of the foregoing, in each case in which any Debtor has an ownership interest.

"Oil and Gas Lease" means any Contract pursuant to which the Debtors lease, have rights of ingress, egress, easement or passage, or otherwise have rights in or access to surface or subsurface real property and/or the Hydrocarbons or other minerals located thereon or thereunder for the purpose or use of exploration, drilling, production, gathering or transportation of Hydrocarbons.

"Ordinary Course of Business" means the ordinary course of business of the Debtors, consistent in all material respects with past custom and practice of the Debtors. Without limiting the effect of the foregoing, the term "Ordinary Course of Business" as used herein shall be no broader than the term "ordinary course of business" as used in Section 363 of the Bankruptcy Code.

"Organizational Documents" means, with respect to any Person, the certificate or articles of incorporation, bylaws, certificate of formation or organization, partnership agreement, operating agreement, limited liability company agreement or any other similar organizational documents of such Person.

"Permits" means all material governmental (whether federal, state or local) permits, licenses, franchises, certificates, approvals or other similar authorizations.

"Permitted Liens" means:

(a)     easements, restrictive covenants, servitudes, permits, surface leases and other rights with respect to surface operations, and rights-of-way on, over or in respect of any of the Oil and Gas Interests that, singularly or in the aggregate, do not materially interfere with the ownership or operation of the affected Oil and Gas Interests for the production of Hydrocarbons and which are of a nature that would be reasonably acceptable to a prudent owner or operator of oil and gas properties;

A - 8

(b)     all rights reserved to or vested in any Governmental Authority to control or regulate the Oil and Gas Interests and all obligations and duties under all Applicable Laws or under any Permit issued by any Governmental Authority;

(c)     the terms, conditions, restrictions, exceptions, reservations, limitations and other matters contained in the leases, Contracts, instruments and documents which create or reserve to the Debtors their interests in any of the Oil and Gas Interests disclosed on Disclosure Schedule 3.05(a);

(d)     Liens for Taxes or other governmental fees not yet due and payable or being contested in good faith;

(e)     mechanic's, materialmen's, carrier's, supplier's, vendor's, repairer's or other similar statutory Liens arising in the ordinary course of business securing amounts that are not delinquent or are being contested in good faith;

(f)     utility easements, restrictive covenants, zoning, entitlement, building, subdivision, environmental and other similar restrictions that, singularly or in the aggregate, do not materially interfere with the operation of the Oil and Gas Interests for the production of Hydrocarbons and which are of a nature that would be reasonably acceptable to a prudent owner or operator of oil and gas properties;

(g)     Liens created by Buyer or any of their respective successors or assigns;

(h)     inchoate liens or security interests created pursuant to LSA-R.S. 9:4882, Miss. Code Ann. § 53-3-41 and similar statutory provisions in favor of working interest owners in jurisdictions where the Oil and Gas Interests are located;

(i)     all lessors' royalties, overriding royalties, net profits interests, carried interests, and reversionary interests, and all other Liens, rights to take in kind and any other burden or right, provided for in any Oil and Gas Lease or in any other Contract or instrument disclosed on Disclosure Schedule 3.05(a) or otherwise reflected on Schedule 11.03(a);

(j)     any liens, rights to take in kind and any other burden contained in or created pursuant to any Oil and Gas Lease or in any other Contract or instrument disclosed on Disclosure Schedule 3.05(a) or otherwise reflected on Schedule 11.03(a);

(k)     liens on the Cash Deposits in favor of the issuer of the Existing Letters of Credit to secure advances and related obligations under the Existing Letters of Credit.

(l)     any other Liens that do not, individually or in the aggregate, materially interfere with the ownership or operation of the Oil and Gas Interests subject thereto or affected thereby for the production of Hydrocarbons (as currently operated) and that would be acceptable by a prudent owner or operator of oil and gas properties.

Notwithstanding the foregoing or anything to the contrary in Section 13.13 or in the Disclosure Schedules or introduction thereto, Permitted Liens shall not include any matters

referenced in the Disclosure Schedules except to the extent expressly set forth in a Disclosure Schedule (or portion thereof) specified in this definition.

"Permitted Post-Closing Liens" means, in the case of any Debtor, (a) any Liens described in the definition of Permitted Liens, including any Liens securing the Debtors' obligations under Desired 365 Contacts, but excluding any Liens that (i) secure Claims that Buyer has no obligation to satisfy pursuant to this Agreement or any other Transaction Document or (ii) secure claims from which the Properties are released as of Closing pursuant to the Sale Order, and (b) any Liens disclosed on Schedule 11.03(b).

"Person" means any person, entity or Governmental Authority of any nature whatsoever, specifically including an individual, firm, company, corporation, partnership, trust, joint venture, association, joint stock company, limited liability company, estate, unincorporated organization or other entity or organization.

"Principal Catahoula Assets" means each of the following assets as described on Schedule 2.17: (a) Deck Barge – 1969 Conrad 100 x 30 x 6 Deck Barge; (b) Deck Barge – 12 x 30 Deck Barge (no power); (c) Drilling Barge – 80 x 100 Drilling Barge, Miss Mullins, w/ Rig; (d) Drilling Rig – Drilling Rig on Barge and (e) Service Barge – 30 x 110 Self-propelled Service.

"Proceeding" means any action, claim, demand, audit, hearing, complaint, investigation, litigation, or suit commenced, brought, conducted, or heard by or before any Governmental Authority.

"Property Expenses" means all expenses, charges, capital expenses, joint interest billings, lease operating expenses, lease rental and maintenance costs, exploration expenses, production expenses, development expenses, drilling expenses, workover expenses, geological, geophysical and any other exploration or development expenditures charged or incurred under applicable operating agreements or other Contracts that are attributable to the ownership, maintenance and operation of the Debtors' interest in the Oil and Gas Interests during the period in question, and shall expressly include without limitation:

(a)     all capital expenditures, including drilling costs, reworking costs, shut-in royalties and all other capital expenditures (collectively, for purposes of this clause (a), "capital expenditures") incurred in connection with the development, exploration, operation and maintenance of the Oil and Gas Interests during the Closing Period;

(b)     with respect to any of the Oil and Gas Interests that are subject to operating agreements with Third Parties (that are not the Debtors) acting as the operator ("Non-Operated Oil and Gas Interests"), all overhead charges charged under such operating agreements;

(c)     amounts paid under the Purchased Contracts; and

(d)     overhead charges charged by Third Parties under applicable operating agreements with respect to Oil and Gas Interests not operated by the Debtors or their Affiliates (but not overhead of Debtors allocated to the Operated Properties, which is addressed in Section 2.04(a)(iv));

provided, that Property Expense shall not include any expenses related to curing any Defect or repairing or replacing any Casualty Loss.

"Representatives" means, with respect to any Person, the officers, directors, employees, members, managers, partners, investment bankers, attorneys, accountants, consultants or other advisors, agents or representatives of such Person, when acting in such capacity on behalf of such Person.

"Royalties" means royalties, overriding royalties, or other interest owners' revenues or proceeds attributable to the sale of Hydrocarbons.

"Sale Hearing" has the meaning set forth in the Bid Procedures.

"Sale Order" means an order or orders of the Bankruptcy Court in the form and containing such terms, to the extent such terms pertain to the transactions contemplated by this Agreement, as are reasonably acceptable to Buyer and the Debtors, approving this Agreement and all of the terms and conditions hereof, and approving and authorizing the Debtors to consummate the Transactions.

"SEC" means the Securities and Exchange Commission.

"Straddle Tax Period" means any Tax period beginning before and ending on or after the Effective Time.

"Subsidiary" means, with respect to any Person, any entity of which securities or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at any time directly or indirectly owned by such Person.

"Successful Bidder" has the meaning set forth in the Bid Procedures.

"Tax" means (i) any tax, governmental fee or other like assessment or charge of any kind whatsoever (including withholding on amounts paid to or by any Person), together with any interest, penalty, addition to tax or additional amount imposed by any Governmental Authority (a "Taxing Authority") responsible for the imposition of any such tax (domestic or foreign), and any liability for any of the foregoing as transferee, (ii) in the case of any Debtor, liability for the payment of any amount of the type described in clause (i) as a result of being or having been before the Closing Date a member of an affiliated, consolidated, combined or unitary group, or a party to any agreement or arrangement, as a result of which liability of any Debtor to a Taxing Authority is determined or taken into account with reference to the activities of any other Person, and (iii) liability of any Debtor for the payment of any amount of the type described in (i) or (ii) as a result of any existing express or implied agreement or arrangement (including an indemnification agreement or arrangement).

"Tax Refund" means any refund, credit, or offset of Taxes, including, but not limited to, any refund, credit, or offset of Taxes attributable to (i) any severance, production or other Taxes imposed upon or measured by the production of Hydrocarbons or the receipt of proceeds

therefrom, (ii) the exemption from any state production Taxes for horizontally drilled wells and (iii) property or ad valorem Taxes.

"<u>Tax Return</u>" means any return, declaration, report, claim for refund, or information return or statement relating to Taxes, including any schedule or attachment thereto, and including any amendment thereof.

"<u>Taxing Authority</u>" has the meaning set forth in the definition of Tax.

"<u>Title Defect</u>" has the meaning set forth in the definition of Defect.

"<u>Third Party</u>" means any Person other than a Party or its Affiliates.

"<u>Transaction Documents</u>" means this Agreement, the Letter of Credit, the Assignment and Bill of Sale, the Assumption Agreement, the Liquidating Trust Agreement, any other agreement between or among Buyer and any Debtor that expressly states that it constitutes a Transaction Document for purposes of this Agreement, and all other agreements, documents and instruments entered into by Buyer, on the one hand, and a Debtor, on the other hand, as of or after the date hereof and at or prior to Closing in connection with the transactions contemplated hereby (as each such document, agreement and instrument may be amended, supplemented or modified).

"<u>Transactions</u>" means the transactions contemplated by this Agreement and the other Transaction Documents, including the purchase and sale of Properties for the Purchase Price and the assumption of the Assumed Liabilities in accordance with this Agreement and the other Transaction Documents.

"<u>Well</u>" means a well for the purpose of discovering or producing Hydrocarbons or disposing of fluids produced in connection with the production of Hydrocarbons.

"<u>Withholding Taxes</u>" means all applicable federal, state or local income taxes and applicable employment (social security, unemployment insurance and Medicare) and other withholding obligations, in each case withheld from employees of the Debtors prior to Closing.

(b)      Each of the following terms is defined in the Section set forth opposite such term:

| Term | Section |
|---|---|
| Accounts Receivable Collections | 2.08(c) |
| Accounts Receivable Setoffs | 2.08(b) |
| Acquisition | 7.02(b) |
| Adjusted Purchase Price | 2.03 |
| Affected Interest | 11.04(a)(i)(C) |
| Agreed Defect Amount | 11.02(c)(iii) |
| Agreement | Preamble |
| Allocation | 6.02(f) |
| Alternative Bidder | 5.02(c) |
| Ancillary Contract | 2.14(i) |
| Arbiter | 12.01 |

US 604317v.3

| Term | Section |
|------|---------|
| Asserted Defect Amount | 11.01(a)(ii) |
| Assignment and Bill of Sale | 2.05(c)(i) |
| Assumption Agreement | 2.05(c)(iv) |
| Audit Fees | 2.09(f) |
| Axis E&P | Preamble |
| Axis Marketing | Preamble |
| Axis Onshore | Preamble |
| Bankruptcy Cases | Recitals |
| Bid Procedures Motion | 7.02(a) |
| Break-Up Fee | 9.03(a)(iii) |
| Buyer | Preamble |
| Casualty Loss | 10.01 |
| Chosen Courts | 13.06(b) |
| Closing | 2.05 |
| Closing Accounts Receivables Statement | 2.08 |
| Closing Amount Shortfall | 2.10(b) |
| Closing Date Adjusted Purchase Price | 2.04(d)(i) |
| Closing Date Defect Amount | 11.04(c) |
| Closing Statement | 2.04(d)(i) |
| Code | 3.10(b) |
| Commitment Letter | 4.06 |
| Court Order | 2.12(c)(ii) |
| Data | 2.01(f)(iii) |
| Debtor | Preamble |
| Debtors | Preamble |
| Debtor Dispute Notice | 11.02(a) |
| Debtors' Substances | 2.02(d) |
| Defect Excess | 11.04(e) |
| Defect Notice | 11.01(a) |
| Defect Reports | 11.01(b) |
| Desired 365 Contracts | 5.04(b) |
| Disputed Defect Claim(s) | 11.02(c) |
| Effective Time Tank Oil | 2.04(a)(iii) |
| End Date | 9.01(b) |
| Equitable Limitations | 3.03 |
| Escrow Agent | 12.02(a) |
| Escrow Amount | 12.02(a) |
| Escrow Cash Shortfall | 12.10(b) |
| Escrow Funds | 12.02(a) |
| Estimated Closing Date Defect Amount | 11.04(c)(iv) |
| Excluded Assets | 2.02 |
| Excluded Liabilities | 2.05(b) |
| Existing Letters of Credit | 3.17 |
| FERC | 3.13 |
| Final Disputed Defect Amount | 12.02(iii) |

| Term | Section |
|------|---------|
| Final Settlement Statement | 2.09(a) |
| Identified Claim Affected Interest | 11.04(a)(ii)(C) |
| Identified Claims Deductible | 11.04(e) |
| Identified Claims Excess | 11.04(e) |
| Joint Direction | 2.12(c) |
| Leases | 2.01(a) |
| Letter of Credit | 2.12(a) |
| Material Contract | 3.05(a) |
| NGA | 3.13 |
| Objection Notice | 2.09(c) |
| Oil and Gas Properties | 2.01(a) |
| Operated JOAs | 5.03(a) |
| Operated Properties | 5.01(a) |
| Operating GP | Preamble |
| Party | Preamble |
| Parties | Preamble |
| Petition Date | Recitals |
| Pooling Order | 5.03(b) |
| Prepaid JOA Funds | 2.06 |
| Properties | 2.01(a) |
| Prorated Expense Items | 2.04(c)(ii) |
| Purchase Price | 2.03 |
| Purchased Contracts | 2.01(g) |
| Ram Drilling | Preamble |
| Referee | 2.09(d) |
| Rejection Amount | 5.04(a) |
| Remaining Accounts Receivables | 2.08(d)(i)(A) |
| Retained Remediation Interest | 11.04(b)(i) |
| Sale Motion | 7.02(b) |
| Subsidiary GP | Preamble |
| Suspense Funds | 2.07 |
| Tax Proceeding | 7.07 |
| TDE Property Holdings | Preamble |
| 365 Notice Date | 5.04(a) |
| 365 Schedule | 5.04(a) |
| Title Affected Interest | 11.04(a)(i)(C) |
| Title Defect Deductible | 11.04(e) |
| Title Defect Excess | 11.04(e) |
| TriDimension | Preamble |

(c)     The words "hereof", "herein" and "hereunder" and words of like import used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The headings and captions herein are included for convenience of reference only and shall be ignored in the construction or interpretation hereof. References to Articles, Sections, Exhibits and Schedules are to Articles, Sections,

US 604317v.3

Exhibits and Schedules of this Agreement unless otherwise specified. All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Exhibit or Schedule but not otherwise defined therein and defined herein, shall have the meaning as defined in this Agreement. Any singular term in this Agreement shall be deemed to include the plural, and any plural term the singular. Whenever the words "include", "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation", whether or not they are in fact followed by those words or words of like import. "Writing", "written" and comparable terms refer to printing, typing and other means of reproducing words (including electronic media) in a visible form. References to any Person include the successors and permitted assigns of that Person. References from or through any date mean, unless otherwise specified, from and including or through and including, respectively. References to "law", "laws" or to a particular statute or law shall be deemed also to include any and all Applicable Law. The word "or" will have the inclusive meaning represented by the phrase "and/or." The phrase "and/or" when used in a conjunctive phrase, shall mean any one or more of the Persons specified in or the existence or occurrence of any one or more of the events, conditions or circumstances set forth in that phrase; provided, however, that when used to describe the obligation of one or more Persons to do any act, it shall mean that the obligation is the obligation of each of the Persons but that it may be satisfied by performance by any one or more of them. "Shall" and "will" have equal force and effect. The Parties and their counsel have reviewed the provisions of this Agreement and have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement. All references to immediately available funds or dollar amounts contained in this Agreement shall mean United States dollars. THE PARTIES AGREE THAT THE BOLD AND/OR CAPITALIZED LETTERS IN THIS AGREEMENT CONSTITUTE CONSPICUOUS LEGENDS.