Kenneth Stohner, Jr.
State Bar No. 19263700
Jackson Walker, LLP
901 Main Street, Suite 6000
Dallas, TX 75202
(214) 953-6000
(214) 953-5822 – Fax

ATTORNEYS FOR QFH HOLDINGS, LLC

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | Case No. 10-33565-sgj-11 |
| TRIDIMENSION ENERGY, L.P., *et al.,* | § | |
| | § | Chapter 11 |
| | § | |
| | § | Jointly Administered |
| Debtors. | § | |

**OBJECTION TO (1) MOTION TO (A) APPROVE THE PROCEDURES FOR THE SOLICITATION OF OFFERS; (B) APPROVE THE FORM AND MANNER OF NOTICE; (C) APPROVE PROCEDURES FOR DETERMINING CURE AMOUNTS FOR EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (D) APPROVE DHTE BID PROTECTIONS AND PROCEDURES; AND (E) APPROVE A BREAK-UP FEE IN CONNECTION WITH THE TRANSACTION CONTEMPLATED BY THE PURCHASE AGREEMENT AND (2) MOTION FOR AN ORDER AUTHORIZING (A) THE SALE OF THE DEBTORS' RIGHT, TITLE AND INTEREST IN, TO AND UNDER SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF CLAIMS, ENCUMBRANCES, LIENS, AND INTEREST, (B) THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES AND (C) RELATED RELIEF**

NOW COMES QF Holdings, LLC ("QFH"), as owner of the claim of Ace Family Hardware and as a potential purchaser, by and through its attorneys, Eichenbaum, Liles & Heister, PA and Jackson Walker L.L.P., and in support of its objection to the Motions would respectfully state the following:

# I.
## Background Facts

1. On May 21, 2010, the Debtors each filed a voluntary petition for relief ("Petition") under Chapter 11 of Title 11 of the United States Code.

2. An Official Committee of Unsecured Creditors was appointed by the U.S. Trustee on June 2, 2010.

3. On October 19, Debtors filed their Motion for an Order Authorizing (A) the Sale of the Debtors' Right, Title and Interest In, To and Under Substantially All of the Debtors' Assets Free and Clear of Claims, Encumbrances, Liens, and Interest, (B) the Assumption and Assignment of Executory Contracts and Unexpired Leases and (C) Related Relief (the "Sale Motion") and its Motion to (A) Approve the Procedures for the Solicitation of Offers; (B) Approve the Form and Manner of Notice; (C) Approve Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; (D) Approve DHTE Bid Protections and Procedures; and (E) Approve a Break-Up Fee in Connection with the Transaction Contemplated by the Purchase Agreement (the "Sale Procedures Motion").

4. QFH is the owner of the claim of Ace Hardware pursuant to an Assignment executed on October 22, 2010, and is also a potential purchaser of the assets of the Debtors.

# II.
## Negotiation for Purchase of Assets

5. Prior to the filing of the Petition, QFH negotiated with the Debtors for the purchase of their oil and gas properties. The parties did not reach a final agreement on the purchase of assets prior to the filing of the Petition.

6. After the filing of the Petition, the Debtors engaged Stevens, Inc. as their investment advisor, to direct and manage a sale process to market and solicit offers for the sale of the Debtors' assets.

7. Commencing in July, 2010, QFH engaged in the bankruptcy sale process by conducting due diligence in reviewing available data and entering discussions with the Debtors and Stevens, Inc. with the expectation that the Debtors and Stevens, Inc. would act under the principles of good faith and fair dealing. QFH expressed its interest in becoming a "stalking horse" bidder in the purchase of the Debtors' assets.

8. On August 11, 2010, QFH and TriDimension Energy, L.P. executed a letter of intent whereby the Debtors agreed to the terms for a purchase of their assets whereby QFH would be the "stalking horse bidder" for the assets and entitled to a break-up fee of $1,500,000.00. The Parties then began to negotiate the terms of an asset purchase agreement. The Debtors ceased work on the asset purchase agreement in early September indicating that the price adjustments contained in the letter of intent were causing objections and needed to be removed. QFH indicated that it would remove the price adjustments and lower the price.

9. On October 3, 2010, the Debtors contacted QFH expressing its desire to finalize an agreement with QFH for the sale of their assets wherein QFH would serve as a "stalking horse" bidder at a price which eliminated the price adjustments and contingencies contained in the prior letter of intent. QFH agreed to do so and the Parties negotiated a final asset purchase agreement agreed to by the parties on October 15, 2010. From the inception of the negotiations through and including Friday, October 15, 2010, QFH, on a consistent basis received assurances from Debtors' representatives that it was going to be the stalking horse bidder.

10. The assurances given on behalf of the Debtors induced QFH to continue its exhaustive due diligence efforts and negotiations of an asset purchase agreement. As late as Friday, October 15, 2010, negotiations with the Debtors were virtually complete with the exception of two minor points raised by the Creditors Committee. The two final points were

resolved and representatives of QFH were advised "we have a deal" by representatives of the Debtors.

11. The Asset Purchase Agreement was executed by QFH and QFH was prepared to wire its deposit on October 15, 2010. From that point forward, continual telephone calls and e-mails were made to the Debtors concerning the need to obtain information to deposit the funds contemplated by the bid procedures and the Asset Purchase Agreement. Despite having been advised that a deal had been made, representatives of the Debtors failed to return phone calls, failed to respond to e-mails and unilaterally cut off all communications with QFH.

12. On Monday, October 18, 2010, while telephone calls and emails to the Debtors were not returned, word reached QFH that the Debtors were going to abandon the "deal" struck with QFH and, instead, choose a different entity as the "stalking horse." Based upon the concern that the Debtors had reneged on their commitment that an agreement had been reached, and to avoid potential disputes, QFH, on Monday, October 18, 2010, reaffirmed all provisions of its Asset Purchase Agreement and increased its bid amount from $28,000,000.00 to $29,240,000.00.

13. With the revelation of the newly selected stalking horse described in the Sale Motion, it is obvious that the offer of QFH is $1,240,000.00 higher than the current proposed bid. QFH has supplied the Debtors evidence that its financing is in place and not contingent. QFH has made a proposal to purchase the assets of the Debtors that is non-contingent on financing and is significantly higher than that of the current proposed stalking horse.

14. The offer of the current proposed potential buyer in the Sale Motion is the exact amount of the extensively negotiated original price proposed by QFH in the Asset Purchase Agreement signed on October 15, 2010 – $28,000,000.00. While not identical word for word, the QFH Asset Purchase Agreement and that of the newly proposed stalking horse are very

similar. The benefit of the extensive work and effort expended by QFH and its professionals is now being transferred to SR Acquisition I, LLC ("<u>SRA</u>"), the new proposed "stalking horse," with no return or consideration to QFH.

15. The amount of due diligence, negotiations and effort put into the proposal to become the stalking horse bidder by QFH was justified based upon the representations by representatives of the Debtors to QFH that "we have a deal." It is impossible to draw the conclusion that the efforts of the currently proposed stalking horse in any way approaches the efforts dedicated and expended by QFH, based upon inducements by the Debtors and assurances to QFH that it was going to be the stalking horse.

### III.
### Objection to Approval of Breakup Fee

16. On information and belief, the proposal set forth by the current proposed "stalking horse" bidder was gleaned from information provided to SRA by the Debtors. QFH has dedicated thousands of man hours and invested significant amounts of money to reach the point where it was advised that a deal had been reached. It is inconceivable that the entity selected by the Debtors based upon their "business judgment" could have occurred without access to the information and terms negotiated by and between the Debtors and QFH.

17. To the extent that the Debtors and the current proposed stalking horse have availed themselves of the due diligence performed by QFH, (as evidenced by the resulting terms negotiated over the last months between the Debtors and QFH) the "stalking horse" should not be entitled to the benefits provided in a breakup fee as part of its Asset Purchase Agreement. The breakup fee should be excluded from the proposed Asset Purchase Agreement and bid procedures and QFH objects to the same being included. If QFH is not to be designated as the

"stalking horse" and entitled to a break-up fee, then no party should be granted such rights so that there is a level playing field.

## IV.
## Objection to Sale Motion

18. QFH objects to the proposed sale to SRA. As set forth herein, QFH believed and continues to believe, that it had a "deal" with the Debtors to become the "stalking horse" bidder. The representations made to QFH gave the clear impression that it was the only party the Debtors were negotiating with to become the "stalking horse" bidder. Up until the close of business on October 15, 2010, the Debtors continued to represent to QFH it would be the "stalking horse" bidder, causing it to expend through the process thousands of man hours and to incur significant expenses.

19. QFH has proposed a purchase price that exceeds the price by SRA in the Sale Motion by $1,240,000.00. It is clearly not in the interests of creditors and the estate to approve a lower price. The fact that the terms of the current proposed Asset Purchase Agreement are extremely similar to that of the offer submitted by QFH, coupled with the fact that QFH has provided adequate assurance to the Debtors of its ability to finance the proposed sale and is offering $1,240,000.00 more than the offer of the current proposed "stalking horse," is more than sufficient justification for the Court to deny the Sale Motion.

20. At no point in time did the Debtors indicate to QFH that they were negotiating with another party to become a "stalking horse." This can lead to only one of two conclusions. First, the Debtors, through their silence, withheld pertinent information from QFH in an effort to further the Debtors' position to the benefit to the estate and at the expense of QFH. If true, such actions constitute a breach of the duty of good faith and fair dealing.

21. Alternatively, if the current proposed "stalking horse" candidate came into the picture at the last second, it cannot possibly justify the breakup fee consideration contained in the proposal and the same should be stricken by the Court, putting the proposed "stalking horse" on the same and level playing field with QFH. If the playing field is made level, it is clear that the offer of QFH is superior to that of the current proposed purchaser and is in the best interest of the creditors and the estate.

22. QFH objects to the sale of assets as currently proposed by the Debtors in the Sale Motion. The Sale Motion should be denied. Alternatively, QFH should replace the current proposed "stalking horse" and be approved by the Court as the "stalking horse" for the proposed sale of the Debtors' assets at the higher purchase price submitted by QFH.

## V.
### Prayer for Relief

WHEREFORE, PREMISES CONSIDERED, QF Holdings, LLC prays that this Court enter an Order (a) denying the Sale Procedure Motion in relation to the creation of a breakup fee for the current proposed purchaser as the "stalking horse;" (b) denying the Sale Motion and the establishment of the current proposed purchaser as the "stalking horse;" (c) alternatively, substitute QFH as the "stalking horse" candidate at the higher price proposed by QFH; (d) granting QFH its costs herein expended, and (e) for such other and further relief to which it may show itself to be justly entitled at law or in equity.

DATED: October 25, 2010.

Respectfully submitted,

By: */s/ Richard L. Ramsay*
Richard L. Ramsay
Arkansas Bar No. 77108
EICHENBAUM, LILES & HEISTER, P.A.
124 W. Capitol Avenue, Suite 1900
Little Rock, AR 72201
(501) 376-4531  Fax: (501) 376-8433
rick.ramsay@elhlaw.com

Kenneth Stohner, Jr.
State Bar No. 19263700
kstohner@jw.com
JACKSON WALKER L.L.P.
901 Main Street, Suite 6000
Dallas, Texas 75202
(214) 953-6000
(214) 661-5822 – Fax

ATTORNEYS FOR QFH HOLDINGS, LLC

## **CERTIFICATE OF SERVICE**

      This is to certify that on this 25th day of October, 2010 a true and correct copy of the foregoing was served via the Court's ECF/PACER system and/or by United States first class mail, postage prepaid, to the following parties and upon all parties receiving notice via the Court's ECF/PACER system:

| | |
|---|---|
| William L. Wallander | U.S. Trustee |
| Clayton T. Hufft | 1100 Commerce Street |
| Beth Lloyd | Room 976 |
| Vinson & Elkins LLP | Dallas, Texas 75242 |
| Trammell Crow Center | |
| 2001 Ross Avenue, Suite 3700 | |
| Dallas, Texas 75201-2975 | |
| | |
| Richard M. Roberson | |
| Gardere Wynne Sewell LLP | |
| 1601 Elm Street, Suite 3000 | |
| Dallas, Texas 75201 | |

                                                          */s/ Kenneth Stohner, Jr.*
                                                          Kenneth Stohner, Jr.

5950416v.1