**THIS IS NOT A SOLICITATION OF ACCEPTANCES OF THE CHAPTER 11 PLAN OF TRIDIMENSION ENERGY, L.P. AND THE OTHER DEBTORS IN THESE CHAPTER 11 CASES. ACCEPTANCES MAY NOT BE SOLICITED UNTIL A DISCLOSURE STATEMENT HAS BEEN APPROVED BY THE BANKRUPTCY COURT AS CONTAINING "ADEQUATE INFORMATION" WITHIN THE MEANING OF SECTION 1125(a) OF THE BANKRUPTCY CODE. THIS DISCLOSURE STATEMENT IS BEING SUBMITTED FOR APPROVAL BUT HAS NOT YET BEEN APPROVED BY THE BANKRUPTCY COURT AND IS SUBJECT TO AMENDMENT PRIOR TO SUCH APPROVAL BEING GRANTED.**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **IN RE:** | § § § | **Case No. 10-33565-SGJ** |
| **TRIDIMENSION ENERGY, L.P.,** *et al.* | § § | **Chapter 11** |
| **DEBTORS.** | § § § § | **Jointly Administered** |

**AMENDED DISCLOSURE STATEMENT FOR THE
AMENDED JOINT PLAN OF LIQUIDATION FOR THE DEBTORS**

**Dated: ~~February 18,~~ March 21, 2011**

NOTE**:** THE DEBTORS, THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS AND THE SENIOR LIEN AGENT (AS DEFINED HEREIN) BELIEVE THAT ACCEPTANCE OF THE PLAN DESCRIBED IN THIS DISCLOSURE STATEMENT IS IN THE BEST INTERESTS OF THE DEBTORS' ESTATES AND THEIR CREDITORS. **ACCORDINGLY, THE PLAN PROPONENTS RECOMMEND THAT YOU <u>VOTE TO APPROVE</u> THE PLAN.**

**TABLE OF CONTENTS**

ARTICLE I      INTRODUCTION .................................................................................... 3

     1.1.      Introduction .................................................................................... 3
     1.2.      Considerations In Preparation Of The Disclosure Statement And Plan; Disclaimers .................................................................................... 3
     1.3.      Disclosure Statement; Construction ............................................... 5
     1.4.      Solicitation Package ....................................................................... 6
     1.5.      Voting Procedures, Ballots, And Voting ......................................... 6
     1.6.      The Confirmation Hearing And Objection Deadline ........................ 7
     1.7.      Recommendation Of The Debtors, Senior Lien Agent, And Committee To Approve Plan ........................................................................... 9

ARTICLE II      GENERAL INFORMATION REGARDING THE DEBTORS ................ 10

     2.1.      Background ................................................................................... 10
     2.2.      Corporate Structure of the Debtors ............................................. 10
     2.3.      Management of the Debtors ......................................................... 11
     2.4.      Existing Capital Structure Of The Debtors – The Credit Agreements ... 11
     2.5.      Events Leading To Chapter 11 .................................................... 12

ARTICLE III      EVENTS DURING THE CHAPTER 11 CASES ................................ 12

     3.1.      Commencement of the Chapter 11 Cases ..................................... 12
     3.2.      Appointment of the Official Committee of Unsecured Creditors ..... 13
     3.3.      Use of Cash Collateral and Debtor-in-Possession Financing .......... 13
     3.4.      Retention of Professionals by the Debtors .................................... 16
     3.5.      Bankruptcy Schedules and Statements of Financial Affairs ........... 17
     3.6.      Meeting of Creditors ................................................................... 17
     3.7.      Operating Reports ....................................................................... 17
     3.8.      Claims Process ............................................................................ 17
     3.9.      Retention & Incentive Plans ........................................................ 18
     3.10.      Royalty Payments ....................................................................... 19
     3.11.      Limited Substantive Consolidation .............................................. 19
     3.12.      Settlement Between the Senior Lien Agent, the Senior Lien Holders, and the Committee ........................................................................... 20
     3.13.      Sale of Substantially All Assets of the Debtors ............................ 23
     3.14.      Reclamation Demands ................................................................. 25
     3.15.      Litigation .................................................................................... 25

ARTICLE IV      FINANCIAL INFORMATION ........................................................ ~~34~~36

     4.1.      Assets ......................................................................................... ~~34~~36
     4.2.      Liabilities ................................................................................... ~~34~~36
     4.3.      Other ......................................................................................... ~~36~~38

ARTICLE V      PLAN OVERVIEW ....................................................................... ~~36~~38

     5.1.      Introduction ................................................................................ ~~36~~38
     5.2.      Summary of the Plan ................................................................... ~~37~~39

i

| | | |
|---|---|---|
| 5.3. | Summary Of Proposed Distributions Under The Plan | ~~39~~41 |
| ARTICLE VI | SUMMARY OF CERTAIN PLAN PROVISIONS | ~~46~~48 |
| 6.1. | Means for Implementation of the Plan | ~~46~~48 |
| 6.2. | Provisions Governing Distributions Generally | ~~51~~53 |
| 6.3. | Treatment of Executory Contracts and Unexpired Leases | ~~52~~54 |
| 6.4. | Effects of Confirmation | ~~53~~55 |
| 6.5. | Retention of Jurisdiction | ~~55~~57 |
| 6.6. | The Liquidating Trust. | ~~55~~57 |
| 6.7. | Funding of Res of Trust. | ~~55~~57 |
| 6.8. | The Liquidating Trustee. | ~~55~~57 |
| 6.9. | Compensation of the Liquidating Trustee. | ~~56~~58 |
| 6.10. | Bonding Requirement | ~~56~~58 |
| 6.11. | Termination. | ~~56~~58 |
| 6.12. | Committee and Liquidating Trust Committee | ~~56~~58 |
| 6.13. | Reserves Administered by the Liquidating Trust | ~~57~~59 |
| 6.14. | Procedures for Resolving Disputed, Contingent, and Unliquidated Claims | ~~60~~62 |
| ARTICLE VII | CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND SECURITIES LAW CONSIDERATIONS | ~~62~~64 |
| 7.1. | General | ~~62~~64 |
| 7.2. | Tax Status of the Debtors | ~~63~~65 |
| 7.3. | Certain U.S. Federal Income Tax Consequences to the Debtors | ~~63~~65 |
| 7.4. | Tax Consequences to Creditors | ~~64~~66 |
| 7.5. | U.S. Federal Income Tax Consequences of the Liquidating Trust | ~~65~~67 |
| 7.6. | Importance of Obtaining Professional Tax Assistance | ~~67~~69 |
| 7.7. | Securities Law Considerations | ~~67~~69 |
| ARTICLE VIII | THE BEST INTERESTS OF CREDITORS TEST | ~~69~~71 |
| 8.1. | Best Interests Test | ~~69~~71 |
| 8.2. | Liquidation Analysis | ~~70~~72 |
| ARTICLE IX | ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN | ~~71~~73 |
| 9.1. | Alternative Plan(s) | ~~71~~73 |
| 9.2. | Liquidation Under Chapter 7 | ~~71~~73 |
| ARTICLE X | CERTAIN RISK FACTORS TO BE CONSIDERED | ~~72~~74 |
| 10.1. | Certain Bankruptcy Law Considerations | ~~72~~74 |
| 10.2. | Certain Tax Considerations, Risks and Uncertainties | ~~74~~76 |
| ARTICLE XI | THE SOLICITATION; VOTING PROCEDURES | ~~74~~76 |
| 11.1. | Voting Deadline | ~~74~~76 |
| 11.2. | Voting Procedures | ~~74~~76 |
| 11.3. | Miscellaneous | ~~75~~77 |
| 11.4. | Fiduciaries and Other Representatives | ~~75~~77 |
| 11.5. | Parties Entitled to Vote | ~~75~~77 |

US 713619 ~~4.DOC~~v.6

| 11.6. | Agreements upon Furnishing Ballots | ~~76~~78 |
|-------|-----------------------------------|----------|
| 11.7. | Waivers of Defects, Irregularities, Etc. | ~~76~~78 |
| 11.8. | Withdrawal of Ballots; Revocation | ~~76~~78 |
| 11.9. | Further Information; Additional Copies | ~~77~~79 |

| EXHIBIT A | Amended Joint Plan of Liquidation for the Debtors |
|-----------|---------------------------------------------------|
| EXHIBIT B | Disclosure Statement Order |
| EXHIBIT C | Proposed Settlements with Certain Holders of M&M Claims |
| EXHIBIT D | Schedule of Payments Made During Preference Period |
| EXHIBIT E | Liquidation Analysis |

US 713619 ~~4.DOC~~v.6

# DISCLAIMER

ALL HOLDERS OF CLAIMS ARE ADVISED AND ENCOURAGED TO READ THIS DISCLOSURE STATEMENT AND THE AMENDED JOINT PLAN OF LIQUIDATION FOR THE DEBTORS DATED ~~FEBRUARY 18,~~MARCH 21, 2011 (AS AMENDED, MODIFIED AND SUPPLEMENTED FROM TIME TO TIME, THE "PLAN"), IN THEIR ENTIRETY BEFORE VOTING TO ACCEPT OR REJECT THE PLAN. ALL SUMMARIES OF THE PLAN AND OTHER STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THE PLAN, THE EXHIBITS ANNEXED TO THE PLAN, ANY SUPPLEMENTS TO THE PLAN, AND THE EXHIBITS ANNEXED TO THIS DISCLOSURE STATEMENT. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND THERE CAN BE NO ASSURANCE THAT THE STATEMENTS CONTAINED HEREIN WILL BE CORRECT AT ANY TIME AFTER THE DATE HEREOF. HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH HEREIN SINCE THE DATE HEREOF. MOREOVER, THERE MAY BE ERRORS IN THE STATEMENTS AND/OR FINANCIAL INFORMATION CONTAINED HEREIN AND/OR ASSUMPTIONS UNDERLYING SUCH STATEMENTS AND/OR FINANCIAL INFORMATION. THE DEBTORS, THE OTHER PLAN PROPONENTS AND THEIR RESPECTIVE ADVISORS EXPRESSLY DISCLAIM ANY OBLIGATION TO UPDATE OR CORRECT ANY SUCH FINANCIAL INFORMATION OR ASSUMPTIONS.

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE AND NOT NECESSARILY IN ACCORDANCE WITH FEDERAL OR STATE SECURITIES LAWS OR OTHER APPLICABLE LAW. THIS DISCLOSURE STATEMENT AND THE PLAN FOR THE DEBTORS DESCRIBED HEREIN HAVE NOT BEEN APPROVED OR DISAPPROVED BY THE SECURITIES AND EXCHANGE COMMISSION OR ANY STATE SECURITIES COMMISSION, AND NEITHER THE SECURITIES AND EXCHANGE COMMISSION NOR ANY STATE SECURITIES COMMISSION HAS PASSED UPON THE ACCURACY OR ADEQUACY OF THE INFORMATION CONTAINED HEREIN. TO THE EXTENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, NEITHER THE OFFER NOR THE ISSUANCE OF ANY SUCH SECURITIES PURSUANT TO THE PLAN HAS BEEN REGISTERED UNDER THE 1933 ACT OR ANY SIMILAR STATE SECURITIES OR "BLUE SKY" LAWS. ANY SUCH OFFER OR ISSUANCE IS BEING MADE IN RELIANCE ON THE EXEMPTIONS FROM REGISTRATION THEREUNDER SPECIFIED IN SECTION 1145 OF THE BANKRUPTCY CODE. ANY REPRESENTATION TO THE CONTRARY IS A CRIMINAL OFFENSE. PERSONS OR ENTITIES TRADING IN OR OTHERWISE PURCHASING, SELLING OR TRANSFERRING SECURITIES OR CLAIMS OF THE DEBTORS IN THESE CASES SHOULD EVALUATE THIS

DISCLOSURE STATEMENT AND THE PLAN IN LIGHT OF THE PURPOSE FOR WHICH THEY WERE PREPARED.

AS TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING OR THREATENED LITIGATION OR ACTIONS, THIS DISCLOSURE STATEMENT AND THE EXHIBITS HERETO DO NOT CONSTITUTE AND MAY NOT BE CONSTRUED AS AN ADMISSION OF ANY FACT OR LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS AND SHALL BE INADMISSIBLE FOR ANY PURPOSE ABSENT THE EXPRESS WRITTEN CONSENT OF THE DEBTORS AND THE PARTY AGAINST WHOM SUCH INFORMATION IS SOUGHT TO BE ADMITTED.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS INCLUDED HEREIN FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN AND MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE HOW TO VOTE ON THE PLAN.

THIS DISCLOSURE STATEMENT WILL NOT BE ADMISSIBLE IN ANY NON-BANKRUPTCY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, NOR WILL IT BE CONSTRUED TO CONSTITUTE CONCLUSIVE ADVICE ON THE TAX, SECURITIES, OR OTHER LEGAL EFFECTS OF THE PLAN AS TO HOLDERS OF CLAIMS AGAINST, OR INTERESTS IN, THE DEBTORS.

THE COMMITTEE AND THE SENIOR LIEN AGENT, ALTHOUGH CO-PROPONENTS OF THE PLAN, ARE NOT RESPONSIBLE FOR AND SHALL HAVE NO LIABILITY AS TO THE ACCURACY OR ADEQUACY OF ANY OF THE INFORMATION CONTAINED HEREIN.

## DISCLOSURE REGARDING FORWARD-LOOKING STATEMENTS

This Disclosure Statement includes information regarding certain "forward-looking statements" within the meaning of Section 27A of the 1933 Act and Section 21E of the Securities Exchange Act of 1934, as amended, all of which are based upon various estimates and assumptions that the Debtors believe to be reasonable as of the date hereof. These statements involve risks and uncertainties that could cause actual future outcomes to differ materially from those set forth in this Disclosure Statement. Such risks and uncertainties include, but are not limited to:

- litigation risks and uncertainties;

- costs associated with the Debtors' restructuring efforts, including their chapter 11 filings; and

- Claim and liability estimates.

You should understand that the foregoing as well as other risk factors discussed in this Disclosure Statement, including those listed in <u>Article X</u> of this Disclosure Statement under the

heading "Certain Risk Factors to be Considered," could cause future outcomes to differ materially from those expressed in such forward looking statements. Given the uncertainties, you are cautioned not to place undue reliance on any forward-looking statements in determining whether to vote in favor of the Plan or to take any other action. The Debtors undertake no obligation to publicly update or revise information concerning the Debtors' restructuring efforts or their cash position or any forward-looking statements to reflect events or circumstances that may arise after the date of this Disclosure Statement, except as required by law.

# ARTICLE I

# INTRODUCTION

## 1.1. Introduction

TriDimension Energy, L.P. ("TriDimension"), Axis E&P, LP, Axis Marketing, LP, Axis Onshore, LP, Ram Drilling, LP, TDE Operating GP LLC, TDE Property Holdings, LP, and TDE Subsidiary GP LLC each filed voluntary petitions for relief under chapter 11 of title 11 of the United States Bankruptcy Code on May 21, 2010 (as defined in the Plan, the "Petition Date"), in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division. Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, the Debtors continue to operate their businesses and to manage their properties as debtors-in-possession during the pendency of the Debtors' Cases.

On February 18, 2011, the Debtors filed the *Joint Plan of Liquidation for the Debtors* [Docket No. ~~621~~]621] and, thereafter, on March 21, 2011, the Debtors filed the *Amended Joint Plan of Liquidation for the Debtors* [Docket No. 678] (as previously defined, the "Plan"). The Plan was formulated after extensive negotiations with (i) the Official Committee of Unsecured Creditors, which was appointed by the Office of the United States Trustee on June 2, 2010, and (ii) Amegy Bank, N.A., in its capacity as administrative agent (in such capacity, the "Senior Lien Agent") for the Senior Lien Holders. This Disclosure Statement describes the Debtors' business operations, certain aspects of the Plan, and significant events occurring in the Cases and related matters.

## 1.2. Considerations In Preparation Of The Disclosure Statement And Plan; Disclaimers

BECAUSE ACCEPTANCE OF THE PLAN WILL CONSTITUTE ACCEPTANCE OF ALL THE PROVISIONS THEREOF, HOLDERS OF CLAIMS ARE URGED TO CONSIDER CAREFULLY THE INFORMATION REGARDING TREATMENT OF THEIR CLAIMS CONTAINED IN THIS DISCLOSURE STATEMENT.

THE CONFIRMATION AND EFFECTIVENESS OF THE PLAN ARE SUBJECT TO MATERIAL CONDITIONS PRECEDENT. THERE CAN BE NO ASSURANCE THAT THOSE CONDITIONS WILL BE SATISFIED.

THE DEBTORS PRESENTLY INTEND TO SEEK TO CONSUMMATE THE PLAN AND TO CAUSE THE EFFECTIVE DATE TO OCCUR PROMPTLY AFTER

CONFIRMATION OF THE PLAN.  THERE CAN BE NO ASSURANCE, HOWEVER, AS TO WHEN AND WHETHER CONFIRMATION OF THE PLAN AND THE EFFECTIVE DATE ACTUALLY WILL OCCUR.

TO BE COUNTED, YOUR BALLOT MUST BE DULY COMPLETED, EXECUTED, AND ACTUALLY RECEIVED BY THE VOTING DEADLINE.  HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE ENCOURAGED TO READ AND CONSIDER CAREFULLY THIS ENTIRE DISCLOSURE STATEMENT, INCLUDING THE PLAN.

*****

**THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE PLAN, STATUTORY PROVISIONS, DOCUMENTS RELATED TO THE PLAN, ANTICIPATED EVENTS IN THE CASES, AND FINANCIAL INFORMATION.  ALTHOUGH THE DEBTORS BELIEVE THAT THE SUMMARIES ARE FAIR AND ACCURATE, SUCH SUMMARIES ARE QUALIFIED TO THE EXTENT THAT THEY DO NOT SET FORTH THE ENTIRE TEXT OF THE PLAN OR CERTAIN DOCUMENTS (AND HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD REFER TO THE PLAN AND SPECIFIED DOCUMENTS IN THEIR ENTIRETY AS ATTACHED HERETO), STATUTORY PROVISIONS, EVENTS, OR INFORMATION.  FACTUAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS BEEN PROVIDED BY THE DEBTORS, EXCEPT WHERE OTHERWISE SPECIFICALLY NOTED.  HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO REVIEW THE ENTIRE PLAN, A COPY OF WHICH IS ATTACHED HERETO AS <u>EXHIBIT A</u>.  IN THE EVENT ANY PROVISION OF THIS DISCLOSURE STATEMENT IS FOUND TO BE INCONSISTENT WITH A PROVISION OF THE PLAN, THE PROVISION OF THE PLAN SHALL CONTROL.**

IN DETERMINING WHETHER TO VOTE TO ACCEPT THE PLAN, HOLDERS OF CLAIMS MUST RELY UPON THEIR OWN EXAMINATION OF THE DEBTORS AND THE TERMS OF THE PLAN, INCLUDING THE MERITS AND RISKS INVOLVED.  THE CONTENTS OF THIS DISCLOSURE STATEMENT SHOULD NOT BE CONSTRUED AS PROVIDING ANY LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE.  EACH SUCH HOLDER SHOULD CONSULT WITH ITS OWN LEGAL, BUSINESS, FINANCIAL, AND TAX ADVISORS WITH RESPECT TO ANY SUCH MATTERS CONCERNING THIS DISCLOSURE STATEMENT, THE SOLICITATION, THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY.

*****

TO THE EXTENT THE LIQUIDATING TRUST INTERESTS CONSTITUTE SECURITIES UNDER THE 1933 ACT, THE DEBTORS ARE RELYING ON SECTION 1145(a) OF THE BANKRUPTCY CODE TO EXEMPT FROM REGISTRATION UNDER THE SECURITIES LAWS THE OFFER AND ISSUANCE OF SECURITIES IN CONNECTION WITH THE PLAN.

EXCEPT AS SET FORTH HEREIN, NO PERSON HAS BEEN AUTHORIZED BY THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE DEBTORS. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN OFFER TO SELL OR THE SOLICITATION OF AN OFFER TO BUY ANY SECURITIES OTHER THAN, IN THE EVENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, SUCH SECURITIES TO WHICH IT RELATES, OR AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY ANY SECURITIES IN ANY JURISDICTION IN WHICH, OR TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF, AND THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE DATE HEREOF, UNLESS OTHERWISE STATED HEREIN, AND NEITHER THE DELIVERY OF THIS DISCLOSURE STATEMENT NOR, IN THE EVENT ANY RIGHTS OR INTERESTS ISSUED PURSUANT TO THE PLAN ARE DEEMED SECURITIES, THE DISTRIBUTION OF ANY SECURITIES PURSUANT TO THE PLAN WILL, UNDER ANY CIRCUMSTANCE, CREATE ANY IMPLICATION THAT THE INFORMATION CONTAINED HEREIN IS CORRECT AT ANY TIME SUBSEQUENT TO THE DATE HEREOF, OR SUCH OTHER DATE AS DESCRIBED HEREIN. ANY ESTIMATES OF CLAIMS OR EQUITY INTERESTS SET FORTH IN THIS DISCLOSURE STATEMENT MAY VARY FROM THE AMOUNTS OF CLAIMS OR EQUITY INTERESTS DETERMINED BY THE DEBTORS OR ULTIMATELY ALLOWED BY THE BANKRUPTCY COURT, AND AN ESTIMATE SHALL NOT BE CONSTRUED AS AN ADMISSION OF THE AMOUNT OF SUCH CLAIM.

INFORMATION INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT SPEAKS AS OF THE DATE OF SUCH INFORMATION OR THE DATE OF THE REPORT OR DOCUMENT IN WHICH SUCH INFORMATION IS CONTAINED OR AS OF A PRIOR DATE AS MAY BE SPECIFIED IN SUCH REPORT OR DOCUMENT. ANY STATEMENT CONTAINED IN A DOCUMENT INCORPORATED BY REFERENCE HEREIN SHALL BE DEEMED TO BE MODIFIED OR SUPERSEDED FOR ALL PURPOSES TO THE EXTENT THAT A STATEMENT CONTAINED IN THIS DISCLOSURE STATEMENT OR IN ANY OTHER SUBSEQUENTLY FILED DOCUMENT WHICH IS ALSO INCORPORATED OR DEEMED TO BE INCORPORATED BY REFERENCE, MODIFIES OR SUPERSEDES SUCH STATEMENT. ANY STATEMENT SO MODIFIED OR SUPERSEDED SHALL NOT BE DEEMED, EXCEPT AS SO MODIFIED OR SUPERSEDED, TO CONSTITUTE A PART OF THIS DISCLOSURE STATEMENT.

### 1.3.     Disclosure Statement; Construction

This Disclosure Statement has been prepared to comply with section 1125 of the Bankruptcy Code and is hereby transmitted by the Debtors to holders of Claims and Equity

Interests for use in the solicitation of acceptances from the holders of Claims (the "Solicitation") of the Plan, a copy of which is attached hereto as **Exhibit A**. **Unless otherwise defined in this Disclosure Statement, capitalized terms used herein have the meanings ascribed to them in the Plan.**

For purposes of this Disclosure Statement, the following rules of interpretation shall apply: (i) whenever the words "include," "includes" or "including" are used, they shall be deemed to be followed by the words "without limitation," (ii) the words "hereof," "herein," "hereby" and "hereunder" and words of similar import shall refer to this Disclosure Statement as a whole and not to any particular provision, (iii) article, section and exhibit references are to this Disclosure Statement unless otherwise specified, and (iv) with respect to any Distribution or Payment under the Plan, "on" a date means on or as soon as reasonably practicable thereafter.

The purpose of this Disclosure Statement is to provide "adequate information" to Persons who hold Claims to enable them to make an informed decision before exercising their right to vote to accept or reject the Plan. By order of the Bankruptcy Court (the "Disclosure Statement Order"), this Disclosure Statement was approved and held to contain adequate information. A true and correct copy of the Disclosure Statement Order is attached hereto as **Exhibit B**.

**THE APPROVAL BY THE BANKRUPTCY COURT OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE AN ENDORSEMENT BY THE BANKRUPTCY COURT OF THE PLAN OR A GUARANTEE OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN. THE MATERIAL CONTAINED HEREIN IS INTENDED SOLELY FOR THE USE BY HOLDERS OF CLAIMS AND EQUITY INTERESTS IN EVALUATING THE PLAN AND BY HOLDERS OF CLAIMS IN VOTING TO ACCEPT OR REJECT THE PLAN AND, ACCORDINGLY, MAY NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN THE DETERMINATION OF HOW TO VOTE ON THE PLAN. THE PLAN IS SUBJECT TO NUMEROUS CONDITIONS AND VARIABLES AND THERE CAN BE NO ASSURANCE THAT THE PLAN, IF CONFIRMED, WILL BE EFFECTUATED.**

### 1.4. Solicitation Package

Accompanying this Disclosure Statement for the purpose of soliciting votes on the Plan are copies of (i) the notice of, among other things, the time for submitting Ballots to accept or reject the Plan, the date, time, and place of the hearing to consider the confirmation of the Plan and related matters, and the time for filing objections to the confirmation of the Plan, and (ii) a Ballot or Ballots (and return envelope(s)) that you must use in voting to accept or to reject the Plan, or a notice of non-voting status, as applicable. If you did not receive a Ballot and believe that you should have, please contact the Solicitation Agent (as defined below) at the address or telephone number set forth in the next subsection.

### 1.5. Voting Procedures, Ballots, And Voting

After carefully reviewing the Plan and this Disclosure Statement, and the exhibits thereto, and the detailed instructions accompanying your Ballot, holders of Claims in Classes 3, 4, 5, 6A and 6B should indicate their acceptance or rejection of the Plan by voting in favor of or against

the Plan on the enclosed Ballot. Such holders should complete and sign their Ballot and return it in the envelope provided so that it is RECEIVED by the Voting Deadline (as defined below).

Each Ballot has been coded to reflect the Class of Claims it represents. Accordingly, in voting to accept or reject the Plan, you must use only the coded Ballot or Ballots sent to you with this Disclosure Statement.

If you have any questions about the procedure for voting your Claim or with respect to the packet of materials that you have received, please contact The BMC Group, Inc. (the "Solicitation Agent") (i) telephonically or (ii) in writing by (a) hand delivery, (b) overnight mail or (c) first class mail using the information below:

by hand delivery or overnight mail at:

TriDimension Energy, L.P.
c/o BMC-Analytics Incorporated
8750 Lake Drive East
Chanhassen, MN 55317-9384
Telephone: 888.909.0100

by first class mail at:

TriDimension Energy, L.P.
c/o BMC Group
Po Box 3020
Chanhassen, MN 55317-3020
Telephone: 888.909.0100

**THE SOLICITATION AGENT MUST RECEIVE ORIGINAL BALLOTS ON OR BEFORE 4:00 P.M., CENTRAL TIME, ON ~~_____,~~APRIL 21, 2011 (THE "VOTING DEADLINE") AT THE APPLICABLE ADDRESS ABOVE. EXCEPT TO THE EXTENT ALLOWED BY THE BANKRUPTCY COURT, BALLOTS RECEIVED AFTER THE VOTING DEADLINE WILL NOT BE ACCEPTED OR USED IN CONNECTION WITH THE DEBTORS' REQUEST FOR CONFIRMATION OF THE PLAN OR ANY MODIFICATION THEREOF.**

The Plan Proponents reserve the right to amend the Plan. Amendments to the Plan that do not materially and adversely affect the treatment of Claims or Equity Interests may be approved by the Bankruptcy Court at the Confirmation Hearing without the necessity of re-soliciting votes. In the event re-solicitation is required, the Debtors will furnish new solicitation packets that will include new ballots to be used to vote to accept or reject the Plan, as amended.

### 1.6. The Confirmation Hearing And Objection Deadline

**THE BANKRUPTCY COURT HAS SET ~~_____,~~APRIL 28, 2011, AT ~~:00 ~~9:30 A.M., CENTRAL TIME, AS THE DATE AND TIME FOR THE HEARING ON**

CONFIRMATION OF THE PLAN AND TO CONSIDER ANY OBJECTIONS TO THE PLAN. THE CONFIRMATION HEARING WILL BE HELD AT THE UNITED STATES BANKRUPTCY COURT, JUDGE JERNIGAN'S COURTROOM, 1100 COMMERCE, 14TH FLOOR, DALLAS, TEXAS 75242. THE DEBTORS WILL REQUEST CONFIRMATION OF THE PLAN AT THE CONFIRMATION HEARING.

THE BANKRUPTCY COURT HAS FURTHER FIXED ~~_____~~APRIL 21, 2011, AT 4:00 P.M., CENTRAL TIME, AS THE DEADLINE (THE "OBJECTION DEADLINE") FOR FILING OBJECTIONS TO CONFIRMATION OF THE PLAN WITH THE BANKRUPTCY COURT. OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE SERVED SO AS TO BE RECEIVED BY THE FOLLOWING PARTIES ON OR BEFORE THE OBJECTION DEADLINE:

*Counsel to the LP Debtors:*

William L. Wallander, SBT #20780750
Clayton T. Hufft, SBT #24056658
Beth Lloyd, SBT #24060179
Bradley R. Foxman, SBT #24065243
**VINSON & ELKINS LLP**
Trammell Crow Center
2001 Ross Avenue, Suite 3700
Dallas, Texas 75201-2975
Tel: 214.220.7700
Fax: 214.220.7716
bwallander@velaw.com; chufft@velaw.com;
blloyd@velaw.com; bfoxman@velaw.com

*Counsel to the GP Debtors:*

Peter Franklin, SBT #07378000
Erin K. Lovall, SBT #24032553
**FRANKLIN SKIERSKI LOVALL HAYWARD LLP**
10501 N. Central Expressway, Suite 106
Dallas, Texas 75231
Tel: 972.755.7100
Fax: 972.755.7110
pfranklin@fslhlaw.com; elovall@fslhlaw.com

*Counsel          to          the          Senior          Lien          Agent:*

Charles     S.     Kelley,     SBT     #11199580     _____
Andres G. Romay, SBT #24060516
**MAYER BROWN LLP**

700 Louisiana Street, Suite 3400
Houston, TX 77002-2730
Tel.: 713.238.3000
Fax: 713.238.4634
ckelley@mayerbrown.com; aromay@mayerbrown.com

*Counsel to the Official Committee of Unsecured Creditors:*

Richard M. Roberson, SBT #16993800
Michael S. Haynes, SBT #24050735
**GARDERE WYNNE SEWELL LLP**
3000 Thanksgiving Tower
1601 Elm Street
Dallas, Texas 75201-4761
Tel: 214.999.3000
Fax: 214.999.4667
rroberson@gardere.com; mhaynes@gardere.com

*United States Trustee:*

Nancy S. Resnick
1100 Commerce Street, Room 976
Dallas, TX 75242
Tel: 214.767.8967
Fax: 214.767.8971
nancy.s.resnick@usdoj.gov

**ANY OBJECTION TO CONFIRMATION OF THE PLAN MUST BE IN WRITING AND (A) MUST STATE THE NAME AND ADDRESS OF THE OBJECTING PARTY AND THE AMOUNT OF ITS CLAIM OR THE NATURE OF ITS EQUITY INTEREST AND (B) MUST STATE WITH PARTICULARITY THE NATURE OF ITS OBJECTION. ANY CONFIRMATION OBJECTION NOT TIMELY FILED AND SERVED AS SET FORTH HEREIN SHALL BE DEEMED WAIVED AND SHALL NOT BE CONSIDERED BY THE BANKRUPTCY COURT.**

### 1.7. Recommendation Of The Debtors, Senior Lien Agent, And Committee To Approve Plan

The Debtors approved the solicitation of acceptances of the Plan and all of the transactions contemplated thereunder. In light of the benefits to be attained by the holders of Claims pursuant to consummation of the transactions contemplated under the Plan, the Debtors recommend that such holders of Claims vote to accept the Plan. The Debtors have reached this decision after considering the alternatives to the Plan that are available to the Debtors. These alternatives include liquidation under chapter 7 of the Bankruptcy Code or liquidation under chapter 11 of the Bankruptcy Code with an alternative plan of liquidation. The Debtors determined, after consulting with their financial and legal advisors, the Senior Lien Agent, and

Committee, that the transactions contemplated in the Plan would likely result in a distribution of greater value to creditors than would a liquidation under chapter 7.

THE DEBTORS, SENIOR LIEN AGENT, AND COMMITTEE SUPPORT THE PLAN, ARE CO-PROPONENTS OF THE PLAN, AND RECOMMEND ALL HOLDERS OF CLAIMS WHOSE VOTES ARE BEING SOLICITED TO TIMELY SUBMIT BALLOTS TO ACCEPT THE PLAN.

## ARTICLE II

## GENERAL INFORMATION REGARDING THE DEBTORS

### 2.1.    Background

Prior to December 8, 2010, TriDimension, Axis E&P, LP, Axis Marketing, LP, Axis Onshore, LP, Ram Drilling, LP, TDE Operating GP LLC, TDE Property Holdings, LP, and TDE Subsidiary GP LLC operated in the oil and gas industry.  The Debtors' core operations consisted of exploration for, and acquisition, production, and sale of, crude oil and natural gas.  Prior to such time, the Debtors held leases covering approximately 165,000 net acres of oil and gas property, operated approximately 150 wells, and held working interests in approximately 300 wells.  Their assets were located in various portions of Louisiana and Mississippi.  The Debtors were also lessees under oil and gas leases and were parties to certain operating agreements, farmout agreements, joint venture agreements, gas marketing agreements, gas transportation agreements, and other agreements.  As discussed more fully below in Section 3.13, on December 8, 2010, the Debtors sold substantially all of their assets to SR Acquisition I, LLC and ceased their oil and gas and business operations.

As of the Petition Date, the Debtors' workforce consisted of 31 employees.  At such time, the Debtors also utilized approximately 12 independent contractors who performed various functions including accounting, landman, and pumper/gauger services.  As of ~~February 14,~~March 21, 2011, TriDimension had two employees, Kenneth A. Gregg and John A. Goedert, and two independent contractors, Almina Ahmic and Matt Dykes.  The remaining seven Debtors have no employees.

Financial information concerning the Debtors' financial condition as of the Petition Date can be found in the Debtors' Schedules and Statement of Financial Affairs filed with the Bankruptcy Court and addressed more fully herein.  Additionally, current information concerning the Debtors may be found in the Monthly Operating Reports filed with the Bankruptcy Court.

Pleadings filed in the Cases may also be obtained from the website maintained by the Debtors' claims and noticing agent at http://www.bmcgroup.com/tridimension.

### 2.2.    Corporate Structure of the Debtors

TDE Operating GP LLC, a Delaware limited liability company (the "General Partner"), is the general partner of TriDimension, a privately held Delaware limited partnership.  TriDimension owns five direct operating subsidiaries, TDE Property Holdings, LP, Axis E&P, LP, Axis

Onshore, LP, Axis Marketing, LP, and Ram Drilling, LP, each a Louisiana partnership in commendam (collectively, the "TriDimension Subsidiaries").  TDE Subsidiary GP LLC, a Delaware limited liability company ("Subsidiary GP"), is the general partner of each of the TriDimension Subsidiaries.  Each of General Partner, Subsidiary GP, TriDimension, and the TriDimension Subsidiaries is a Debtor in these Cases.

The Debtors' current organizational structure is the result of a business acquisition that was completed in April 2008.  As a result of that transaction, (i) General Partner owns a .01% general partnership interest in TriDimension, (ii) TriDimension currently owns all of the membership interests in Subsidiary GP and a 99.99% limited partnership interest in each of the TriDimension Subsidiaries, and (iii) Subsidiary GP owns a .01% general partnership interest in each of the TriDimension Subsidiaries.

The headquarters for each of the Debtors is located at 16610 Dallas Parkway, Suite 2500, Dallas, Texas 75248.  At the Debtors' corporate headquarters, the Debtors' management oversees the operations, finance, payroll, accounting, and tax functions of all of the Debtors.

### 2.3.   Management of the Debtors

The current members of the board of managers of TriDimension are Joseph Colonetta, Jason Downie, William Jaudes, Allen Mann, Edward Herring, and Doug Lamb.  James Ryan and Royal Carson previously served as members of the board of managers of TriDimension, but no longer serve in such capacities.

The sole current member of senior management of the Debtors is Kenneth A. Gregg, Chief Financial Officer.  James Ryan and Patrick S. O''Neal previously served as members of the Debtors' senior management , but no longer serve in such capacities.

### 2.4.    Existing Capital Structure Of The Debtors – The Credit Agreements

TriDimension is the borrower under that certain Senior Lien Loan Agreement dated April 23, 2008, as amended, by and among TriDimension, as borrower, the TriDimension Subsidiaries, as guarantors, the Senior Lien Agent, as administrative agent, and Amegy Bank, N.A., BMO Capital Markets Financing, Inc., and Union Bank, N.A, as lenders (in such capacity, and as defined in the Plan, the "Senior Lien Holders").  The aggregate principal amount of the advances currently outstanding under the Senior Lien Loan Agreement is approximately $37.5 million. Each of the TriDimension Subsidiaries has guaranteed the obligations of TriDimension under the Senior Lien Loan Agreement.

The Senior Lien Agent was also the hedge provider with respect to certain hedge transactions in effect under that certain ISDA Agreement dated as of June 7, 2006 between the Senior Lien Agent and TriDimension (the "Hedges").  On May 7, 2010, TriDimension and the Senior Lien Agent mutually agreed to terminate and unwind the Hedges in order for TriDimension to gain the benefit of certain favorable changes in commodity prices and prevent greater anticipated indebtedness due to commodity price changes over upcoming summer months. Ultimately, the Hedges were terminated and unwound, which resulted in a settlement claim of approximately $5.6 million and the Senior Lien Agent asserts such amounts are secured *pari passu* with the remaining amounts outstanding under the Senior Lien Loan Agreement and accrue interest at the same rates.

The Debtors granted the Senior Lien Agent and Senior Lien Holders liens and security interests on substantially all of the Debtors' assets and, on information and belief, such liens and security interests have been filed of public record.  In addition, TriDimension has pledged to the Senior Lien Holders TriDimension's rights, title and interest in the equity of each of the TriDimension Subsidiaries.  Pursuant to certain cash collateral and debtor-in-possession financing orders entered in the Cases, the Debtors have stipulated, subject to the Challenge Rights (as defined in Section 3.3 hereof), to the validity, enforceability, and perfection of the liens and security interests of the Senior Lien Agent and Senior Lien Holders on substantially all of the Debtors' assets.  The Committee's Challenge Rights do not expire until the earlier to occur of (a) the effective date of a confirmed chapter 11 plan containing a settlement between the Committee, the Senior Lien Agent, and the Senior Lien Holders, and (b) twenty days after the conversion of the Debtors' Cases to cases under chapter 7 of the Bankruptcy Code.

### 2.5.    Events Leading To Chapter 11

The Debtors experienced financial difficulties as a result of the economic environment and the declines in the prices of crude oil and natural gas from and after the summer of 2008 through the Petition Date, as well as the effects of weather related delays and difficulties affecting the Debtors' development and production activities.  As a result of such economic environment, the Debtors were unable to procure capital resources from other sources such as bank funding, private investment, or debt and equity markets.  The combination of these factors severely impaired the Debtors' liquidity and compelled the Debtors to commence these Cases in order to maximize the value of their assets for the benefit of their creditors and other constituencies.

# ARTICLE III

## EVENTS DURING THE CHAPTER 11 CASES

### 3.1. Commencement of the Chapter 11 Cases

On the Petition Date, the Debtors each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. Since the Petition Date, the Debtors have operated their businesses as debtors and debtors-in-possession. On and soon after the Petition Date, the Debtors sought certain relief from the Bankruptcy Court to ensure that their operations continued with the least possible disruption. Such "First Day Motions" were heard by the Bankruptcy Court as early as May 25, 2010. After the hearings, the Bankruptcy court entered the following orders:

- *Order Directing Joint Administration of Cases* [Docket No. 46];

- *Order Granting Complex Chapter 11 Bankruptcy Case Treatment* [Docket No. 47];

- *Order (A) Approving Notice of Case Commencement; (B) Approving Filing of Consolidated List of 40 Largest Unsecured Creditors; (C) Establishing Bar Dates; and (D) Approving Service by Electronic Means* [Docket No. 48];

- *Order Extending Time to File Schedules and Statements of Financial Affairs* [Docket No. 49];

- *Order Granting Emergency ~~Motions~~Motion to (I) Approve Maintenance of Certain Prepetition Bank Accounts and Cash Management System; and (II) Continue Use of Existing Checks and Business Forms* [Docket No. 50];

- *Order (I) Authorizing Debtors to (A) Pay Prepetition Wages and Salaries to Employees and (B) Pay Prepetition Benefits and Continue Benefit Programs in the Ordinary Course and (II) Directing Banks to Honor Checks for Payment of Prepetition Employee Obligations* [Docket No. 51];

- *Order Granting Emergency Motion for an Order (A) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services; and (B) Establishing Procedures for Determining Adequate Assurances of Payment* [Docket No. 59];

- *Order Granting Motion for Authority to Pay or Honor Prepetition Obligations to Certain Critical Vendors* [Docket No. 61];

- *Order Authorizing Debtors to Pay Prepetition Sales, Use, Property, Production, and Other Taxes and Related Obligations* [Docket No. 180];

- *Order Granting Application Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing Employment and Retention of Stephens Inc. as Investment Bankers for the Debtors* [Docket No. 194];

- *Order Granting Application to Employ Vinson & Elkins, LLP as Counsel for the Debtors* [Docket No. 211]; and

- *Interim Agreed Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Interim Order at Docket No. 63; Final Order at Docket No. 184].

### 3.2. <u>Appointment of the Official Committee of Unsecured Creditors</u>

On June 2, 2010, the Office of the United States Trustee appointed the Committee to represent the interests of the Debtors' unsecured creditors. The current members of the Committee are representatives from: Weatherford International, Precision Drilling Company L.P., Miss Lou Oil Well Supply, Hamilton Acquisitions, Inc., Schlumberger Technology Corp., X-Chem, Baker Hughes Incorporated, XTO Energy Inc., and Stokes & Spiehler Onshore Inc. The Committee retained Gardere Wynne Sewell LLP as counsel pursuant to a final order [Docket No. 212] entered on July 15, 2010.

### 3.3. <u>Use of Cash Collateral and Debtor-in-Possession Financing</u>

The Bankruptcy Court has entered the following orders regarding the Debtors' use of cash collateral and debtor-in-possession financing:

- *Interim Agreed Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 63], entered by the Bankruptcy Court on May 27, 2010;

- *Agreed Final Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 184], entered by the Bankruptcy Court on June 28, 2010;

- *Amended Agreed Interim Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 333], entered by the Bankruptcy Court on October 1, 2010;

- *Second Amended Agreed Interim Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 333], entered by the Bankruptcy Court on October 19, 2010; and

- *Second Agreed Final Order Authorizing Use of Cash Collateral Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing*

*Lienholders* [Docket No. 401] (the "Final Financing Order"), entered by the Bankruptcy Court on October 29, 2010.

Additionally, the following amended budgets and extensions were filed regarding the Debtors' use of cash collateral and/or debtor-in-possession financing:

- On June 11, 2010, the Debtors filed the *Notice of Amended Budget Pursuant to Interim Agreed Order Authorizing Use of Cash Collateral, Authorizing Credit Secured by Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 105];

- On August 13, 2010, the Debtors filed the *Notice of Amended Budget Pursuant to Final Agreed Order Authorizing Use of Cash Collateral, Authorizing Credit Secured by Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 277];

- On August 24, 2010, the Debtors filed the *Notice of Second Amended Budget Pursuant to Final Agreed Order Authorizing Use of Cash Collateral, Authorizing Credit Secured by Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 289];

- On December 3, 2010, the Debtors filed the *Notice of Extension of Second Agreed Final Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 521];

- On December 7, 2010, the Debtors filed the *Second Notice of Extension of Second Agreed Final Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 529]; and

- On December 22, 2010, the Debtors filed the *Third Notice of Extension of Second Agreed Final Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 573]; and

- On February 22, 2011, the Debtors filed the *Fourth Notice of Extension of Second Agreed Final Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 629].

Under the Final Financing Order, the Debtors are authorized to use the cash, cash equivalents, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents (collectively, the "Cash Collateral") in which the Senior Lien Agent and the Senior Lien Holders have an interest pursuant to Senior Lien Loan Agreement, subject to the terms set forth therein. The Debtors were also authorized to obtain debtor-in-possession financing in an amount not to exceed $7.4 million from the Post-Petition Lenders (as defined in the Final

Financing Order) (the "DIP Facility"). All amounts due and owing under the DIP Facility were paid in full by the Debtors on or about December 10, 2010 from proceeds of the sale of substantially all of the Debtors' assets, and the DIP Facility has since been terminated and is no longer available to the Debtors.

The Debtors are required to use the Cash Collateral in accordance with the latest approved budget (the "Budget") to continue their ordinary course operations and to maintain the value of their bankruptcy estates. Under the Final Financing Order, the authority to use Cash Collateral and the DIP Facility was to terminate on November 30, 2010, subject to extensions on the terms set forth therein. Since the entry of the Final Financing Order, ~~three~~four stipulations extending the use of Cash Collateral have been executed by the Debtors and the Post-Petition Lenders, ultimately extending the authority to use Cash Collateral until ~~February~~April 15, 2011 (as of the date hereof) [Docket Nos. 521, 529, 573, and ~~573~~629]. The Debtors anticipate that they will be able to further extend the ~~February~~April 15, 2011, deadline to provide them sufficient time to confirm the Plan.

As part of the agreement to use Cash Collateral and access to the DIP Facility, the Debtors stipulated to the validity and enforceability of the liens and security interests held by the Senior Lien Agent and the Senior Lien Holders pursuant to the Senior Lien Loan Agreement. Additionally, the Committee was given the right to challenge until a date certain the extent, validity, or priority of the Senior Lien Agent's and Senior Lien Holders' security interests and liens (the "Challenge Rights") under the various interim cash collateral orders and the Final Financing Order. The expiration date for the Committee's Challenge Rights was extended by various agreements during the pendency of the Cases so that the deadline for the Committee to assert its Challenge Rights is now the earlier to occur of (a) the effective date of a confirmed chapter 11 plan containing a settlement between the Committee, the Senior Lien Agent, and the Senior Lien Holders, and (b) twenty days after the conversion of the Debtors' Cases to cases under chapter 7 of the Bankruptcy Code [Docket Nos. 298, 369, 482, and 569].

Pursuant to sections 361, 362, 363(e) and 364(d)(1) of the Bankruptcy Code, in the Final Financing Order, the Debtors granted various forms of adequate protection for the use of such Cash Collateral and DIP Facility to the Senior Lien Agent, Senior Lien Holders, and Trade Lien Creditors (as defined in the Final Financing Order), and Other Secured Creditors (as defined in the Final Financing Order). For more information regarding the scope of the liens and priority claims provided as adequate protection, reference should be made to the various interim cash collateral orders and the Final Financing Order.

### 3.4. Retention of Professionals by the Debtors

During the Cases, the Debtors have filed retention applications for certain professionals to represent and assist them in the administration of the Cases. Many of these professionals have been actively involved with the negotiation and development of the terms of the Plan and the transactions contemplated thereunder, and many of these professionals will continue to provide needed services throughout the Cases.

In May 2010, the Debtors retained FTI Consulting, Inc. ("FTI") to act as the Debtors' financial advisors and assist with the Debtors' sale process. FTI's retention was approved by the

Bankruptcy Court on a modified basis by order dated June 30, 2010 [Docket No. 187]. FTI is being compensated by the Debtors on an hourly basis, subject to Bankruptcy Court approval through the fee application process. The Debtors will also reimburse FTI for all reasonable out of pocket expenses.

The Debtors retained Stephens Inc. ("Stephens") to act as their investment banker in connection with the Cases. Under the terms of the engagement, as modified by the *Order Granting Application Pursuant to 11 U.S.C. §§ 327(a) and 328(a) Authorizing Employment and Retention of Stephens Inc. as Investment Bankers for the Debtors* [Docket No. 194], Stephens received a monthly fee of $25,000. Further, Stephens received a success fee of $500,000 (less any monthly fees previously paid) in connection with the sale of substantially all of the Debtors' assets in December 2010. Stephens' engagement terminated thereafter.

The LP Debtors retained Vinson & Elkins LLP ("V&E") as their bankruptcy and restructuring counsel, and the GP Debtors retained Franklin Skierski Lovall Hayward, LLP ("FSLH") as their bankruptcy and restructuring counsel. The LP Debtors retained Ottinger Herbert, LLC ("Ottinger") as their special and conflicts counsel, and Copeland, Cook, Taylor & Bush ("Copeland Cook") as their special Mississippi counsel. V&E, FSLH, Ottinger and Copeland Cook are being compensated on an hourly basis subject to Bankruptcy Court approval through the fee application process. The LP Debtors and GP Debtors, as applicable, will also reimburse V&E, FSLH, Ottinger and Copeland Cook for all reasonable out of pocket expenses.

The Debtors have retained The BMC Group, Inc. to serve as their claims and noticing agent, and as their Solicitation Agent in connection with the Solicitation. The Debtors will pay the Solicitation Agent reasonable and customary compensation for its services in connection with the Solicitation and other noticing needs of the Debtors, plus reimbursement for reasonable out of pocket expenses. The Debtors also will pay any other customary fees and expenses attributable to the Solicitation. The Solicitation Agent will perform administrative tasks only and will not make any recommendation to any holder of a Claim with respect to its acceptance or rejection of the Plan.

Final orders approving the retention of the above professionals were entered by the Bankruptcy Court as follows: (a) FTI [Docket No. 187]; (b) Vinson & Elkins, LLP, as restructuring counsel for the LP Debtors [Docket No. 211]; (c) Franklin Skierski Lovall Hayward, LLP, as restructuring counsel for the GP Debtors [Docket No. 276]; (d) Ottinger, as special and conflicts counsel [Docket No. 223]; (e) Copeland Cook, as special Mississippi counsel [Docket No. 283]; (f) Stephens, as investment bankers for the Debtors [Docket No. 194]; and (g) The BMC Group, Inc., as the claims and noticing agent for the Debtors [Docket No. 179].

### 3.5. <u>Bankruptcy Schedules and Statements of Financial Affairs.</u>

On June 22, 2010, the Debtors each timely filed their Bankruptcy Schedules. The Bankruptcy Schedules set forth the detailed listing of the Debtors' assets and liabilities as of the commencement of these Cases. On August 27, 2010, the LP Debtors each filed a limited amendment to their respective Bankruptcy Schedules.

### 3.6.   Meeting of Creditors

On June 28, 2010, the United States Trustee conducted the meeting of creditors pursuant to section 341 of the Bankruptcy Code for the Debtors' Cases.

### 3.7.   Operating Reports

As required by the United States Trustee, Monthly Operating Reports for the months of June 2010 through ~~December 2010~~January 2011 have been filed with the Clerk of the Bankruptcy Court.  These Monthly Operating Reports are incorporated herein by reference.

### 3.8.   Claims Process

(a)   Last Date to File Proofs of Claims

The deadline by which non-governmental entities were required to submit their Proofs of Claim was set as July 28, 2010 and by which governmental entities were required to submit their Proofs of Claim was set as November 17, 2010.

(b)   Claims Reconciliation

As of the filing of this Disclosure Statement, approximately ~~371~~220 Proofs of Claims had been Filed.  After removing duplicate, amended and/or ~~amended~~ Claims subject to other specific objection(s) and giving effect to substantive consolidation, approximately $~~58,675,858.10~~57,693,201.67 in Proofs of Claim have been asserted against the Debtors (approximately $43,530,519.18 of Senior Lien Claims, $4,622,335.17 of M&M Secured Claims, $~~2,143,800.00~~1,769,962.23 of Other Secured Claims, $~~4,322.56~~2,249.33 of Ad Valorem Tax Claims, $~~2,741.43~~2,766.43 of Priority Tax Claims, $~~197,676.66~~7,291.66 of Priority Claims and $~~8,174,463.10~~7,758,077.67 of Non-Senior Lien General Unsecured Claims).  The Debtors are in the process of reviewing and objecting to certain Proofs of Claim.  The Debtors expect that the claims pool will be reduced based on their review and reconciliation.

### 3.9.   Retention & Incentive Plans

(a)   Key Employee Retention Plan

On July 19, 2010, the Debtors filed the *Motion for an Order Approving and Authorizing (A) the Implementation of the Key Employee Retention Program and (B) Severance for Certain Employees Upon Occurrence of Certain Events* [Docket No. 224] by which they sought authority to implement a retention program for the Debtors' employees (the "Retention Program") given the disruption created by the filing of the Cases and to provide a severance package to certain employees upon the occurrence of certain events.  The Retention Program was authorized and approved by Order [Docket No. 284] of the Bankruptcy Court entered on August 18, 2010.

Under the Retention Program, the Debtors are authorized to make fixed retention payments (the "Retention Payments") to up to 28 employees identified therein (the

"Employees")[1]  The Retention Payments are to be made on the earlier of (i) termination of the Employee due to a change in control of the Debtors or (ii) 90 days after a plan of reorganization or liquidation is confirmed.  As of January 31, 2011, Retention Payments in the amount of approximately $149,359.85 (gross) had been paid to 26 former Employees under the Retention Program in accordance with the foregoing clause (i).  The maximum remaining amount of Retention Payments that may be paid under the Retention Program is $26,250.00.

(b)     Management Incentive Plan

On November 8, 2010, the Debtors filed their *Motion for Entry of an Order Approving and Authorizing Implementation of Management Incentive Program and Authorizing Payments Thereunder* [Docket No. 423] by which they sought authority to establish an incentive plan (the "Incentive Plan") for their key management personnel.  The Bankruptcy Court entered an order [Docket No. 501] authorizing and approving the Incentive Plan on November 24, 2010.

The key management personnel who are participants in the Incentive Plan are Patrick S. O'Neal, the former Chief Operating Officer for the Debtors, and Kenneth A. Gregg, Chief Financial Officer for the Debtors (collectively, the "Incentive Plan Participants").

Under the Incentive Plan as originally approved by the Bankruptcy Court on November 24, 2010, each of the Incentive Plan Participants are, subject to certain conditions, entitled to an incentive payment equal to one month of their annual base salary as a result of the consummation of the sale of substantially all of the Debtors' assets.  As of the date hereof, the one-month's salary incentive payments owed by the Debtors to Patrick S. O'Neal and Kenneth A. Gregg have been paid.

On December 23, 2010, the Debtors filed the *Motion to Authorize Modification of Vacation Policy with Respect to Remaining Employees and Management Incentive Plan* [Docket No. 574] (the "Incentive Plan Modification").  Under the Incentive Plan Modification, each Incentive Plan Participant will receive, in addition to the incentive payment set forth above,  two-months salary within ten business days of the later of the following: (i) execution of a revised Incentive Plan agreement containing a release of all claims and causes of action of the Incentive Plan Participant against the Debtors, and (ii) the earlier to occur of (a) termination without cause, (b) the conversion of the Cases to cases under chapter 7 of the Bankruptcy Code, or (c) confirmation of a plan of liquidation.  These additional incentive payments will be funded solely by the Senior Lien Agent (on behalf of the Senior Lien Holders) and TriDimension Holdings, L.P., a non-debtor equity owner of the Debtors, each of which shall fund one-month's salary for each Incentive Plan Participant.  The Bankruptcy Court entered an order approving the Incentive Plan Modification on January 11, 2011 [Docket No. 587].

**3.10.   Royalty Payments**

On the Petition Date, the Debtors requested authority to make certain payments to royalty and working interest owners on account of pre-petition sales of oil and gas (the "Royalty and Working Interest Payments") pursuant to its *Emergency Motion for Interim and Final Orders (A)*

---

[1] The Employees do not include the Incentive Plan Participants (as defined below).  The Retention Payment for certain Employees was tied to the Net Proceeds from the sale of substantially all assets of the Debtors.

*Authorizing the Debtors to Use Cash Collateral, (B) Authorizing the Debtors to Obtain Post-Petition Financing, (C) Granting Security Interests and Superpriority Administrative Expense Status to the Post-Petition Lenders, (D) Granting Adequate Protection to Existing Lienholders, (E) Authorizing the Debtors to Make Payments to Certain Royalty and Working Interest Owners, and (F) Granting Related Relief* [Docket No. 22]. The Bankruptcy Court authorized the Debtors to make the Royalty and Working Interest Payments in the *Interim Agreed Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 63]. In the *Final Agreed Order Authorizing Use of Cash Collateral, Authorizing Credit Secured By Senior Liens, and Granting Adequate Protection to Existing Lienholders* [Docket No. 63], the Bankruptcy Court limited the amount of such payments to no more than $32,000 in the aggregate. As such, the Debtors have made certain payments for royalties that are owed on account of prepetition production of oil and gas. Additionally, the Debtors have continued to make the royalty payments that are owed on account of postpetition production.

### 3.11. Limited Substantive Consolidation

Pursuant to the Bankruptcy Court's *Order Approving Substantive Consolidation of the Debtors*, solely for the purpose of the Cases and the Plan, (a) each Claim against any of the Debtors will be deemed to be a claim against a consolidated entity consisting of all of the Debtors; (b) any Proof of Claim Filed against one or more of the Debtors will be deemed to have been filed against the consolidated entity; (c) all intercompany claims by and among the Debtors will be eliminated and released except any intercompany claims that are subject to an M&M Claim or M&M Lien, provided notwithstanding the foregoing, (i) such intercompany claims shall be preserved solely for the purposes of preserving the M&M Claim or M&M Liens in collateral to avoid dilution of the priority of Liens against the property affected thereby, and (ii) any such M&M Claim or Lien shall not be enforced or enforceable against any Liquidating Trust Assets; and (d) all guarantees by one of the Debtors in favor of any of the other Debtors will be eliminated, and all guarantees executed by any of the Debtors in favor of a creditor will be deemed to be a single obligation. Substantive consolidation shall have no effect on valid, enforceable, and unavoidable Liens except for Liens that secure an intercompany claim that is eliminated by virtue of substantive consolidation and Liens against property that ceases to exist by virtue of substantive consolidation. Specifically, substantive consolidation shall not increase the percentage working interest against which a holder of a Secured Claim asserts a Lien. Further, substantive consolidation shall not (u) create a Claim in a Class different from the Class in which a Claim would have been placed in the absence of substantive consolidation, (v) change the priority or nature of a Claim in a manner different from the priority or nature of such Claim in the absence of substantive consolidation, (w) affect any preserved Causes of Action, including Avoidance Actions, of each of the Debtors, (x) affect the legal or organizational structure of the Debtors or their respective ownership of any property or assets; (y) affect the defenses to any Causes of Action, other than proper-party defenses, or (z) affect payments out of any insurance policies or proceeds of such policies.

**3.12.** **Settlement Between the Senior Lien Agent, the Senior Lien Holders, and the Committee**

Pursuant to the Final Financing Order, the Committee is authorized to, among other things, challenge, file objections to, or seek the avoidance of the liens, security interests, and claims of the Senior Lien Agent and the Senior Lien Holders. In contemplation of this deadline, the Committee and Senior Lien Agent (on behalf of itself and the Senior Lien Holders) commenced active negotiations to resolve any and all potential claims and challenges the Committee may have with respect to the Senior Lien Agent's and the Senior Lien Holders' liens, security interests, and claims. As a result of such discussions, the Committee, Senior Lien Agent, and Senior Lien Holders agreed to resolve any potential disputes, claims, and objections regarding the liens, security interests, and claims of the Senior Lien Agent and Senior Lien Holders on the following terms which are set out more fully in the Plan:

- On the Effective Date of the Plan, all assets of the Debtors, including, without limitation, the Debtors' Cash, Sale Proceeds, accounts receivable, contract rights, general intangibles, and rights relating thereto, real property, personal property, Causes of Action, and all books and records of the Debtors (as defined in the Plan, collectively, the "Liquidating Trust Assets"), shall be transferred to the Liquidating Trust, a trust to be organized under the laws of the State of Texas, Free and Clear.

- The Liquidating Trust shall be responsible for collecting, receiving, holding, maintaining, administering, and liquidating the Liquidating Trust Assets, resolving all Disputed Claims, making all payments and distributions to holders of Allowed Claims in accordance with the terms of the Plan, closing the Cases, and otherwise implementing the Plan and finally administering the Debtors' estates.

- On the Effective Date of the Plan, a Liquidating Trustee shall be appointed to administer the Liquidating Trust and perform such other duties as set forth in the Plan and/or Liquidating Trust Agreement. The person to serve as the Liquidating Trustee shall be selected by mutual consent of the Debtors, Committee and Senior Lien Agent, in consultation with the Debtors.

- On the Effective Date of the Plan, the Liquidating Trustee shall establish the Carveout Reserve by depositing approximately $1.3 million (as defined in the Plan, the "Carveout Reserve Amount") of Sale Proceeds therein. With the exception of $25,000 to be deposited from the Carveout Reserve into the Liquidating Trust Expense Reserve, the Carveout Reserve shall be used exclusively to (a) first, pay (or reserve for payment of) all Allowed M&M Secured Claims and Allowed Operational Cure Claims and (b) thereafter, to the extent funds are remaining in the Carveout Reserve, be transferred to the Series B Distribution Reserve for distribution to holders of Series B Liquidating Trust Interests (which will be issued to holders of Allowed Non-Senior Lien General Unsecured Claims in full satisfaction of such Allowed Claims). The Senior Lien Agent and the Senior Lien Holders shall have no claim to amounts held in the Carveout Reserve and any liens or security interests of the Senior Lien Agent or Senior Lien Holders in the

Carveout Reserve Amount shall be released and extinguished on the Effective Date of the Plan.

- On the Effective Date of the Plan, the Liquidating Trustee shall establish the Senior Claim Reserve by depositing, from the Sale Proceeds, cash in an amount estimated by the Bankruptcy Court sufficient to satisfy all Allowed Ad Valorem Tax Claims, Allowed Administrative Claims (other than Deferred Professional Fee Claims), Allowed Priority Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Non-Operational Cure Claims payable or to be paid. The Senior Claim Reserve shall be used exclusively to pay all such Allowed Claims. To the extent funds are remaining in the Senior Claim Reserve after payment (or reservation for payment) of all such Allowed Claims, such remaining funds shall be transferred to the Senior Lien Holder Distribution Reserve for distribution to the Senior Lien Holders.

- On the Effective Date of the Plan, the Liquidating Trustee shall establish the Liquidating Trust Expense Reserve by depositing $75,000 from the Sale Proceeds and $25,000 from the Carveout Reserve therein. The Liquidating Trust Expense Reserve shall be used exclusively for the payment of Liquidating Trust Expenses.

- On the Effective Date of the Plan, the Liquidating Trustee shall establish the Senior Lienholder Distribution Reserve by depositing the Remaining Sale Proceeds (the Sale Proceeds remaining after funding the Carveout Reserve Amount, Senior Claim Reserve, and the Liquidating Trust Expense Reserve) therein. Except as otherwise set forth in the Plan, the Senior Lien Holder Distribution Reserve shall be used exclusively to pay Allowed Senior Lien Secured Claims.

- In exchange for and in full satisfaction and discharge of their Allowed Senior Lien Deficiency Claims, each holder of an Allowed Senior Lien Deficiency Claim shall receive its Pro Rata share of the Series A Liquidating Trust Interests on the Effective Date (or as soon as reasonably practicable thereafter). Holders of Series A Liquidating Trust Interests will be entitled to receive Distributions of Available Cash from the Series A Distribution Reserve on account of such Series A Liquidating Trust Interests, subject to other applicable terms of the Plan and Liquidating Trust Agreement.

- In exchange for and in full satisfaction and discharge of their Allowed Non-Senior Lien General Unsecured Claims, each holder of an Allowed Non-Senior Lien General Unsecured Claim shall receive its Pro Rata share of the Series B Liquidating Trust Interests on the Effective Date (or as soon as reasonably practicable thereafter). Holders of Series B Liquidating Trust Interests will be entitled to receive Distributions of Available Cash from the Series B Distribution Reserve on account of such Series B Liquidating Trust Interests, subject to other applicable terms of the Plan and Liquidating Trust Agreement.

- To the extent the Liquidating Trust receives/recovers Unrestricted Liquidating Trust Cash Proceeds (i.e., Cash or Cash proceeds constituting Liquidating Trust

Assets from sources other than Sale Proceeds) ~~become available to the Liquidating Trust~~, seventy-five percent (75%) of such Unrestricted Liquidating Trust Cash Proceeds shall be deposited in the Series A Distribution Reserve for the sole benefit of the holders of Series A Liquidating Trust Interests and twenty-five percent (25%) of such Unrestricted Liquidating Trust Cash Proceeds shall be deposited in the Series B Distribution Reserve for the sole benefit of holders of Series B Liquidating Trust Interests after (i) payment (or reservation for payment) of all incurred Direct Expenses and Allowed Deferred Professional Fee Claims[2] and (ii) payment (or reservation for payment of incurred or anticipated Liquidating Trust Expenses) of Liquidating Trust Expenses, provided, that, amounts deposited in the Series B Distribution Reserve will be subject to reduction based on certain Liquidating Trust Expenses as set forth in <u>Section 7.6</u> of the Plan.

- With respect to asserted M&M Secured Claims, at any time prior to the Confirmation Hearing, the Committee, in its sole and absolute discretion, may (a) seek to settle any or all such Claims of creditors asserting M&M Secured Claims, and (b) object to any or all Claims of creditors asserting M&M Secured Claims. The Committee and holder of an M&M Secured Claim, with the written consent of the Debtors, may settle and agree that none, a portion, or all of an asserted M&M Secured Claim shall be entitled to treatment as a Class 4 Allowed M&M Secured Claim (each, a "Settled M&M Secured Claim"), with the portion of such asserted M&M Secured Claim that is not a Settled M&M Secured Claim receiving treatment as an Allowed Non-Senior Lien General Unsecured Claim. The terms of such proposed settlements are more fully described in <u>Section 6.1(g)</u> herein and in <u>Section 4.2(d)</u> of the Plan.

- On the Effective Date of the Plan, the Senior Lien Agent, the Senior Lien Holders, and their respective successors, predecessors, affiliates, officers, directors, employees, agents, representatives, consultants and attorneys shall be deemed to have been irrevocably released, acquitted, and otherwise discharged by the Debtors, their predecessors and successors, and their respective estates (including the Liquidating Trust) of and from any and all claims and Causes of Action.

PLEASE SEE <u>SECTION 6.1(g)</u> OF THIS DISCLOSURE STATEMENT AND <u>SECTIONS 4.2(d)</u> AND <u>6.12</u> OF THE PLAN FOR A DETAILED EXPLANATION OF THE TREATMENT OF M&M SECURED CLAIMS (INCLUDING THE SETTLEMENT OPTION DISCUSSED ABOVE). ALSO SEE <u>EXHIBIT C</u> ATTACHED HERETO FOR A LIST AND DESCRIPTION OF THE PROPOSED SETTLEMENTS BEING OFFERED TO CERTAIN HOLDERS OF ALLEGED M&M SECURED CLAIMS PURSUANT TO THE TERMS OF THE PLAN.

The terms of this resolution have been incorporated into and are otherwise reflected in the Plan and this Disclosure Statement.

---

[2] As of March 15, 2011, Deferred Professional Fee Claims aggregated approximately $387,284.

### 3.13.  Sale of Substantially All Assets of the Debtors

(a)  Marketing Efforts

The marketing process for the sale of substantially all of the Debtors' assets began in earnest in early May of 2010.  During such process, Stephens contacted approximately 174 parties who it thought might be interested in engaging in a transaction with the Debtors.  Among the parties contacted by Stephens were other oil and gas companies, hedge funds, private equity funds, and other investors.  ~~60~~Sixty parties signed confidentiality agreements in order to obtain access to the diligence materials assembled by the Debtors.  Stephens continued discussions with prospective buyers through September of 2010.  The Debtors received at least 11 bids or bona fide indications of interest from third parties.  Ultimately, the Debtors engaged in substantial negotiation of agreements with at least two parties.  After considerable negotiations, the Debtors selected SR Acquisition I, LLC to serve as the "stalking horse" bidder in connection with the proposed sale of substantially all of the assets of the Debtors.

(b)  Bid Procedures

On October 19, 2010, the Debtors filed the *Motion to (A) Approve the Procedures for the Solicitation of Offers; (B) Approve the Form and Manner of Notice; (C) Approve Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; (D) Approve the Bid Protections and Procedures; and (E) Approve a Break-Up Fee in Connection with the Transaction Contemplated by the Purchase Agreement* [Docket No. 366].  The Bankruptcy Court entered the *Order (A) Approving the Procedures for the Solicitation of Higher or Better Offers; (B) Approving the Form and Manner of Notice; (C) Approving Procedures for Determining Cure Amounts for Executory Contracts and Unexpired Leases; (D) Approving the Stock Purchase Agreement and Authorizing the Debtors to Enter Into the Stock Purchase Agreement and Comply with their obligations Thereunder; (E) Approving a Break-Up Fee in Connection with the Transaction Contemplated by the Stock Purchase Agreement; and (F) Granting Related Relief* [Docket No. 399] (the "Bid Procedures Order") on October 28, 2010.

Pursuant to the Bid Procedures Order, the Bid Procedures (as defined in the Bid Procedures Order) and the Debtors' selection of SR Acquisition I, LLC as the "stalking horse" bidder for substantially all of the Debtors' assets were approved.  The Bid Deadline (as defined pursuant to the Bid Procedures Order) was set for November 11, 2010 at 4:00 p.m., prevailing Central time.  The Debtors received only one additional bid for their assets by the Bid Deadline.  In accordance with the Bid Procedures, an auction was held on November 16, 2010 (the "Auction").

(c)  Auction

At the Auction, the Debtors accepted a cash bid in the amount of $33,125,000.00 (subject to adjustment as set forth in the Bid Procedures Order, Bid Procedures or Purchase Agreement (as defined below)) from SR Acquisition I, LLC as the Successful Bidder (as defined in the Bid Procedures Order).  BRC Acquisition I, LLC offered the second highest or best Qualified Bid (as defined in the Bid Procedures), which was a cash bid in the amount of $33,025,000 (subject to

adjustment as set forth in the Bid Procedures Order, Bid Procedures, or Back-Up Bidder Agreement (as defined in the Bid Procedures Order)).

(d)     Sale Hearing

The Debtors filed their *Motion for an Order Authorizing (A) the Sale of the Debtors' Right, Title and Interest In, To and Under Substantially All of the Debtors' Assets Free and Clear of Claims, Encumbrances, Liens, and Interests, (B) the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Related Relief* (the "Sale Motion") [Docket No. 368] on October 19, 2010, whereby the Debtors sought approval of the sale of substantially all assets of the Debtors to SR Acquisition I, LLC pursuant to the Purchase Agreement (defined below). After a hearing held on November 17, 2010, the Court approved the Sale Motion pursuant to the *Order Authorizing (A) the Sale of the Debtors' Right, Title and Interest In, to and Under Substantially All of the Debtors' Assets Free and Clear of Claims, Encumbrances, Liens, and Interests, (B) the Assumption and Assignment of Executory Contracts and Unexpired Leases, and (C) Related Relief* (the "Sale Order") [Docket No. 481].

(e)     Consummation of the Sale

On December 8, 2010, the Debtors consummated the sale of substantially all of the assets of the Debtors to SR Acquisition I, LLC, a Delaware limited liability company (the "Buyer"), pursuant to the Sale Order. A copy of the purchase agreement governing such sale (as amended, the "Purchase Agreement") is attached to the Sale Order as **Exhibit A**.

Pursuant to the Purchase Agreement, substantially all assets of the Debtors were transferred to Buyer, Free and Clear of any and all Liens, Claims, and other interests except as otherwise set forth in the Purchase Agreement. Certain executory contracts and unexpired leases of the Debtors were also assumed by the Debtors and assigned to the Buyer in connection therewith. As consideration for the Properties (as defined in the Purchase Agreement), the Buyer agreed to pay cash in the amount of $33,125,000 (subject to adjustment as set forth in the Bid Procedures Order, Bid Procedures, and Purchase Agreement) and assume all Assumed Liabilities (as defined in the Purchase Agreement).

On December 8, 2010, the closing date of the sale, the Debtors received cash proceeds from the Buyer in the amount of $~~30,431.72~~30,431,453.72. In addition to such amount, $2,896,000 (the "Defect Escrow Amount") was paid by the Buyer and placed in escrow pursuant to Section 11.5 of the Purchase Agreement in connection with certain claimed environmental defects asserted by the Buyer in accordance with the procedures set forth in the Purchase Agreement.

To the extent the Debtors (or the Liquidating Trust as assignee of the Debtors' rights under the Purchase Agreement) become entitled to all or any portion of the Defect Escrow Amount, such amounts shall be deemed Sale Proceeds pursuant to the terms of the Plan.

The sale proceeds received by the Debtors on the closing date of the sale (less amounts used to pay the DIP Facility and amounts used by the Debtors as Cash Collateral in accordance with the Final Financing Order) are currently being held by the Debtors to be distributed in

accordance with the Plan.  As of January 31, 2011, approximately $22,563,196.89 in such proceeds were remaining and held by the Debtors.

### 3.14. Reclamation Demands

On June 7, 2010, X-Chem, Inc. ("X-Chem") sent the Debtors a reclamation demand letter by which it sought to reclaim certain goods delivered by X-Chem to the Debtors within 45 days before the Petition Date.  After reviewing such demand, the Debtors determined that the goods X-Chem sought to reclaim had been consumed at the time such demand was made and/or the demand was otherwise improper as it contained certain invoices that could not be substantiated by the Debtors.

### 3.15. Litigation

(a)     Post-Petition Litigation

(i)     *TriDimension Energy, L.P. v. Vada Group, L.P., et al., Adversary Proceeding No. 10-03224-SGJ*

On or about September 5, 2007, TriDimension entered into a Purchase and Participation Agreement (the "Participation Agreement") with Vada Group, L.P. ("Vada").  The Participation Agreement covers listed oil and gas leases, assets, and prospects in Louisiana and provided for, among other things, the joint development of prospects in certain designated areas.  Through the Participation Agreement, Vada transferred, among other things, partial ownership in certain oil and gas leases, easements, and wells in the Livonia Field in Pointe Coupee Parish, Louisiana to TriDimension.  Vada also agreed to offer TriDimension the right to participate in the exploration and development of certain designated prospects described in the Participation Agreement.

Disputes arose between TriDimension, on the one hand, and Vada and Vada's affiliate, Liberty Resources, Inc. ("Liberty"), on the other hand, regarding the parties' respective rights under the Participation Agreement, including, without limitation, whether TriDimension owed certain amounts to Vada under the Purchase Agreement (which TriDimension disputes). Specifically, Vada alleges that TriDimension owes Vada at least $1,301,200.72 (the "Alleged Balance") under the Participation Agreement, which amount TriDimension believes was expressly forgiven and excused under the Participation Agreement because Vada failed to timely offer participations to Debtors and drill the requisite number of wells in designated Louisiana prospects. Based on the Alleged Balance, in as early as March 2009, Liberty, as contract operator of certain wells in which the Debtors own a working interest, began, upon information and belief, diverting revenues from TriDimension's share of production to Vada so that Vada could apply it to the Alleged Balance.  As of January 31, 2011, TriDimension believes that Vada and/or Liberty have wrongfully withheld at least $1,220,000.00 in production revenues that TriDimension is owed by Liberty and/or Vada under certain joint operating agreements.  Despite TriDimension's demands that Vada and Liberty turn over these production revenues to TriDimension, Vada and Liberty have refused to do so to date.

On July 9, 2010, Vada filed its *Motion for Leave to Recoup* [Docket No. 198] (the "Motion to Recoup") with the Bankruptcy Court pursuant to which Vada requested that the

Bankruptcy Court grant it leave of court and/or relief from the automatic stay so that Vada could recoup or setoff the production revenues owed TriDimension by Vada's affiliate, Liberty, against the Alleged Balance that Vada claims is owed it by TriDimension.  On July 30, 2010, the LP Debtors filed their *Objection to Vada Group LP's Motion for Leave to Recoup* [Docket No. 251]. By order of the Bankruptcy Court entered on August 18, 2010, the Motion to Recoup was consolidated with the Vada Adversary Proceeding (as defined below).

On July 30, 2010, TriDimension filed a Complaint against Vada and Liberty in the Bankruptcy Court thereby initiating Adversary Proceeding No. 10-03224-SGJ (the "Vada Adversary Proceeding").  In its Complaint, TriDimension alleged 20 counts against Vada and Liberty arising in connection with the Participation Agreement including, without limitation, breach of the Participation Agreement, breach of joint operating agreements, conversion, unjust enrichment, breach of fiduciary duties, constructive trust, violation of the automatic stay, turnover of property of the estate, avoidance of fraudulent transfers, preferential transfers, and post-petition transfers, and declaratory judgment.  Specifically, the Complaint requests, *inter alia*, that the Bankruptcy Court award damages to TriDimension resulting from Vada's and Liberty's breach of the Participation Agreement and related joint operating agreements, including the production revenues which TriDimension alleges have been wrongfully withheld by Vada and Liberty and the costs of bankruptcy caused by their breaches, and enter a declaratory judgment finding, *inter alia*, that the Alleged Balance is no longer due and payable and that Vada and Liberty are not entitled to recoup or set off the Alleged Balance allegedly owed to Vada against the production revenues owed by Liberty to TriDimension.

On September 13, 2010, Vada and Liberty filed their *Original Answer to TriDimension Energy, L.P.'s Complaint, Affirmative Defenses and Counterclaim* [Docket No. 11; Adv. Pro. No. 10-03224-SGJ] pursuant to which Vada and Liberty, among other things, denied any and all liability to TriDimension and asserted counterclaims against TriDimension for breach of contract, conversion, unjust enrichment, unfair trade practices, compensation, and declaratory judgment.

On ~~January 19,~~March 18, 2011, the Bankruptcy Court entered its *Agreed ~~Revised Scheduling~~ Order Extending the Stay to Facilitate Settlement Negotiations* [Docket No. ~~10-03224-SGJ~~26; Adv. Pro. No. 10-03224-SGJ] pursuant to which the Bankruptcy Court stayed the Vada Adversary Proceeding through ~~February 18,~~April 1, 2011, at which time the parties are required to present a joint status report to the Bankruptcy Court.

(ii)     *Vada's Notice of Appeal of Sale Order*

On November 29, 2010, Vada filed its *Notice of Appeal* [Docket No. 490, amended by Docket No. 505] with the Bankruptcy Court, appealing the Bankruptcy Court's entry of the Sale Order to the United States District Court for the Northern District of Texas, Dallas Division (the "District Court").  On December 7, 2010, Vada filed its *Designation of Record and Statement of Issues on Appeal* [Docket No. 528] pursuant to which Vada designated certain documents to be included in the record on appeal and identified its issues on appeal.  On December 21, 2010, the Debtors filed their *Designation of Additional Items to Include in Record on Appeal* [Docket No. 571].  ~~As of the date hereof, the appeal has not yet been docketed with~~On March 18, 2011, the record on appeal was transmitted by the Bankruptcy Court to the District Court.

      (b)      <u>Debtors' Motion to Enforce and Implement Asset Purchase Agreement and for Disallowance of any Alleged Defect Discovered Through Breach of Asset Purchase Agreement.</u>

The Purchase Agreement includes, among other things, a procedure by which the purchase price paid by the Buyer may be adjusted downward on account of certain asserted environmental defects with respect to the Debtors' oil and gas properties that were sold to the Buyer pursuant thereto. In connection with this procedure, the Debtors agreed to afford the Buyer and its authorized representatives access to the Debtors' properties to perform certain restricted non-invasive environmental testing on such properties. Upon conclusion of its environmental investigation, the Buyer asserted environmental defects in the amount of $2,896,000 with respect to the Debtors' properties and such amount was withheld from the consideration paid by the Buyer and placed in escrow pending resolution of such asserted environmental defects in accordance with the procedures set forth in the Purchase Agreement.

On January 4, 2010, the Debtors filed their *Motion to Enforce and Implement Asset Purchase Agreement and for Disallowance of any Alleged Defect Discovered through Breach of the Asset Purchase Agreement* [Docket No. 584] (the "<u>Motion to Enforce</u>"). Pursuant to the Motion to Enforce, the Debtors request that the Bankruptcy Court enter an order (i) finding that the Buyer breached the Purchase Agreement by conducting invasive environmental testing in contravention of the Purchase Agreement, (ii) enforcing the terms of the Purchase Agreement by ordering that the alleged environmental defects identified by the Buyer through invasive testing (collectively, the "<u>Invasive Testing Defects</u>") are not eligible for assertion as a defect for which a purchase price adjustment may be made under the Purchase Agreement, (iii) ordering the release and disbursement to the Debtors of funds held in escrow attributable to the Invasive Testing Defects (approximately $2,165,000), (iv) preventing the Invasive Testing Defects from being submitted to an arbiter for any consideration or determination as to the validity or value of any Identified Claims (as defined in the Purchase Agreement) that relate to the Invasive Testing Defects, and (v) awarding all damages, costs, expenses and attorneys' fees to which the Debtors would be entitled.

On January 26, 2011, the Buyer filed its *Objection to the Debtors' Motion to Enforce and Implement Asset Purchase Agreement and for Disallowance of any Alleged Defect Discovered Through Breach of the Asset Purchase Agreement* [Docket No. 603] (the "<u>Buyer Objection</u>"). Pursuant to the Buyer Objection, the Buyer requests that the Court deny the Motion to Enforce alleging, among other things, that (i) the Debtors breach of covenant claims did not survive the closing of the sale pursuant to the Purchase Agreement, (ii) the Buyer did not breach the Purchase Agreement and received the Debtors' consent to conduct the invasive environmental testing, (iii) the Debtors were not harmed by the testing, and (iv) the Debtors' damage claims are barred by the Purchase Agreement. On that same date, the Buyer also filed its *Motion for the Entry of an Order Requiring any Cause of Action Asserted by the Debtors Related to the Asset Purchase Agreement to be Filed Solely as an Adversary Proceeding* [Docket No. <u>602</u>] (the "<u>Buyer Motion</u>"). Pursuant to the Buyer Motion, the Buyer ~~requests~~<u>requested</u> that the Court dismiss the Motion to Enforce and require any action related to a breach of the Purchase Agreement to be filed in the form of an adversary proceeding.

~~The Debtors anticipate that a hearing on the Buyer Motion and a status conference on the Motion to Enforce will be scheduled before the Bankruptcy Court in late February, 2011.~~

Following a status conference regarding the Buyer Motion held by the Bankruptcy Court on February 28, 2011, the Bankruptcy Court entered the *Agreed Order Withdrawing Motion to Enforce and Implement Asset Purchase Agreement and for Disallowance of any Alleged Defect Discovered through Breach of the Asset Purchase Agreement* [Docket No. 650] (the "Agreed Order"). Pursuant to the Agreed Order, (i) the Debtors withdrew the Motion to Enforce and agreed to refile the claims asserted therein in the form of an adversary proceeding, (ii) the Debtors and Buyer agreed that, in the event the Debtors file the adversary proceeding on or before March 30, 2011, any arbitration that could be conducted under the Purchase Agreement will be abated pending entry of a final judgment of the Bankruptcy Court disposing of such adversary proceeding, and (iii) the Debtors and Buyer agreed to the entry of an expedited scheduling order upon the filing of the adversary proceeding as more fully described therein.

(c) Motions to Lift the Automatic Stay

During the pendency of these Cases, the Debtors have encountered motions to lift the automatic stay filed by various creditors, including Pryme Lake Exploration, LLC and M.J. Farms, Ltd. [Docket Nos. 83 and 219, respectively]. The Debtors have opposed such requests, and after negotiations with the respective parties, have entered into agreed orders on each of the lift stay motions [Docket No. 97 and 260, respectively].

(d) Pre-Petition Stayed Litigation

The following chart summarizes state court litigation that has been stayed with respect to the Debtors by the filing of these Cases:

| Case Name | Cause No. | Court | Status As of Petition Date | Claims Alleged |
|---|---|---|---|---|
| Buena Vista Corporations v. Axis Onshore, LP | 25356 Div A | 7th Judicial District Court, Parish of Concordia, LA | Answer filed on April 16, 2010. | Monies Due and Owing- Services Rendered |
| Steve Kent Trucking, Inc. v. Axis Onshore LP | C590741, Section 26 | 19th Judicial District Court, Parish of East Baton Rouge, LA | Petition received on May 22, 2010. | Monies Due and Owing- Services Rendered |
| Weatherford U.S., L.P., et al. v. Axis Onshore, L.P., TDE Subsidiary GP, LLC, Tridimension Energy, LP, and TDE Operating GP, LLC | Case No. 201024349 | 270th Judicial District Court of Harris County, TX | Petition received in May 2010. | Monies Due and Owing – Services Rendered and Goods Supplied |

| | | | | |
|---|---|---|---|---|
| Petroleum Engineers, Inc. v. Axis Onshore, L.P. | Case No. C580710 | 9th Judicial District Court, Parish of East Baton Rouge, LA | Answer and counterclaim filed on September 11, 2009. | Monies Due and Owing; Axis Onshore, LP filed a counterclaim against PEI and Hamilton Engineering, Inc. for negligence and breach of contract |
| BMJ Construction LLC v. Axis Onshore, LP and TDE Subsidiary GP LLC | Case No. 9647213 | 23rd Judicial District Court, Parish of Ascension, LA | Petition filed on May 21, 2010. | Monies Due and Owing – Services Rendered |
| MJ Farms, Ltd. v. Exxon Mobil Corp., et al. | Case No. 24055(B), Div. A | 7th Judicial District Court, Parish of Concordia, LA | Trial date set; relief from automatic stay granted so that case may proceed against non-Debtor defendants. | Claims for environmental and property damage; Axis Onshore, LP added as third-party defendant by other defendants. |
| Agri-South Group, LLC, et al. v. Exxon Mobil Corp., et al. | Case No. 24132 | 7th Judicial District Court, Parish of Concordia, LA | Third party demand received October 2009. | Claims for environmental and property damage; Axis Onshore, LP added as third-party defendant by other defendants. |

(e)    ~~Potential~~ Litigation Not Yet Commenced

The Plan preserves all Causes of Action, unless expressly otherwise released, and provides for them to be transferred to the Liquidating Trust on the Effective Date of the Plan.  The Causes of Action include certain Avoidance Actions and other ~~claims and potential~~ claims that the Debtors hold against third parties.  In accordance with section 1123(b)(3) of the Bankruptcy Code, the Plan further provides that the Liquidating Trustee will have standing, on and after the Effective Date of the Plan, to pursue the Causes of Action and will be deemed appointed as the representative of the Estates for the purpose of enforcing, prosecuting, and settling them.  The Estates ~~do or may~~ hold the following Causes of Action, among others, all of which shall be preserved and transferred to the Liquidating Trust (unless expressly otherwise released by the Plan):

(i)      <u>Preferences, Fraudulent Transfers and Other Avoidance Actions</u>.

Pursuant to section 547 of the Bankruptcy Code, a debtor may recover certain preferential transfers of property, including Cash, made while insolvent during the ninety days immediately prior to the filing of its bankruptcy petition with respect to preexisting debts to the extent the transferee received more than it would have in respect of the preexisting debt had the transferee not received the payment and had the debtor been liquidated under chapter 7 of the Bankruptcy Code. In the case of "insiders," the Bankruptcy Code provides for a one-year preference period.

Transfers made in the ordinary course of the debtor's and the transferee's business according to their ordinary business terms are generally not recoverable. Furthermore, if the transferee extended credit subsequent to the transfer (and prior to the commencement of the bankruptcy case), such extension may constitute a defense, to the extent of any new value, against any otherwise recoverable transfer of property. If a preferential transfer were recovered by the debtor, the transferee would have a general unsecured claim against the debtor to the extent of the debtor's recovery.

The Debtors estimate that they made payments in the approximate amount of $3,446,651.20 to various creditors within the ninety-day period preceding the Petition Date and payments of $13,824,210.77 to insiders within the one-year period preceding the Petition Date. These payments by amount and payee are listed on the attached **Exhibit D** and incorporated herein by reference. The Debtors have not yet analyzed whether the recipients of such payments would have a defense to a preference action. <u>Under the Plan, all Avoidance Actions of the Debtors against the payees listed on the attached</u> **Exhibit D** <u>with respect to the payments listed thereon shall be preserved and transferred to the Liquidating Trust, and the Liquidating Trustee will have the authority as a representative of the Estates to investigate and prosecute all such Avoidance Actions in accordance with section 1123(b)(3) of the Bankruptcy Code.</u>

Under section 548 of the Bankruptcy Code and various state laws, a debtor may recover certain prepetition transfers of property, including the grant of a security interest in property, made while insolvent to the extent the debtor receives less than fair value for such property. In addition, avoidance actions exist under sections 544, 545, 549 and 553(b) of the Bankruptcy Code that allow a debtor to avoid and/or recover certain property. As of the date hereof, the Debtors have not yet estimated the potential recovery from the prosecution of their Avoidance Actions. Under the Plan, <u>all such Avoidance Actions shall be preserved and transferred to the Liquidating Trust, and</u> the Liquidating Trustee will have the authority as a representative of the Estates to investigate and prosecute all such Avoidance Actions in accordance with section 1123(b)(3) of the Bankruptcy Code. <u>The Liquidating Trustee will pursue[3] all Avoidance Actions, including those listed on</u> **Exhibit D**. <u>In addition to the Avoidance Actions listed on Exhibit D, the Liquidating Trustee will also pursue all claims and Causes of Action against recipients of working-interest assignments, both pre- and post-petition, for which the Debtors did not receive reasonably equivalent value. The Liquidating Trustee will also pursue all claims and Causes of Action against Pryme Oil & Base Inc., Pryme Lake Exploration LLC, and Pryme Energy LLC for all pre- and post-petition assignments of property, including but not limited to, working interest</u>

[3] <u>Pursuit of an Avoidance Action may include, but not be limited to, service of a demand letter, settlement negotiation, pursuit of litigation, and any other means available to the Liquidating Trustee to obtain a resolution of such claim Avoidance Action.</u>

assignments and assignments of personal property, for which the Debtors did not receive reasonably equivalent value.

(ii)     Other Causes of Action

(A)     Investigation of Causes of Action

The Liquidating Trustee will continue the investigation and, analysis, and pursuit[4] of Causes of Action against a number of persons, relating to, among other things, the following:

- Any lawsuits for, or in any way involving, the collection of accounts receivable, lien foreclosures or any matter related to the Plan;
- Any actions against landlords, lessees, sublessees, or assignees arising from various leases, subleases, and assignment agreements relating thereto, including, but not limited to, actions for overcharges relating to taxes, common area maintenance and other similar charges;
- Any litigation or lawsuit initiated by any of the Debtors that is currently pending, whether in the Bankruptcy Court, before the American Arbitration Association, or any other court or tribunal;
- Any and all Causes of Action against any customer or vendor who has improperly asserted or taken action through setoff or recoupment; and
- Any and all actions, whether legal, equitable, or statutory in nature, arising out of, or in connection with, the Debtors' business operations.

In addition, there may be numerous other Causes of Action which currently exist or may subsequently arise that are not set forth in the Plan or Disclosure Statement, because the facts upon which such Causes of Action are based are not fully or currently known by the Debtors and as a result, cannot be raised during the pendency of the Cases (collectively, "Unknown Causes of Action"). The failure to list any such Unknown Cause of Action in the Plan or the Disclosure Statement is not intended to limit the rights of the Liquidating Trust to pursue any Unknown Cause of Action to the extent the facts underlying such Unknown Cause of Action become fully known to the Debtors or the Liquidating Trustee. The Liquidating Trustee will pursue unknown Causes of Action to the extent they become known.

(B)     Preservation of All Causes of Action Not Expressly Settled or Released

The Debtors have attempted to disclose herein certain material Causes of Action including Avoidance Actions and other actions that they may hold against third parties. However, the Plan Proponents have not performed an exhaustiveconcluded the investigation orand analysis of all potential claims and Causes of Action against third parties. It is the contemplation of the Plan, that such investigation and analysis will continue post-Confirmation by the Liquidating Trustee. You should not rely on the omission of the disclosure of a claim or Cause of Action to assume

---

[4] Pursuit of such claim or Cause of Action may include, but not be limited to, service of a demand letter, settlement negotiation, pursuit of litigation, and any other means available to the Liquidating Trustee to obtain a resolution of such claim or Cause of Action.

that the Debtors hold no claim or Cause of Action against any third-party, including any Creditor that may be reading this Disclosure Statement and/or casting a Ballot.

**Unless expressly released by the Plan or by an order of the Bankruptcy Court, any and all such claims or Causes of Action against third parties are specifically reserved and will vest in or be transferred to the Liquidating Trust, including but not limited to any such claims or Causes of Action relating to any counterclaims, demands, controversies, costs, debts, sums of money, accounts, reckonings, bonds, bills, damages, obligations, liabilities, objections, legal proceedings, equitable proceedings, and executions of any nature, type, or description, avoidance actions, preference actions, fraudulent transfer actions, strong-arm power actions, state law fraudulent transfer actions, improper assignments of interest, negligence, gross negligence, willful misconduct, usury, fraud, deceit, misrepresentation, conspiracy, unconscionability, duress, economic duress, defamation, control, interference with contractual and business relationships, conflicts of interest, misuse of insider information, concealment, disclosure, secrecy, misuse of collateral, wrongful release of collateral, failure to inspect, environmental due diligence, negligent loan processing and administration, wrongful recoupment, wrongful setoff, violations of statutes and regulations of governmental entities, instrumentalities and agencies, equitable subordination, debt recharacterization, substantive consolidation, securities and antitrust laws violations, tying arrangements, deceptive trade practices, breach or abuse of any alleged fiduciary duty, breach of any special relationship, course of conduct or dealing, obligation of fair dealing, obligation of good faith, at law or in equity, in contract, in tort, or otherwise, known or unknown, suspected or unsuspected.**

Unless expressly released by the Plan or by an order of the Bankruptcy Court, the Debtors ~~may~~ hold claims against ~~a holder~~holders of ~~a Claim~~Claims or Equity ~~Interest~~Interests and the Liquidating Trustee ~~may~~will pursue such claims, including but not limited to, the following claims and Causes of Action, all of which shall be preserved for the benefit of the Liquidating Trust:[5]

- Preference claims under section 547 of the Bankruptcy Code, including, but not limited to, any and all such claims against recipients listed on **Exhibit D** attached hereto;

- Fraudulent transfer and other avoidance claims arising under sections 506, 542 through 551, and 553 of the Bankruptcy Code and various state laws, including, but not limited, to claims against any recipients of transfers included in the Debtors' Statements of Financial Affairs;

- Unauthorized post-petition transfer claims including, without limitation, claims under section 549 of the Bankruptcy Code;

- Claims and Causes of Action asserted in current litigation, whether commenced pre- or post-petition, including all litigation referenced in the Debtors' Statements of Financial Affairs, including, but not limited to, any assignments of working

---

[5] Pursuit of a claim or Cause of Action may include, but not be limited to, service of a demand letter, settlement negotiation, pursuit of litigation, and any other means available to the Liquidating Trustee to obtain a resolution of such claim or Cause of Action.

interests that were not made pursuant to a farmout agreement protected by 11 U.S.C. § 541(b)(4);

- Counterclaims asserted in current litigation;

- Claims and Causes of Action against Petroleum Engineers, Inc. and Hamilton Engineering, Inc. (and their respective insurers) arising in connection with the drilling of certain wells including, without limitation, those claims asserted or assertable in the case styled *Petroleum Engineers, Inc. v. Axis Onshore, L.P.*, Case No. C580710, pending before the 9th Judicial District Court, Parish of East Baton Rouge, Louisiana;

- Claims and Causes of Action against Vada and Liberty (and their respective insurers) asserted or assertable by the Debtors in the Vada Adversary Proceeding;

- Claims and Causes of Action against Teledrift, Inc. ~~and/or,~~ Teledrift Company and/or Flotek (and their respective insurers) in connection with Axis Onshore, L.P.'s rental and service of certain defective equipment from Teledrift that caused damage in connection with the drilling of ~~a certain~~the Graves 37-1 No. 1 well in Wilkinson County, Mississippi;

- Claims and Causes of Action (including Avoidance Actions) against Pryme Oil and Gas, Inc., Pryme Lake Exploration, LLC and their respective affiliates (and their respective insurers) in connection with the sale and/or purchase of certain oil and gas properties, a barge and related equipment and the operation thereof;

- Claims and Causes of Action against SR Acquisition I, LLC and/or its affiliates (and their respective insurers) pursuant to, in connection with, or arising under the Purchase Agreement or transactions consummated thereby, including, without limitation, those claims and Causes of Action asserted in the Motion to Enforce and the adversary proceeding to be commenced in connection therewith;

- Claims and Causes of Action against ~~the Debtors' former and/or current officers, directors, managers, and employees (and their respective insurers), including, without limitation those former and/or current officers, directors, managers, and employees listed in Section 2.3 hereof;~~ Rock Financial Partners, LLC, Rock Energy Capital, LLC, QF Holdings, LLC, QF Holdings, Inc., Wright Capital Corp., L. Walter Quinn, Joseph W. Gregory, Michael J. Sullivan, Don Wright, and any and all of their former and/or current officers, directors, managers, employees, and affiliates (and their respective insurers) related to the marketing, management, and sale of substantially all of the Debtors' assets for, among other claims, interference with contractual and business relationships, conspiracy, conflict of interest, misuse of insider information, misuse of collateral, negligence, breach or abuse of fiduciary duties, breach of special relationships, breach of conduct or dealing, breach of contract, and usurpation of corporate opportunities;

- Claims ~~against~~and Causes of Action against the Debtors' former and/or current officers, directors, managers, and employees (and their respective insurers), including, without limitation those former and/or current officers, directors, managers, and employees listed in Section 2.3 hereof for, among other claims, interference with contractual and business relationships, conspiracy, conflict of interest, misuse of insider information, misuse of collateral, negligence, negligent oversight, breach or abuse of fiduciary duties, breach of special relationships, breach of conduct or dealing, breach of contract, and usurpation of corporate opportunities, including, but not limited to, Claims and Causes of Action related to (a) efforts arising out of the Debtors' pre- and post-petition efforts to sell assets of the Debtors and non-Debtor assets to (i) ArcLight Capital Partners and any of its insiders, affiliates and/or affiliates of insiders (and their respective insurers), and (ii) Rock Financial Partners, LLC, Rock Energy Capital, LLC, QF Holdings, LLC, QF Holdings, Inc., Wright Capital Corp., L. Walter Quinn, Joseph W. Gregory, Michael J. Sullivan, Don Wright, and any and all of their former and/or current officers, directors, managers, employees, and affiliates (and their respective insurers), and (b) any and all relationships, transactions, dealings, Claims and Causes of Action related to any and all former and/or current affiliates and insiders of any of the Debtors (and their respective insurers), including, but not limited to, Britlind Resources LLC, Golden West Holdings, LLC, Golden West Drilling, LLC, Telluride Exploration LLC, Tucson Real Estate LLC, E-Operating LLC, E-Operating Holdings, E-Energy, Array Operating, Concordia Rental Tools, Lamar Acquisition LLC, Vital Oil Well Service, Miss-Lou Oil Well Service, and JMR Oil;

- Claims and Causes of Action against any and all former and/or current affiliates and insiders of any of the Debtors (and their respective insurers), including, but not limited to, Britlind Resources LLC, Golden West Holdings, LLC, Golden West Drilling, LLC, Telluride Exploration LLC, Tucson Real Estate LLC, E-Operating LLC, E-Operating Holdings, E-Energy, Array Operating, Concordia Rental Tools, Lamar Acquisition LLC, Vital Oil Well Service, Miss-Lou Oil Well Service, and JMR Oil (and their respective insurers) for, among other claims, fraudulent transfers, wrongful recoupment, interference with contractual and business relationships, conspiracy, conflict of interest, misuse of insider information, misuse of collateral, negligence, negligent oversight, breach or abuse of fiduciary duties, breach of special relationships, breach of conduct or dealing, breach of contract, and usurpation of corporate opportunities;

- Claims and Causes of Action against the Debtors' direct and indirect Equity Interest holders (and their respective insurers), including, without limited to, HM Capital Partners I LP and its affiliates; and

- Claims and Causes of Action related to the improper assignments of property and interests.

The Liquidating Trustee shall pursue all defendants described in this Disclosure Statement for all claims and Causes of Action described herein that are not resolved by the Debtors prior to the Effective Date. Pursuit of a claim or Cause of Action may include, but not be limited to,

service of a demand letter, settlement negotiation, pursuit of litigation, and any other means available to the Liquidating Trustee to obtain a resolution of such claim or Cause of Action. In the event the Liquidating Trustee is not able to resolve any claims and Causes of Action described in the Disclosure Statement, the Liquidating Trustee will escalate its pursuit of claims and Causes of Action by any means authorized under the Plan, Disclosure Statement, Liquidating Trust Agreement, and applicable law, including litigation in such forum as the Liquidating Trustee deems appropriate. Resolution of the claims and Causes of Action described in this Disclosure Statement by the Liquidating Trustee shall be in accordance with the requirements and procedures set forth in the Plan and Liquidating Trust Agreement.

The Liquidating Trustee shall be appointed representative of the Estates pursuant to section 1123(b)(3)(B) of the Bankruptcy Code with respect to the Causes of Action and, except as otherwise ordered by the Bankruptcy Court and subject to any releases in the Plan, on the Effective Date, the Liquidating Trust shall be transferred all Causes of Action, and may enforce, sue on, settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action. Except as otherwise ordered by the Bankruptcy Court, the Liquidating Trustee shall be vested with authority and standing to prosecute any Causes of Action.

The Debtors' failure to identify a claim or Cause of Action herein is specifically not a waiver of any claim or Cause of Action. The Debtors will not ask the Bankruptcy Court to rule or make findings with respect to the existence of any Cause of Action or the value of the entirety of the Estates at the Confirmation Hearing; accordingly, except claims or Causes of Action which are expressly released by the Plan or by an Order of the Bankruptcy Court, the Debtors' failure to identify a claim or Cause of Action herein shall not give rise to any defense of any preclusion doctrine, including, but not limited to, the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable, or otherwise), or laches with respect to claims or Causes of Action which could be asserted against third parties, including holders of Claims against or Equity Interests in the Debtors who may be reading this Disclosure Statement and/or casting a Ballot, except where such claims or Causes of Action have been explicitly released in the Plan or the Confirmation Order.

In addition, the Debtors and the Liquidating Trust expressly reserve the right to pursue or adopt any claim alleged in any lawsuit in which the Debtors are a party.

**PLEASE TAKE NOTICE THAT, WITH THE EXCEPTION OF THOSE CAUSES OF ACTION THAT ARE EXPRESSLY RELEASED OR WAIVED UNDER THE TERMS OF THE PLAN, ALL CAUSES OF ACTION OF THE DEBTORS AND THEIR ESTATES, WHETHER OR NOT SPECIFIED HEREIN, WILL BE PRESERVED AND TRANSFERRED TO THE LIQUIDATING TRUST PURSUANT TO THE PLAN. THE LACK OF DISCLOSURE OF ANY PARTICULAR CAUSE OF ACTION SHALL NOT CONSTITUTE, NOR BE DEEMED TO CONSTITUTE, A RELEASE OR WAIVER OF SUCH CAUSE OF ACTION, AS THE DEBTORS INTEND FOR THE PLAN TO PRESERVE AND TRANSFER TO THE LIQUIDATING TRUST ANY AND ALL CAUSES OF ACTION HELD BY THE DEBTORS AND THEIR ESTATES AS OF THE EFFECTIVE DATE OF THE PLAN.**

# ARTICLE IV

## FINANCIAL INFORMATION

### 4.1.  Assets

The Debtors' assets as of the Petition Date are set forth in the Bankruptcy Schedules and reference should be made thereto for information concerning such assets as of the Petition Date.

As more fully described in Section 3.13 of this Disclosure Statement, on December 8, 2010, the Debtors sold all of their right, title and interest in, to, and under substantially all of their assets to the Buyer in accordance with the terms of the Purchase Agreement and Sale Order.  As a result of such sale, as of January 31, 2011, the Debtors' remaining material assets consisted of Sale Proceeds in the amount of $22,563,196.89, accounts receivable in the face amount of approximately $2,371,035.00, Causes of Action, and contract rights and claims under the Purchase Agreement.

### 4.2.  Liabilities

(a)  Prepetition

(i)  Secured Claims

The Debtors Bankruptcy Schedules, on a collective basis and after giving effect to substantive consolidation, disclose Secured Claims of up to an aggregated amount of $43,528,019.18 43,530,519.18 as of the Petition Date, all of such amount on account of the Senior Lien Claims of the Senior Lien Agent and the Senior Lien Holders.  Proofs of Claim asserting alleged Other Secured Claims (excluding M&M Secured Claims and Senior Lien Claims) have been filed against the Debtors by approximately 25 17 different parties in the aggregate amount of $2,143,800.00. 1,769,962.23.

(ii)  Ad Valorem Tax Claims

The Debtors' Bankruptcy Schedules, on a collective basis and after giving effect to substantive consolidation, disclose Ad Valorem Tax Claims of up to an aggregate amount of $0.00.  Proofs of Claim asserting alleged Ad Valorem Tax Claims have been filed against the Debtors in the amount of $4,322.56. 2,249.33.

(iii)  Priority Tax Claims

The Debtors' Bankruptcy Schedules, on a collective basis and after giving effect to substantive consolidation, disclose Priority Tax Claims of an unknown amount in the aggregate as of the Petition Date.  These Priority Tax Claims relate to claims asserted by the Debtors' taxing authorities.  Pursuant to various orders entered by the Bankruptcy Court, including the "first day" order allowing payment of certain prepetition taxes [Docket No. 180] and resolutions reached with certain taxing authorities, the Debtors believe that the Priority Tax Claims, if any, have been

reduced to less than $~~3,000.~~3,000.00. Proofs of Claim asserting alleged Priority Tax Claims have been filed against the Debtors in the amount of $~~2,741.43~~2,766.43.

    (iv)    <u>Priority Claims</u>

The Debtors' Bankruptcy Schedules disclose Priority Claims related to claims asserted by the Debtors' current and former employees and independent contractors. Pursuant to various Orders entered by the Bankruptcy Court, including the "first day" order allowing payment of prepetition employee obligations [Docket No. 51], the Debtors believe that the Priority Claims have been reduced to less than $~~10,000.~~10,000.00. However, Proofs of Claim asserting alleged Priority Claims have been filed against the Debtors in the aggregate amount of $~~197,676.66.~~196,402.66. The Debtors believe that at least $~~190,360.00~~189,111.00 of these alleged Priority Claims are improperly asserted as priority claims and ~~should be reclassified as~~the Debtors have sought reclassification (as a Non-Senior Lien General Unsecured Claim) and/or disqualification of these Claims.

    (v)    <u>M&M Claims, Non-Senior Lien General Unsecured Claims and Cure Claims</u>

The Debtors' Bankruptcy Schedules, on a collective basis and after giving effect to substantive consolidation, disclose trade and general unsecured claims of up to $3,836,798.22 in the aggregate as of the Petition Date. This amount includes, among other things, Non-Senior Lien General Unsecured Claims and M&M ~~Secured~~ Claims (including Cure Claims) of the Debtors' trade vendors, royalty and working interest owners, and various other general and administrative claimants, and it excludes any prepetition claims resulting from post-petition events (such as rejections of executory contracts or unexpired leases) and general unsecured claims of the Senior Lien Agent and the Senior Lien Holders.

Proofs of Claim asserting alleged Non-Senior Lien General Unsecured Claims and M&M Secured Claims (including Cure Claims), after removing duplicate, amended and/or claims subject to a pending objection and giving effect to substantive consolidation, have been filed against the Debtors in the amounts of approximately $~~8,174,463.10~~7,758,077.67 and $4,622,335.17, respectively. All unpaid Operational Cure Claims are asserted M&M Secured Claims~~, and such unpaid~~. All Non-Operational Cure Claims ~~do not exceed $_____~~have been paid in full as of the date hereof.

Based upon the settlement between the Senior Lien Agent, Senior Lien Holders, and Committee as more fully set forth herein and in the Plan, a Carveout Reserve, which shall be funded with approximately $1.3 million of Sale Proceeds[6], will be established by the Liquidating Trust and shall (a) first, be used to pay $~~25,000~~25,000.00 of the Liquidating Trust Expense Carveout, (b) second, be used to pay (or to reserve for payment of) all Allowed M&M Secured Claims and all Allowed Operational Cure Claims in full, and (c) thereafter, to the extent any funds remain in the Carveout Reserve, be transferred to the Series B Distribution Reserve for

---

[6] Pursuant to the Plan, the $1.3 million Carveout Reserve Amount is to be reduced by all amounts paid by the Debtors prior to the Effective Date on account of Operational Cure Claims pursuant to the Sale Order. As of the date hereof, $74,050.29 of Operational Cure Claims have been paid by the Debtors and, as a result, the Debtors anticipate the Carveout Reserve Amount to be $1,225,949.71 on the Effective Date.

Distribution to the holders of Series B Liquidating Trust Interests in accordance with the terms of the Plan.

(vi)     Filed Claims

As of the filing of this Disclosure Statement, approximately 371277 Proofs of Claims have been Filed.  The aggregate Face Amount of these Proofs of Claim substantially exceeds the amount of Claims set forth in the Bankruptcy Schedules.  Although the Debtors believe that many Proofs of Claim are overstated, filed in the incorrect class or filed in duplicate or otherwise improper, the Debtors are only in the initial stage of the Claims reconciliation process and they expect that a significant portion of that process will be conducted by the Liquidating Trustee and occur after the Effective Date of the Plan.  As of the date of this Disclosure Statement, the Debtors have objected to certain amended Claims, Claims filed in duplicate (whether against the same Debtor or against another Debtor), and certain Claims filed in an incorrect class.

(b)     Post-Petition

Since the Petition Date, the Debtors generally have paid undisputed Administrative Claims as they have become due and owing in the ordinary course of their businesses and they have paid fees and expenses of professionals pursuant to the *Order Granting Expedited Motion to Establish Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Case Professionals* [Docket No. 178] and various interim orders approving professional fees and expenses.  As of January 31, 2011, the Debtors may have incurred fees and expenses on account of undisputed Administrative Claims and Professional Fees that have not been paid.  The Debtors estimate that those post-petition liabilities aggregate to approximately $1,206,079 as of January 31, 2011.

**4.3.    Other**

For a more detailed discussion and analysis of the Debtors' assets and liabilities, reference should be made to the exhibits attached hereto, the Debtors' Bankruptcy Schedules, the Proofs of Claims, and the Debtors' Monthly Operating Reports on filed in these Cases.

**ARTICLE V**

**PLAN OVERVIEW**

**5.1.    Introduction**

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code.  Chapter 11 promotes equality of treatment of creditors and equity security holders who hold substantially similar claims against or interests in the debtor and its assets.  In furtherance of these two goals, upon the filing of a petition for relief under chapter 11, section 362 of the Bankruptcy Code provides for an automatic stay of substantially all acts and proceedings against the debtor and its property, including all attempts to collect claims or enforce liens that arose prior to the commencement of the chapter 11 case.

The consummation of a plan is typically the principal objective of a chapter 11 case. A plan sets forth the means for satisfying claims against and equity interests in a debtor. Confirmation of a plan by the bankruptcy court makes the plan binding upon the debtor, any issuer of securities under the plan, and any creditor of or equity security holder in the debtor, whether or not such creditor or equity security holder (i) is impaired under or has accepted the plan or (ii) receives or retains any property under the plan. Subject to certain limited exceptions and other than as provided in the plan itself or the confirmation order, the confirmation order discharges the debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the obligations specified under the confirmed plan, and terminates all rights and interests of equity security holders.

This Disclosure Statement sets forth certain detailed information regarding the Debtors' history and significant events expected to occur during the Cases. This Disclosure Statement also describes the Plan, alternatives to the Plan, effects of Confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the Confirmation process and the voting procedures that holders of Claims must follow for their votes to be counted.

**THE REMAINDER OF THIS SECTION PROVIDES A SUMMARY OF THE PLAN, AND OF THE CLASSIFICATION AND TREATMENT OF CLAIMS AND EQUITY INTERESTS UNDER THE PLAN. IT IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN (AS WELL AS THE EXHIBITS ATTACHED THERETO AND DEFINITIONS THEREIN), WHICH IS ATTACHED HERETO AS _EXHIBIT A_.**

THE PLAN ITSELF AND THE DOCUMENTS REFERRED TO THEREIN CONTROL THE ACTUAL TREATMENT OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS UNDER THE PLAN AND WILL, UPON OCCURRENCE OF THE EFFECTIVE DATE, BE BINDING UPON ALL HOLDERS OF CLAIMS AGAINST AND EQUITY INTERESTS IN THE DEBTORS, THEIR ESTATES, ALL PARTIES RECEIVING PROPERTY UNDER THE PLAN, AND OTHER PARTIES IN INTEREST. IN THE EVENT OF ANY CONFLICT BETWEEN THIS DISCLOSURE STATEMENT, ON THE ONE HAND, AND THE PLAN OR ANY OTHER OPERATIVE DOCUMENT, ON THE OTHER HAND, THE TERMS OF THE PLAN AND/OR SUCH OTHER OPERATIVE DOCUMENT WILL CONTROL.

### 5.2. Summary of the Plan

The primary purpose of the Plan is to facilitate the resolution and treatment of the Debtors' outstanding Claims, Liens and Equity Interests. The Plan contemplates the creation of a Liquidating Trust to liquidate certain Liquidating Trust Assets and distribute any remaining funds (after the payment of certain Allowed Claims), in accordance with the Plan, to holders of Allowed Senior Lien Deficiency Claims and Allowed Non-Senior Lien General Unsecured Claims. Under the Plan, Claims against the Debtors' Estates are classified as follows:

| Class | Class Description | Status | Voting Rights |
|-------|-------------------|--------|---------------|
| Class 1 | Allowed Ad Valorem Tax Claims | Unimpaired | Not Entitled to Vote |
| Class 2 | Allowed Priority Claims | Unimpaired | Not Entitled to Vote |
| Class 3 | Allowed Senior Lien Secured Claims | Impaired | Entitled to Vote |
| Class 4 | Allowed M&M Secured Claims | Impaired | Entitled to Vote |
| Class 5 | Allowed Other Secured Claims | Impaired | Entitled to Vote |
| Class 6A | Allowed Senior Lien Deficiency Claims | Impaired | Entitled to Vote |
| Class 6B | Allowed Non-Senior Lien General Unsecured Claims | Impaired | Entitled to Vote |
| Class 7 | Allowed Subordinated Claims | Impaired | Not Entitled to Vote |
| Class 8 | Allowed Equity Interests | Impaired | Not Entitled to Vote |

Under the Plan, certain holders of Claims (generally, Allowed Administrative Claims (other than Allowed Deferred Professional Fee Claims)), Allowed Ad Valorem Tax Claims (Class 1), Allowed Priority Claims (Class 2), Allowed Priority Tax Claims, Allowed Other Secured Claims (Class 45), Allowed Non-Operational Cure Claims and U.S. Trustee Fees payable or to be paid, as provided under the Plan) will be paid in full by the Liquidating Trust from Sale Proceeds. Holders of Allowed Senior Lien Secured Claims (Class 3) will be paid the Remaining Sale Proceeds after funding of various Reserve Accounts. Holders of Allowed M&M Secured Claims and Allowed Operational Cure Claims (each subject to any settlements entered into with respect to such Claims in accordance with the terms of the Plan) will be paid in full by the Liquidating Trust from the Carveout Reserve.

Holders of Allowed Senior Lien Deficiency Claims (Class 6A) will receive their Pro Rata share of (a) Series A Liquidating Trust Interests and (b) distributions of Available Cash from the Series A Distribution Reserve on account of such Liquidating Trust Interests in accordance with the terms of the Plan if and when available for distribution. The Series A Distribution Reserve will be funded solely with the Series A Liquidating Trust Interest holders' allocable share (generally 75%, after payment (or reserving for payment) of certain claims entitled to priority and trust expenses) of Unrestricted Liquidating Trust Cash Proceeds, if any, in accordance with Section 11.9 of the Plan.

Holders of Allowed Non-Senior Lien General Unsecured Claims (Class 6B) will receive their Pro Rata share of (a) Series B Liquidating Trust Interests and (b) distributions of Available Cash from the Series B Distribution Reserve on account of such Liquidating Trust Interests in accordance with the terms of the Plan if and when available for distribution. The Series B Distribution Reserve will be funded solely with (a) the Series B Liquidating Trust Interest holders' allocable share (generally 25%, after payment (or reserving for payment) of certain claims entitled to priority and trust expenses) of Unrestricted Liquidating Trust Cash Proceeds, if any, in accordance with Section 11.9 of the Plan and (b) Cash remaining in the Carveout Reserve, if any, after funding of $25,000 of the Liquidating Trust Expense Carveout and payment (or reservation for payment) of all Allowed M&M Secured Claims and all Allowed Operational Cure Claims.

The Plan sets forth a settlement option for eligible holders of M&M Claims. Pursuant to the Plan, the Committee may agree with the holder of an asserted M&M Secured Claim the extent, if any, that an asserted M&M Secured Claim will be entitled to treatment as an Allowed

M&M Secured Claim (as defined in the Plan, a "Settled M&M Secured Claim") versus treatment as an Allowed Non-Senior Lien General Unsecured Claim, as described in Sections 5.3 and 6.1(g) of this Disclosure Statement. As part of the settlement, the holder of a Settled M&M Secured Claim shall agree that eighty percent (80%) of such Settled M&M Secured Claim shall be an Allowed Secured Claim and paid from the Carveout Reserve. The remaining twenty percent (20%) of the Settled M&M Secured Claim (as defined in the Plan, the "Redistributed M&M Secured Claim") shall remain in the Carveout Reserve for distribution to holders of Allowed Operational Cure Claims and other Allowed M&M Secured Claims (only to the extent necessary), and thereafter, to the extent any such amounts remain, be transferred to the Series B Distribution Reserve for the benefit of holders of Series B Liquidating Trust Interests (i.e., holders of Allowed Non-Senior Lien General Unsecured Claims). Holders of Settled M&M Secured Claims shall waive any right to assert a Claim or right to distribution on account of the Redistributed M&M Secured Claim. As part of any such settlement, the Debtors and the Liquidating Trustee shall release such holder of a Settled M&M Secured Claim from any and all Avoidance Actions.

Under the Plan, all existing Equity Interests in or of the Debtors will be cancelled, terminated and extinguished and, except as set forth in the Plan, will have no rights or entitlements, and all Subordinated Claims will be discharged and extinguished.

### 5.3. Summary Of Proposed Distributions Under The Plan

Under the Plan, Claims against and Equity Interests in the Debtors are placed into Classes. Certain Claims, including Priority Tax Claims and Administrative Claims, are not classified and, if not paid prior to Confirmation, will receive payment in full in Cash on the distribution date set forth in the Plan and as described below.

The table below summarizes the classification and treatment of the prepetition Claims and Equity Interests under the Plan. This summary is qualified in its entirety by reference to the provisions of the Plan.

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of **Allowable** Claims or Equity Interests[7] | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| Class 1: Allowed Ad Valorem Tax | Unimpaired | [_____]$2,249.33 | Each holder of an Allowed Ad Valorem Tax Claim against the Debtors' Estates shall either (i) be paid by the Liquidating Trustee from the Senior Claim Reserve, as set forth in Section 11.5 of the Plan, the amount of such holder's Allowed Ad |

⁷ Claims are estimates only and may be subject to all⁷

⁷ The Estimated Aggregate Amount of Allowable Claims or Equity Interests is based on the Debtors' estimate after taking into account all pending claim objections, contemplated claim objections, the M&M Claim settlement process and the like. There is no assurance that the pending or contemplated claim objections will be successful and therefore the Amount of Allowable Claims may be significantly higher, which could materially reduce the actual recoveries of the Debtors' creditors under this Plan. The Debtors reserve all rights regarding the same. Claims included in one class may be properly classified in another class. The estimated Allowable amount contained in Classes 4 and 6B assumes all holders of Class 4 Claims will accept the proposed settlements in the amounts set forth on Exhibit C hereto.

**AMENDED** DISCLOSURE STATEMENT FOR THE
Page 42 of 7779
**AMENDED** JOINT PLAN OF LIQUIDATION FOR THE DEBTORS
US 713619 4.DOCv.6

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of **Allowable** Claims or Equity Interests[37] | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| Claims | | | Valorem Tax Claim in one Cash payment on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter), or (B) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order, or (ii) receive such other less favorable treatment that may be agreed upon in writing by the Liquidating Trustee and such holder. The Cash payment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Ad Valorem Tax Claim; *provided, however,* that any Lien upon property, or the net proceeds from the sale of such property, related to such Claim shall attach to the Cash held in the Senior Claim Reserve with the same force, validity, priority, and effect, if any, of such security interest and Lien.<br><br>Estimated Recovery – 100% |
| Class 2: Allowed Priority Claims | Unimpaired | [~~　　~~]$7,291.66 | Each holder of an Allowed Priority Claim against the Debtors' Estates shall either (i) be paid by the Liquidating Trustee from the Senior Claim Reserve, as set forth in Section 11.5 of the Plan, the amount of such holder's Allowed Priority Claim in one Cash payment on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter), or (B) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order, or (ii) receive such other less favorable treatment that may be agreed upon in writing by the Liquidating Trustee and such holder. The Cash payment shall be in exchange for and in full satisfaction and discharge of the holder's Allowed Priority Claim.<br><br>Estimated Recovery – 100% |
| Class 3: Allowed Senior Lien Secured Claims | Impaired | [~~　　~~]Approx. $18,619,711.50[8] | The Allowed Senior Lien Secured Claims shall be satisfied in full by the Payment by the Liquidating Trustee of (a) the full amount of the Remaining Sale Proceeds on hand on the Effective Date (or as soon as reasonably practicable thereafter) and (b) the full amount of any Remaining Sale Proceeds that become available thereafter from the Senior Lien Holder Claim Reserve as soon as reasonably practicable or upon reasonable request of the Senior Lien Agent, each by wire transfer to a single account designated by the Senior Lien Agent in writing to the Liquidating Trustee. Such Payments shall be in exchange for and in full satisfaction and discharge of all Allowed Senior Lien Secured Claims. The Senior Lien Agent shall be solely responsible for the further distribution to the holders of Allowed Senior Lien Secured Claims of such Payment made to it in accordance with Section 4.2(c) of the Plan. None of the |

[8] Does not take into account potential recoveries in connection with the SR Environmental Claim.

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of **Allowable** Claims or Equity Interests[37] | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| | | | Debtors, the Liquidating Trust, or the Liquidating Trustee shall have any responsibility for the making of any such further disbursements by the Senior Lien Agent, nor shall any of them have any liability on account of any disbursements that are made, or not made, by the Senior Lien Agent in accordance with Section 4.2(c) of the Plan.<br><br>Any Lien or security interest of the Senior Lien Agent and/or the Senior Lien Holders on account of the Allowed Senior Lien Secured Claims shall attach solely to the Remaining Sale Proceeds and any funds held in the Senior Lien Holder Distribution Reserve, with all other Liens or security interests of the Senior Lien Agent and/or the Senior Lien Holders being released and expunged on the Effective Date of the Plan.<br><br>Estimated Recovery – [_____]100% |

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of **Allowable** Claims or Equity Interests[37] | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| Class 4: Allowed M&M Secured Claims | Impaired | [~~_____~~]$702,054.81 | Each holder of an Allowed M&M Secured Claim against any of the Debtors' Estates shall either (i) be paid by the Liquidating Trustee from the Carveout Reserve, as set forth in <u>Section 11.5</u> of the Plan, the amount of such holder's Allowed M&M Secured Claim in one Payment on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter) or (B) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order, or (ii) receive such other less favorable treatment that may be agreed upon in writing by the Liquidating Trustee and such holder, in exchange for and in full satisfaction and discharge of the holder's Allowed M&M Secured Claim; *provided, however,* any security interest in or Lien upon, property, or the net proceeds from the sale of such property, related to such Claim, shall attach to the Cash held in the Carveout Reserve with the same force, validity, priority, and effect, if any, of such security interest and Lien.<br><br>Notwithstanding the foregoing, the Committee, in its sole and absolute discretion, may, prior to the Confirmation Hearing (a) seek to settle any or all Claims of creditors asserting M&M Secured Claims, and (b) object to any or all Claims of creditors asserting M&M Secured Claims. Such objections may include (but not be limited to) the extent, if any, that an M&M Secured Claim is entitled to treatment as a Class 4 Allowed M&M Secured Claim versus treatment as a Class 6B Allowed Non-Senior Lien General Unsecured Claim. The Committee and holder of an M&M Secured Claim, with the written consent of the Debtors, may settle and agree that none, a portion, or all of an asserted M&M Secured Claim shall be entitled to treatment as a Class 4 Allowed M&M Secured Claim (as defined in the Plan, a "<u>Settled M&M Secured Claim</u>"), with the portion of such asserted M&M Secured Claim that is not a Settled M&M Secured Claim receiving treatment as a Class 6B Allowed Non-Senior Lien General Unsecured Claim. Any such proposed settlements shall be disclosed in the Disclosure Statement or Plan Supplement, and the Plan (as supplemented by this Disclosure Statement and Plan Supplement) shall constitute a motion to approve any such settlements pursuant to Rule 9019 of the Bankruptcy Rules.<br><br>As part of any settlement, the holder of a Settled M&M Secured Claim shall agree that eighty percent (80%) of such Settled M&M Secured Claim shall be an Allowed M&M Secured Claim and paid from the Carveout Reserve. The remaining twenty percent (20%) of the Settled M&M Secured Claim (as defined in the Plan, the "<u>Redistributed M&M Secured Claim</u>") shall remain in the Carveout Reserve for distribution first to holders |

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Allowable Claims or Equity Interests[37] | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| | | | of Allowed Operational Cure Claims and other Allowed M&M Secured Claims (only to the extent necessary), and, thereafter, to the extent any such amounts remain, be transferred to the Series B Distribution Reserve for the benefit of holders of Series B Liquidating Trust Interests (i.e., holders of Allowed Non-Senior Lien General Unsecured Claims). Holders of a Settled M&M Secured Claim shall waive any right to assert a Claim or right to distribution on account of the Redistributed M&M Secured Claim. |
| | | | The holder of a Settled M&M Secured Claim shall evidence their acceptance of such settlement by electing on a timely cast Ballot to receive such treatment as agreed upon and as set forth in the Plan, this Disclosure Statement, and/or the Plan Supplement. An election to settle an M&M Secured Claim shall constitute a vote to accept the Plan, a waiver of the right to collect, and a release of all M&M Secured Claims held by such electing holder, and the holder of such M&M Secured Claims shall be deemed to have released: (i) its M&M Secured Claims, and (ii) any and all liability for, or enforcement of, any potential liens, Liens or Claims with respect to the property to which such M&M Secured Claims, potential liens, Liens or Claims relate. The Debtors and Liquidating Trustee shall release such holder of a Settling M&M Secured Claim from any and all Avoidance Actions. The holder of such M&M Secured Claim that timely elects to settle its M&M Secured Claim shall be deemed to be the holder of an Allowed M&M Secured Claim in the Face Amount of such M&M Secured Claim for classification and voting, but shall have an Allowed Claim only in the amount of the Settled M&M Secured Claim for purposes of distribution. Any holder of an M&M Secured Claim making the election to settle such M&M Secured Claim shall be deemed to assign its M&M Liens to the Liquidating Trust; *provided, however,* notwithstanding any assignment of such M&M Liens: (i) the M&M Liens are assigned solely for the purpose of avoiding dilution of the priority of Liens against the property affected thereby, (ii) any such M&M Liens assigned to the Liquidating Trust shall not be enforced or enforceable against any other Person or any property of any other Person, and (iii) any such M&M Liens shall be, and are, released, including of record, pursuant to the Plan (including Sections 6.9 and 6.13 of the Plan). |
| | | | Each holder of a Settled M&M Secured Claim against any of the Debtors' Estates shall be paid, on the Effective Date (or as soon as reasonably practicable thereafter), the amount of such holder's Allowed M&M Secured Claim (in accordance with |

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of Allowable Claims or Equity Interests[37] | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| | | | Section 4.2(d)(ii) of the Plan) in exchange for and in full satisfaction and discharge of the holder's M&M Secured Claim provided that the holder of such M&M Secured Claim elects on a timely cast Ballot to receive such treatment with respect thereto.<br><br>Estimated Recovery – [_____]%100% (Subject to Proposed Settlements)<br><br>**PLEASE SEE <u>EXHIBIT C</u> ATTACHED HERETO FOR A LIST AND DESCRIPTION OF THE PROPOSED SETTLEMENTS BEING OFFERED TO CERTAIN HOLDERS OF ALLEGED M&M SECURED CLAIMS PURSUANT TO THE TERMS OF THE PLAN. IN THE EVENT ANY ADDITIONAL SETTLEMENT IS OFFERED TO A HOLDER OF ALLEGED M&M SECURED CLAIMS WHO IS NOT LISTED ON <u>EXHIBIT C</u> HERETO, SUCH ADDITIONAL PROPOSED SETTLEMENT WILL BE DISCLOSED IN THE PLAN SUPPLEMENT.** |
| Class 5: Allowed Other Secured Claims | Impaired | [_____]$81,117.45 | Each holder of an Allowed Other Secured Claim against any of the Debtors' Estates shall either (i) as set forth in Section 11.5 of the Plan, be paid by the Liquidating Trustee from the Senior Claim Reserve the amount of such holder's Allowed Other Secured Claim in one Payment on the later of (A) the Effective Date (or as soon as reasonably practicable thereafter) and (B) fifteen Business Days following the date such Claim is Allowed by Non-Appealable Order, or (ii) receive such other less favorable treatment that may be agreed upon in writing by the Liquidating Trustee and such holder, in exchange for and in full satisfaction and discharge of the holder's Allowed Other Secured Claim; *provided, however,* any security interest in or Lien upon, property, or the net proceeds from the sale of such property, related to such Claim, shall attach to the Cash held in the Senior Claim Reserve with the same force, validity, priority, and effect, if any, of such security interest and Lien.<br><br>Estimated Recovery – [_____]100% |

| Class | Treatment of Claim/Equity Interest | Estimated Aggregate Amount of **Allowable** Claims or Equity Interests[37] | Proposed Treatment of Allowed Claims or Equity Interests |
|---|---|---|---|
| Class 6A: Allowed Senior Lien Deficiency Claims | Impaired | ~~Unknown~~Approx. $24,910,807.68 | Each holder of an Allowed Senior Lien Deficiency Claim against any of the Debtors' Estates shall receive in exchange for and in full satisfaction and discharge of such Claim its Pro Rata share of (i) the Series A Senior Liquidating Trust Interests on the Effective Date (or as soon as reasonably practicable thereafter), and (ii) Distributions of Available Cash from the Series A Distribution Reserve on account of such Series A Liquidating Trust Interest as provided in Sections 10.1 and 10.3 of the Plan, subject to other applicable terms of the Plan and the Liquidating Trust Agreement.<br><br>Estimated Recovery – [_____]0% to 8.3% |
| Class 6B: Allowed Non-Senior Lien General Unsecured Claims | Impaired | [_____]$5,046,727.52 | Each holder of an Allowed Non-Senior Lien General Unsecured Claim against any of the Debtors' Estates shall receive in exchange for and in full satisfaction and discharge of such Claim its Pro Rata Share of (i) the Series B Liquidating Trust Interests on the Effective Date (or as soon as reasonably practicable thereafter), and (ii) Distributions of Available Cash from the Series B Distribution Reserve on account of such Series B Liquidating Trust Interest as provided in Sections 10.2 and 10.4 of the Plan, subject to other applicable terms of the Plan and the Liquidating Trust Agreement.<br><br>Estimated Recovery – [_____]9% to 23% |
| Class 7: Allowed Subordinated Claims | Impaired | Unknown | Holders of Subordinated Claims against any of the Debtors' Estates shall not be entitled to receive or retain any property under the Plan or from the Liquidating Trust on account of such Claims.<br><br>Estimated Recovery – 0% |
| Class 8: Allowed Equity Interests | Impaired | Unknown | Holders of Equity Interests in any of the Debtors shall not be entitled to receive any Payments or retain any property under the Plan or from the Liquidating Trust on account of such Equity Interests.  Upon the Effective Date, all Equity Interests shall be cancelled, terminated and extinguished except for the limited purposes set forth in Section 7.8 of the Plan.<br><br>Estimated Recovery – 0% |

# ARTICLE VI

## SUMMARY OF CERTAIN PLAN PROVISIONS

### 6.1.    Means for Implementation of the Plan

(a)    <u>Conditions Precedent to the Effective Date</u>.  Each of the following events shall occur on or before the Effective Date:

(i)    the Confirmation Order, in a form and substance reasonably acceptable to each of the Plan Proponents, shall have been entered by the Bankruptcy Court and shall not be subject to a stay and shall include one or more findings that (i) the Plan is confirmed with respect to each Debtor, (ii) the Debtors have acted in good faith and in compliance with the applicable provisions of the Bankruptcy Code as set forth in Bankruptcy Code § 1125(e), and (iii) the Debtors are authorized to take all actions and consummate all transactions contemplated under the Plan;

(ii)    the Court shall have approved the transfer of the Liquidating Trust Assets to the Liquidating Trust Free and Clear and the termination and extinguishment of the Equity Interests in the Debtors;

(iii)    the Liquidating Trustee shall be identified in the Plan Supplement;

(iv)    the Bankruptcy Court shall have determined that the Liquidating Trustee is or will be duly authorized to take the actions contemplated in the Plan and the Liquidating Trust Agreement, which approval and authorization may be set forth in the Confirmation Order;

(v)    the Bankruptcy Court shall have entered an Order approving the substantive consolidation of the Debtors on the terms set forth in <u>Section 6.7</u> of the Plan;

(vi)    all documents, instruments, and agreements provided under, or necessary to implement, the Plan shall have been executed and delivered by the applicable parties; and

(vii)    all other documents required to be Filed with the Plan Supplement, each in form and substance reasonably acceptable to the Plan Proponents, shall have been duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived.

(b)    <u>Creation of the Liquidating Trust</u>.  On the Effective Date, the Liquidating Trust shall be formed pursuant to the Plan, the Liquidating Trust Agreement shall be executed, and the Liquidating Trust shall be established and become effective.  In accordance with the Plan and the Liquidating Trust Agreement, the Liquidating Trust shall be established for the purpose of collecting, receiving, holding, maintaining, administering, and liquidating the Liquidating Trust Assets; resolving all Disputed Claims; making all payments and distributions to holders of Allowed Claims in accordance with the terms of the Plan; closing the Cases; and otherwise

implementing the Plan and finally administering the Estates.  The Liquidating Trust shall not engage in a trade or business and shall conduct its activities consistent with the Liquidating Trust Agreement.  On and after the Effective Date, the Liquidating Trust shall perform and pay when due liabilities, if any, related to ownership or operation of the Liquidating Trust Assets.

(c)     Transfer of Liquidating Trust Assets.  Except as otherwise set forth in the Plan or the Confirmation Order, on the Effective Date, the Liquidating Trust Assets shall be transferred and assigned to, the Liquidating Trust Free and Clear, but subject to the Liquidating Trust's obligations under the Plan.  The Debtors shall convey, transfer, assign and deliver to the Liquidating Trust all or any portion of the Liquidating Trust Assets, subject to all Liens that are Liquidating Trust Permitted Liens or are not released pursuant to the terms of the Plan.

(d)     Issuance of Liquidating Trust Interests.  It is an integral and essential element of the Plan that the offer and issuance of Liquidating Trust Interests pursuant to the Plan, to the extent such Liquidating Trust Interests constitute securities under the 1933 Act, shall be exempt from registration under the 1933 Act and any State or local law, pursuant to Bankruptcy Code § 1145 or other applicable exemptions, without limitation.  The Confirmation Order shall include a finding and conclusion, binding upon all parties to the Cases, the Debtors, the Liquidating Trustee, the U.S. Securities and Exchange Commission and all other federal, state and local regulatory enforcement agencies, to the effect that the Liquidating Trustee is a successor to the Debtors under the Plan pursuant to Bankruptcy Code § 1145, that the offer of the Liquidating Trust Interests is occurring pursuant to the Plan, that the offer of the Liquidating Trust Interests is in exchange for a claim against, or an interest in, the Debtors, and that such offer and issuance, to the extent such Liquidating Trust Interests constitute securities under the 1933 Act, fall within the exemption from registration under the 1933 Act and any state or local law pursuant to Bankruptcy Code § 1145.  In lieu of certificates evidencing the Liquidating Trust Interests, the Liquidating Trustee shall maintain a register of the names, addresses, and interest percentages of the holders of the Liquidating Trust Interests based upon the provisions of the Plan which designate the Persons who are entitled to receive the beneficial interests in the Liquidating Trust. The Liquidating Trust Interests may not be transferred, sold, pledged, or otherwise disposed of, or offered for sale except for transfers by operation of law.

(e)     Cancellation of Equity Interests.  On the Effective Date, all Equity Interests in the Debtors (including those Equity Interests held in treasury by any of the Debtors) shall be terminated and extinguished and the certificates that previously evidenced ownership of those Equity Interests shall be deemed cancelled (all without further action by any Person or the Bankruptcy Court) and shall be null and void and such certificates shall evidence no rights or interests in any of the Debtors except for the limited purposes set forth in Section 7.8 of the Plan.

(f)     Limited Substantive Consolidation.  Pursuant to the Bankruptcy Court's *[Order Approving Substantive Consolidation of the Debtors]*, solely for the purpose of the Cases and the Plan, (a) each Claim against any of the Debtors will be deemed to be a claim against a consolidated entity consisting of all of the Debtors; (b) any Proof of Claim Filed against one or more of the Debtors will be deemed to have been filed against the consolidated entity; (c) all intercompany claims by and among the Debtors will be eliminated and released except any intercompany claims that are subject to an M&M Claim or M&M Lien, provided notwithstanding the foregoing, (i) such intercompany claims shall be preserved solely for the purposes of

preserving the M&M Claim or M&M Liens in collateral to avoid dilution of the priority of Liens against the property affected thereby, and (ii) any such M&M Claim or Lien shall not be enforced or enforceable against any Liquidating Trust Assets; and (d) all guarantees by one of the Debtors in favor of any of the other Debtors will be eliminated, and all guarantees executed by any of the Debtors in favor of a creditor will be deemed to be a single obligation. Substantive consolidation shall have no effect on valid, enforceable, and unavoidable Liens except for Liens that secure an intercompany claim that is eliminated by virtue of substantive consolidation and Liens against property that ceases to exist by virtue of substantive consolidation. Specifically, substantive consolidation shall not increase the percentage working interest against which a holder of a Secured Claim asserts a Lien. Further, substantive consolidation shall not (u) create a Claim in a Class different from the Class in which a Claim would have been placed in the absence of substantive consolidation, (v) change the priority or nature of a Claim in a manner different from the priority or nature of such Claim in the absence of substantive consolidation, (w) affect any preserved Causes of Action, including Avoidance Actions, of each of the Debtors, (x) affect the legal or organizational structure of the Debtors or their respective ownership of any property or assets; (y) affect the defenses to any Causes of Action, other than proper-party defenses, or (z) affect payments out of any insurance policies or proceeds of such policies. Except as otherwise set forth herein, on the Effective Date, the Debtors are discharged and released from all intercompany claims and all intercompany claims are extinguished and eliminated.

(g)      <u>Procedures regarding M&M Secured Claims and Operational Cure Claims</u>.

(i)      <u>M&M Secured Claims</u>.  As provided in <u>Section 4.2(d)</u> of the Plan, the Committee, in its sole and absolute discretion, may, prior to the Confirmation Hearing (a) seek to settle any or all Claims of creditors asserting M&M Secured Claims, and (b) object to any or all Claims of creditors asserting M&M Secured Claims.  Such objections may include (but not be limited to) the extent, if any, that an M&M Secured Claim is entitled to treatment as a Class 4 Allowed M&M Secured Claim versus treatment as a Class 6B Allowed Non-Senior Lien General Unsecured Claim.  The Committee currently contemplates that the Committee and parties asserting M&M Secured Claims shall attempt to reach an agreement as to the extent that an asserted M&M Secured Claim shall be entitled to treatment as a Class 4 M&M Secured Claim, and the extent to which an asserted M&M Secured Claim shall be entitled to treatment as a Class 6B Allowed Non-Senior Lien General Unsecured Claim.

The Committee further contemplates that if the Committee and a party asserting an M&M Secured Claim reach an agreement as to the extent that an asserted M&M Secured Claim shall be entitled to treatment as a Class 4 M&M Secured Claim (which agreement shall be subject to the Debtors' written consent), such Class 4 M&M Secured Claim shall be a Settled M&M Secured Claim, and the balance of the M&M Secured Claim shall be a Class 6B Allowed Non-Senior Lien General Unsecured Claim.  Eighty percent (80%) of a Settled M&M Secured Claim shall be an Allowed M&M Secured Claim and paid from the Carveout Reserve.  The remaining twenty percent (20%) of the Settled M&M Secured Claim (as defined in the Plan, the "<u>Redistributed M&M Secured Claim</u>") shall remain in the Carveout Reserve for distribution first to holders of Allowed Operational Cure Claims and other Allowed M&M Secured Claims (only to the extent necessary) and, thereafter, to the extent any such amounts remain, be transferred to the Series B Distribution Reserve for the benefit of holders of Series B Liquidating Trust Interests.

Holders of a Settled M&M Secured Claim shall waive any right to assert a Claim or right to distribution on account of the Redistributed M&M Secured Claim.

Each holder of a Settled M&M Secured Claim against any of the Debtors' Estates shall be paid, on the Effective Date (or as soon as reasonably practicable thereafter), the amount of such Settled M&M Secured Claim in exchange for and in full satisfaction and discharge of the holder's M&M Secured Claim provided that the holder of such M&M Secured Claim elects on a timely cast Ballot to receive such treatment with respect thereto.

SEE EXHIBIT C ATTACHED HERETO FOR A LIST AND DESCRIPTION OF THE PROPOSED SETTLEMENTS BEING OFFERED TO CERTAIN HOLDERS OF ALLEGED M&M SECURED CLAIMS PURSUANT TO THE TERMS OF THE PLAN. IN THE EVENT ANY ADDITIONAL PROPOSED SETTLEMENT IS OFFERED TO A HOLDER OF ALLEGED M&M SECURED CLAIMS WHO IS NOT LISTED ON EXHIBIT C HERETO, SUCH ADDITIONAL PROPOSED SETTLEMENT WILL BE DISCLOSED IN THE PLAN SUPPLEMENT.

Any such proposed settlements shall be disclosed in the Disclosure Statement and/or Plan Supplement, and the Plan (as supplemented by the Disclosure Statement and Plan Supplement) shall constitute a motion to approve any such settlements pursuant to Rule 9019 of the Bankruptcy Rules.

In the event an asserted M&M Secured Claim is not settled as set forth herein or otherwise Allowed by a Non-Appealable Order entered prior to the Confirmation Hearing, the Liquidating Trustee shall be entitled to object to, resolve, settle, compromise, or litigate to judgment such Claim in accordance with Article XII of the Plan.

(ii)    Operational Cure Claims. The Committee, in its sole and absolute discretion, may, prior to the Confirmation Hearing (a) seek to settle any or all Claims of creditors asserting Operational Cure Claims, and (b) object to any or all Claims of creditors asserting Operational Cure Claims. Such objections may include (but not be limited to) the extent, if any, that an Operational Cure Claim must be paid in connection with the assumption and assignment of an executory contract or unexpired lease pursuant to the Sale Order. The Committee currently contemplates that the Committee and parties asserting Operational Cure Claims shall attempt to reach an agreement as to the extent that an asserted Operational Cure Claim must be paid in connection with the assumption and assignment of an executory contract or expired lease pursuant to the Sale Order, and the extent to which an asserted Operational Cure Claim shall be treated as a Class 6B Allowed Non-Senior Lien General Unsecured Claim.

The Committee further contemplates that, if the Committee and a party asserting an Operational Cure Claim reach an agreement as to the extent that an Operational Cure Claim must be paid in connection with the Sale Order (which agreement shall be subject to the Debtors' written consent), such Operational Cure Claim shall be a "Settled Operational Cure Claim," and any unpaid balance of the Operational Cure Claim shall be treated as a Class 6B Allowed Non-Senior Lien General Unsecured Claim. Eighty percent (80%) of a Settled Operational Cure Claim shall be an Allowed Operational Cure Claim and paid from the Carveout Reserve. The remaining twenty percent (20%) of the Settled Operational Cure Claim (as defined in the Plan, the "Redistributed Operational Cure Claim") shall remain in the Carveout Reserve for distribution first to holders of Allowed Operational Cure Claims and other Allowed M&M Secured Claims (only to the extent necessary) and, thereafter, to the extent any such amounts remain, be transferred to the Series B Distribution Reserve for the benefit of holders of Series B Liquidating Trust Interests.

Any such proposed settlements shall be disclosed in the Disclosure Statement and/or Plan Supplement, and the Plan (as supplemented by the Disclosure Statement and Plan Supplement) shall constitute a motion to approve any such settlements pursuant to Rule 9019 of the Bankruptcy Rules.

To the extent an asserted Operational Cure Claim is not settled as set forth in Section Section 6.12 of the Plan or otherwise Allowed by Non-Appealable Order entered prior to the Confirmation Hearing, the Liquidating Trustee shall be entitled to object to, resolve, settle, compromise, or litigate to judgment such Claim in accordance with Article XII of the Plan.

SEE EXHIBIT C ATTACHED HERETO FOR A LIST AND DESCRIPTION OF THE PROPOSED SETTLEMENTS BEING OFFERED TO CERTAIN HOLDERS OF ALLEGED OPERATIONAL CURE CLAIMS PURSUANT TO THE TERMS OF THE PLAN. IN THE EVENT ANY ADDITIONAL PROPOSED SETTLEMENT IS OFFERED TO A HOLDER OF ALLEGED OPERATIONAL CURE CLAIMS WHO IS NOT LISTED ON EXHIBIT C HERETO, SUCH ADDITIONAL PROPOSED SETTLEMENT WILL BE DISCLOSED IN THE PLAN SUPPLEMENT.

(h)     Release of Liens.  On the Effective Date, all Liens (except any Liquidating Trust Permitted Liens with respect to the Liquidating Trust Assets) on any property of any Debtors shall automatically terminate, all Collateral subject to such Liens shall be automatically released, and all guarantees of any Debtors shall be automatically discharged and released; *provided, however,* that such Liquidating Trust Permitted Liens shall attach to Cash in the applicable Reserve Accounts in the Liquidating Trust, as provided in the Plan or the Confirmation Order.

(i)     Preservation of Rights of Action; Settlement of Litigation Claims.

(i)     Preservation of Causes of Action.  All Causes of Action, rights of setoff and other legal and equitable defenses of any Debtor or any Estate are preserved for the benefit of the Liquidating Trust unless expressly released, waived, or relinquished under the Plan or Confirmation Order.  No Person may rely on the absence of a specific reference in the Plan or

the Disclosure Statement to any Cause of Action against them as an indication that the Liquidating Trust will not pursue a Cause of Action against them.

(ii) <u>Liquidating Trustee as Representative of the Estate</u>. The Liquidating Trustee shall be appointed representative of the Estates pursuant to Bankruptcy Code § 1123(b)(3)(B) with respect to the Causes of Action and, except as otherwise ordered by the Bankruptcy Court and subject to any releases in the Plan, on the Effective Date, the Liquidating Trust shall be transferred all Causes of Action, and may enforce, sue on, and, subject to Bankruptcy Court approval (except as otherwise provided in the Plan) settle or compromise (or decline to do any of the foregoing) any or all of the Causes of Action. Except as otherwise ordered by the Bankruptcy Court, the Liquidating Trustee shall be vested with authority and standing to prosecute any Causes of Action. The Liquidating Trustee and his or her attorneys and other professional advisors shall have no liability for pursuing or failing to pursue any such Causes of Action.

(iii) <u>Settlement of Litigation Claims and Disputed Claims</u>. At any time after the Confirmation Date and before the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors, with the consent of the Committee and the Senior Lien Holders, may settle some or all of the Causes of Action or the Disputed Claims subject to obtaining any necessary Bankruptcy Court approval. The proceeds from the settlement of a Cause of Action shall constitute a Liquidating Trust Asset that shall be transferred to the Liquidating Trust on the Effective Date, for Distribution in accordance with the Plan and the Liquidating Trust Agreement.

## 6.2. **Provisions Governing Distributions Generally**

(a) <u>Initial Cash Distribution to Holders of Class 6A Allowed Senior Lien Deficiency Claims on Account of Series A Liquidating Trust Interests</u>. On or before the first semi-annual anniversary of (*i.e.*, upon the conclusion of the six month period following) the Effective Date, an initial Cash Distribution will be made Pro Rata from the Series A Distribution Reserve to holders of Series A Liquidating Trust Interests; provided, however, an initial Cash Distribution will be made only if the Liquidating Trustee determines, in accordance with the terms of the Trust Agreement, that sufficient Available Cash in the Series A Distribution Reserve exists.

(b) <u>Initial Cash Distribution to Holders of Class 6B Allowed Non-Senior Lien General Unsecured Claims on Account of Series B Liquidating Trust Interests</u>. On or before the first semi-annual anniversary of the Effective Date, an initial Cash Distribution will be made Pro Rata from the Series B Distribution Reserve to holders of Series B Liquidating Trust Interests; provided, however, an initial Cash Distribution will be made only if the Liquidating Trustee determines, in accordance with the terms of the Trust Agreement, that sufficient Available Cash in the Series B Distribution Reserve exists.

(c) <u>Subsequent Cash Distributions to Holders of Series 6A Allowed Senior Lien Deficiency Claims on Account of Series A Liquidating Trust Interests</u>. After the initial Cash Distribution under <u>Section 10.1</u> of the Plan, the Liquidating Trustee shall make Cash Distributions Pro Rata from the Series A Distribution Reserve to holders of Series A Liquidating Trust Interests beginning on the first annual anniversary of the Effective Date and continuing on each semi-annual anniversary thereafter; provided, however, each such Distribution will be made only if

the Liquidating Trustee determines, in accordance with the terms of the Trust Agreement, that sufficient Available Cash in the Series A Distribution Reserve exists; provided, further, if and when the Liquidating Trustee determines that sufficient Available Cash in the Series A Distribution Reserve exists to make a Distribution more frequently, the Liquidating Trustee may make such Distribution; provided, further, if the Liquidating Trustee intends to make its final Cash Distribution, such Cash Distribution shall be made regardless of the amount of Available Cash in the Series A Distribution Reserve.

(d) Subsequent Cash Distributions to Holders of Class 6B Allowed Non-Senior Lien General Unsecured Claims on Account of Series B Liquidating Trust Interests. After the initial Cash Distribution under Section 10.2 of the Plan, the Liquidating Trustee shall make Cash Distributions Pro Rata from the Series B Distribution Reserve to holders of Series B Liquidating Trust Interests beginning on the first annual anniversary of the Effective Date and continuing on each semi-annual anniversary thereafter; provided, however, each such Distribution will be made only if the Liquidating Trustee determines, in accordance with the terms of the Trust Agreement, that sufficient Available Cash in the Series B Distribution Reserve exists; provided, further, if and when the Liquidating Trustee determines that sufficient Available Cash in the Series B Distribution Reserve exists to make a Distribution more frequently, the Liquidating Trustee may make such Distribution; provided, further, if the Liquidating Trustee intends to make its final Cash Distribution, such Cash Distribution shall be made regardless of the amount of Available Cash in the Series B Distribution Reserve.

### 6.3. Treatment of Executory Contracts and Unexpired Leases

Except to the extent (a) the Debtors previously have assumed or rejected an executory contract or unexpired lease, (b) prior to the Effective Date, the Bankruptcy Court has entered an Order assuming an executory contract or unexpired lease, or (c) at the Confirmation Hearing, the Bankruptcy Court approves the assumption of any executory contracts or unexpired leases, the Debtors' executory contracts and unexpired leases shall be deemed rejected on the Effective Date, pursuant to Bankruptcy Code §§ 365 and 1123.

(a) Cure of Operational Cure Claims. Any Operational Cure Claims relating to the assumption and assignment of an executory contract or unexpired lease pursuant to the Sale Order and ordered to be paid by the Bankruptcy Court shall, to the extent not paid prior to the Effective Date, be paid by the Liquidating Trustee from the Carveout Reserve on or as soon as reasonably practicable after the Effective Date. In the event of a dispute concerning the allowance or payment of an Operational Cure Claim, the dispute shall be resolved by the Bankruptcy Court or by the written agreement of the holder of such Operational Cure Claim and the Liquidating Trustee. Nothing herein shall require the Liquidating Trustee to pay any cure amount on an Operational Cure Claim that is a Disputed Claim, but an amount of Cash necessary to pay the entire cure amount shall be maintained in the Carveout Reserve pending the entry of an Order of the Bankruptcy Court determining the amount of the Cure Claim to which such cure amount relates or upon payment by agreement as authorized by the Plan. As soon as practicable after any cure amount on an Operational Cure Claim that is a Disputed Claim becomes an Allowed Operational Cure Claim, the Liquidating Trustee shall distribute to the holder of such

Allowed Operational Cure Claim, out of the Carveout Reserve, Cash in the full amount of such Allowed Operational Cure Claim.

(b)     Cure of Non-Operational Cure Claims.  Any Non-Operational Cure Claims relating to the assumption and assignment of an executory contract or unexpired lease pursuant to the Sale Order and ordered to be paid by the Bankruptcy Court shall, to the extent not paid prior to the Effective Date, be paid by the Liquidating Trustee from the Senior Claim Reserve on or as soon as reasonably practicable after the Effective Date.  In the event of a dispute concerning the allowance or payment of a Non-Operational Cure Claim, the dispute shall be resolved by the Bankruptcy Court or by the written agreement of the holder of such Non-Operating Cure Claim, the Liquidating Trustee, and the Senior Agent.  Nothing herein shall require the Liquidating Trustee to pay any cure amount on a Non-Operational Cure Claim that is a Disputed Claim, but an amount of Cash necessary to pay the entire cure amount shall be maintained in the Senior Claim Reserve pending the entry of an Order of the Bankruptcy Court determining the amount of the Cure Claim to which such cure amount relates or upon payment by agreement as authorized by the Plan.  As soon as practicable after any cure amount on a Non-Operational Cure Claim that is a Disputed Claim becomes an Allowed Non-Operational Cure Claim, the Liquidating Trustee shall distribute to the holder of such Allowed Non-Operational Cure Claim, out of the Senior Claim Reserve, Cash in the full amount of such Allowed Non-Operational Cure Claim.

(c)     Cure of Pryme Cure Claims.  Any Pryme Cure Claims shall be paid by Pryme Oil and Gas, Inc., Pryme Lake Exploration, LLC, and SR Acquisition I, LLC as required by paragraph 51 of the Sale Order, and shall not be an obligation or liability of the Debtors or the Liquidating Trust.

**6.4.   Effects of Confirmation**

(a)     Discharge.   Except as otherwise provided in the Plan or in the Confirmation Order, pursuant to Bankruptcy Code § 1141, the Confirmation of the Plan will not discharge the Debtors of any debts.

(b)     Legal Binding Effect.  On and after the Effective Date, the provisions of the Plan shall bind all holders of Claims and Equity Interests and their respective successors and assigns, whether or not they accept the Plan.  On and after the Effective Date, except as expressly provided in the Plan, all holders of Claims, Liens and Equity Interests shall be precluded from asserting any Claim, Cause of Action or Liens against the Debtors or the Estates, the Liquidating Trust, or the Liquidating Trustee or their respective property and assets based on any act, omission, event, transaction or other activity of any kind that occurred or came into existence prior to the Effective Date.

(c)     Exculpation and Limitation of Liability.  **NOTWITHSTANDING ANYTHING SET FORTH IN THE PLAN, NEITHER THE DEBTORS, THE ESTATES, THE LIQUIDATING TRUST, THE LIQUIDATING TRUSTEE, THE SENIOR LIEN AGENT, THE SENIOR LIEN HOLDERS, THE COMMITTEE, NOR THE MEMBERS OF THE COMMITTEE (BUT SOLELY IN THEIR CAPACITY AS MEMBERS OF THE COMMITTEE) SHALL HAVE ANY RIGHT OF ACTION AGAINST THE DEBTORS, THE ESTATES, THE LIQUIDATING TRUSTEE, THE LIQUIDATING TRUST, THE**

SENIOR LIEN AGENT, THE SENIOR LIEN HOLDERS, THE COMMITTEE, THE MEMBERS OF THE COMMITTEE (BUT SOLELY IN THEIR CAPACITY AS MEMBERS OF THE COMMITTEE) OR ANY OF THEIR RESPECTIVE ATTORNEYS, ACCOUNTANTS, INVESTMENT BANKERS, FINANCIAL ADVISORS, OR OTHER PROFESSIONALS, FOR ANY ACT OR OMISSION IN CONNECTION WITH, RELATING TO OR ARISING OUT OF THE CASES, THE PURSUIT OF CONFIRMATION OF THE PLAN, THE CONSUMMATION OF THE PLAN, THE PREPARATION AND DISTRIBUTION OF THE DISCLOSURE STATEMENT, THE ADMINISTRATION OF THE LIQUIDATING TRUST, THE PLAN OR THE PROPERTY TO BE DISTRIBUTED UNDER THE PLAN, OR THE OFFER, ISSUANCE, SALE, OR PURCHASE OF A SECURITY OFFERED OR SOLD UNDER THE PLAN, PROVIDED SUCH EXCULPATED PERSON DID NOT AND DOES NOT ENGAGE IN WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR FRAUD AND IN COMPLIANCE WITH THE APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE AND PROVIDED FURTHER THAT SUCH EXCULPATION SHALL NOT EXTEND TO SUCH EXCULPATED PERSON'S RIGHTS AND OBLIGATIONS UNDER THE PLAN, THE PLAN DOCUMENTS OR THE LIQUIDATING TRUST AGREEMENT.

(d)     **Release of Senior Lien Agent and Senior Lien Holders**. NOTWITHSTANDING ANYTHING SET FORTH IN THE PLAN TO THE CONTRARY, IN CONSIDERATION FOR THE FUNDING OF THE CARVEOUT AMOUNT, THE LIQUIDATING TRUST EXPENSE RESERVE, AND THE SENIOR CLAIM RESERVE FROM THE SALE PROCEEDS AND OTHER BENEFITS PROVIDED BY THE RELEASED PARTIES IN CONNECTION WITH THE PLAN, ON THE EFFECTIVE DATE AND TO THE EXTENT NOT ALREADY RELEASED, THE SENIOR LIEN AGENT, THE SENIOR LIEN HOLDERS, AND THEIR RESPECTIVE SUCCESSORS, PREDECESSORS, AFFILIATES, OFFICERS, DIRECTORS, EMPLOYEES, AGENTS, REPRESENTATIVES, CONSULTANTS AND ATTORNEYS (COLLECTIVELY, THE "RELEASED PARTIES") SHALL BE DEEMED TO HAVE BEEN IRREVOCABLY AND UNCONDITIONALLY RELEASED, ACQUITTED, AND OTHERWISE DISCHARGED BY THE DEBTORS (BOTH PRE- AND POST-PETITION), THEIR PREDECESSORS AND SUCCESSORS, AND THEIR RESPECTIVE ESTATES (INCLUDING WITHOUT LIMITATION FROM THE LIQUIDATING TRUST) OF AND FROM ANY AND ALL CLAIMS, CAUSES OF ACTION OR AVOIDANCE ACTIONS; WHETHER SOUNDING IN TORT, BREACH OF CONTRACT, NEGLIGENCE, NEGLIGENCE PER SE, FRAUD OR MISREPRESENTATION, STATUTORY VIOLATION OR ANY OTHER LEGAL THEORY; WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, ASSERTED OR NOT ASSERTED, SCHEDULED OR NOT SCHEDULED, NOW EXISTING OR HEREAFTER ARISING IN LAW, EQUITY OR OTHERWISE; WHETHER ARISING UNDER THE BANKRUPTCY CODE (INCLUDING, WITHOUT LIMITATION, UNDER CHAPTER 5 OF THE BANKRUPTCY CODE) OR OTHER APPLICABLE STATE, FEDERAL OR FOREIGN LAW; WHETHER ARISING FROM OR RELATED TO, ANY AND ALL RESPECTS, ACTS, CONDUCT, COMMUNICATIONS, ERRORS OR OMISSIONS OCCURRING ON OR BEFORE THE EFFECTIVE DATE IN CONNECTION WITH,

BASED ON, RELATING TO OR IN ANY MANNER ARISING FROM, IN WHOLE OR IN PART, THE DEBTORS, THE CASES, THE NEGOTIATION OF ANY TRANSACTION OR DOCUMENT IN THE CASES, INCLUDING WITHOUT LIMITATION ANY AND ALL LOAN DOCUMENTS, CREDIT AGREEMENTS, MORTGAGES, PLEDGES AND SECURITY AGREEMENTS, AND ANY AMENDMENTS, MODIFICATIONS OR RESTATEMENTS THERETO (AS DEFINED IN SUCH LOAN DOCUMENTS AND CREDIT AGREEMENTS BETWEEN THE LENDERS AND ANY OF THE DEBTORS). ANY AND ALL SUCH CLAIMS THAT MAY BE ASSERTED BY, THROUGH AND UNDER THE DEBTORS OR THEIR RESPECTIVE ESTATES OR THE LIQUIDATING TRUST AGAINST THE RELEASED PARTIES SHALL BE WAIVED AND RELEASED IN FULL AS OF THE EFFECTIVE DATE OF THE PLAN.**

### 6.5. **Retention of Jurisdiction**

Under the Plan, notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date of the Plan, the Bankruptcy Court shall retain jurisdiction, to the fullest extent legally permitted, over the Cases, all proceedings arising under, arising in or related to the Cases, the Confirmation Order, the Plan and administration of the Liquidating Trust. Some specific types of disputes and proceedings that the Bankruptcy Court shall retain jurisdiction over are identified in Article XV of the Plan.

### 6.6. **The Liquidating Trust.**

The Liquidating Trust is created for the purpose of liquidating the Liquidating Trust Assets and making the Payments or Distributions to (i) certain holders of Allowed Claims from the Reserve Accounts and (ii) holders of Liquidating Trust Interests from the Series A Distribution Reserve and Series B Distribution Reserve, as applicable, and the Liquidating Trust is not otherwise authorized to engage in any trade or business. The beneficiaries of the Liquidating Trust are the holders of Allowed Senior Lien Deficiency Claims and Allowed Non-Senior Lien General Unsecured Claims in Classes 6A and 6B, respectively.

### 6.7. **Funding of Res of Trust.**

To fund the Liquidating Trust, all of the Liquidating Trust Assets shall be transferred and assigned to the Liquidating Trust, and the Liquidating Trust shall be in possession of, and have title to, all the Liquidating Trust Assets, as of the Effective Date. The Liquidating Trustee, as trustee of the Liquidating Trust shall be substituted as the plaintiff, defendant, or other party in all lawsuits regarding Causes of Action pending in which any of the Debtors or the Committee is the plaintiff as of the Effective Date. The conveyances of all Liquidating Trust Assets shall be accomplished pursuant to the Plan and the Confirmation Order and shall be effective upon the Effective Date. The Debtors shall convey, transfer, assign and deliver the Liquidating Trust Assets Free and Clear of all Liens that are not Liquidating Trust Permitted Liens or released pursuant to the terms of the Plan. Upon the Effective Date, the Liquidating Trust shall also be deemed to have taken (a) an assignment of all Causes of Action against third parties for obligations or claims existing on or created by virtue of the Effective Date, unless expressly released in the Plan, and (b) an assignment, bill of sale, deed and/or release covering all other

Liquidating Trust Assets to the extent necessary to effect the transfer and assignment of such Liquidating Trust Assets.

### 6.8. The Liquidating Trustee.

The Liquidating Trustee shall be appointed by mutual consent of the Senior Lien Agent and the Committee, in consultation with the Debtors. If no agreement can be reached by the Senior Lien Agent and the Committee, the Liquidating Trustee shall be appointed by the Court. The Liquidating Trustee shall retain and have all the rights, powers and duties necessary to carry out his or her responsibilities under the Plan and the Liquidating Trust Agreement, and as otherwise provided in the Confirmation Order. However, the Liquidating Trustee shall not be obligated to review, investigate, evaluate, analyze, or object to Fee Applications or Professional Fee Claims relating to services rendered and expenses incurred prior to the Effective Date. The Liquidating Trustee shall be required to perform his or her duties as set forth in the Plan and the Liquidating Trust Agreement.

### 6.9. Compensation of the Liquidating Trustee.

The Liquidating Trustee's compensation, on a post-Effective Date basis, shall be determined by the Senior Lien Agent and the Committee and disclosed in the Plan Supplement. The payment of the fees of the Liquidating Trustee and any professionals retained by the Liquidating Trustee shall be made by the Liquidating Trust from the Liquidating Trust Expense Reserve in accordance with the Plan and the Liquidating Trust Agreement.

### 6.10. Bonding Requirement. Within five (5) business days after the Effective Date and unless waived in writing by the Liquidating Trust Committee, the Liquidating Trustee shall, [at the expense of the Liquidating Trust], procure a performance bond or bonds for the benefit of the Liquidating Trust in the amount of at least $~~_____~~100,000 written by an insurance or bonding company authorized to do business in the State of Texas reasonably acceptable to the Liquidating Trust Committee.

### 6.11. Termination.

The duties, responsibilities and powers of the Liquidating Trustee shall terminate after all Liquidating Trust Assets, including Causes of Action transferred and assigned to the Liquidating Trust, or involving the Liquidating Trustee on behalf of the Liquidating Trust, are fully resolved, abandoned or liquidated and the Available Cash and other amounts held in Reserve Accounts have been distributed in accordance with the Plan and the Liquidating Trust Agreement. Except in the circumstances set forth below, the Liquidating Trust shall terminate no later than three years after the Effective Date. However, if warranted by the facts and circumstances provided for in the Plan, and subject to the approval of the Bankruptcy Court upon a finding that an extension is necessary for the purpose of the Liquidating Trust, the term of the Liquidating Trust may be extended one or more times (not to exceed a total of four extensions, unless the Liquidating Trustee receives a favorable ruling from the Internal Revenue Service that any further extension would not adversely affect the status of the Liquidating Trust as a grantor trust for federal income tax purposes) for a finite period, not to exceed six months, based on the particular circumstances at issue. Each such extension must be approved by the Bankruptcy Court within two months

prior to the beginning of the extended term with notice thereof to all of the unpaid beneficiaries of the Liquidating Trust. Upon the occurrence of the termination of the Liquidating Trust, the Liquidating Trustee shall File with the Bankruptcy Court a report thereof, seeking an order discharging the Liquidating Trustee.

### 6.12. Committee and Liquidating Trust Committee

(a) __Dissolution of Committee__. The Committee will continue in existence through the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code. Unless otherwise ordered by the Bankruptcy Court, on the Effective Date, (a) the Committee will be dissolved and their members will be released of all their duties, responsibilities and obligations in connection with the Cases, the Plan and the implementation of the same and (b) the retention or employment of the Committee's Professionals and other agents will terminate.

(b) __Creation of Liquidating Trust Committee__. One member of the Liquidating Trust Committee shall be selected by the Senior Lien Agent, one member of the Liquidating Trust Committee shall be selected by the Committee, and one member of the Liquidating Trust Committee shall be selected jointly by the individuals selected by the Senior Lien Agent and the Committee. If the individuals selected by the Senior Lien Agent and the Committee are unable to agree upon the third member of the Liquidating Trust Committee, then such selection shall be made by the Bankruptcy Court. If a member of the Liquidating Trust Committee resigns or is otherwise removed, a replacement Liquidating Trust Committee member, as identified in the Plan Supplement, will be appointed.

### 6.13. Reserves Administered by the Liquidating Trust

(a) __Establishment of Reserve Accounts__. The Liquidating Trustee shall establish each of the Reserve Accounts (which, notwithstanding anything to the contrary contained in the Plan, may be effected by either establishing a segregated account or establishing book entry accounts, in the sole discretion of the Liquidating Trustee).

(i) __Undeliverable Distribution Reserve__

(A) __Deposits__. If a Payment or Distribution to any holder of an Allowed Claim is returned to the Liquidating Trustee as undeliverable or is otherwise unclaimed, such Payment or Distribution shall be deposited in a segregated, interest-bearing account, designated as an "Undeliverable Distribution Reserve," for the benefit of such holder until such time as such Payment or Distribution becomes deliverable, is claimed or is deemed to have been forfeited in accordance with Section 11.2(b) of the Plan.

(B) __Forfeiture__. Any holder of an Allowed Claim that does not assert a claim pursuant to the Plan for an Undeliverable or Unclaimed Payment or Distribution within one year after the first Payment or Distribution is made to such holder shall be deemed to have forfeited its claim for such Undeliverable or Unclaimed Payment or Distribution and shall be forever barred and enjoined from asserting any such claim for

the Undeliverable or Unclaimed Payment or Distribution against any Debtor, any Estate, the Liquidating Trustee, the Liquidating Trust, or their respective properties or assets.  In such cases, any Cash or other property held by the Liquidating Trust in the Undeliverable Distribution Reserve for distribution on account of such claims for Undeliverable or Unclaimed Payments or Distributions, including the interest that has accrued on such Undeliverable or Unclaimed Payments or Distribution while in the Undeliverable Distribution Reserve, shall become the property of the Liquidating Trust, notwithstanding any federal or state escheat laws to the contrary, and shall be available for immediate distribution by the Liquidating Trust as Unrestricted Liquidating Trust Cash Proceeds according to the terms of the Liquidating Trust Agreement.

(C)     <u>Disclaimer</u>.   The Liquidating Trustee and his or her respective agents and attorneys are under no duty to take any action to either (i) attempt to locate any Claim holder, or (ii) obtain an executed Internal Revenue Service Form W-9 from any Claim holder.

(D)     <u>Payment or Distribution from Reserve</u>.   Within fifteen Business Days after the holder of an Allowed Claim satisfies the requirements of the Plan such that the payment(s) or distribution(s) attributable to its Claim is no longer an Undeliverable or Unclaimed Payment or Distribution (provided that satisfaction occurs within the time limits set forth in <u>Section 11.2(b)</u> of the Plan), the Liquidating Trustee shall pay out of the Undeliverable Distribution Reserve to such holder the amount of the Undeliverable or Unclaimed Payment or Distribution attributable to such Claim, including the interest that has accrued on such Undeliverable or Unclaimed Payment or Distribution while in the Undeliverable Distribution Reserve.

(ii)     <u>Liquidating Trust Expense Reserve</u>.   On the Effective Date, the Liquidating Trustee shall deposit the Liquidating Trust Expense Carveout into the Liquidating Trust Expense Reserve.  The funds constituting the Liquidating Trust Expense Reserve are to be used by the Liquidating Trustee solely to satisfy the expenses of the Liquidating Trust and the Liquidating Trustee as set forth in the Plan; *provided, however,* that all costs and expenses associated with the winding up of the Liquidating Trust and the storage of records and documents shall constitute expenses of the Liquidating Trust and shall be paid from the funds held in the Liquidating Trust Expense Reserve.  In no event shall the Liquidating Trustee be required or permitted to use his or her personal funds or assets for such purposes.

Beginning on the first semi-annual anniversary of the Effective Date and each semi-annual anniversary thereafter, the Liquidating Trustee shall evaluate and remove from the Remaining Sale Proceeds (only to the extent permitted by <u>Section 4.2(c)</u> of the Plan) and the Unrestricted Liquidating Trust Cash Proceeds, as applicable, the amount that he or she estimates will be sufficient to pay the Liquidating Trust Expenses incurred during each six (6) month period following such semi-annual anniversary, as well as the costs and expenses associated with the winding up of the Liquidating Trust and the storage of records and documents, deems necessary or appropriate in accordance with the procedures set forth in the Liquidating Trust Agreement; *provided, that*, until such time as the Allowed Deferred Professional Fees are paid in full, the Unrestricted Liquidating Trust Cash Proceeds may not be used to pay (or used to reserve for payment of) any Liquidating Trust Expenses other than Direct Expenses already accrued or

incurred (which Direct Expenses shall be paid on a *pari passu* and pro rata basis with the Allowed Deferred Professional Fees); *provided, further,* that any Liquidating Trust Expenses directly attributable to the collection of Remaining Sale Proceeds shall only be paid from amounts reserved for such expenses pursuant to Section 4.2(c) of the Plan.

(iii)     Senior Lien Holder Distribution Reserve.  On the Effective Date, the Liquidating Trustee shall establish the Senior Lien Holder Distribution Reserve.  After the Effective Date, all Remaining Sale Proceeds received by the Liquidating Trust shall be deposited and held in the Senior Lien Holder Distribution Reserve pending their Payment (less amounts reserved for payment of Liquidating Trust Expenses and transferred to the Liquidating Trust Expense Reserve pursuant to Section 4.2(c) of the Plan) to the holders of Allowed Senior Lien Secured Claims in accordance with Section 4.2(c) of the Plan.

(iv)     Senior Claim Reserve.  On the Effective Date, the Liquidating Trustee shall establish the Senior Claim Reserve by depositing from the Sale Proceeds Cash in the amount estimated by the Bankruptcy Court to be necessary to satisfy all Allowed Ad Valorem Tax Claims, Allowed Administrative Claims (other than Deferred Professional Fee Claims), Allowed Priority Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Non-Operational Cure Claims payable or to be paid and that remain unpaid as of the Effective Date, and shall use such funds to pay such Allowed Claims.  If all or any portion of an Allowed Ad Valorem Tax Claim, Allowed Administrative Claim (other than a Deferred Professional Fee Claim), Allowed Priority Claim, Allowed Priority Tax Claim, Allowed Other Secured Claim, and Allowed Non-Operational Cure Claim shall become a Disallowed Claim, the amount on deposit in the Senior Claim Reserve attributable to such Disallowed Claim, including the interest that has accrued on said amount while on deposit in the Senior Claim Reserve, shall remain in the Senior Claim Reserve or be transferred out of the Senior Claim Reserve, as determined by the Liquidating Trustee, as follows:  (a) it shall remain in the Senior Claim Reserve to the extent that the Liquidating Trustee determines necessary to ensure that the Cash remaining in the Senior Claim Reserve is sufficient to ensure that all Allowed Ad Valorem Tax Claims, Allowed Administrative Claims (other than Deferred Professional Fee Claims), Allowed Priority Claims, Allowed Priority Tax Claims, Allowed Other Secured Claims, and Allowed Non-Operational Cure Claims payable or to be paid will be paid in accordance with the Plan; and (b) to the extent not required to remain in the Senior Claim Reserve pursuant to clause (a), it shall be transferred to the Senior Lien Holder Distribution Reserve.

Beginning on the Effective Date and thereafter, on each semi-annual anniversary of the Effective Date, the Liquidating Trustee shall evaluate and deposit (from Unrestricted Liquidating Trust Cash Proceeds) or remove Cash in or from the Senior Claim Reserve in an amount that he or she estimates will be sufficient to pay U.S. Trustee Fees incurred during each twelve (12) month period beginning on the Effective Date or the anniversary thereof, as applicable.

(v)     Carveout Reserve.  On the Effective Date, the Liquidating Trustee shall establish the Carveout Reserve by depositing, from the Sale Proceeds, Cash in the amount of the Carveout Reserve Amount.  Amounts held in the Carveout Reserve shall (a) first, be used to pay $25,000 of the Liquidating Trust Expense Carveout, (b) second, be used to pay (or to reserve for payment of) all Allowed M&M Secured Claims and all Allowed Operational Cure Claims in full, and (c) thereafter, to the extent any funds remain in the Carveout Reserve, be transferred to

the Series B Distribution Reserve for Distribution to the holders of Series B Liquidating Trust Interests in accordance with the terms of the Plan. The Carveout Reserve shall not be used to pay any other Claims.

(vi) <u>Series A Distribution Reserve</u>. On the Effective Date, the Liquidating Trustee shall establish the Series A Distribution Reserve for the sole benefit of holders of Series A Liquidating Trust Interests. In accordance with and subject to the conditions and procedures set forth in <u>Section 11.9</u> of the Plan, the Liquidating Trustee shall deposit Unrestricted Liquidating Trust Cash Proceeds in the Series A Distribution Reserve for the benefit of the holders of Series A Liquidating Trust Interests. All Distributions of Available Cash to the holders of Series A Liquidating Trust Interests shall be made from the Series A Distribution Reserve.

(vii) <u>Series B Distribution Reserve</u>. On the Effective Date, the Liquidating Trustee shall establish the Series B Distribution Reserve for the sole benefit of holders of Series B Liquidating Trust Interests. In accordance with and subject to the conditions and procedures set forth in <u>Section 11.9</u> of the Plan, the Liquidating Trustee shall deposit Unrestricted Liquidating Trust Cash Proceeds in the Series B Distribution Reserve for the benefit of the holders of Series B Liquidating Trust Interests. The Liquidating Trustee shall also deposit Cash from the Carveout Reserve in the Series B Distribution Reserve if and to the extent Cash, if any, remains in the Carveout Reserve after (a) funding of $25,000 of the Liquidating Trust Expense Carveout and (b) payment (or reservation for payment) of all Allowed M&M Secured Claims and all Allowed Operational Cure Claims in accordance with the priorities set forth in <u>Section 11.6</u> of the Plan. All Distributions of Available Cash to the holders of Series B Liquidating Trust Interests shall be made from the Series B Distribution Reserve.

(viii) <u>Unrestricted Liquidating Trust Cash Proceeds</u>. To the extent Unrestricted Liquidating Trust Cash Proceeds become available on or after the Effective Date, seventy-five percent (75%) of such Unrestricted Liquidating Trust Cash Proceeds shall be deposited in the Series A Distribution Reserve for the sole benefit of the holders of Series A Liquidating Trust Interests after (i) payment (or reservation for payment) of all incurred Direct Expenses and Allowed Deferred Professional Fee Claims and (ii) payment (or reservation for payment of incurred or anticipated Liquidating Trust Expenses in an amount determined by the Liquidating Trustee in his or her sole discretion) of Liquidating Trust Expenses. Such Unrestricted Liquidating Trust Cash Proceeds deposited in the Series A Distribution Reserve shall be paid to the holders of Series A Liquidating Trust Interests in accordance with <u>Article X</u> of the Plan.

To the extent Unrestricted Liquidating Trust Cash Proceeds become available on or after the Effective Date, twenty-five percent (25%) of such Unrestricted Liquidating Trust Cash Proceeds shall be deposited in the Series B Distribution Reserve for the sole benefit of the holders of Series B Liquidating Trust Interests after (i) payment (or reservation for payment) of all incurred Direct Expenses and Allowed Deferred Professional Fee Claims and (ii) payment (or reservation for payment of incurred or anticipated Liquidating Trust Expenses in an amount determined by the Liquidating Trustee in his or her sole discretion) of Liquidating Trust Expenses. Such Unrestricted Liquidating Trust Cash Proceeds deposited in the Series B Distribution

Reserve shall be paid to the holders of Series B Liquidating Trust Interests in accordance with Article X of the Plan.

## 6.14.   Procedures for Resolving Disputed, Contingent, and Unliquidated Claims

(a)   Objection Deadline; Prosecution of Objections.   As soon as reasonably practicable, but in no event later than 180 days after the Effective Date (unless extended with or without notice by an Order of the Bankruptcy Court), the Liquidating Trustee shall File objections to Claims and serve such objections upon the holders of each of the Claims to which objections are made.  If the Liquidating Trustee does not File an Objection to a Claim on or before 180 days after the Effective Date (unless extended with or without notice by an Order of the Bankruptcy Court), such Claim shall be deemed to be an Allowed Claim.  Nothing contained herein shall limit the Liquidating Trustee's right to object to, or deem to Allow, Claims, if any, Filed or amended more than 180 days after the Effective Date.  Subject to the limitations set forth in the Plan and the Liquidating Trust Agreement, the Liquidating Trustee shall be authorized to resolve all Disputed Claims by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court having competent jurisdiction the validity, nature, and/or amount thereof.  If the Liquidating Trustee and the holder of a Disputed Claim agree to compromise, settle, and/or resolve a Disputed Claim by granting such holder an Allowed Claim in the amount of $50,000 or less, then the Liquidating Trustee may compromise, settle, and/or resolve such Disputed Claim without further Bankruptcy Court approval; *provided, however,* that the Liquidating Trustee may not compromise, settle and/or resolve any Disputed Claim which would be payable from the Senior Claim Reserve in an amount to exceed $50,000 without either the written consent of the Senior Lien Agent or Bankruptcy Court Approval*; provided, further,* that the Liquidating Trustee shall File a notice with the Bankruptcy Court advising that the Allowed Claim has been compromised, settled, and/or resolved.  If the Liquidating Trustee and the holder of a Disputed Claim agree to compromise, settle, and/or resolve a Disputed Claim by granting such holder an Allowed Claim in an amount between $50,000 and $100,000, then the Liquidating Trustee may compromise, settle, and/or resolve such Disputed Claim with the consent of the Liquidating Trust Committee in accordance with the Liquidating Trust Agreement without further Bankruptcy Court approval; *provided, however,* that the Liquidating Trustee shall File a notice with the Bankruptcy Court advising that the Allowed Claim has been compromised, settled, and/or resolved.  Otherwise, subject to the Liquidating Trust Agreement, the Liquidating Trustee may only compromise, settle, and/or resolve such Disputed Claim with Bankruptcy Court approval.

Any Proofs of Claim that are Filed after the applicable Bar Date, including amendments to existing Proofs of Claim, or applications for the allowance of an Administrative Claim that are Filed after the Post-Confirmation Bar Date shall be deemed invalid and Disallowed unless consented to by the Liquidating Trustee or authorized by Order of the Bankruptcy Court.

Notwithstanding the foregoing, objections to, and compromises, settlements, and resolutions of, M&M Secured Claims occurring prior to the Confirmation Hearing shall be governed solely by Section 6.12 of the Plan.

(b)   No Payments or Distributions Pending Allowance.   Notwithstanding any other provision of the Plan, no Payments or Distribution by the Liquidating Trustee shall be made

with respect to all or any portion of a Disputed Claim unless and until all objections to such Disputed Claim have been settled or withdrawn or have been determined by Non-Appealable Order, and the Disputed Claim, or some portion thereof, has become an Allowed Claim.

## ARTICLE VII

## CERTAIN FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN AND SECURITIES LAW CONSIDERATIONS

### 7.1.    General

The following discussion summarizes certain U.S. federal income tax consequences to the Debtors and certain holders of Allowed Claims of the implementation of the Plan and the formation of and conveyances to the Liquidating Trust. This summary is for general information purposes only, and should not be relied upon for purposes of determining the specific tax consequences of the Plan with respect to any particular Debtor or holder of an Allowed Claim. This discussion does not purport to be a complete analysis or listing of all potential tax considerations.

The discussion is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury Regulations promulgated thereunder, judicial decisions, and published administrative rules and pronouncements of the Internal Revenue Service ("IRS"), all as in effect on the date hereof. Legislative, judicial or administrative changes or new interpretations enacted or promulgated after the date hereof could alter or modify the analyses set forth below with respect to the U.S. federal income tax consequences of the Plan. Any such changes or new interpretations may have retroactive effect and could significantly affect the U.S. federal income tax consequences of the Plan described below.

The U.S. federal income tax consequences of the Plan are complex and are subject to significant uncertainties. The Debtors have not requested a ruling from the IRS or an opinion of counsel with respect to any of the tax aspects of the Plan or the formation of and conveyances to the Liquidating Trust. Thus, no assurance can be given as to the interpretation that the IRS will adopt. In addition, this discussion does not address foreign, state or local tax consequences of the Plan or the formation of and conveyances to the Liquidating Trust, nor does it purport to address the U.S. federal income tax consequences of the Plan or the formation of and conveyances to the Liquidating Trust to (i) special classes of taxpayers (such as Persons who are related to the Debtors within the meaning of the Tax Code, non-U.S. persons, broker-dealers, banks, mutual funds, insurance companies, financial institutions, small business investment companies, regulated investment companies, tax-exempt organizations, and investors in pass-through entities and holders of Claims or Equity Interests who are themselves in bankruptcy) or (ii) holders not entitled to vote on the Plan, including holders whose Claims or Equity Interests are to be extinguished without any Distribution. Holders of Allowed Claims should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below.

This discussion assumes that holders of Claims or Equity Interests hold only Claims or Equity Interests in a single Class. Holders of multiple Classes of Claims or Equity Interests

should consult their own tax advisors as to the effect such ownership may have on the U.S. federal income tax consequences described below. This discussion further assumes that the various debt and other arrangements to which the Debtors are a party will be respected for U.S. federal income tax purposes in accordance with their form.

**ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AS MANDATED BY SECTION 1125 OF THE BANKRUPTCY CODE AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM. ALL HOLDERS OF CLAIMS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE HEREBY NOTIFIED THAT: (1) ANY DISCUSSION OF FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER OF A CLAIM FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON HOLDERS OF CLAIMS UNDER THE TAX CODE, (2) SUCH DISCUSSION IS WRITTEN IN CONNECTION WITH THE CONFIRMATION OF THE PLAN TO WHICH THE TRANSACTIONS DESCRIBED IN THIS DISCLOSURE STATEMENT ARE ANCILLARY, AND (3) HOLDERS OF CLAIMS SHOULD SEEK ADVICE BASED UPON THEIR PARTICULAR CIRCUMSTANCES FROM THEIR OWN TAX ADVISOR.**

### 7.2. <u>Tax Status of the Debtors</u>

Each of the Debtors is classified as a pass through entity for U.S. federal income tax purposes. Accordingly, all items of income, gain, loss, deduction, and credit of the Debtors, for U.S. federal income tax purposes (such as gains, losses, and cancellation of indebtedness income from effectuation of the Plan), will be taken into account by the persons who own equity interests in the Debtors.

### 7.3. <u>Certain U.S. Federal Income Tax Consequences to the Debtors</u>

The Debtors will generally realize gain or loss on the sale, or transfer to the Liquidating Trust, of substantially all of their assets equal to the difference between (i) the amount realized on the sale and the fair market value of the assets transferred to the Liquidating Trust, and (ii) their adjusted tax basis in the assets sold or transferred. The character of any gain or loss as capital or ordinary, and in the case of capital gain or loss, as short term or long term, will depend upon the nature of assets sold or transferred and the Debtors' holding period for the assets.

To the extent that the consideration issued to holders of Claims pursuant to the Plan is attributable to accrued but unpaid interest, the Debtors should be entitled to interest deductions in the amount of such accrued interest, but only to the extent the Debtors have not already deducted

such amount.  The Debtors should not have COD income (as defined below) from the discharge of any accrued but unpaid interest pursuant to the Plan to the extent that the payment of such interest would have given rise to a deduction pursuant to § 108(e)(2) of the Internal Revenue Code.

Further, the discharge of a recourse debt obligation by a debtor for an amount of Cash and/or fair market value of property that is less than the adjusted issue price of the debt obligation (as determined for U.S. federal income tax purposes) gives rise to cancellation of indebtedness ("COD") income, which must be included in the debtor's income, subject to certain statutory or judicial exceptions that can apply to limit the amount of COD income (such as where the payment of the canceled debt would have given rise to a tax deduction).  A specific statutory exception applies to certain debtors if the discharge of indebtedness is granted in a case under Title 11 of the United States Code (relating to bankruptcy) and pursuant to a plan approved by a bankruptcy court in such case.  A separate exception applies to taxpayers if the discharge occurs when the taxpayer is insolvent.  In the case of debtors that are pass through entities, both of the aforementioned statutory exceptions must be applied at the partner level.  Unless an exception applies, the owners of equity interests of the Debtors will realize their distributive share of COD income realized by the Debtors as a result of the Plan to the extent an Allowed Claim is cancelled for no consideration, or in exchange for Cash or other assets conveyed, if any, that in the aggregate is less than the adjusted issue price of the Allowed Claim.

For the foregoing reasons, the precise amount of taxable gain or loss, COD income, or both, which the Debtors, and hence the owners of equity interests of the Debtors will realize as a result of effectuation of the Plan cannot be determined until the date of the exchange.

### 7.4.  Tax Consequences to Creditors

The tax consequences of the implementation of the Plan and formation of the Liquidating Trust to a creditor of the Debtors (a "Creditor") will depend in part, on the type of consideration received by the Creditor in exchange for its Allowed Claim, whether the Creditor reports income on the accrual or cash basis, whether the Creditor receives consideration in more than one tax year of the Creditor, whether the Creditor is a resident of the United States, and whether all consideration received by the Creditor is deemed to be received by that Creditor in an integrated transaction.  The tax consequences of the receipt of Cash or property that is allocable to interest are discussed below in the section entitled "Receipt of Interest."

(a)     Receipt of Cash and Other Property

A Creditor who receives Cash and/or other property (including Liquidating Trust Assets deemed received as discussed below) in satisfaction of its Claim generally will recognize gain (or loss) on the exchange equal to the difference between the amount of any Cash and the fair market value of any property received (not allocable to interest) and the Creditor's tax basis in its Claim. The character of any gain or loss as capital or ordinary income or loss and, in the case of capital gain or loss, as short-term or long-term, will depend on a number of factors, including (i) the nature and origin of the Claim (e.g., Claims arising in the ordinary course of a trade or business or made for investment purposes); (ii) the tax status of the holder of the Claim; (iii) whether the Claim is a capital asset in the hands of the holder; (iv) whether the Claim has been held by the

holder for more than one year; (v) the extent to which the holder previously claimed a loss or a bad debt deduction with respect to the Claim; and (vi) the extent to which the holder acquired the Claim at a market discount. Creditors should consult their own tax advisors regarding the amount and character of gain or loss, if any, to be recognized by them under the Plan.

(b)     Receipt of Interest

Consideration received by a Creditor that is attributable to accrued interest not previously included in taxable income should be treated as ordinary income, regardless of whether the Creditor's existing Claims are capital. Conversely, a holder of an Allowed Claim may be able to recognize a deductible loss (or possibly a write-off against a reserve for worthless debts) to the extent that any accrued interest on the Allowed Claim was previously included in the holder's gross income but was not paid in full by the Debtors. The extent to which the consideration received by a holder of an Allowed Claim will be attributable to accrued interest is unclear.

(c)     Market Discount

The Tax Code generally requires holders of debt instruments with "market discount," (generally, the amount by which the "adjusted issue price" of a debt instrument (i.e., the sum of its issue price plus accrued original issue discount) exceeds the holder's adjusted tax basis in such debt instrument), to treat as ordinary income any gain realized on the disposition of such debt instruments to the extent of the market discount accrued during the holder's period of ownership. Holders should consult their own tax advisors as to the potential application of the market discount rules to them in light of their individual circumstances, and the advisability of making an election to accrue market discount on a current basis.

(d)     Backup Withholding

Under the Tax Code, interest, dividends and other "reportable payments" may, under certain circumstances, be subject to "backup withholding" at a 28% rate. Withholding generally applies if the holder:  (a) fails to furnish his social security number or other taxpayer identification number ("TIN"), (b) furnishes an incorrect TIN, (c) fails properly to report interest or dividends, or (d) under certain circumstances, fails to provide a certified statement, signed under penalty of perjury, that the TIN provided is its correct number and that it is not subject to backup withholding. Backup withholding is not an additional tax, but merely an advance payment, which may be refunded or credited against such holder's U.S. federal income taxes. Certain persons are exempt from backup withholding, including, in certain circumstances, corporations and financial institutions.

**7.5.     U.S. Federal Income Tax Consequences of the Liquidating Trust**

(a)     Classification of the Liquidating Trust

The Liquidating Trust will be organized for the primary purpose of liquidating the Liquidating Trust Assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonable necessary to, and consistent with, it's liquidating purpose. Thus, the Liquidating Trust is intended to be classified for U.S. federal

income tax purposes as a "liquidating trust" within the meaning of Treasury Regulation Section 301.7701-4(d). Under the Plan, all relevant parties are required to treat the Liquidating Trust as a liquidating trust, subject to definitive guidance to the contrary from the IRS. In general, a liquidating trust is not a separate taxable entity but rather is treated as a grantor trust, pursuant to Sections 671 et seq. of the Tax Code, owned by the Persons who transfer assets to it.

Although the Liquidating Trust has been structured with the intention of complying with guidelines established by the IRS in Rev. Proc. 94-45, 1994-2 C.B. 684, for the formation of a liquidating trust, it is possible that the IRS could require a different characterization of the Liquidating Trust, which could result in a different and possibly greater tax liability to the Liquidating Trust or the holders of the Liquidating Trust Interests. No request for a ruling from the IRS will be sought on the classification of the Liquidating Trust, and there can be no assurance that the IRS would not (or will not) take a contrary position to the classification of the Liquidating Trust. If the IRS were to successfully challenge the classification of the Liquidating Trust as a grantor trust, the U.S. federal income tax consequences to the Liquidating Trust and the holders of the Liquidating Trust Interests could be materially different from those discussed herein. The following discussion assumes treatment of the Liquidating Trust as a grantor trust for U.S. federal income tax purposes.

(b)     Creation of the Liquidating Trust

If the Liquidating Trust is treated as a "liquidating trust" then, upon its creation, each beneficiary of the Liquidating Trust would be treated as having received and as owning an undivided interest in the assets of the Liquidating Trust in exchange for surrendering all or a portion of such beneficiary's Allowed Claim followed by a transfer by the beneficiary of such assets to the Liquidating Trust. Under the Plan, all parties (including, without limitation, the Debtors, the Liquidating Trustee, the Liquidating Trust and the Liquidating Trust Beneficiaries) are required to report consistently with the foregoing for federal and applicable state and local income tax purposes. The basis of such beneficiary's interest in the Liquidating Trust Assets received will be equal to its fair market value as of the Effective Date. The fair market value of the portion of the Liquidating Trust Assets that is treated as having been transferred to each Liquidating Trust Beneficiary will be determined by the Liquidating Trustee, and all parties must utilize such fair market values determined by the Liquidating Trustee for federal and applicable state and local income tax purposes. The determination of the fair market value of an Allowed Claim holder's interest in the Liquidating Trust Assets is factual in nature and the IRS may challenge any such determination.

(c)     Allocation of Income and Loss and Disposition of Liquidating Trust Assets

Each holder of a Liquidating Trust Interest must report on its U.S. federal income tax return its allocable share of income, gain, loss, deduction and credit recognized or incurred by the Liquidating Trust. Deductions attributable to activities and administrative expenses of the Liquidating Trust may be subject to limitation in the hands of the holders of the Liquidating Trust Interests. Upon the sale or other disposition of any Liquidating Trust Assets, each holder of a Liquidating Trust Interest must report on its U.S. federal income tax return its share of any gain or loss measured by the difference between (i) its share of the amount of Cash and/or the fair market value of any property received by the Liquidating Trust in exchange for the Liquidating

Trust Asset so sold or otherwise disposed of, and (ii) such holder's adjusted tax basis in its share of such Liquidating Trust Asset. The character of any such gain or loss to any such holder will be determined as if such holder itself had directly sold or otherwise disposed of such Liquidating Trust Asset. The character of items of income, gain, loss, deduction and credit to any holder of a Liquidating Trust Interest, and the ability of such holder to benefit from any deductions or losses, will depend on the particular circumstances or status of any such holder.

As a grantor trust, each holder of a Liquidating Trust Interest has an obligation to report its share of the Liquidating Trust's tax items (including gain on the sale or other disposition of a Liquidating Trust Asset). Accordingly, holders of a Liquidating Trust Interest may incur a tax liability as a result of owning a beneficial interest in the Liquidating Trust, regardless of whether the Liquidating Trust distributes Cash or other Liquidating Trust Assets. Although the Liquidating Trust provides that it will generally make Cash distributions at least semi-annually, due to the Liquidating Trust's requirements to satisfy certain liabilities, and due to possible differences in the timing of income on, and the receipt of Cash from, the Liquidating Trust Assets, a holder of a Liquidating Trust Interest may, in certain years, be required to report and pay tax on a greater amount of income than the amount of Cash received from the Liquidating Trust by such holder in such year.

(d)     Reserve for Disputed Claims

Subject to definitive guidance from the IRS or a court of competent jurisdiction to the contrary, the Liquidating Trustee will (a) treat all Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims, as a "disputed ownership fund" governed by Treasury Regulation section 1.468B-9 for federal income tax purposes, consisting of separate and independent shares to be established in respect of each Disputed Claim, and (b) to the extent permitted by applicable law, report consistently with the foregoing for state and local income tax purposes. Accordingly, all Liquidating Trust Assets allocable to, or retained on account of, Disputed Claims will be subject to tax annually on a separate entity basis on any net income earned with respect to the applicable trust assets, and all distributions from this separate trust will be treated as received by holders in respect of their Disputed Claims as if distributed by the Debtors. All parties (including, without limitation, the Debtors, the Liquidating Trustee and the Liquidating Trust Beneficiaries) will be required to report for tax purposes consistently with the foregoing.

**7.6.     Importance of Obtaining Professional Tax Assistance**

**THE FOREGOING SUMMARY HAS BEEN PROVIDED FOR INFORMATIONAL PURPOSES ONLY AS MANDATED BY SECTION 1125 OF THE BANKRUPTCY CODE. THE TAX CONSEQUENCES ARE IN MANY CASES UNCERTAIN AND MAY VARY DEPENDING ON A HOLDER'S PARTICULAR CIRCUMSTANCES. ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS ARE URGED TO CONSULT THEIR TAX ADVISORS CONCERNING THE FEDERAL, STATE, LOCAL, AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.**

### 7.7. Securities Law Considerations

The Liquidating Trust Interests may not be transferred, sold, pledged or otherwise disposed of, or offered for sale, except for transfers by operation of law. The offer and issuance of the Liquidating Trust Interests will be made without registration under the 1933 Act, or under any state securities laws. To the extent the Liquidating Trust Interests constitute securities, the offer and issuance of the Liquidating Trust Interests will be made in reliance upon the exemption from registration afforded by sections 1125 and 1145 of the Bankruptcy Code. The Confirmation Order will include provisions to the effect that such exemptions are applicable to the offer and issuance of the Liquidating Trust Interests and that the Liquidating Trust is a "successor" to Debtors within the meaning of section 1145 of the Bankruptcy Code. No indenture will be qualified under the Trust Indenture Act of 1939, as amended (the "1939 Act"), with respect to the Liquidating Trust in reliance on the exemption provided by section 304(a)(1) of the 1939 Act.

Section 1145(a)(1) of the Bankruptcy Code exempts the offer or sale of securities pursuant to a plan of reorganization or liquidation from the registration requirements of the 1933 Act and from registration under state securities laws if the following conditions are satisfied: (i) the securities are offered and sold by a debtor or a successor of the debtor under a plan of reorganization or liquidation; (ii) the recipients of the securities hold a claim against, an interest in, or a claim for an administrative expense against, the debtor; and (iii) the securities are issued in exchange for the recipients' claims against or interests in the debtor, or principally in such exchange and partly for cash or property. In general, offers and sales of securities made in reliance on the exemption afforded under section 1145(a) of the Bankruptcy Code are deemed to be made in a public offering, so that the recipients thereof, other than underwriters (as defined in section 1145(b) of the Bankruptcy Code), are free to resell such securities without registration under the 1933 Act. In addition, such securities generally may be resold without registration under state securities laws pursuant to various exemptions provided by the respective laws of the several states. However, as noted above, the Liquidating Trust Interests may not be transferred, sold, pledged or otherwise disposed of, or offered for sale, except for transfers by operation of law.

THE FOREGOING SUMMARY DISCUSSION IS GENERAL IN NATURE AND HAS BEEN INCLUDED IN THIS DISCLOSURE STATEMENT SOLELY FOR INFORMATIONAL PURPOSES PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE. THE DEBTORS MAKE NO REPRESENTATIONS CONCERNING, AND DO NOT HEREBY PROVIDE, ANY OPINIONS OR ADVICE WITH RESPECT TO THE SECURITIES AND BANKRUPTCY MATTERS DESCRIBED HEREIN. IN LIGHT OF THE UNCERTAINTY CONCERNING THE AVAILABILITY OF EXEMPTIONS FROM THE RELEVANT PROVISIONS OF FEDERAL AND STATE SECURITIES LAWS, THE DEBTORS ENCOURAGE EACH CREDITOR, EQUITY INTEREST HOLDER, LIQUIDATING TRUST INTEREST HOLDER, AND PARTY IN INTEREST TO CONSIDER CAREFULLY AND CONSULT WITH ITS OWN LEGAL ADVISORS WITH RESPECT TO ALL SUCH MATTERS.

# ARTICLE VIII

## THE BEST INTERESTS OF CREDITORS TEST

**8.1.** **Best Interests Test**

The Bankruptcy Code requires that the Bankruptcy Court find that the Plan is in the best interest of all holders of Claims and Equity Interests that are Impaired by the Plan and that have not accepted the Plan as a requirement to confirm the Plan. The "best interests" test, as set forth in section 1129(a)(11) of the Bankruptcy Code, requires the Bankruptcy Court to find either that all members of an Impaired Class of Claims or Equity Interests have accepted the Plan or that the Plan will provide a member who has not accepted the Plan with a recovery of property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would receive or retain if the Debtors were liquidated under chapter 7 of the Bankruptcy Code on such date.

To calculate the probable distribution to members of each Impaired Class of Claims and Equity Interests if the Debtors were liquidated under chapter 7, the Bankruptcy Court must first determine the aggregate dollar amount that would be generated from the disposition of the Debtors' assets if liquidated in chapter 7 cases under the Bankruptcy Code. This "liquidation value" would consist primarily of the proceeds from a forced sale of the Debtors' assets by a chapter 7 trustee.

The amount of liquidation value available to holders of unsecured Claims against the Debtors would be reduced by, first, the claims of secured creditors (to the extent of the value of their collateral), and by the costs and expenses of liquidation, as well as by other administrative expenses and costs of the chapter 7 cases. Costs of a liquidation of the debtors under chapter 7 of the Bankruptcy Code would include the compensation of a chapter 7 trustee and his or her counsel and other professionals, asset disposition expenses, and litigation costs. The liquidation itself would trigger certain priority payments that otherwise would be due in the ordinary course of business. Those priority claims would be paid in full from the liquidation proceeds before the balance would be made available to pay unsecured Claims or to make any distribution in respect of Equity Interests.

In chapter 7 liquidation, no junior class of Claims or Equity Interests may be paid unless all classes of Claims or Equity Interests senior to such junior class are paid in full. Section 510(a) of the Bankruptcy Code provides that subordination agreements are enforceable in a bankruptcy case to the same extent that such subordination is enforceable under applicable non-bankruptcy law. Therefore, no class of Claims or Equity Interests that is contractually subordinated to another class would receive any payment on account of its Claims or Equity Interests, unless and until such senior classes were paid in full.

Once the Bankruptcy Court ascertains the recoveries in liquidation of the Debtors' secured and priority creditors, it would then determine the probable distribution to unsecured creditors from the remaining available proceeds of the liquidation. If this probable distribution has a value greater than the value of distributions to be received by the unsecured creditors under the Plan, then the Plan is not in the best interests of creditors and cannot be confirmed by the Bankruptcy Court. As shown in the Liquidation Analysis attached hereto as **Exhibit E**, the

Debtors believe that each member of each Class of Impaired Claims and Equity Interests will receive at least as much, if not more, under the Plan as it would receive if the Debtors were liquidated.

**8.2.    Liquidation Analysis**

The Debtors believe that under the Plan, all holders of Impaired Claims and Equity Interests will receive property with a value greater than or equal to the value each such holder would receive in a liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  The Debtors' belief is based primarily on:

- consideration of the effects that a chapter 7 liquidation would have on the ultimate proceeds available for distribution to holders of Impaired Claims and Equity Interests, including:

    ° increased costs and expenses of a liquidation under chapter 7 arising from fees payable to one or more chapter 7 trustees and professional advisors to such trustee(s), who may not be familiar with the Debtors' industry and business operations;

    ° increased costs and expenses of litigation in connection with resolving claims with respect to the validity, extent or priority of the Senior Lien Agent's and Senior Lien Holders' claims, liens and security interests;

    ° substantial increases in Claims, as well as substantially increased estimated contingent Claims;

    ° substantial delay in distributions, if any, to the holders of Claims and Equity Interests that would likely ensue in a chapter 7 liquidation; and

    ° the liquidation analysis prepared by the Debtors.

The Debtors believe that any liquidation analysis includes some speculation as such an analysis necessarily is premised on assumptions and estimates which are inherently subject to significant uncertainties and contingencies, many of which would be beyond the control of the Debtors.  Thus, there can be no assurance as to values that would actually be realized in a chapter 7 liquidation, nor can there be any assurance that a Bankruptcy Court would accept the Debtors' conclusions or concur with such assumptions in making its determinations under section 1129(a)(11) of the Bankruptcy Code.

For example, the Liquidation Analysis necessarily contains an estimate of the amount of Claims which will ultimately become Allowed Claims.  No order or finding has been entered by the Bankruptcy Court or any other court estimating or otherwise fixing the amount of Claims at the projected amounts of Allowed Claims set forth in the Liquidation Analysis.  In preparing the Liquidation Analysis, the Debtors have projected an amount of Allowed Claims within a reasonable range such that, for purposes of the Liquidation Analysis, the largest possible liquidation dividend to holders of Allowed Claims can be assessed.  The estimate of the amount of

Allowed Claims set forth in the Liquidation Analysis should not be relied on for any other purpose, including any determination of the value of any distribution to be made on the account of Allowed Claims under the Plan.

The annexed Liquidation Analysis is provided solely to disclose to holders of Claims and Equity Interests the effects of a hypothetical chapter 7 liquidation of the Debtors, subject to the assumptions set forth therein.

# ARTICLE IX

# ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Debtors believe that the Plan affords holders of Claims and Equity Interests the potential for the greatest realization on the Debtors' assets and, therefore, is in the best interests of such holders. If, however, enough acceptances received from Classes 3, 4, 5, 6A, and 6B sufficient for the Debtors to confirm the Plan are not received, or the Plan is not subsequently confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan or plans or (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## 9.1. Alternative Plan(s)

If enough acceptances to confirm the Plan are not received or if the Plan is not confirmed, the Debtors (or, if the Debtors' exclusive periods in which to file and solicit acceptances of a reorganization plan have expired, any other party in interest) could attempt to formulate and propose a different plan or plans of liquidation. Such a plan would necessarily involve an orderly liquidation of assets.

With respect to an alternative plan, the Debtors have explored various other alternatives in connection with the extensive negotiation process involved in the formulation and development of the Plan. The Debtors believe that the Plan, as described herein, which is the result of extensive negotiations between the Debtors and the other Plan Proponents, enables holders of Claims and Equity Interests to realize the greatest possible value under the circumstances, and that, as compared to any alternative plan, the Plan has the greatest chance to be confirmed and consummated.

## 9.2. Liquidation Under Chapter 7

Proceeding under chapter 7 would impose significant additional monetary and time costs on the Debtors' Estates. Under chapter 7, one or more trustees would be elected or appointed to administer the Estates, to resolve pending controversies, including Disputed Claims against the Debtors and Claims of the various estates against other parties, and to make distributions to holders of Claims. A chapter 7 trustee would be entitled to compensation in accordance with the scale set forth in section 326 of the Bankruptcy Code, and the trustee would also incur significant administrative expenses.

There is a strong probability that a chapter 7 trustee in these Cases would not possess any particular knowledge about the Debtors. Additionally, a trustee would probably seek the

assistance of professionals who may not have any significant background or familiarity with these Cases. The trustee and any professionals retained by the trustee likely would expend significant time familiarizing themselves with these Cases. This would result in duplication of effort, increased expenses, and delay in payments to creditors.

In an analysis of liquidation under chapter 7, it must be recognized that additional costs in both time and money are inevitable. In addition to these time and monetary costs, there are other problems in a chapter 7 liquidation that would result in a substantially smaller recovery for holders of Claims and Equity Interests than under the Plan.

Further, distributions under the Plan probably would be made earlier than would distributions in a chapter 7 case. Distributions of the proceeds of a chapter 7 liquidation might not occur until one or more years after the completion of the liquidation in order to afford the trustee the opportunity to resolve claims and prepare for distributions.

THE DEBTORS BELIEVE THAT THE PLAN AFFORDS SUBSTANTIALLY GREATER RECOVERY TO HOLDERS OF CLAIMS AND EQUITY INTERESTS THAN SUCH HOLDERS WOULD RECEIVE IF THE DEBTORS WERE LIQUIDATED UNDER CHAPTER 7 OF THE BANKRUPTCY CODE.

In the Liquidation Analysis, the Debtors have taken into account the nature, status, and underlying value of their assets, the ultimate realizable value of such assets, and the extent to which the assets are subject to liens and security interests. In the opinion of the Debtors, the recoveries projected to be available in liquidation will not afford holders of Allowed Claims and Allowed Equity Interests as great a realization as does the Plan.

**ARTICLE X**

**CERTAIN RISK FACTORS TO BE CONSIDERED**

PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN, ALL HOLDERS OF CLAIMS AND EQUITY INTERESTS SHOULD READ AND CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW, AS WELL AS ALL OTHER INFORMATION SET FORTH OR OTHERWISE REFERENCED IN THIS DISCLOSURE STATEMENT. THESE RISK FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION. ADDITIONAL RISKS AND UNCERTAINTIES NOT PRESENTLY KNOWN TO THE DEBTORS OR THAT THEY CURRENTLY DEEM IMMATERIAL MAY ALSO HARM THEIR ESTATES.

**10.1.** **Certain Bankruptcy Law Considerations**

(a) Parties-in-Interest May Object To the Plan and Confirmation

Section 1129 of the Bankruptcy Code provides certain requirements for a chapter 11 plan to be confirmed. Parties-in-interest may object to confirmation of a plan based on an alleged

failure to fulfill these requirements or other reasons. The Debtors believe that the Plan complies with the requirements of the Bankruptcy Code.

(b)   Parties-in-Interest May Object To the Debtors' Classification of Claims and Equity Interests

Section 1122 of the Bankruptcy Code provides that a plan of reorganization may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests in such class.

The Debtors believe that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because each class of Claims and Equity Interests encompass Claims or Equity Interests that are substantially similar to the other Claims or Equity Interests in each such class.

(c)   The Debtors May Not Be Able To Obtain Confirmation of the Plan

The Debtors cannot ensure they will receive enough acceptances to confirm the Plan. But, even if the Debtors do receive enough acceptances, there can be no assurance that the Bankruptcy Court will confirm the Plan. Even if enough acceptances are received and, with respect to those Classes deemed to have rejected the Plan, the requirements for "cramdown" are met, the Bankruptcy Court, which as a court of equity may exercise substantial discretion, may choose not to confirm the Plan or may require additional solicitations or consents prior to confirming the Plan. Section 1129 of the Bankruptcy Code requires, among other things, that the value of distributions to dissenting holders of Claims and Equity Interests may not be less than the value such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. Although the Debtors believe that the Plan will meet such tests, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

The Debtors' ability to propose and confirm an alternative plan is uncertain. Confirmation of any alternative plan under chapter 11 of the Bankruptcy Code would likely take significantly more time and result in delays in the ultimate distributions to the holders of Claims. If confirmation of an alternative plan is not possible, the Debtors would likely be liquidated under chapter 7. Based upon the Debtors' analysis, liquidation under chapter 7 would result in distributions of reduced value, if any, to holders of Claims and Equity Interests.

(d)   Failure to Consummate or Effectuate the Plan

Consummation of the Plan is conditioned upon, among other things, entry of the Confirmation Order approving any transactions contemplated thereunder. As of the date of this Disclosure Statement, there can be no assurance that any or all of the foregoing conditions will be met or that the other conditions to consummation, if any, will be satisfied. Accordingly, even if the Plan is confirmed by the Bankruptcy Court, there can be no assurance that the Plan will be consummated and effectuated and the liquidation completed.

(e)    Risk of Non-Occurrence of the Effective Date

Although the Debtors believe that the Effective Date may occur within a reasonable time following the Confirmation Date, there can be no assurance as to such timing.

(f)    Claims Estimation

There can be no assurance that the estimated amount of Claims and Equity Interests are correct, and the actual Allowed amounts of Claims and Equity Interests may differ from estimates. The estimated amounts are subject to certain risks, uncertainties and assumptions. Should one or more of these risks or uncertainties materialize or should underlying assumptions prove incorrect, the actual Allowed amounts of Claims and Equity Interests may vary from those estimated therein.

## 10.2.    Certain Tax Considerations, Risks and Uncertainties

THERE ARE A NUMBER OF MATERIAL INCOME TAX CONSIDERATIONS, RISKS AND UNCERTAINTIES ASSOCIATED WITH CONSUMMATION OF THE PLAN. INTERESTED PARTIES SHOULD READ CAREFULLY THE DISCUSSION SET FORTH IN ARTICLE VII OF THIS DISCLOSURE STATEMENT FOR A DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES BOTH TO THE DEBTORS AND TO HOLDERS OF CLAIMS THAT ARE IMPAIRED UNDER THE PLAN.

## ARTICLE XI

## THE SOLICITATION; VOTING PROCEDURES

## 11.1.    Voting Deadline

The Voting Deadline, that is the period during which Ballots with respect to the Plan will be accepted by the Debtors, will terminate on _____, 2011.April 21, 2011 at 4:00 p.m., Central Time. Except to the extent permitted by the Bankruptcy Court, Ballots that are received after the Voting Deadline will not be counted or otherwise used by the Debtors in connection with the Debtors' request for Confirmation of the Plan (or any permitted modification thereof).

## 11.2.    Voting Procedures

Under the Bankruptcy Code, for purposes of determining whether enough acceptances have been received, only holders of Claims who actually vote will be counted. The failure of a holder to deliver a duly executed Ballot will be deemed to constitute an abstention by such holder with respect to voting on the Plan and such abstentions, will not be counted as votes for or against the Plan.

The Debtors are providing a copy of this Disclosure Statement, the Plan, Ballot and other necessary information (the "Solicitation Package") to holders of Claims whose names appear as of _____,March 23, 2011 in the records maintained by the Debtors. Holders of Claims should provide all of the information requested by the Ballots and return all Ballots in the return

envelope provided with each such Ballot. As related to holders of Claims in Classes 3 (Allowed Senior Lien Secured Claims) and 6A (Allowed Senior Lien Deficiency Claims), such solicitation shall be submitted to the Senior Lien Agent, who shall be solely responsible for disseminating the Solicitation Package to the Senior Lien Holders and for submitting Ballots and casting votes on behalf of the Senior Lien Holders.

### 11.3. Miscellaneous

Additional Voting and Solicitation information is contained in the Disclosure Statement Order, attached hereto as **Exhibit B**.

### 11.4. Fiduciaries and Other Representatives

If a Ballot is signed by a trustee, executor, administrator, guardian, attorney-in-fact, officer of a corporation, or another acting in a fiduciary or representative capacity, such Person should indicate such capacity when signing and, unless otherwise determined by the Debtors, must submit proper evidence satisfactory to the Debtors of authority to so act. Authorized signatories should submit the separate Ballot of each beneficial owner for whom they are voting.

UNLESS THE APPLICABLE BALLOT BEING FURNISHED IS TIMELY SUBMITTED TO THE SOLICITATION AGENT ON OR PRIOR TO THE VOTING DEADLINE, SUCH BALLOT WILL BE REJECTED AS INVALID AND WILL NOT BE COUNTED AS AN ACCEPTANCE OR REJECTION OF THE PLAN. IN NO CASE SHOULD A BALLOT BE DELIVERED TO ANY ENTITY OTHER THAN THE NOMINEE OR THE SOLICITATION AGENT.

### 11.5. Parties Entitled to Vote

Under section 1124 of the Bankruptcy Code, a class of claims or equity interests is deemed to be "Impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or equity interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim or equity interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim or equity interest as it existed before the default.

In general, a holder of a claim or equity interest may vote to accept or to reject a plan if the claim or equity interest is "allowed," which means generally that no party-in-interest has objected to such claim or equity interest, and the claim or equity interest is Impaired by the plan. If, however, the holder of an Impaired claim or equity interest will not receive or retain any distribution under the plan on account of such claim or equity interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims and equity interests do not actually vote on the plan. If a claim or equity interest is not Impaired by the plan, the Bankruptcy Code deems the holder of such claim or equity interest to have accepted the plan and, accordingly, holders of such claims and equity interests are not entitled to vote on the plan.

Classes 1 and 2 of the Plan are Unimpaired.  Accordingly, under section 1126(f) of the Bankruptcy Code, all such Classes of Claims are deemed to have accepted the Plan and are not entitled to vote in respect of the Plan.

Classes 3, 4, 5, 6A and 6B of the Plan are Impaired.  Therefore, the holders of Claims in Classes 3, 4, 5, 6A and 6B are being solicited for votes in favor of the Plan.

Classes 7 and 8 of the Plan are Impaired and will not receive or retain any distribution or property under the Plan on account of their respective Claims or Equity Interests. Accordingly, under section 1126(g) of the Bankruptcy Code, such Classes 7 and 8 of Claims and Equity Interests, respectively, are deemed to have rejected the Plan and are not entitled to vote on the Plan.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code.

## 11.6.    Agreements upon Furnishing Ballots

The delivery of an accepting Ballot to the Solicitation Agent by a holder of Claims pursuant to one of the procedures set forth above will constitute the agreement of such holder to accept (i) all of the terms of, and conditions to, the Solicitation and (ii) the terms of the Plan (including the releases, if opted in to by the holder, and injunctions thereunder); *provided, however*, all parties in interest retain their right to object to Confirmation of the Plan pursuant to section 1128 of the Bankruptcy Code.

## 11.7.    Waivers of Defects, Irregularities, Etc.

Unless otherwise directed by the Bankruptcy Court, all questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Solicitation Agent and the Debtors in their sole discretion, which determination will be final and binding.  As indicated in Section 11.8 of this Disclosure Statement, effective withdrawals of Ballots must be delivered to the Solicitation Agent prior to the Voting Deadline. The Debtors reserve the absolute right to contest the validity of any such withdrawal.  The Debtors also reserve the right to reject any and all Ballots not in proper form, the acceptance of which would, in the opinion of the Debtors or their counsel, be unlawful.  The Debtors further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot.  The interpretation (including of the Ballot and the respective instructions thereto) by the Debtors, unless otherwise directed by the Bankruptcy Court, will be final and binding on all parties.  Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Debtors (or the Bankruptcy Court) determine.  Neither the Debtors nor any other Person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification.  Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or

waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

## 11.8.     Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to the Solicitation Agent at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by the Solicitation Agent in a timely manner at the address set forth in Section 1.5 of this Disclosure Statement. The Debtors intend to consult with the Solicitation Agent to determine whether any withdrawals of Ballots were received and whether enough acceptances of the Plan have been received. As stated above, the Debtors expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

A purported notice of withdrawal of Ballots which is not received in a timely manner by the Solicitation Agent will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted to the Solicitation Agent prior to the Voting Deadline a properly completed Ballot may revoke such Ballot and change his, her or its vote by submitting to the Solicitation Agent prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date will be counted for purposes of determining whether enough acceptances have been received pursuant to section 1126 of the Bankruptcy Code.

The Debtors will pay all costs, fees and expenses relating to the Solicitation.

## 11.9.     Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or Equity Interest, or about the Solicitation Package, or if you wish to obtain an additional copy of the Plan, the Disclosure Statement, the Plan Supplement[39] or any exhibits to such documents (at your own expense, unless otherwise specifically required by Federal Rule of Bankruptcy Procedure 3017(d)), please contact the Solicitation Agent:

| | | |
|---|---|---|
| TriDimension | Energy, | LP |
| c/o | BMC-Analytics | Incorporated |
| 18750 | Lake | Drive | East |
| Chanhassen, | MN | 55317-9384 |
| Telephone: 888.909.0100 | | |

---

[39] Additionally, copies of these documents may also be obtained from the Bankruptcy Courts' docket for these Cases.

## RECOMMENDATION AND CONCLUSION

For all of the reasons set forth in this Disclosure Statement, the Debtors believe that Confirmation and consummation of the Plan is preferable to all other alternatives discussed herein. Consequently, the Debtors, with the support of the Senior Lien Agent and the Committee, urge all holders of Claims to vote to accept the Plan, and to complete and return their Ballots so that they will be received by the Solicitation Agent on or before 4:00 p.m., Central time, on April 21, 2011.

Dated: Dallas, Texas
February 18,March 21, 2011

TRIDIMENSION ENERGY LP
AND ITS AFFILIATED DEBTORS


By:   /s/ Kenneth A. Gregg
     Name:  Kenneth A. Gregg
     Title:   Chief Financial Officer

# EXHIBIT "A"

## AMENDED JOINT PLAN OF LIQUIDATION OF THE DEBTORS

### [SEE DOCKET NO. 678]

**EXHIBIT "B"**

**DISCLOSURE STATEMENT ORDER**

[SEE DOCKET NO. ____]~~EXHIBIT "B"~~

~~[TO BE FILED PRIOR TO DISCLOSURE STATEMENT HEARING]~~

**EXHIBIT "C"**

**PROPOSED SETTLEMENTS WITH CERTAIN HOLDERS OF M&M SECURED CLAIMS AND OPERATIONAL CURE CLAIMS**

[TO BE FILED PRIOR TO DISCLOSURE STATEMENT HEARING]

**EXHIBIT C**
US 713619 4.DOCv.6

# EXHIBIT "D"

[TO BE FILED PRIOR TO DISCLOSURE STATEMENT HEARING]
## SCHEDULE OF PAYMENTS MADE DURING PREFERENCE PERIODS

## EXHIBIT "E"

[TO BE FILED PRIOR TO DISCLOSURE STATEMENT HEARING]
## LIQUIDATION ANALYSIS